# 24-251-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



DR. SARI EDELMAN,

*Plaintiff-Appellant,*

*v.*

NYU LANGONE HEALTH SYSTEM, NYU LANGONE HOSPITALS, NYU LANGONE MEDICAL CENTER, NYU LANGONE NASSAU RHEUMATOLOGY, NYU SCHOOL OF MEDICINE, NYU GROSSMAN SCHOOL OF MEDICINE, NYU HOSPITALS CENTER, ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH ANTONIK, JOSHUA SMIRNOW,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the Southern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

Joseph M. Labuda
MILMAN LABUDA LAW GROUP PLLC
*Attorneys for Plaintiff-Appellant*
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
516-328-8899


(212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................iv

INTRODUCTION ...................................................................................1

ISSUE I: THE DISTRICT COURT IMPROPERLY GRANTED
DEFENDANTS-APPELLEES' MOTION FOR JUDGMENT
AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(B)
REVERSING THE JURY'S VERDICT IN FAVOR OF PLAINTIFF-
APPELLANT ON HER CLAIMS FOR RETALIATION AS
AGAINST NYU AND JOSEPH ANTONIK ...........................................2

    I.   Preliminary Statement ....................................................................2

    II.   Legal Argument.............................................................................4

        A.   Standard.................................................................................4

            i.   Judgment as a Matter of Law

            ii.   Elements of a Claim for Retaliation Under Title VII,
               the New York State Human Rights Law, and the
               New York City Human Rights Law .................................6

        B.   Application ............................................................................7

            i.   Dr. Edelman Participated in a Protected Activity
               of Which the Defendants Had Knowledge....................7

               a.   Dr. Sari Edelman's Trial Testimony .....................13

                   i.   The September 16, 2017 Incident
                       With Antonik .................................................13

                   ii.   On September 17, 2019 (The Next Day)
                       Dr. Edelman Complained to HR About
                       Antonik's Sexist Conduct.............................15

i

       iii.  Dr. Edelman Followed Up With HR About Antonik and Also Subsequently Complained About Sex Discrimination From Antonik's Supervisor, Kaplan ........................................................18

     b.  Pacina's Trial Testimony........................................................24

     c.  Antonik's Trial Testimony ....................................................28

    ii.  Retaliatory Conduct as Evidence of Knowledge .........................31

ISSUE II: THE DISTRICT COURT IMPROPERLY GRANTED DEFENDANTS' JNOV MOTION AS TO KAPLAN ON DR. EDELMAN'S RETALIATION CLAIMS ........................................................36

ISSUE III: THE DISTRICT COURT IMPERMISSIBLY PREVENTED THE JURY FROM CONSIDERING PUNITIVE DAMAGES ..............................................................................................37

ISSUE IV: THE JURY IMPROPERLY DETERMINED THAT DR. EDELMAN FAILED TO PROVE THAT NYU VIOLATED THE FEDERAL AND NEW YORK STATE EQUAL PAY ACT .......................39

  I.  Legal Standards ...........................................................................40

    A.  Rule 50 Standard ...........................................................40

    B.  Legal Framework of the Federal and New York State Equal Pay Act ........................................................40

  II.  Argument...........................................................................42

    A.  Dr. Edelman Established a Prima Facie Case of Discrimination under both the Federal and NYS EPA ......................42

     i.  Dr. Edelman and Dr. Modi were Paid Differently .........................42

     ii.  Dr. Edelman and Dr. Modi Performed Equal Work ....................42

      a.  Dr. Modi and Dr. Edelman's Job Required Equal Skill ................................................................43

ii

      b.  Dr. Modi and Dr. Edelman's Jobs Required Equal Effort ........................................................................... 45

      c.  Responsibility ............................................................... 46

   iii.  Dr. Modi and Dr. Edelman's Jobs Were Performed Under Similar Working Conditions ............................... 47

B.  NYU Failed to Establish any Affirmative Defenses Under Federal and NYS EPA ............................................. 48

   i.  Dr. Modi's Prior Pay is an Unavailing Defense ........... 49

   ii.  Dr. Modi's RVU Target is an Unavailing Affirmative Defense ................................................... 51

ISSUE V: THE DISTRICT COURT JUDGE ERRED IN ITS NYLL JURY INSTRUCTIONS ............................................... 52

CONCLUSION ................................................................................ 57

CERTIFICATE OF COMPLIANCE ............................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Alrich v. Randolph Cent. Sch. Dist.,
  963 F.2d. 520 (2d. Cir. 1992)........................................................41, 49

Anderson v. Branen,
  17 F.3d 552 (2d Cir. 1994)..............................................................54

Barret v. Forest Labs., Inc.,
  39 F. Supp. 3d 407, 430 (S.D.N.Y. 2014).......................................56

Batson v Kentucky,
  476 US 79, 106 S Ct 1712, 90 L Ed 2d 69 (1986).........................57

Belfi v. Frendergast,
  191 F.3d. 129 (2d. Cir. 1999)........................................................41, 49

Cash v. County of Erie,
  654 F.3d 324 (2d Cir. 2011)..............................................................4

Casmento v. Volmar ConsTr., Inc.,
  No. 20-CIV-00944 (LJL),
  2022 WL 15773966 (S.D.N.Y. Oct. 28, 2022)................................40

Chauca v. Abraham,
  841 F.3d 86 (2d Cir. 2016).............................................................38

Chiaramonte v. Animal Med. Ctr.,
  677 F. App'x 689 (2d Cir. 2017) ....................................................41

Chin v. Port Auth. of N.Y. & N.J.,
  685 F.3d 131(2d. Cir. 2012)............................................................55

Corning Glass Works v. Brennan,
  417 U.S. 188 (1974).......................................................................50

Distasio v. Perkin Elmer Corp.,
  157 F.3d 55 (2d Cir. 1998)...............................................................6

Edelman v. NYU Langone Health Sys.,
    2023 U.S. Dist. LEXIS 229211 (S.D.N.Y. 2023)................................................2

Edelman v. NYU Langone Health System,
    2022 U.S. Dist. LEXIS 176681 (S.D.N.Y. 2022)..................................22, 31, 34

EEOC v. J.C. Penny Co., Inc.,
    843 F.2d 249 (6th Cr. 1988)................................................................49

EEOC v. Port Authority of N.Y. and N.J.,
    768 F.3d 247 (2d Cir. 2014)................................................................43

Eisenhauer v. Culinary Inst. Of Am.,
    84 F.4th 507 (2d. Cir. 2023)........................................................40, 41

Enercomp, Inc. v. McCorhill Pub., Inc.,
    873 F.2d 536 (2d Cir. 1989)..........................................................5, 27

Fairbrother v. Morrison,
    412 F.3d 39 (2d Cir. 2005)..........................................................10, 12

Farias v. Instructional Sys.,
    259 F.3d 91 (2d Cir. 2001)................................................................37

Galdieri-Ambrosini v. National Realty & Dev. Corp.,
    136 F.3d 276 (2d Cir. 1998)................................................................5

Gordon v. New York City Bd. of Educ.,
    232 F.3d 111 (2d Cir. 2000)..........................................................29, 30

Griggs v. Duke Power Co. Inc.,
    401 U.S. 424 (1971)..........................................................................53

Hatzimihalis v. SMBC Nikko Sec. Am., Inc.,
    2023 U.S. Dist. LEXIS 95248,
    2023 WL 3764823 (S.D.N.Y June 1, 2023) ....................................41

Henry v. Wyeth Pharms., Inc.,
    616 F.3d 134 (2d Cir. 2010)................................................................30

Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.,
  716 F.3d 10 (2d Cir. 2013)...........................................................22, 24

Knox v. John Varvatos Enterprises Inc.,
  512 F. Supp. 3d 470 (S.D.N.Y. 2021).............................................46

Kwan v. Andalex Grp., LLC,
  737 F.3d 834 (2d Cir. 2013)......................................................30, 34

McCullock v. H.B. Fuller Co.,
  61 F.3d 1038 (2d Cir. 1995).......................................................5, 39

Nadel v. Isaksson,
  321 F.3d 266 (2d Cir. 2003)..............................................................4

People v Allen,
  86 NY2d 101, 653 NE2d 1173, 629 NYS2d 1003 (1995)...............57

People v Hecker,
  15 N.Y.3d 625 (2010) ......................................................................56

Presutti v. FDIC,
  24 Fed. Appx. 92 (2d Cir. 2001) .......................................................4

Pucino v. Verizon Communs., Inc.,
  618 F.3d 112 (2d Cir. 2010)..............................................................7

Rasmy v. Marriott Int'l, Inc.,
  952 F.3d 379 (2d Cir. 2020)..............................................................6

Rosioreanu v. City of N.Y.,
  526 F. App'x 118 (2d Cir. 2013) .........................................22, 23, 24

Rothstein v. Carriere,
  373 F.3d 275 (2d. Cir. 2004)...........................................................42

Saunders Ventures, Inc. v. Salem,
  797 Fed. Appx. 568 (2d Cir. 2019) ...................................................4

Schonfeld v. Hilliard,
  218 F.3d 164 (2d Cir. 2000).............................................................37

SEC v. Ginder,
    752 F.3d 569 (2d Cir. 2014).................................................................39

Sidor v. Reno,
    95 CIV. 9588 (KMW), 1997 U.S. Dist. LEXIS 14260,
    1997 WL 582846 (S.D.N.Y. Sept. 19, 1997)....................................56

Simblest v. Maynard,
    427 F.2d 1 (2d Cir. 1970).......................................................4, 24, 26

Smith v. Lightning Bolt Prods.,
    861 F.2d 363, 367 (2d Cir. 1988)....................................................24

Stoler v. Inst. for Integrative Nutrition,
    13 Civ. 1275, 2013 U.S. Dist. LEXIS 163796,
    2013 WL 6068598 (S.D.N.Y. Nov. 18, 2013)...................................56

Summa v. Hofstra Univ.,
    708 F.3d 115 (2d Cir. 2013)...........................................................30

Tepperwien v. Entergy Nuclear Operations, Inc.,
    663 F.3d 556 (2011)...................................................................38, 39

Tolbert v. Queens College,
    242 F.3d 58 (2d Cir. 2001)..........................................................11, 12

Tomka v. Seiler Corp.,
    66 F.3d 1295 (2d. Cir. 1995)......................................................41, 44

United States v. City of New York,
    713 F. Supp. 2d 300 (S.D.N.Y. 2010)..............................................56

United States v. Masotto,
    73 F.3d 1233 (2d Cir. 1996).......................................................53, 54

Usery v. Columbia Univ.,
    568 F.2d 953 (2d. Cir. 1977)...........................................................45

Warmin v. New York City Dep't of Educ.,
    2019 U.S. Dist. LEXIS 125774 (S.D.N.Y. 2019).............................34

White v. Dep't of Corr. Servs.,
    814 F. Supp. 2d 374 (S.D.N.Y. 2011) ................................................ 31

Wu v. Good Samaritan Hosp. Med. Ctr.,
    815 F. App'x 575, 581 n.5 (2d Cir. 2020) ......................................... 41

Ya-Chen Chen v. City Univ. of N.Y.,
    805 F.3d 59 (2d Cir. 2015) ................................................................ 6

**Statutes**

29 U.S.C. § 206(d) ............................................................................... 1

29 U.S.C. § 206(d)(1) .............................................................. 41, 48, 52

United States Code Title VII, 42 U.S.C. § 2000e ........................... *passim*

New York Executive Law § 296(1)(a) ................................................. 1

New York Executive Law § 296(a)(e) .................................................. 6

New York Labor Law § 194 ......................................... 1, 39, 41, 53

NYLL § 194(1) ......................................................................... 41, 52

NYLL § 194(1)(b)(iv) ......................................................................... 48

NYLL § 194(1)(d) ..................................................................... 51, 52, 53

NYLL § 194(2)(a) ............................................................................... 48

**Other Authorities**

29 C.F.R. § 1620.15(a) ....................................................................... 43

29 C.F.R. § 1620.17(a) ....................................................................... 46

Fed. R. Civ. P. 50 ................................................................................ 2

Fed. R. Civ. P. 50(a)(1) ....................................................................... 4

Fed. R. Civ. P. 50(b) ................................................................. *passim*

Fed. R. Civ. P. 59 ...................................................................2, 39, 40, 57

Fed. R. Civ. P. 59(a)(1)(A) ................................................................40

New York City Administrative Code § 8-107(1)(a).................................................1

U.S. Bureau of Labor Statistics, BLS Reports,
    "Highlights of women's earnings in 2020,"
    https://www.bls.gov/opub/reports/womens-
    earnings/2020/home.htm.......................................................................55

## INTRODUCTION

Plaintiff-Appellant Dr. Sari Edelman ("Dr. Edelman") brought the following claims against corporate Defendants-Appellees NYU ("NYU") for violations of: (i) the Equal Pay Act ("EPA") New York State Equal Pay Act ("NYS EPA") pursuant to 29 U.S.C. § 206(d) and NYLL § 194, respectively, as well as Defendants-Appellees Joshua Swirnow ("Swirnow") and Dr. Andrew Rubin ("Rubin") for unequal pay; (ii) Title VII of the United States Code, 42 U.S.C. § 2000e against NYU for retaliation; (iii) the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") pursuant to New York Executive Law § 296(1)(a) and New York City Administrative Code § 8-107(1)(a), respectively, against all Defendants-Appellees ("Defendants") for retaliation; and (iv) the NYCHRL pursuant to New York City Administrative Code § 8-107(1)(a) against all Defendants for discrimination based on allegedly sexist remarks. Defendants deny the allegations in all respects.

A trial began on July 10, 2023. During the trial, the District Court, Liman, L.J. ("District Court") granted Defendants' motions for judgment as a matter of law on the issue of willfulness under the EPA claims. The District Court also granted judgment as a matter of law in favor of: (i) Defendant-Appellee David Kaplan ("Kaplan") on all claims of retaliation; (ii) Kaplan, Rubin, and Swirnow on the discrimination claims; and (iii) all Defendants on the claim for punitive damages.

On July 19, 2023, the jury found that Dr. Edelman had proven her claims against NYU and Antonik for retaliation and awarded Dr. Edelman judgment for damages in the sum of $700,000.00 for front pay.

The jury also found that Dr. Edelman had not proven her EPA or NYS EPA claims, her discrimination claims, or her retaliation claims against Rubin and Swirnow by a preponderance of the evidence.

On December 26, 2023, after the Parties filed cross-motions under FRCP 50 and 59, and following oral argument on same, the District Court directed a verdict in favor of Defendants on all of Dr. Edelman's retaliation claims and vacated the jury's corresponding award of compensatory damages for front pay. See Edelman v. NYU Langone Health Sys., 2023 U.S. Dist. LEXIS 229211 (S.D.N.Y. 2023).

Dr. Edelman filed her Notice of Appeal on January 24, 2024.

**ISSUE I: The District Court improperly granted Defendants-Appellees' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) reversing the jury's verdict in favor of Plaintiff-Appellant on her claims for retaliation as against NYU and Joseph Antonik**

**I.    Preliminary Statement**

In granting Defendants' motion for Judgment Notwithstanding the Verdict ("JNOV") on Dr. Edelman's retaliation claims, the District Court ruled that "there is no evidence that Antonik knew Plaintiff's complaint alleged gender discrimination. Without that knowledge, Antonik could not have intended to retaliate against Plaintiff for reporting gender discrimination." See A3383. In realty, there is

ample evidence in the trial record that Dr. Edelman complained to NYU human resources ("HR") representative Kathleen Pacina ("Pacina") about Antonik's gender-based discrimination. Since Dr. Edelman complained to HR about Antonik's sexist conduct, it was reasonable for the jury to conclude that HR spoke to Antonik about Dr. Edelman's gender-based complaint because (as the trial record demonstrates) HR investigated the allegations, asked specific questions about same, and interviewed all parties to get both sides of the story. Thus, the jury had a reasonable basis to conclude that Antonik knew about Dr. Edelman's gender-based discrimination complaint against him and that Antonik retaliated against Dr. Edelman and ultimately got her fired.

It was not unreasonable for the jury to adopt Dr. Edelman's testimony in its entirety, use common sense, and make reasonable inferences based on the facts presented at trial as they believed them to be true in rendering their verdict. Therefore, the District Court improperly granted Defendants' motion for JNOV because there is not such a complete absence of evidence supporting the jury's findings in favor of Dr. Edelman on her retaliation claims as against NYU and Antonik. As such, a jury could reasonably find Antonik knew of Dr. Edelman's gender-based discrimination complaint and retaliated against her.

For the reasons set forth below, the District Court erred in granting Defendants' motion for JNOV. As such, the District Court's order should be reversed and the

jury's verdict granting Dr. Edelman compensatory damages in the amount of $700,000.00 should be reinstated in its entirety.

## II. Legal Argument

### A. Standard

#### i. Judgment as a Matter of Law

The Second Circuit reviews a district court's decision to set aside a jury verdict *de novo* "but use[s] the same standards that [the district court] must apply." Presutti v. FDIC, 24 Fed. Appx. 92, 95 (2d Cir. 2001); see also Saunders Ventures, Inc. v. Salem, 797 Fed. Appx. 568, 571 (2d Cir. 2019). The standard for determining whether a JNOV should be granted is "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." Simblest v. Maynard, 427 F.2d 1, 5 (2d Cir. 1970); see also Nadel v. Isaksson, 321 F.3d 266, 272 (2d Cir. 2003). A judgment as a matter of law may only be granted if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed. R. Civ. P. 50(a)(1); see also Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (emphasizing that "a Rule 50 motion may be granted only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that 'a reasonable juror would have been compelled to accept the view of the moving party.'" (internal citations omitted)). "It is axiomatic that a

4

district court should not grant a motion for judgment as a matter of law unless there is such a <u>complete absence of evidence</u> supporting the verdict that the jury's findings could only have been the result of surmise and conjecture." <u>McCullock v. H.B. Fuller Co.</u>, 61 F.3d 1038, 1044 (2d Cir. 1995) (emphasis added)).

In <u>Enercomp, Inc. v. McCorhill Pub., Inc.</u>, 873 F.2d 536, 541 (2d Cir. 1989), this Court held that "the jury's verdict cannot be disturbed unless we can say, without considering either the credibility of witnesses or the weight their testimony deserves, that the only conclusion a reasonable factfinder could have reached is one favoring defendants."

This Court has emphasized that a district court "must give deference to all credibility determinations and reasonable inferences of the jury, and <u>it may not itself weight the credibility of witnesses or consider the weight of the evidence</u>." <u>Galdieri-Ambrosini v. National Realty & Dev. Corp.</u>, 136 F.3d 276, 289 (2d Cir. 1998) (emphasis added).

Here, based on the evidence and using "their common sense and experience in drawing inferences," the jury could easily have found—contrary to the District Court's finding—that Antonik knew that Dr. Edelman's complaint was based on gender discrimination and that Antonik and NYU retaliated against Dr. Edelman for engaging in protected activity in violation of the law. As such, the District Court improperly ignored the trial record supporting the fact that Dr. Edelman engaged in

5

protected activity by complaining about gender-based harassment from Antonik, as well as the jury's credibility determinations of the witnesses and considerations as to the weight of the evidence and impermissibly substituted its own inferences for that of the jury when it nullified the jury's verdict.

Therefore, the District Court erred when it reversed the jury's verdict in favor of Dr. Edelman on her retaliation claims against Antonik and NYU.

### ii. Elements of a Claim for Retaliation Under Title VII, the New York State Human Rights Law, and the New York City Human Rights Law

In order to establish a claim for retaliation under Title VII, a plaintiff must demonstrate (1) their participation in a protected activity, (2) the employer's knowledge of that protected activity, (3) that they suffered an adverse employment action, and (4) a causal connection between the protected activity and the adverse employment action. See Rasmy v. Marriott Int'l, Inc., 952 F.3d 379, 391 (2d Cir. 2020); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 66 (2d Cir. 1998).[1]

---

[1] The standards under the New York State Human Rights Law and the New York City Human Rights Law are more lenient than that of Title VII. See, e.g., N.Y. Exec. Law 296(a)(e); see also Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 76 (2d Cir. 2015).

**B.   Application**

    **i.   Dr. Edelman Participated in a Protected Activity of Which the Defendants Had Knowledge**

Based on the trial record, the jury could have reasonably found that Dr. Edelman engaged in protected activity when she made a complaint to HR based on gender discrimination. Pacina spoke to Antonik about Dr. Edelman's complaint shortly after Dr. Edelman lodged her complaint. As such, a jury could also have found, and did find, that Antonik knew that Dr. Edelman's complaint was based on gender discrimination and that, as a result, Dr. Edelman had engaged in protected activity. As such, the jury could have reasonably found that Dr. Edelman engaged in protected activity about which the Defendants had knowledge.

Dr. Edelman testified in great detail during the trial about the harassment she suffered at the hands of Antonik. Dr. Edelman testified that on September 16, 2019, Antonik screamed at her in her office, physically intimidating her and verbally berating her about how NYU "owned" her. She explained how she felt physically threatened by Antonik's conduct and asked him to leave her office, and that he called her a "bitch". See, e.g., Pucino v. Verizon Communs., Inc., 618 F.3d 112, 118 (2d Cir. 2010) ("[i]t is surely the case that use of that word [bitch] in many contexts reflects [hostility towards women]"). Dr. Edelman also testified that she felt Antonik's conduct was sexist. See A1210, lines 2-10.

7

Dr. Edelman also testified that *the very next day* she complained to HR about Antonik's conduct. Specifically, Dr. Edelman testified that she complained to Pacina about Antonik's hostile and abusive conduct toward Dr. Edelman and that Dr. Edelman and Pacina "went through the events of what happened . . . for 20, 30 minutes." A1210; 6-8. In fact, one of the most alarming events that transpired was that Antonik called Dr. Edelman a bitch and that she felt that Antonik's abusive conduct was a sexist, discriminatory, and chauvinistic attack. See A1206; 16; see also A1210; 4-5. The jury could reasonably conclude that one of the "events" that Dr. Edelman complained to Pacina about over the course of their 20–30-minutee conversation was being called a bitch by Antonik and how she felt Antonik was being hostile to her because of her sex.

Dr. Edelman also testified that she explained all the events that happened between Dr. Edelman and Antonik, including Antonik calling Dr. Edelman a bitch. See A1209; 21-25-A1210; 1-10. Moreover, it is reasonable for the jury to conclude that Pacina reiterated Dr. Edelman's complaint (including the bitch comment) to Antonik as part of her investigation.

In fact, Pacina testified about her role as an HR manager at NYU to the following:

Q:   Now, generally speaking, whenever a complaint is received, you talk to all the parties involved, correct?
A:   Yes.
Q:   And you talk to the person that made the complaint, right?

A:     Yes.

Q:     You also talk to the person who the complaint is against, right?

A:     Yes.

Q:     And sometimes you speak to other witnesses that may have been involved, right?

A:     Correct.

Q:     And you then provide a response after doing so, correct?

A:     Yes.

Q:     You also determine in your capacity as an employee relations manager whether a complaint that's made is founded or unfounded, right?

A:     Correct.

Q:     You basically determine whether the complaint has any merit, right?

A:     Yes.

A2176; 21-25-A2177; 1-15. Pacina's job, therefore, was to investigate allegations, such as Dr. Edelman's complaint of gender-based discrimination, and to speak with all parties involved.

Indeed, Pacina testified that she investigated Dr. Edelman's complaint and spoke with Antonik at some point after she spoke with Dr. Edelman. See A2197; 3-17. Thus, based on Pacina's job description and her testimony regarding her job duties, the jury could have reasonably inferred that Pacina conveyed Dr. Edelman's entire gender-based complaint of discrimination to Antonik, including the use of the term bitch by Antonik.

Here, however, the District Court improperly and without foundation asserted its own credibility determination rejecting Dr. Edelman's testimony and accepting Pacina and Antonik's version of events regarding the nature of Dr. Edelman's complaint.

Yet, this Court has repeatedly held that the district court cannot substitute its own credibility determinations and reasonable inferences for that of the jury. In Fairbrother v. Morrison, 412 F.3d 39 (2d Cir. 2005), a case strikingly similar to the instant matter, this Court reversed the lower court's grant of JNOV in favor of the defendants on the plaintiff's hostile work environment claim on the basis that a jury could have determined that the conditions of the plaintiff's employment had been altered. Id. at 52. There, this Court found that the district court had impermissibly issued a determination on the plaintiff's credibility, holding that:

> We note, at the outset, that the district court opinion devoted significant attention to evidence that, if relevant at all, appears to bear primarily on Fairbrother's credibility.
> . . .
> The district court's focus on this evidence, and its ultimate conclusion that "Fairbrother's version of the alleged facts is insufficient to permit a reasonable jury to have found that she had been subjected to a sexually hostile work environment," suggest a determination that a jury could not deem Fairbrother credible. However, a motion for judgment as a matter of law must be considered "with credibility assessments made against the moving party." Indeed, it is difficult to understand how the district court reached its conclusion without engaging in "'weighing the credibility of the witnesses or otherwise considering the weight of the evidence,'" a task expressly prohibited when considering judgment as a matter of law. The district court erred to the extent it determined that Fairbrother's allegations were not to be believed. (Emphasis added)

Id. at 49-50 (internal citations omitted).

Further, in Fairbrother, based on the plaintiff's testimony, this Court emphasized that "a jury could reasonably find such severe or pervasive workplace

hostility." Id. at 50-51 (holding, *inter alia*, that the plaintiff "testified to the following. For a period of several months, she was called 'bitch' almost daily, and called 'whore' ten to fifteen times."). Based on the above, this Court reversed the district court's grant of JNOV on the plaintiff's sexually hostile work environment claim. Id. at 58.

Similarly, in Tolbert v. Queens College, 242 F.3d 58 (2d Cir. 2001), this Court reversed the district court's grant of JNOV in favor of the defendant on plaintiff's claim for discrimination on the basis of race, finding that the court "did not view the evidence as a whole, or take it in the light most favorable to [the plaintiff], or disregard evidence favorable to the defense that the jury was not required to believe." Id. at 71. Specifically, this Court held "[it] is beyond the province of the district court, and of this Court, to second-guess [the jury's] factual inferences and credibility assessments." Id. at 73 (emphasis added).

Here, in granting Defendants' motion for JNOV, the District Court reasoned that although Dr. Edleman "testified at trial that Antonik uttered the word 'bitch' under his breath during their [September 16, 2019] conversation" (A3345), Antonik "denied using that word" (Id.). The District Court held that "Plaintiff neither testified nor adduced any other evidence indicating that she told Pacina that Antonik had called her a bitch" (A3373) and that "it would be unduly 'speculative' for the jury to assume Antonik 'must have been informed of [Plaintiff's] protected activity'

during his conversation with Pacina without any countervailing evidence to support that conclusion" (A3378). This is simply not true. Dr. Edelman testified that she went through the Antonik incident with Pacina and further testified that she explained to Pacina the Antonik incident the same way she described it to the jury. In both instances, this would have included that Antonik called her a bitch and that she felt he was being sexist. Moreover, both Pacina and Antonik testified that they did not recall everything that they discussed about Dr. Edelman's complaint (A2208; 10-11; A2196; 23-25-A2197; 1-20), but Antonik testified that he knew that Dr. Edelman's complaint was about the way he spoke to her and was about more than just office space (A1623; 5-13).

Indeed, the jury could have easily rejected—and did reject—Antonik's self-serving testimony and accepted Dr. Edelman's testimony instead. The *jury*, not the District Court, was the sole judge of each witness's credibility and testimony, and the jury decided to reject the self-serving testimony of the NYU defendants who denied knowledge of Dr. Edelman's protected conduct. Thus, it was within the province of the jury to accept Dr. Edelman's testimony regarding her gender-based complaint.

Therefore, like the district courts in Fairbrother and Tolbert, the District Court here impermissibly second-guessed the credibility determinations of the jury, improperly weighed the credibility of the witnesses at trial, and failed to make

reasonable inferences that the jury made in rendering judgment on the JNOV in favor of defendants.

### a. **Dr. Sari Edelman's Trial Testimony**

#### i. **The September 16, 2017 Incident With Antonik**

Dr. Edelman specifically testified that when Antonik came into her office on September 16, 2019 and told her that she would need to share her office space with another doctor that she told him she would need to look at her contract and have her attorneys review it because it was her understanding that her contract "afforded [her] full-time use of [her] office." See A1205; 9-12. She then testified that when she told this to Antonik, his "demeanor changed" (A1205; 18) and that:

> He started to say to me you think that because you put this stuff in your office -- and he started to go like this and point to the picture on my desk and this on my desk and that on my desk. And I'm right there, and he's flailing his arms, and he's a big guy and I'm a small person. And he was very close to me, and he started saying: Because you put all your stuff here, this doesn't belong to you. This all belongs to NYU. All of it belongs to NYU, this whole office. None of it's yours. We -- we own you. And at that point I backed myself up and I said you need to leave. During his rant he uttered, under his breath, bitch. I was so shaken up at that point because he was in my space. I felt like he completely lost his composure, and I needed to end the conversation. And I said you need to leave, and he left. And after he walked out, I kind of called my husband at that point. He calmed me down enough that I could drive home, and when I got home that night, I was physically shaken. (Emphasis added)

A1206; 6-22.

Dr. Edelman also testified that during this verbal altercation with Antonik she "thought [Antonik] was coming at me. I thought he was going to hurt me." See A1207; 1-2. She testified that Antonik: "was close enough that I felt if something knocked over, because he was trying to get at the things on my desk, it could have flown at me or could have potentially reached out to me." A1209; 11-14. She further testified that she felt that Antonik's behavior was sexist and chauvinistic because:

> The way he was speaking to me, telling me that nothing in that office belongs to me. There were my diplomas on the wall. It was space that I had negotiated with NYU to see and treat my patients based on my experience as a rheumatologist. There was no seniority that he had over me to say that he, he had – that it belonged to him more than me. The only difference was that he was a male, and he was saying he owned me. I was with the organization at that space longer than him. I had more years of training than him, and he's telling me that this is his. Yes, NYU employs me, but he doesn't own me. He doesn't own the things in my office. He doesn't own the right to tell me -- to say you're going to do what we tell you to do. This was chauvinistic. I mean this wasn't a conversation about hey, I want to, you know, we're thinking about using your space. This was: No. You're going to do what we tell you to do, and if you don't, this is how it's going to go down. (Emphasis added)

A1210;13-25-A1211; 4.

Further, during her cross-examination Dr. Edelman testified:

Q.     So it wasn't until [Antonik] muttered that word [bitch] that he injected sexism in to the conversation?

A:     I felt all of it was sexist, but that word defined it.

14

A1443; 25-A1444; 1-2. Dr. Edelman also testified that Antonik: "doesn't have the right to physically intimidate me, shout at me, wave his arms in front of me and call me a bitch." <u>See</u> A1452; 14-16.

These above-mentioned events are the "events of what happened" that Dr. Edelman testified about that the jury could reasonably find Dr. Edelman discussed with Pacina.

### ii. On September 17, 2019 (The Next Day) Dr. Edelman Complained to HR About Antonik's Sexist Conduct

Dr. Edelman then testified that the very <u>next day</u> she put in a verbal complaint with Pacina about the incident with Antonik. <u>See</u> A1209; 15-25-A1210; 1. She testified that:

> <u>My complaint was about the, the hostile and abusive behavior that had occurred the day before with Mr. Atonik</u> [sic]; that I didn't feel safe and I wanted it rectified; that I felt that it was a <u>sexist, discriminatory, chauvinistic attack</u> and it needed to be addressed with HR. <u>We went through the events of what happened on the phone. I was probably on the phone with her for 20, 30 minutes. She took everything down</u>. There was a case number assigned, and she said that she would get back to me. (Emphasis added).

A1210; 2-10. Based on this testimony, the jury could have reasonably concluded that "the events of what happened" as Dr. Edelman described them to Pacina

included Antonik calling Dr. Edelman a bitch and that she felt that Antonik was sexist, discriminatory, and chauvinistic in his attack against her.[2]

After Dr. Edelman testified about the Antonik incident, Dr. Edelman also testified that she described to Pacina exactly what she had just told the jury concerning the Antonik incident:

> Q:  Did you explain to Ms. Pacina what you just described to the jury over the last couple minutes [concerning the Antonik incident]?
> A:  I did.

A1211; 7-9. This testimony followed directly after Dr. Edelman's testimony about the Antonik incident and the bitch comment (which was a mere five (5) pages prior in the trial transcript and no more than a couple of minutes in real time).

Thus, the trial record clearly contains multiple instances of Dr. Edelman complaining to HR about being called a bitch and Antonik's improper sexist conduct. It should be noted that there was no testimony by Dr. Edelman that she "excluded" details of Antonik's sexist attack on Dr. Edleman when she described the incident to Pacina. Further, "the events of what happened" also included how Dr. Edelman felt, including that she felt about the "sexist, discriminatory, chauvinistic attack." See A1210; 4-5. So, the jury could easily determine that Dr. Edelman complained to Pacina that Antonik was yelling, calling her a bitch, and physically

---

[2] Indeed, Dr. Edelman was asked about the word "bitch" eight (8) times during her cross-examination and repeatedly confirmed that Antonik called her a bitch during their confrontation during both her direct and cross-examinations. See A1438; 14-16.

intimidating her because she was a woman and that she felt it was hostile and abusive behavior based on Dr. Edelman's gender.

Moreover, Dr. Edelman did not qualify the word "everything" when she told the jury that she and Pacina went through the events of September 16, 2019 and that Pacina took "everything" down. Furthermore, Dr. Edelman did not testify about excluding anything from the Antonik incident in her conversation with Pacina. Thus, a jury could reasonably infer that "everything" means exactly what it says: everything, including the fact that Antonik called Dr. Edelman a bitch.

In addition, as more fully outlined, *infra*, there are more than sufficient facts and inferences that the jury could draw to conclude that Pacina informed Antonik about Dr. Edelman's sex-based complaint. Pacina testified that it was her job to investigate allegations such as those contained in Dr. Edelman's complaint and to interview all parties involved. See A2176; 21-25-A2177; 1-15. This is a reasonable version of the facts that the jury could accept as true. As such, a jury could reasonably conclude that, as part of her investigation, Pacina informed Antonik about Dr. Edelman's gender-based discrimination complaint.

In completely ignoring Dr. Edelman's trial testimony, the District Court impermissibly rendered a determination as to her credibility as a witness, when the jury was free to—and in fact, was empowered to—make its own determination as to the credibility of the witnesses who testified at the trial. And the jury could have

reasonably believed Dr. Edelman's version of the events, including the fact that she engaged in protected activity.

### iii. Dr. Edelman Followed Up With HR About Antonik and Also Subsequently Complained About Sex Discrimination From Antonik's Supervisor, Kaplan

Dr. Edelman also testified about her conversation with Kaplan[3], which clearly demonstrates the fact that NYU knew about the entirety of the complaint. Dr. Edelman testified that a week after the incident with Antonik, on September 25, 2019, Kaplan came to her office, saying "I'm sorry or something in that regard, about what happened with Mr. Atonik [sic], and you know, I'm here now to discuss, you know - - the office space" and informing her that NYU had "looked at [her] contract and this is what it says, and, like, this is going to be what it's going to be at this point." See A1213; 15-21.

Dr. Edelman also testified that she continued to follow up with HR about the initial complaint, as well as subsequent discriminatory conduct, specifically highlighting the fact that Antonik and NYU's behavior was sexist and chauvinistic. For example, Dr. Edelman testified that when she repeated her concerns that she needed to speak with her attorneys and review her contract she began getting upset,

---

[3] Kaplan was Antonik's supervisor. See A1680; 9-13.

18

and that, in response, Kaplan "started to say: Doctor. Doctor, calm down. Calm down, Doctor." See A1215; 7. Dr. Edleman testified that:

> It was very -- it was very demeaning. It was patronizing to me, and I stood up and I said: You're going to leave my office now. I'm not having this conversation. You're leaving. You're not going to treat me like that, which is where I draw the line. I am not a child. I'm a doctor. I'm entitled to an opinion, and I'm allowed to get upset. I'm a physician and I'm a woman, and a woman can get upset. I'm allowed to have a dispute in my office and be upset, and it is sexist to say to woman calm down.

Id. at 7-19. Thus, Dr. Edelman specifically complained to Kaplan about his sex-based discriminatory comments to her when he told her to "calm down."

Dr. Edelman further testified that rather than being told to calm down male doctors are told: "What can we do to help you? Let's make this better. You know, that's not the response I'm getting here. I'm getting the response: You're overreacting. You shouldn't be upset. You're being histrionic, dramatic, hysterical. This is the sexist attitude in a workplace." See A1216; 1-6.

Dr. Edelman then testified:

> Q:     So that incident ends and Mr. Kaplan - - after Mr. Kaplan and you separate, do you do anything with respect to contacting anyone at NYU?
> A:     That night I - - before I left I sent another email up to Ms. Pacina, and I explained the events that happened. Now, you know, it's been a week and the initial complaint from the September 16 incident still hasn't been addressed through HR at all. And now a week later, I'm -- I'm experiencing a similar hostile work environment [from Kaplan], and nothing's been done. And this is the email that I sent up; that this needs to be addressed; that I don't feel, feel comfortable working in the office knowing that at

19

any moment that this type of thing can continue to happen. (Emphasis added)

A1216; 7-19. Specifically, Dr. Edelman read the email she sent to Pacina on the

night of September 25, 2019 into the record:

> "Good evening. I am following up on our discussion from last week. Tonight our office manager David Kaplan requested to speak with me and he apologized for Joe Atonik's [sic] behavior stating it was not an appropriate request and wanted to clear the air on any miscommunication. This was a matter of inappropriate conduct in the workplace in mannerism with which I was treated. And I am not sure this discussion with Joe's senior manager was even appropriate as the issue was received with HR and has not been addressed as HR matter.
> . . .
> I consider this a form of bullying in the workplace." (Emphasis added)

A1217; 14-15-A1218; 1-5 (internal citations omitted); see also A1219; 4-7, 10-14

("As a female physician in the organization, I am disappointed that it is 2019,

approaching 2020, in a major hospital organization in New York, and I still have to

contend with male chauvinism'" (internal citations omitted)). Again, Dr. Edelman

raised another charge of sex discrimination at NYU.

Dr. Edelman also testified that she spoke with Swirnow about the situation

with Antonik and Kaplan and that Swirnow "was apologetic for how they handled

[the situation]. He felt they mishandled it; that the issue with space should have been

presented to the group as a whole and that [Edelman] shouldn't have been targeted

in that way." See A1223; 2-6. Dr. Edelman then testified that Swirnow verbally

20

promised her that she could keep her office space Monday-Friday. Id. at 19-20. However, Dr. Edelman testified that when she told Swirnow that she "was going to maintain or keep the HR complaint" and "that the issue of office space was an independent situation to the HR complaint" (A1224; 9-11) that Swirnow: "was not happy with it. And after that he didn't say anything. And it was a moment in time where I realized I wasn't going to have the support of upper level administration in following this through" (A1224; 19-22). Dr. Edleman testified that:

> I think in that moment I -- <u>I felt like I was, you know, potentially a target</u>, like they were -- they were not going to support me through this, and when you're expressing something of this magnitude and they're not taking it to the level that they should be, <u>I felt like they most likely were going to fire me. And at that point in time I kind of walked around, from then forward kind of always, you know, wondering when it was coming</u>. (Emphasis added)

A1225; 6-13. Thus, Dr. Edelman clearly testified that she told and reiterated to Pacina—both verbally and in writing—about both Antonik's discriminatory conduct and Kaplan's subsequent discriminatory conduct (as well as to Kaplan himself about his own conduct), and it is clear from the record that these complaints were gender-based.

Further, Dr. Edelman testified that she diligently followed-up with HR to ascertain the status of the investigation, especially after Kaplan and Swirnow spoke to her and attempted to placate her about Antonik's behavior. Dr. Edelman testified how she outlined her concerns about NYU's conduct and non-responsiveness with

regard to her complaint to HR in subsequent emails, and how, in response, HR told her that the investigation had been closed mere weeks after it was opened, with no substantive conclusion, and without providing her with an opportunity to follow through with same.

Therefore, the jury could reasonably infer that Dr. Edelman conveyed a complaint based on gender discrimination to Pacina. See Edelman v. NYU Langone Health System, 2022 U.S. Dist. LEXIS 176681, *33 (S.D.N.Y. 2022) ("Contrary to Defendants' argument, Plaintiff's communications with Defendants' HR professionals throughout October and November 2019 made clear that she was complaining of sex discrimination, which is a protected activity under Title VII"); see also A152.

In its Rule 50 decision, the District Court cited to Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 17 (2d Cir. 2013) and Rosioreanu v. City of N.Y., 526 F. App'x 118, 120 (2d Cir. 2013) for the proposition that Dr. Edelman's complaint was insufficient to put Antonik and NYU on notice of the fact that her retaliation claims were based on gender discrimination. However, those cases are distinguishable from the instant facts. In Kelly, this Court rejected the plaintiff's claim for retaliation because "[t]here [wa]s nothing in Kelly's complaint [] to indicate that 'her sex, in one way or another, played a substantial role in [the individual defendants'] behavior.'" Kelly, 716 F.3d 10 at 15-16 (internal

22

citations omitted) (finding that "Kelly 'd[id] not allege that [individual defendants] engaged in sexually explicit behavior or conversations in the office, or that [they] took any actions or made any statement[s] that were of a sexual or gender-specific nature that could be perceived as "demeaning to women"'"). Similarly, in Rosioreanu this Court upheld the lower court's grant of a Rule 50(b) motion because "Rosioreanu's complaints could easily have described a conflict between co-workers of any sex—regardless of the presence or absence of discriminatory animus" and, as such, "no evidence presented at trial permitted a jury reasonably to infer that the [defendant] had notice (or should have had notice) that Rosioreanu believed that the conduct of which she complained was based on her sex." Rosioreanu, 526 F. App'x at 120.

Here, in contrast, and as set forth in further detail, *supra*, Dr. Edelman sufficiently testified that she put NYU on notice that her complaint was based on gender discrimination and that the complaint was more than just about a conflict between co-workers. Contrary to the District Court's determination, Dr. Edelman did in fact testify that she told Pacina about the verbal confrontation with Antonik, including the fact that she called her a bitch and how she felt Antonik and Kaplan were treating her differently because she was a woman, and a jury could reasonably conclude that HR and NYU were on notice of her sex-based complaint of discrimination. As such, the District Court erred in determining otherwise. See

23

Maynard, 427 F.3d at 5 (emphasizing that JNOV should only be granted when "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached"); see also Smith, 861 F.2d 367 (the court "must disregard all evidence favorable to the moving party that the jury is not required to believe").

Therefore, unlike the plaintiffs in Kelly and Rosioreanu, Dr. Edelman sufficiently established that NYU notice that her complaint was based on gender discrimination.

### b. **Pacina's Trial Testimony**

At trial, Pacina testified that she did not "recall if [Dr. Edelman's complaint] was about the way she was spoken to" (A2190; 12-13), and when asked if she recalled anything "specifically that [Dr. Edelman] said" during their phone call she testified, "No not specifically." (A2208; 10-11). Thus, Pacina has no specific recollection of what Dr. Edelman told her. Pacina did not dispute Dr. Edelman's testimony or testify to the contrary; rather, she stated that she did not recall what Dr. Edelman said. Thus, the jury could reasonably adopt Dr. Edelman's version of events since *she* remembered what she told Pacina.

Dr. Edelman and Pacina also both testified that the initial complaint about the Antonik incident was made over the phone. Contrary to the District Court's decision,

simply because Dr. Edelman did not write "bitch" in her subsequent email communications with Pacina does not mean she did not verbally tell her same or convey the entirety of her gender-based complaint to Pacina during their first conversation on September 17, 2019. A jury could reasonably infer that since Dr. Edelman told Pacina everything—including the bitch comment—she did not need to repeat it in an email. In fact, even if Pacina had testified that Dr. Edelman absolutely did not tell her that the complaint was based on gender discrimination (which was not her testimony), it was reasonable for the jury to reject Pacina's testimony and believe Dr. Edelman's testimony instead. However, Pacina did not do that; rather, Pacina testified that she was unsure as to whether Dr. Edelman made a sex-based complaint against Antonik. See A2208; 10-11. The jury was free to reject Pacina's testimony as entirely self-serving testimony to protect NYU from liability, or for any other reason. It is in the province of the jury to make such credibility assessments, not the District Court.

Based on the contents of Dr. Edelman's complaint about Antonik based on gender discrimination, including the fact that Dr. Edelman told Pacina that Antonik called her a bitch and the fact that she told Pacina that she believed she was being verbally and physically attacked because she was a woman, and because Pacina testified that it was her job to investigate complaints of this nature and speak to all

25

parties involved, it is reasonable for the jury to conclude that Pacina told Antonik about the fact that Dr. Edelman's complaint against him was gender-based.

While the District Court determined that Pacina "testified that she did not understand Plaintiff's complaint to concern the way [Dr. Edleman] was treated vis-à-vis her gender" (A3373), Pacina's HR are not contemporaneous: they are dated nearly six (6) months after Dr. Edelman first relayed her complaints to Pacina over the phone, on September 17, 2019. The jury could reject this testimony as unbelievable given Dr. Edelman's testimony. Indeed, Pacina had no explanation for why her notes were dated March 13, 2020, or whether they may have been edited, and she testified:

> Q: Because of the date issue here, you cannot state with any certainty whether this document [her notes] has ever been edited, correct?
> A: That's correct.

A2195; 25-A2196; 1-2.

Pacina also acknowledged that HR phone calls with employees were "not recorded or logged." <u>See</u> A2184; 15-17. Further, Pacina did not deny relaying Dr. Edelman's gender-based allegations to Antonik: rather she testified that she did not recall what specifically was discussed or speaking to Antonik about retaliation. <u>See</u> A2196; 23-25-A2197; 1-20. Her notes only say "resolution." <u>Id</u>. Pacina testified:

> Q. During your conversation with Mr. Antonik, you never explained to him that it's unlawful for him to retaliate against Dr. Edelman, did you?

26

A.     I don't recall.

A2197; 12-14. The role of HR is to investigate complaints of unlawful activity and to render determinations on same, and that is what Pacina testified was her job. As such, a jury could reasonably infer that Pacina told Antonik about the gender-based nature of Dr. Edelman's complaint and that Antonik knew exactly what Dr. Edelman said. Thus, it is reasonable for a jury to conclude that Pacina fully investigated the complaint, conveyed the full unfiltered contents of Dr. Edelman's complaint to Antonik, and spoke to all parties involved.

The jury made an assessment of credibility and chose to believe Dr. Edelman's testimony, and there is no evidence that doing so was unreasonable, let alone the result of surmise or conjecture. Nor is the District Court's conclusion in favor of Defendants the only conclusion the jury could reach. See Enercomp, Inc., 873 F.2d at 541. Indeed, at the conclusion of the trial, the District Court instructed the jury:

> You've had the opportunity to observe the witnesses. It is now your job to decide how believable each witness was in his or her testimony. You are the sole judge of the credibility of each witness and the importance of his or her testimony. (Emphasis added)

A2521; 9-13. The District Court further instructed the jury:

> You may accept so much of the witness's testimony as you deem true and disregard what you feel is false. By the processes by which I have just described, you, as the sole judges of the facts, decide which of the witnesses you will believe, what portion of each witness's testimony you accept, and what weight you give it. (Emphasis added)

27

A2523; 4-9.

Since (i) Pacina cannot remember what Dr. Edelman told her during their September 17, 2019 phone call, (ii) Pacina cannot remember what she told Antonik about Dr. Edelman's complaint, and (iii) Pacina's notes regarding the call were not contemporaneous (and may have been altered), a jury could reasonably believe that Pacina may have conveyed Dr. Edelman's gender-based discrimination complaint to Antonik during her HR investigation but simply does not remember or does not want to remember. Thus, the jury was free to make inferences about Pacina's uncertain testimony as compared to Dr. Edelman's clear-cut testimony and to accept or reject Pacina's testimony accordingly. Therefore, it was reasonable for the jury to make factual inferences regarding Pacina's testimony and to reject her testimony in favor of Dr. Edelman's.

### c.  Antonik's Trial Testimony

At trial, Antonik testified that he "recall[ed] [h]e had a conversation" with Pacina about Dr. Edelman's complaint and that Pacina "had explained the nature of the complaint" to him. See A1616; 19-25. He further testified:

> Q.    You understood that Dr. Edelman's complaint had really nothing
>       to do with office space; correct?
> A.    Correct.
> Q.    Her complaint was about the way you spoke to her; right?
> A.    Correct.
> Q.    And you were upset about the fact that she complained and you
>       wanted her gone; correct?
> A.    I was bothered by it.

28

A1623; 5-13; <u>see also</u> A1663; 9-25. Thus, based on Dr. Edelman's testimony, Pacina's HR responsibilities, and Antonik's testimony, the jury could reasonably conclude that Pacina told Antonik that Dr. Edelman's complaint against him was based on gender discrimination and that Antonik was aware of same.[4]

Indeed, although Antonik may have denied calling Dr. Edleman a bitch (A1623; 16-22), the jury could reasonably reject his self-serving testimony as incredible for this or any other reason. The jury could have also rejected Antonik's testimony based on his subsequent retaliatory actions in getting Dr. Edelman fired (<u>see</u>, *infra*). As the District Court expressly instructed, it is in the province of the jury—not the District Court—to reject testimony as untruthful. Further, this Court has found that a jury:

> [C]an find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge. (Emphasis added)

<u>Gordon v. New York City Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000) (rejecting the defendant's argument that "the corporate agents who carried out the adverse action knew of plaintiff's protected activity" and emphasizing that causation may be

---

[4] Indeed, Antonik testified that he escalated the incident with Dr. Edelman by reporting it to his superiors. <u>See</u> A1661; 11-17. Thus, the jury could reasonably infer that Antonik escalated the situation because he realized that he had acted unlawfully.

shown "indirectly, by showing that the protected activity was followed closely by discriminatory treatment"); see also Summa v. Hofstra Univ., 708 F.3d 115, 125-26 (2d Cir. 2013); Kwan v. Andalex Grp., LLC, 737 F.3d 834, 844 (2d Cir. 2013)).

In Gordon, this Court found that "to the extent that the district court charged the jury that the very agents of the Board who engaged in retaliatory actions against Gordon had to know of her protected activity, it erred." Gordon, 232 F.3d at 117. Similarly, in Summa, this Court emphasized that "[t]o the extent that decisionmaker knowledge is relevant in establishing causation, that knowledge may be satisfied by demonstrating that 'the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity acts pursuant to encouragement by a superior (who has knowledge) to disfavor the plaintiff.'" Summa, 737 F.3d at 127 (quoting Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 148 (2d Cir. 2010)).

Thus, like the defendants in Gordon and Summa, NYU's knowledge could also be imputed to Antonik by the jury notwithstanding his denial of same based on his animus and subsequent retaliatory conduct.

Therefore, the jury could reasonably have found that Antonik had knowledge of Dr. Edelman's gender-based discrimination complaint based on his and NYU's subsequent conduct as fully outlined below.

###### ii.    Retaliatory Conduct as Evidence of Knowledge

Finally, Antonik's conduct and the adverse employment actions that Dr. Edelman suffered in the aftermath of filing her complaint with HR further evidence Antonik's knowledge of her gender-based complaint and his retaliatory animus.

In the days, weeks, and months following Dr. Edelman's complaint, Antonik engaged in a series of retaliatory conduct that the jury could reasonably find evidenced his knowledge of the gender-based nature of Dr. Edelman's complaint. For example, the trial record establishes that Miriam Ruiz's log on Dr. Edelman ("the Ruiz log") started shortly after Dr. Edelman filed her complaint, which could show retaliatory animus.[5] See White v. Dep't of Corr. Servs., 814 F. Supp. 2d 374, 390 (S.D.N.Y. 2011) (emphasizing that "[n]egative reactions by an employer to a plaintiff's complaints of discrimination have been deemed indicative of retaliatory animus"); see also Edelman, 2022 U.S. Dist. LEXIS at *34 ("Defendants began making a record of purportedly non-discriminatory reasons to discharge Plaintiff within weeks after she made her discrimination complaint and then fired her at the first opportunity"). At trial, Defendants failed to introduce any other such disciplinary log for any other doctor, thus showing that Antonik and Kaplan were targeting Dr. Edelman after she filed her complaints. Dr. Edelman also testified

---

[5] Ruiz testified that she reported directly to Antonik. See A1248; 17-19.

about how she was never given a negative review until after she filed her complaint with HR, and that, thereafter, Antonik engaged on a campaign of disparagement to collect complaints about Dr. Edelman concluding with her ultimate termination from NYU.

During her direct examination, Dr. Edelman testified:

Q. With the remainder of 2019 and your time at NYU, did you receive any verbal or written performance evaluation for the year 2019?
A. No.
Q. Were any issues raised to you in 2019, either verbal or written, about your performance?
A. No.
Q. And with respect to 2020, was there any performance evaluation done in 2020?
A. No.
Q. Any issues raised to you in 2020?
A. No.

A1236; 23-25-A1237; 1-9.

Dr. Edelman also testified that NYU never gave her a "for cause" reason for her termination. See A1239; 16-18. Rather, Dr. Edelman testified that Dr. Rubin told her that her termination "had nothing to do with [Dr. Edelman's] care as a physician, that [her] patients loved [her] and [she] was a very good doctor. See A1242; 2-4. When asked "Q. Did Mr. Rubin ever tell you that you were being fired for cause" Dr. Edelman testified "A. No." Id. at 13-15.[6]

---

[6] Indeed, during the trial Dr. Rubin testified on re-direct examination that on December 4, 2020, he sent an email of reference to the former dean of the School of Medicine at the University of

32

Dr. Edelman specifically testified:

Q.   I note that the first entry in this log is November 13th, 2019; is that correct?
A.   Yes, there is an entry prior with no date.
Q.   And that's approximately two months after you made your complaint to HR; is that right?
A.   That's correct.
Q.   Are there any other entries prior to that date, any dated entries prior to that date?
A.   No.

A1243; 7-15-A1244; 1-4.

Indeed, the District Court acknowledged in its order granting Defendants' motion for JNOV that "the earliest complaint about Plaintiff's performance was November 13, 2019", after she reported Antonik to HR. See A3348. This is because Dr. Edelman's contract provided that she could only be fired for cause. See A2624. Indeed, Dr. Rubin acknowledged during his direct examination that NYU did not have cause to fire Dr Edelman:

Q:   And you agree with me that Dr. Edelman was not terminated for cause, correct?
A:   I do agree with you.
Q:   And she did not fit any of the for-cause definitions laid out in her contract, right?
A:   Correct.

---

Miami in which he referred to Dr. Edelman "as a very good doctor." See A2065; 19-21; see also A3212-A3213. This email belies NYU's reason for terminating Dr. Edelman based on clinical concerns, (i.e., poor performance), which the jury could conclude was a pretext and that the real reason for her termination stemmed from her complaints about sex-based discrimination.

A1994; 2-7. Rather, NYU waited until her contract expired to terminate her employment. See A2624.

The trial record also contains a chain of emails exchanged between and among, *inter alia*, Antonik, Dr. Porges, and Ms. Ruiz, on or about November 6, 2020 [less than two months before her contract was set to expire] in which Antonik stated that: "David [Kaplan] requested all information on Edelman be sent to him today" (A1254; 21-22); they "need clear convincing summary with examples sent" (A1255; 3-4); and "[i]deally, [they] want recent examples of inappropriate behavior and communicates [sic] between Edelman staff and patients" (A758; 6-8); see also A2878-A2881. These emails were exchanged less than a month before Dr. Edelman received notice of her termination from NYU on or about December 1, 2020. See A1241; 1-5. See also Warmin v. New York City Dep't of Educ., 2019 U.S. Dist. LEXIS 125774, *23-24 (S.D.N.Y. 2019) (emphasizing that a causal connection can be established via temporal proximity when the employer commits an adverse action at the first opportunity); Edelman, 2022 U.S. Dist. LEXIS 176681, at *34 ("While the lapse of a bit more than one year is longer than a typical temporal-proximity case . . . Defendants began making a record of purportedly non-discriminatory reasons to discharge [Dr. Edelman] within weeks after she made her discrimination complaint and then fired her at the first opportunity, when her contract came up for renewal"); Kwan v. Andalex Grp., LLC, 737 F.3d 834, 845 (2d Cir. 2013).

Based on the trial record concerning this series of events that transpired after she filed her complaint with HR, the jury could reasonably infer that Ruiz's log on Dr. Edelman, as well as Kaplan and Antonik's conduct in soliciting and compiling negative performance evaluations and complaints about Dr. Edelman, was a direct result of Dr. Edelman filing the complaint with HR and evidences Antonik's (and Kaplan's) knowledge of the contents of same.

In the aftermath of filing her complaint with HR, NYU ultimately fired Dr. Edelman, without cause. See A1242; 13-15. Based on Dr. Edelman and Pacina's testimony about what transpired after Dr. Edelman complained to HR, a jury could reasonably find a causal connection between Antonik and NYU's knowledge of Dr. Edelman's gender-based discrimination complaint based on the retaliatory actions that followed.

Based on the trial record, the District Court's determination that "the complete absence of evidence that Antonik was aware that Plaintiff had complained about gender discrimination is fatal to her retaliation claims against NYU" is misplaced. See A3382. The evidence demonstrates that—at the very least—a reasonable jury could find in favor of Dr. Edelman on her retaliation claims against Antonik and NYU.

35

**ISSUE II: The District Court Improperly Granted Defendants' JNOV Motion as to Kaplan on Dr. Edelman's Retaliation Claims**

The District Court granted Defendants' JNOV as to Kaplan on Dr. Edelman's retaliation claims because "[t]here [wa]s insufficient evidence in the record for a reasonable jury to conclude that Kaplan had any retaliatory intent or that he had any involvement in any adverse action." See A1342; 21-5. The District Court erred because Dr. Edelman testified about complaint about Kaplan's sexist conduct *to Kaplan himself*, as well as to Pacina, and a jury could reasonably conclude that Kaplan had retaliatory intent. See A1215; 7-19; see also A1216, lines 1-6, 10-19.

Further, the trial record contains ample evidence that Kaplan knew that Dr. Edelman's complaint against Antonik was based on gender discrimination. See A1213; 15-21. Further, the trial record reflects that Kaplan directed Antonik to collect information about Dr. Edelman's inappropriate behavior with "clear and convincing examples", just a month before Dr. Edelman was fired. See A1254-A1255; A758; A2878-A2881. Finally, Kaplan was named as a defendant in this lawsuit, and the trial record is complete with evidence demonstrating that Kaplan retaliated against Dr. Edelman based on her complaint. See A174-A187; see also A1254; 21-22; A1255; 3-4; A758; 6-8; A2878-A2881.

In fact, during their deliberations the jury wrote a note stating: "'We noticed that David Kaplan is mentioned as a Defendant but is not listed under any of the claims. Is there a reason for this?'" (internal citations omitted). See A2578; 6-8. It is

likely that the jury thought that Kaplan retaliated against Dr. Edelman (or else they would never have issued the note) but were impermissibly prevented from rendering judgment against him by the District Court.

Therefore, the District Court erred in granting Defendants' JNOV as against Kaplan.

### ISSUE III: The District Court impermissibly Prevented the Jury from Considering Punitive Damages

Finally, the District Court impermissibly prevented the jury from considering an award of punitive damages on Dr. Edelman's retaliation claims under Title VII and the New York City Human Rights Law. Prior to sending the case to the jury, the District Court granted Defendants' motion for JNOV with regard to Dr. Edelman's claim(s) for punitive damages, holding:

> On damages, defendants are granted judgment on the claim for punitive damages. There is no evidence from which a reasonable jury could find that defendants engaged in gross misbehavior or conduct that willfully or wantonly caused hurt to another or engaged in willful or wanton negligence or reckless conduct or consciously disregarded the rights of the plaintiff.

A2432; 16-22.

The Second Circuit "review[s] de novo the district court's refusal to put the issue of punitive damages to the jury." Farias v. Instructional Sys., 259 F.3d 91, 101 (2d Cir. 2001); see also Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000).

This Court emphasized in <u>Tepperwien v. Entergy Nuclear Operations, Inc.</u> that:

> Punitive damages are available under Title VII where an employer discriminates or retaliates against an employee with "malice" or "reckless indifference" to the employee's federally protected rights. A plaintiff can satisfy this burden by presenting evidence that the employer discriminated (or retaliated) against him with "conscious knowledge it was violating the law," or that it engaged in "'egregious' or 'outrageous' conduct from which an inference of malice or reckless indifference could be drawn."

<u>Id</u>, 663 F.3d 556, 572-73 (internal citations omitted); <u>see</u> <u>also</u> <u>Chauca v. Abraham</u>, 841 F.3d 86, 91 (2d Cir. 2016) ("the standard in the Second Circuit for liability for punitive damages under the NYCHRL require[s] a showing that the defendant had engaged in intentional discrimination and had done so with malice or with reckless indifference to the protected rights of the aggrieved individual").

Here, the District Court, without explanation, held that a reasonable jury could not find willful or wanton negligent or reckless conduct on the part of the Defendants. The District Court impermissibly prevented the jury from making credibility determinations and weighing the evidence with regard to punitive damages and instead substituted its own judgment regarding same. Based on the trial testimony, a jury could reasonably conclude that the Defendants engaged in willful or wanton negligent or reckless conduct and disregarded Dr. Edelman's rights in response to Dr. Edelman filing a gender-based discrimination complaint against Antonik and Kaplan. There is not such a complete lack of evidence with regard to

38

punitive damages that a jury should be prevented from considering same. <u>See</u> <u>McCullock</u>, 61 F.3d at 1044; <u>see also</u> <u>SEC v. Ginder</u>, 752 F.3d 569, 574 (2d Cir. 2014); <u>Tepperwien</u>, 663 F.3d at 557.

Therefore, the District Court improperly granted Defendants' motion for JNOV with regard to punitive damages and, as such, the case should be remanded for a jury to be charged on punitive damages.

### ISSUE IV: The Jury Improperly Determined that Dr. Edelman Failed to Prove that NYU Violated the Federal and New York State Equal Pay Act.

On July 19, 2023, the jury found that Dr. Edelman had not proven her claims against NYU under the Federal Equal Pay Act and New York Labor Law § 194.On December 26, 2023, the District Court denied Dr. Edelman's motion for a judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or for a new trial pursuant to Federal Rules of Civil Procedure 59, in favor of Dr. Edelman on all EPA and the NYLL claims, stating: "In sum, neither a JNOV nor a new trial is warranted on Dr. Edelman's unequal pay claims under the EPA and NYLL. The [District] Court therefore denies Dr. Edelman's motion." (Decision at 24).

For the reasons set forth below, and upon all evidence adduced at trial, Dr. Edelman respectfully appeals to this Court.

## I.     <u>Legal Standards</u>

### A. Rule 50 Standard

While "[t]he law is pellucid that a party's failure to move under Rule 50(a) has consequences[,] [i]f that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice," which "exists where a jury's verdict is wholly without legal support." <u>See</u> <u>Casmento v. Volmar ConsTr., Inc</u>., No. 20-CIV-00944 (LJL), 2022 WL 15773966, at *3-4 (S.D.N.Y. Oct. 28, 2022) (citation omitted). Alternatively, a court may grant a motion for a new trial under Rule 59 "for any reason for which a new trial has heretofore been granted in an action at law in federal court." <u>See</u> Fed. R. Civ. P. 59(a)(1)(A).

This Court should grant Dr. Edelman's request for a motion for judgment as a matter of law under Rule 50(b), or, in the alternative, grant a new trial under Rule 59.

### B. Legal Framework of the Federal and New York State Equal Pay Act

To establish a claim under the EPA, a plaintiff must demonstrate: "(i) that the employer pays different wages to employees of the opposite sex; (ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; (iii) and the jobs are performed under similar working conditions." <u>Eisenhauer v. Culinary</u>

Inst. Of Am., 84 F.4th 507, 523 (2d. Cir. 2023) (quoting Belfi v. Frendergast, 191 F.3d. 129, 135 (2d. Cir. 1999)). If a plaintiff establishes a prima facie claim, the burden then shifts to the employer to show that the wage differential is justified by a disparity via: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex." Alrich v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 524 (2d. Cir. 1992) (quoting 29 U.S.C. § 206(d)(1)) (internal citations omitted). Further, an employer "who attempts to justify a pay differential based on a 'factor other than sex' must also prove that the gender-neutral factor was adopted for a legitimate business reason." Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d. Cir. 1995). If an affirmative defense is established by the employer, a plaintiff may counter the defense with evidence that the employer's reason is a pretext for sex discrimination. Belfi v. Prendergast, 191 F.3d 129, 136 (2d Cir. 1999).[7]

As outlined below, the Court should vacate the jury verdict because the trial record unequivocally establishes that Dr. Edelman and Dr. Modi did equal work but

---

[7] Similarly, New York Labor Law ("NYLL") § 194 employs language "extremely similar to the EPA." Hatzimihalis v. SMBC Nikko Sec. Am., Inc., 2023 U.S. Dist. LEXIS 95248, 2023 WL 3764823, at *4 (S.D.N.Y June 1, 2023). Under the NYLL, the equal pay claim is "analyzed under the same standards to the federal Equal Pay Act." Wu v. Good Samaritan Hosp. Med. Ctr., 815 F. App'x 575, 581 n.5 (2d Cir. 2020) (summary order) (quoting Chiaramonte v. Animal Med. Ctr., 677 F. App'x 689, 690 n.1 (2d Cir. 2017) (summary order)). The key distinction, however, is the "factor other than sex" affirmative defense under NYLL § 194(1), which states the employer must "prove that the pay disparity in question results from a differential based on a job-related factor. Eisenhauer, 84 F.4th at 525. It also requires that the reason for the pay disparity not have a disparate impact on women.

Dr. Edelman earned substantially less and "[m]anifest injustice exists [since the] jury's verdict is wholly without legal support." See Rothstein v. Carriere, 373 F.3d 275, 291 (2d. Cir. 2004).

## II.    Argument

### A.   Dr. Edelman Established a Prima Facie Case of Discrimination under both the Federal and NYS EPA

At trial, the evidence most favorable to NYU supports a finding that Dr. Edelman established a prime facie case. A1293; 20–A1294; 4 (Edelman); A1525; 4-A1526; 7 (Mehta).

### i.    Dr. Edelman and Dr. Modi were Paid Differently

The evidence adduced at trial shows that Dr. Modi earned $360,000.00 in compensation while Dr. Edelman only earned $278,000.00. See A1292; 23- A1293; 5.  Thus, Dr. Edelman clearly met the first prong of her prima facie case under the EPA.

As such, this Court should reverse jury verdict on the grounds that it lacked any evidence to support the jury's findings that NYU paid Dr. Edelman less than Dr. Modi, her male counterpart.

### ii.    Dr. Edelman and Dr. Modi Performed Equal Work

As fully outlined below, the trial record also establishes that Dr. Edelman and Dr. Modi performed equal work requiring equal skill, effort and responsibility. A1293; 20-A1294; 4 (Edelman); A1525; 4-A1526; 7 (Mehta).

42

### a. Dr. Modi and Dr. Edelman's Job Required Equal Skill

"To satisfy this standard, a Plaintiff must establish that the jobs compared entail common duties or content." EEOC v. Port Authority of N.Y. and N.J., 768 F.3d 247, 255 (2d Cir. 2014). Specifically, equal skill is defined as including "such factors as experience, training, education, and ability," as measured "in terms of the performance requirements of the job" at issue. Id.; quoting 29 C.F.R. § 1620.15(a) (emphasis added). In determining whether employees have equal skills under the EPA, the relevant comparison is to the skills required by the job, not a comparison of the skills possessed by individual employees. 29 C.F.R. § 1620.15(a). Possession of a skill not needed to perform a job cannot be considered in making a determination regarding equality of skill. Id.

At trial, the evidence established that Dr. Edelman's duties were substantially similar and common to Dr. Modi's. They both had virtually identical education (they both graduated from the same medical school), experience (they both graduated and had been practicing for about the same amount of time), training and ability (they both went through the same fellowship programs.) See A1274; 2-A1275; 21, A1382; 11-A1383; 3 (regarding Edelman's research experience); A1544; 12-A1545; 5 (Mehta); A2097; 11-A2098; 18 (Rubin); A2345; 9-A2347; 2 (Modi).

The trial record also reveals that Dr. Modi had two extra years of experience and leadership skills (which, Dr. Modi testified he did not use at NYU). See A2346;

20-21 (regarding Modi's experience), A2361; 5-13 (regarding Modi's leadership skills). NYU testified that those skills were imperative in NYU's expansion of its Long Island presence (however, he was not hired or assigned to this responsibility). See A2355; 7-18 (Modi). NYU further testified that these traits justify Dr. Modi's salary. A2026;15-A2027;7 (Rubin). However, this Court has previously found that even ten (10) years of additional experience is insufficient without linking the experience to the difference in pay. Tomka, 66 F.3d at 1312 ("While [Plaintiff's] experience may very well explain the discrepancy, [Defendant] has the burden of persuasion to show both that it *based [Plaintiff's] higher salary on this factor* and *that experience is a job-related qualification for the position in question.* … [Defendant's] mere assertion that [Plaintiff's] salary was based on his experience is insufficient to meet this burden…") (emphasis added). Here, NYU presented no evidence to meet its burden of establishing such a link. In fact, the administrative designation was assigned to Dr. Porges, who made $340,000.00 upon starting with many years more experience than Dr. Modi, and was less than that of Dr. Modi, who made $360,000.00 upon hire. A2073; 20-A2075; 13. (Rubin). Therefore, no reasonable jury could conclude Dr. Modi had higher or greater skill as compared to Dr. Edelman based on the trial record.

### b. Dr. Modi and Dr. Edelman's Jobs Required Equal Effort

Under the EPA, "effort is the physical or mental exertion required in performing a job." See Usery v. Columbia Univ., 568 F.2d 953, 959 (2d. Cir. 1977). At trial, the evidence established that Drs. Modi and Edelman's jobs required substantially equal effort. A1293; 20-A1294; 4 (Edelman), A1525;4-A1526;7 (Mehta). Both doctors were also working on a full-time basis. See A1187; 3-10. Crucially, the trial record is devoid of any evidence that Dr. Modi exerted a greater effort than Dr. Edelman. As such, there can be no dispute that Dr. Edelman and Dr. Modi exerted the same effort in their role as rheumatologists.

It should be noted that at trial, NYU presented evidence concerning wRVUs as a metric of the quantity of production. See A2077; 25-A2079; 12. However, this evidence is an unavailing metric in determining whether Dr. Modi had exerted more effort than Dr. Edelman. In fact, NYU repeatedly presented evidence during trial that there is no correlation between compensation and the number of wRVUs. A1430;l 15-A1431; 2, A2455; 24-A2456; 10. This assertion that Dr. Modi's higher wRVU metric target equates to greater effort is simply unfounded under the law. Moreover, the jury was specifically instructed that that "equal effort" does not require people to use effort in exactly the same way, and that if one job requires additional tasks that consume a significant amount of extra time and effort that the other job does not require, then the jobs do not require substantially equal effort. See A2531; 19-

A2532; 9. As such, even if Dr. Modi saw more patients than Dr. Edelman (i.e., spent less time with each patient), this does not equate to any greater effort on Dr. Modi's part as Dr. Edelman took more time with each patient to understand their needs. See A2332 line 18-A2333 line 4; see also Knox v. John Varvatos Enterprises Inc., 512 F. Supp. 3d 470, 480 (S.D.N.Y. 2021) (finding substantially equal effort based on identical job descriptions).

### c. Responsibility

"The equal pay standard applies to jobs the performance of which requires equal responsibility. Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation. Differences in the degree of responsibility required in the performance of otherwise equal jobs cover a wide variety of situations." See 29 C.F.R. § 1620.17(a).

Dr. Edelman established at trial that she had the same responsibility as Dr. Modi where they were both hired as rheumatologists, to conduct the same job–seeing patients and diagnosing and treating rheumatological diseases. Id.; See also A1174; 10-14, A1188; 21-24, A1471; 1-16 (Edelman); A2354; 18-A2355; 18, A2356; 17-19 (Modi). Moreover, unlike Drs. Goldberg and Porges, whose contracts expressly apportioned their responsibilities to administrative time, Dr. Modi's contract only provided for clinical responsibilities. In fact, the record indicates that

Dr. Modi had no administrative responsibilities at NYU. A2355; 7- 20, A 2369; 16-A2370; 1, A2373; 12-24. Furthermore, there was no evidence in the record that Dr. Modi was hired to build out the Huntington practice. Dr. Edelman's and Dr. Modi's contracts each provide for identical general and clinical responsibilities. Indeed, their general and clinical responsibilities are identical under their contracts under the section aptly entitled "Responsibility." See A2623 and A2625-A2626.

Therefore, there was no indication that Dr. Modi had any greater responsibility than Dr. Edelman. Additionally, Dr. Edelman was available to cover the Huntington location and has worked in that location as part of her contract, but was never offered a full-time position there. See A1434; 14-21 (Edelman), A2075; 22-A2076; 20 (Rubin).

### iii. Dr. Modi and Dr. Edelman's Jobs Were Performed Under Similar Working Conditions

There is no dispute that Dr. Edelman and Dr. Modi performed their jobs under similar working conditions. In fact, in its verdict, the jury properly determined that Dr. Edelman and Dr. Modi had worked under similar working conditions. As a result, Dr. Edelman has satisfied this prong of her EPA claim. See A2597.

Based on the above, and viewed in the light most favorable to NYU, the trial record establishes that Dr. Edelman met her prima facie claim of discrimination under the Federal and NYS EPA. As further outlined below, the trial transcript also establishes that NYU failed to establish any affirmative defenses as a matter of law.

### B. NYU Failed to Establish any Affirmative Defenses Under Federal and NYS EPA

Once Dr. Edelman established her prima facie case, NYU bore the burden of establishing an affirmative defense for the unequal pay of higher wages to Dr. Modi based on (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. See 29 U.S.C. § 206(d)(1) New York Labor Law ("NYLL") § 194(1).

Additionally, unlike the federal EPA, the New York Equal Pay Act requires, with respect to asserting the defense of a bona fide factor other than sex, that the factor shall not be based upon or derived from a differential in compensation based on status within one or more protected class or classes and shall be job-related with respect to the position in question and shall be consistent with business necessity, which is defined as a factor that bears a manifest relationship to the employment in question. It also requires that the basis for the pay disparity not have a disparate impact on women. See NYLL §§ 194(1)(b)(iv) and 194(2)(a). Defendants failed to prove any affirmative defense for a multitude of reasons as it relates to the pay disparity between Dr. Edelman and Dr. Modi.

At trial, NYU produced evidence that the reason it paid Dr. Modi more was because (i) Dr. Modi earned a higher salary at his prior job; and (ii) Dr. Modi had a higher wRVU target than Dr. Edelman. A2349; 9-13 (Modi), A1423; 14-16

48

(Edelman). However, none of these facts constitute a "factor other than sex" to support the pay differential under the federal and state EPA.

### i. Dr. Modi's Prior Pay is an Unavailing Defense

Dr. Modi's prior pay has no bearing on his work at NYU and cannot constitute a legitimate bona fide factor other than sex defense. See Belfi, 191 F.3d 129 at 136. ("…to successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential"); see also Aldrich, 963 F.2d at 525-27 & n. 1 ("Without a job-relatedness requirement, the factor-other-than-sex defense would provide a gaping loophole in the statute through which many pretexts for discrimination would be sanctioned"); EEOC v. J.C. Penny Co., Inc., 843 F.2d 249, 253 (6th Cr. 1988) ("[T]he 'factor other than sex' defense does not include literally any other factor, but a factor that, at a minimum, was adopted for a legitimate business reason")).

In addition, the New York Equal Pay Act (unlike the federal EPA) provides specific examples of what a bona fide factor other than sex includes, i.e., education, training, or experience. Prior pay is not listed as any such example, nor could it be. Education, training, and experience are all factors that bear some relationship to the work being performed; prior pay can never bear any such relationship. As such, prior

pay is not a bona fide factor other than sex that justifies a pay disparity under the New York Equal Pay Act.

NYU failed to meet the job-related requirement to support a justification for the gender-based pay disparity because Dr. Modi's prior pay is not enough by itself to bridge the pay gap where both the male and female doctors have the same credentials and are performing the same work under the same working conditions. Dr. Modi and Dr. Edelman are rheumatologists, saw patients, were full-time, but were paid vastly different salaries without any justification or business necessity.

Permitting NYU to justify their compensation practices will only perpetuate the pay disparity between men and women, as the Supreme Court long ago declared. See Corning Glass Works v. Brennan, 417 U.S. 188 (1974).

The trial record is also devoid as to why Dr. Modi's pay was substantially higher than Dr. Edelman's pay, except that Dr. Modi was earning $340,000.00 at his current job and wanted $360,000.00 to come to NYU. See A1423; 1-9 (Edelman), A1803; 10-13 (Swirnow), A2088; 15-A2089; 3 (Rubin). Meanwhile, Dr. Edelman received $207,000.00, well below her requested compensation of $260,000.00. See A1174; 7-9 (Edelman). Additionally, NYU offered no evidence that prior pay alone determined compensation.

### ii.  Dr. Modi's RVU Target is an Unavailing Affirmative Defense

At trial, NYU also presented evidence that Dr. Modi's wRVU target was substantially higher than Dr. Edelman's, justifying Dr. Modi with a higher salary. As a preliminary matter, NYU repeatedly presented evidence during trial that there is no correlation between compensation and the number of wRVUs. See A1430; 15-A1431; 2, A2455; 24-A2456; 10. In fact, Dr. Raminfard was paid $265,000.00 to meet a wRVU metric target of 3,900 and Dr. Goldberg was paid $290,000.00 to meet a wRVU metric target of 3,481. The lack of correlation, as testified by NYU, between pay and wRVU metrics between similarly situated employees provides no basis for a jury conclusion that Dr. Modi was paid more than Dr. Edelman because his wRVU target was 6,100 and Dr. Edelman's was 5,200. See generally A1866; 10-17. Moreover, a prior wRVU target differential that is not derived but rather adopted from prior working conditions cannot be used to satisfy the "bonafide factor other than sex" requirement as intended by the NYLL. See NYLL § 194(1)(d).

In fact, wRVUs could not form any basis for the pay differential under the law so there was no established system at NYU correlating wRVUs with pay. As a result, the District Court specifically rejected NYU's request for a "system of quality/quantity" jury instruction on the grounds that there was insufficient evidence in the trial record to support such a defense. See A2443; 6-19. Any evidence of a differential in wRVU production cannot create an affirmative defense justifying any

pay disparity between Dr. Edelman and Dr. Modi since the jury was never instructed to consider "a system which measures compensation by quantity ...." <u>See</u> 29 U.S.C. § 206(d)(1); NYLL § 194(1).

As such, NYU cannot now claim that the jury verdict was properly based on a wRVU system measuring the quantity of production.

In addition, the record also fails to establish a factor other than sex that NYU knew of Dr. Modi's wRVU production prior to his hiring. There was no testimony that Dr. Modi told NYU about his wRVU production prior to his hiring at NYU. So wRVUs could not have served as part of NYU's calculus in determining Dr. Modi's higher pay.

**Issue V: The District Court Judge Erred in its NYLL Jury Instructions**

Unlike the Federal EPA, the New York Equal Pay Act provides that any affirmative defense based on a bona fide factor other than sex may be inapplicable in certain circumstances. More specifically, such a defense does not apply when the employee demonstrates: (a) that an employer uses a particular employment practice that causes a disparate impact on the basis of sex, (b) that an alternative employment practice exists that would serve the same business purpose and not produce such differential, and (c) that the employer has refused to adopt such alternative practice. <u>See</u> NYLL § 194(1)(d). This portion of the law was never provided to the jury by the District Court which constitutes more than harmless error. "An erroneous

instruction requires a new trial unless the error is harmless." <u>United States v.</u> <u>Masotto</u>, 73 F.3d 1233, 1237 (2d Cir. 1996).

Dr. Edelman and NYU filed their proposed joint jury instructions with the District Court on April 3, 2023. ECF Docket No. 196. On July 11, 2023, the parties engaged in a Charge Conference with the District Court where the District Court ordered clarification concerning the applicability of statistics and <u>Griggs v. Duke</u> <u>Power Co. Inc</u>., 401 U.S. 424 (1971) ("Griggs") to the New York Labor Law ("NYLL") § 194 claims and its disparate impact exclusion to a "bona fide" factor other than sex defense. Dr. Edelman filed her jury instructions that included a request for a disparate impact charged via letter to the District Court. ECF Docket No. 232; <u>See</u> <u>also</u> A1044-A1049. On July 17, 2023, Dr. Edelman filed a supplemental letter brief in support of her disparate impact charge. ECF Docket No. 237; <u>See</u> <u>also</u> A081; 1083. On July 18, 2023, the District Court denied Dr. Edelman's disparate impact charge stating that there was insufficient evidence in the record from which the jury could find that there was disparate or adverse impact due to the "relevant universe and with respect to the small sample size." A2427; 15-20. The District Court's holding is incorrect and the jury should have been instructed as to the law under NYLL § 194(1)(d).

At trial, the record established that the NYU rheumatology department consisted of five (5) doctors – three (3) male full-time doctors who earn more than

the two (2) female full-time doctors. A1897; 12-16. The District Court improperly decided against instructing the jury concerning the disparate impact that Defendants' compensation scheme has on compensation for females, both with onboarding physicians from private practice with the use of business plans and with renewing employment agreements by negotiating an artificial wRVU target. See A2427; 15-20. The record also established that an alternative pay system existed that would not produce the pay disparity (i.e., pay based on years of experience) but that NYU refused to adopt an alternative pay scheme. A1999; 2-15. Dr. Edelman requested such an instruction based on the fact that NYU's pay practices had a disparate impact on the two (2) female doctors in the practice, Dr. Edelman and Dr. Mehta. See ECF Docket No. 237; A1044-1049. But the District Court improperly rejected Dr. Edelman's argument.

The District Court reasoned that the sample size was too small. See A2427; 15-20. This failure to instruct the jury was more than harmless error since the Court failed to give the jury proper law as to whether NYU's affirmative defense was applicable or inapplicable. See Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994) (holding that a "jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."); see also Masotto, 73 F.3d at 1238 ("An erroneous instruction requires a new trial unless the error is harmless.")

54

To make out a prima facie disparate impact case involving a facially neutral policy, a plaintiff therefore must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." <u>Chin v. Port Auth. of N.Y. & N.J.</u>, 685 F.3d 131, 151(2d. Cir. 2012) (citation omitted).

At trial, the evidence demonstrated that: (i) NYU's practice was to use a prospective doctor's current pay as a basis to negotiate their incoming pay at NYU. A-2096; 5-10 (ii) a pay disparity existed between the male doctors and the female rheumatology doctors at NYU. A2026; 9-A2027; 13 (Rubin testimony showing a clear absence of evidence to support that NYU established that the pay disparity was due to a factor other than sex); and (iii) a causal relationship existed between the doctors prior pay and the pay disparity because it continues to perpetuate the pay disparity between male and female workers that exists. <u>See</u> https://www.bls.gov/opub/reports/womens-earnings/2020/home.htm (finding by U.S. Bureau of Labor Statistics that in 2020, women who were full-time wage and salary workers had median usual weekly earnings that were 82 percent of those of male full-time wage and salary workers).

Furthermore, contrary to the District Court's reasoning concerning a small sample size, courts have held that "at least "when there is a small number of employees, anecdotal evidence alone can suffice" to survive summary judgment and

even to impose liability after a trial. Sidor v. Reno, 95 CIV. 9588 (KMW), 1997 U.S. Dist. LEXIS 14260, 1997 WL 582846, at *10 (S.D.N.Y. Sept. 19, 1997); see United States v. City of New York, 713 F. Supp. 2d 300, 318 (S.D.N.Y. 2010) (concluding, after a bench trial, that anecdotal evidence was sufficient to show a pattern of gender-based discrimination among bridge painters employed by New York City's Department of Transportation); see also Stoler v. Inst. for Integrative Nutrition, 13 Civ. 1275, 2013 U.S. Dist. LEXIS 163796, 2013 WL 6068598, at *7 (S.D.N.Y. Nov. 18, 2013) ("In class actions such as this, individual and class issues are not readily separated. Evidence of company-wide policies of discrimination strengthen individual discrimination claims and vice versa."). It follows that allegations of a sufficient number of instances of discrimination may permit a plausible inference that discrimination was the defendant's standard operating procedure, even if the defendant is a multinational company." Barret, 39 F. Supp. 3d at 430 (citations included).

In fact, the Supreme Court and the New York State Court of Appeals have applied disparate impact in small sample sizes such as jury selection where "facially-neutral grounds for peremptory challenges that have a disparate impact on protected classes are inherently suspect and should be treated as presumptive surrogates for discrimination at step three of the Batson analysis." People v Hecker, 15 N.Y.3d 625,

634 <u>citing</u> <u>Batson v Kentucky</u>, 476 US 79, 106 S Ct 1712, 90 L Ed 2d 69.  <u>See</u> <u>also</u>

<u>People v Allen</u>, 86 NY2d 101, 653 NE2d 1173, 629 NYS2d 1003.

Thus, in giving the wrong jury instruction to the Jury, the District Court erred

and the verdict must be vacated and a new trial must be held on the NYS EPA claim.

**CONCLUSION**

Therefore, Dr. Edelman respectfully requests that this Court: reverse the

District Court's grant of JNOV in favor of the Appellees-Defendants and reinstate

the jury's verdict in favor of Dr. Edelman on her retaliation claims as against NYU

and Antonik; and grant Dr. Edelman's request for a motion for judgment as a matter

of law under Rule 50(b) with respect to the federal and state EPA claims, or, in the

alternative, grant a new trial under Rule 59.

Dated: Lake Success, NY
     May 8, 2024

**MILMAN LABUDA LAW GROUP PLLC**
By: <u>/s/ Joseph M. Labuda</u>
Joseph M. Labuda, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (fax)
joe@mllaborlaw.com
*Attorneys for Plaintiff-Appellant Dr. Sari Edelman*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,868 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.


Dated: Lake Success, NY
     May 8, 2024

            **MILMAN LABUDA LAW GROUP PLLC**
By: /s/ Joseph M. Labuda
Joseph M. Labuda, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (fax)
joe@mllaborlaw.com
*Attorneys for Plaintiff-Appellant Dr. Sari Edelman*

# SPECIAL APPENDIX

## **Table of Contents**

**Page**

Judgment of the United States District Court, Southern District of
New York, so-ordered on July 26, 2023 (Docket No. 260) ........   SPA1

Opinion and Order of the Honorable Lewis J. Liman,
dated December 26, 2023 (Docket No. 292) ............................   SPA2

Judgment of the United States District Court, Southern District of
New York, dated December 26, 2023 (Docket No. 293) ..........   SPA50

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
DR. SARI EDELMAN,

<table>
<tr><td></td><td>Plaintiff,</td><td>21 <strong>CIVIL</strong> 502 (LJL)</td></tr>
</table>

                  -against-                                     **JUDGMENT**

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF
MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER,
ANDREW T. RUBIN, DAVID KAPLAN,
JOSEPH ANTONIK, and JOSHUA SWIRNOW,

                                Defendants.
-----------------------------------------------------------X

         It is hereby **ORDERED, ADJUDGED AND DECREED:** That after a Jury

Trial before the Honorable Lewis J. Liman, United States District Judge, Plaintiff Dr. Sari

Edelman has judgment for damages in the sum of $700,000.00 for front pay as against the

defendants.

**DATED:** New York, New York
        July 26,  2023

                                      **RUBY J. KRAJICK**
                                      _____
**So Ordered:**                            **Clerk of Court**

                               **BY:**    K. mango
_____            _____
       **U.S.D.J.**                             **Deputy Clerk**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #:_____ | |
| DATE FILED: 12/26/2023 | |

---------------------------------------------------------------X
:
DR. SARI EDELMAN,                                            :
                                                            :
                             Plaintiff,                      :
                                                            :                    21-cv-502 (LJL)
                -v-                                          :
                                                            :                 OPINION AND ORDER
NYU LANGONE HEALTH SYSTEM, NYU                               :
LANGONE HOSPITALS, NYU LANGONE MEDICAL                       :
CENTER, NYU LANGONE NASSAU                                   :
RHEUMATOLOGY, NYU SCHOOL OF MEDICINE,                        :
NYU GROSSMAN SCHOOL OF MEDICINE, NYU                         :
HOSPITALS CENTER, ANDREW T. RUBIN, DAVID                     :
KAPLAN, JOSEPH ANTONIK, and JOSHUA                           :
SWIRNOW,                                                     :
                                                            :
                             Defendants.                     :
                                                            :
---------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Sari Edelman ("Plaintiff") and defendants NYU Langone Health System, NYU

Langone Hospitals, NYU Langone Medical Center, NYU Langone Nassau Rheumatology, NYU

School of Medicine, NYU Grossman School of Medicine, and NYU Hospitals Center

(collectively, "NYU"), and Andrew T. Rubin, David Kaplan, Joseph Antonik, and Joshua

Swirnow (together with NYU, "Defendants") cross-move for judgment as a matter of law,

pursuant to Federal Rule of Civil Procedure 50(b), or for a new trial or remittitur, pursuant to

Federal Rule of Civil Procedure 59.  Dkt. Nos. 267, 271.

For the following reasons, Plaintiff's motion is denied and Defendants' motion for

judgment as a matter of law is granted.

**SPA3**

## BACKGROUND

The Court discusses only the evidence adduced at trial that is relevant to the instant motions and, in each instance, in the light most favorable to the non-moving party.

Plaintiff is a rheumatologist.  Trial Tr. 49:25.  She graduated from the New York College of Osteopathic Medicine in 2003.  *Id.* at 50:3–9.  She subsequently performed her residency and a fellowship at Winthrop University Hospital.  *Id.* at 52:12–15.  Upon completing her fellowship in 2008, Plaintiff and a colleague from Winthrop, Dr. Kavini Mehta, went into private practice together, opening their own rheumatology office in Lake Success, New York, on Long Island. *Id.* at 54:10–19, 57:5–21.

In 2014, NYU sought to expand its rheumatology network to Long Island.  The first rheumatologist NYU hired on Long Island was Dr. Avram Goldberg, who worked next door to Plaintiff and Dr. Mehta.  *Id.* at 68:17–25.  Dr. Goldberg approached Plaintiff and Dr. Mehta about joining NYU.  *Id.* at 68:14.  Excited by the opportunity, Plaintiff and Dr. Mehta interviewed with Rubin and Swirnow, who were senior administrators at NYU in Manhattan.  *Id.* at 70:25–71:3.  Rubin was Vice President of Clinical Affairs and Ambulatory Care, *id.* at 867:15–17, and Swirnow was Assistant Vice President for Clinical Affairs and Business Development, *id.* at 644:12–18.  NYU hired Plaintiff and Dr. Mehta and took over their Lake Success office.  *Id.* at 73:25–74:2, 77:20.

Plaintiff entered into a three-year contract with NYU to serve as an assistant professor of medicine and staff physician.  *Id.* at 80:23–81:1, 82:11–12.  During the term of her contract, NYU could only terminate Plaintiff for cause.  *Id.* at 83:13–15.  The contract also contained a target relative value unit ("RVU") for Plaintiff.  *Id.* at 87:25, 88:7–10.  RVUs are government-created metrics that reflect the relative time and difficulty of medical procedures for purposes of Medicare billing.  *Id.* at 84:24–85:14.  NYU tracked its physicians' RVU outputs to measure

## SPA4

their productivity and performance.  *Id.* at 85:18–24.  Plaintiff's target RVU was 4,996.  *Id.* at 87:25, 88:7–10.

Initially, NYU's acquisition of Plaintiff's private practice was seamless, at least from an administrative perspective.  While the sign on the door changed, Plaintiff continued to work out of the same office with Dr. Mehta and their existing staff.  *Id.* at 79:5–19.  However, new NYU personnel soon joined the Lake Success location.  First, Dr. Goldberg began to practice alongside Plaintiff and Dr. Mehta there.  *Id.* at 93:21–23.  NYU also installed Dr. Andrew Porges at the Lake Success site as its medical director.  *Id.* at 93:24–25, 762:10–12.  And administrative staff arrived to help manage the office—including Kaplan, the senior site director, and Antonik, an office manager who reported to Kaplan.  *Id.* at 110:2–17.

NYU's expansion of its rheumatology network on Long Island was not limited to Lake Success.  While NYU's medical facility in Huntington, New York, had a large patient population, the facility did not offer rheumatological care.  *Id.* at 937:25–938:2.  Rubin, Swirnow, and other senior administrators were eager to recruit a rheumatologist to establish a practice in Huntington and fill that gap.  *Id.* at 737:20–25, 938:1–7.  NYU did so in February of 2017, when it hired Dr. Anang Modi.  *Id.* at 199:13–19.  Like Plaintiff, Dr. Modi attended the New York College of Osteopathic Medicine and then completed his residency and a rheumatology fellowship at Winthrop University.  *Id.* at 1009:8–18, 1256:19–17.  But Dr. Modi earned his degree two years ahead of Plaintiff.  *Id.* at 1257:20–21.  And, following his fellowship, he joined the Queens Long Island Medical Group, a healthcare provider with over 500 physicians that was subsequently acquired by Advantage Care Physicians.  *Id.* at 1257:3–17, 1273:4–9.  Dr. Modi was the medical director of its Hempstead office, where he practiced rheumatology and supervised a team of fifteen physicians.  *Id.* at 1273:9–14.  Based on his

experience and strong reputation, Rubin and Swirnow believed Dr. Modi was an ideal candidate to join NYU's Huntington facility. *Id.* at 737:17–25; 937:20–938:4. Dr. Modi's contract with NYU set his salary at $360,000 and his target RVU at 6,108. *Id.* at 738:10–21.

In 2017, prior to the expiration of her initial contract, Plaintiff and NYU agreed to renew her contract for another three-year term, beginning January 1, 2018. *Id.* at 107:14–21. Plaintiff's renewed contract increased her salary to $278,000 and RVU target to 5,200. *Id.* at 107:22–108:4. Shortly after her renewed contract went into effect, Plaintiff began to spend one day per week seeing patients at NYU's Huntington facility and the remainder of her time at the Lake Success site. *Id.* at 108:12–18, 112:15.

In the late afternoon of September 16, 2019, Antonik approached Plaintiff in her Lake Success office. *Id.* at 110:21–111:1. With the door closed, he informed her that because NYU had hired a new rheumatologist, another physician would need to use Plaintiff's office two days per week. *Id.* at 111:9–17, 114:25. Plaintiff replied that she believed her contract entitled her to full-time use of an office and that she would need to review the contract with her attorneys. *Id.* at 112:7–15. Antonik grew animated at Plaintiff's response. *Id.* at 112:18. According to Plaintiff, although both Antonik and Plaintiff were seated, Antonik moved his chair closer to Plaintiff. *Id.* at 112:20–3. He then raised his arms and pointed at pictures and other personal belongings on Plaintiff's desk, stating that Plaintiff did not own the office just because she put her stuff there. *Id.* at 113:6–12. It all belongs to NYU, he said, this whole office and we own you. *Id.* at 113:12–14. Plaintiff later testified at trial that Antonik uttered the word "bitch" under his breath during this conversation. *Id.* at 113:16. In his testimony, Antonik denied using that word. *Id.* at 530:18. Plaintiff backed up and told Antonik he needed to leave. *Id.* at 113:15–19.

He did.  *Id.* at 113:20.  Plaintiff, who is smaller than Antonik, felt upset and intimated by the confrontation.  *Id.* at 113:22–114:2, 115:18–21.

The following day, Plaintiff called Kathleen Pacina—a Human Resources ("HR") manager responsible for handling performance problems, employee disputes, and other issues, *id.* at 1087:2–15—to complain about the incident, *id.* at 116:18–24.  Plaintiff described what had transpired.  *Id.* at 117:6–7.  As she was senior to Antonik and had been at the Lake Success location longer than he had, she stated that she found his conduct and demeanor profoundly disrespectful.  *Id.* at 117:15–22.  Plaintiff also characterized Antonik's behavior as sexist, discriminatory, and chauvinistic.  *Id.* at 117:4–5.  Pacina took notes during their conversation, assigned the complaint a case number, and said she would get back to Plaintiff.  *Id.* at 117:8–10.

Pacina's notes indicate that Plaintiff described how Antonik "thr[ew] his arms and point[ed] at things" and stated he would "bring this up to the powers that be."  Plaintiff's Ex. 21.  The notes also reflect that Plaintiff said she found Antonik's conduct "intimidating" and that their encounter made Plaintiff "very uncomfortable."  *Id.*  But Pacina's notes did not mention sexism, discrimination, or chauvinism.  *See id.*  And Pacina later testified at trial that she did not understand Plaintiff's complaint to concern the way she was treated vis-à-vis her gender.  Trial Tr. 1100:23–25.

Pacina followed up on Plaintiff's complaint by speaking to Antonik about the incident.  *Id.* at 523:11–15.  That conversation was when Antonik first learned about Plaintiff's complaint.  *Id.* at 523:16–18.  Antonik explained his perspective on what had occurred to Pacina.  *Id.* at 523:23–524:1.  Pacina again took notes.  *Id.* at 1107:23–1108:2.  Those notes state that Antonik denied raising his arms, but acknowledged that he said he would take the issue up with the "powers that . . . be" after Plaintiff said to contact her lawyers regarding her entitlement to an

office.  Plaintiff's Ex. 21.  Antonik told Pacina the office request was not personal to Plaintiff, as

many doctors at NYU had to share their space.  *Id.*

Kaplan reached out to Plaintiff on September 25, 2019.  Trial Tr. 118:14–19.  He

apologized for what had happened with Antonik but explained that NYU had reviewed her

contract and confirmed that she was not entitled to an office five days a week, so she would need

to share her space on Thursdays and Fridays.  *Id.* at 120:15–21.  Plaintiff became frustrated and

refused to discuss the topic further.  *Id.* at 121:5–10.  Kaplan asked her to calm down.  *Id.* at

122:8–9.  Plaintiff considered Kaplan's comment sexist and ejected him from her office.  *Id.* at

122:10–14.  Later that night, Plaintiff emailed Pacina, stating that Kaplan had spoken to her in a

condescending tone, *id.* at 125:13–15, and that she was "disappointed that it is 2019, approaching

2020, in a major hospital organization in New York, and [she] still ha[d] to contend with male

chauvinism," *id.* at 126:5–7.

Swirnow called Plaintiff two days later.  *Id.* at 128:10–14.  They agreed Plaintiff would

no longer go to the Huntington facility and that she could use her Lake Success office five days a

week.  *Id.* at 130:24–131:5.  Plaintiff told Swirnow that she would nevertheless maintain her HR

complaint.  *Id.* at 131:6–16.  Swirnow unenthusiastically assented.  *Id.* at 131:17–19.

Plaintiff and Pacina continued to correspond via email regarding Plaintiff's complaint

throughout October and November of 2019.  *Id.* at 133:8–137:9.  During that time, despite

Swirnow's assurances that Plaintiff could keep her Lake Success office full time, Antonik and

Kaplan notified Plaintiff that they were going to move another doctor into her office on

Thursdays.  *Id.* at 137:13–19.

In 2020, as her contract neared the end of its term, Plaintiff contacted Rubin about

renewing her contract with NYU.  *Id.* at 147:6–9.  Rubin responded that NYU would let her

know its plans. *Id.* Meanwhile, NYU had commenced internal deliberations regarding Plaintiff's performance. Miriam Ruiz, the office manager who oversaw Plaintiff's suite, notified her supervisor, Antonik, regarding several issues with Plaintiff's work. *Id.* at 500:18–501:8, 580:18–19, 810:23–24. When Antonik raised those issues with his supervisor, Kaplan, *id.* at 500:18–501:8, Kaplan asked Antonik for more information, *id.* at 500:7–9, 501:9–13. Antonik emailed Dr. Porges and Ruiz, stating that Kaplan "requested all information on Edleman [sic] to be sent to him today. We need a clear, convincing summary with examples sent." Plaintiff's Ex. 86 at 2. Ruiz later testified that she maintained a spreadsheet for each doctor in her suite, noting issues they had and complaints against them. Trial Tr. 821:21–24. However, the earliest entry on Ruiz's spreadsheet regarding Plaintiff was dated November 13, 2019. *Id.* at 150:5–9. Based on Kaplan's request, Ruiz provided the spreadsheet she maintained on Plaintiff to Antonik. *Id.* at 826:12–13. Antonik drafted Ruiz's spreadsheet entries into an email that he sent to Dr. Porges. *Id.* at 504:24–505:2. Dr. Porges then sent an email to Kaplan, explaining that he had received frequent complaints from clinical and administrative staff about Plaintiff—including about her treatment of other NYU employees and her excessive test and x-ray orders—and providing the issues Antonik had compiled. *See* Plaintiff's Exs. 1, 86; Trial Tr. 504:24–505:2, 612:6–9. Kaplan forwarded Dr. Porges's message to Swirnow. Trial Tr. 616:15–18. When he later spoke to Kaplan, Swirnow said that he and Rubin would "take it from here." *Id.* at 617:17–21. Swirnow and Rubin spoke to Dr. Porges about his concerns with Plaintiff. *Id.* at 677:10–12, 886:2–10. Swirnow and Rubin also spoke to Dr. Goldberg, who echoed Dr. Porges clinical concerns with Plaintiff's performance. *Id.* at 677:15, 762:22–763:1, 886:2–10. Both Dr. Porges and Dr. Goldberg stated that they did not believe mentoring could resolve Plaintiff's performance issues. *Id.* at 762:18–763:3. Rubin spoke to other clinicians as well regarding

# SPA9

Plaintiff. *Id.* at 893:1. Ultimately, Rubin decided not to renew Plaintiff's contract. *Id.* at 905:13–15.

NYU sent Plaintiff a letter in early December 2020, informing her that it would not renew her employment contract. *Id.* at 147:23–148:5. Plaintiff called Rubin, who told her that NYU had decided to go in a different direction, but he offered to help her find a new position. *Id.* at 148:19–149:7. After searching for a new job, Plaintiff accepted a position in Clearwater, Florida as a rheumatologist with the Arthritis and Rheumatism Associates on February 16, 2021. *Id.* at 228:25–229:21.

## PROCEDURAL HISTORY

Plaintiff filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission on January 5, 2021. Dkt. No. 1 ¶ 58. She commenced the instant suit against the Defendants on January 20, 2021. *See* Dkt. No. 1. Plaintiff filed a first amended complaint on January 22, 2022. Dkt. No. 96. Her first amended complaint claimed violations of equal pay protections as well as discrimination and retaliation. *See id.* ¶¶ 60–112. Defendants moved for summary judgment on all of Plaintiff's claims on February 18, 2022. Dkt. No. 108. On September 28, 2022, the Honorable Lorna G. Schofield, to whom the case was then assigned, granted Defendants' motion for summary judgment in part and denied it in part. Dkt. No. 155. Specifically, Judge Schofield granted Defendants summary judgment on Plaintiff's discrimination claims under federal and state law. *Id.* at 33. But the Court ruled that Plaintiff had adduced sufficient evidence to proceed on: her federal unequal pay claims against NYU, Swirnow, and Rubin; her Title VII retaliation claim against NYU; her New York state and New York City retaliation claims against Defendants; and her discrimination claim under New York City law based on allegedly sexist remarks. *Id.*

With leave of the Court, Dkt. No. 169, Plaintiff filed the operative Second Amended Complaint on December 8, 2022, Dkt. No 170.  The Second Amended Complaint added an unequal pay claim against the Defendants under New York state law.  *Id.* ¶¶ 58–62.

On June 7, 2023, the case was reassigned to the undersigned.  After ruling on the parties' motions *in limine*, Dkt. Nos. 221, 224, the Court held an eight-day jury trial beginning on July 10, 2023.  At the close of Plaintiff's case on July 18, 2023, Defendants moved for judgment as a matter of law ("JMOL"), pursuant to Federal Rule of Civil Procedure 50(a).  Trial Tr. 1298:6–1309:13.  Plaintiff opposed that motion.  *Id.* at 1309:24–1330:3.  After taking the matter under advisement, the Court granted JMOL to Defendants on the willfulness of their alleged violations of federal and state equal pay laws.  *Id.* at 1342:7–20.  Additionally, the Court granted JMOL on Plaintiff's retaliation claims against Kaplan, *id.* at 1342:21–22, explaining "[t]here is insufficient evidence in the record for a reasonable jury to conclude that Kaplan had any retaliatory intent or that he had involvement in any adverse action," *id.* at 1342:22–25.  The Court also granted JMOL in favor of Kaplan, Rubin, and Swirnow on Plaintiff's discrimination claims.  *Id.* at 1343:1–15.  Finally, the Court granted JMOL on punitive damages, as Plaintiff had adduced no evidence from which a reasonably jury could find Defendants engaged in sufficiently culpable misconduct.  *Id.* at 1343:16–22.

Following the close of evidence and the parties' summations, the Court charged the Jury on each of Plaintiff's claims.  *Id.* at 1439:24–1446:21 (Equal Pay Act), 1447:1–1450:13 (New York Labor Law), 1450:14–1456:13 (Title VII retaliation), 1456:14–1463:3 (New York State Human Rights Law retaliation), 1463:4–2468:21 (New York City Human Rights Law retaliation), 1468:22–1470:10 (New York City Human Rights Law discrimination).

On July 20, 2023, the Jury returned its verdict. Dkt. No. 243. First, the Jury found that Plaintiff had not proven that her job at NYU required substantially equal skill, effort, and responsibility to any of her three male comparators—namely, Dr. Goldberg, Dr. Porges, and Dr. Modi. *Id.* at 1. The Jury further found that Plaintiff had proven she performed her job under similar working conditions to those comparators, but that she had not proven she was paid less than any of those men for doing substantially equal work. *Id.* at 1–2. Moreover, the Jury found that Defendants had proven that differences in pay between Plaintiff and her male comparators were based on factors other than sex for purposes of both her federal and New York state unequal pay claims. *Id.* at 2.

As for Plaintiff's discrimination claim, the Jury found that Plaintiff failed to prove that NYU or Antonik intentionally discrimination against her based on her gender by making sexist remarks. *Id.* at 6.

Finally, the Jury returned a verdict in Plaintiff's favor on her retaliation claims under federal, state, and city law. The Jury found Plaintiff had proven that she engaged in a protected activity under federal law and that NYU had taken adverse action against her because of that protected activity. *Id.* at 3. Likewise, the Jury determined that Plaintiff had proven that NYU committed an adverse act against her because of her protected conduct under state law, and that Antonik—but not Rubin or Swirnow—aided or abetted NYU's retaliation. *Id.* at 4. And the Jury found that NYU and Antonik, though not Rubin or Swirnow, engaged in conduct that was motivated at least in part by Plaintiff's protected activity, that NYU and Antonik's conduct was would reasonably likely deter a person from engaging in that protected activity, and that Antonik aided or abetted retaliatory conduct. *Id.* at 4–5. The Jury calculated Plaintiff's damages for her retaliation claims to be $700,000 in front pay. *Id.* at 7.

# SPA12

The Court entered Judgment in accordance with the Jury's verdict on July 26, 2023.  Dkt. No. 260.

The parties filed the instant cross-motions under Federal Rules of Civil Procedure 50 and 59 on August 23, 2023, Dkt. Nos. 267, 271, along with accompanying memoranda of law and declarations, Dkt. Nos. 269–270, 272–273.  The parties subsequently filed oppositions and replies, as well as supporting memoranda and declarations.  Dkt. Nos. 276–283.  On December 8, 2023, the Court heard oral argument on the motions.

## LEGAL STANDARD

The moving party's burden on a motion pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law is "particularly heavy" when the "jury has deliberated in the case and actually returned its verdict."  *Cross v. N.Y.C. Trans. Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).  The court may grant judgment as a matter of law only if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party."  Fed. R. Civ. P. 50(a)(1).  "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'"  *SEC v. Ginder*, 752 F3d 569, 574 (2d Cir. 2014) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).  A judgment notwithstanding the verdict ("JNOV") "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]."  *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (alterations in original) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).  A JNOV motion under Rule 50(b) "should be granted only if the court can conclude that, with credibility

## SPA13

assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Id.* at 113 (quoting *Fairbrother v. Morrison,* 412 F.3d 39, 48 (2d Cir. 2005)). "The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir. 1988)); *see also ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

"A post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004). In the initial motion for judgment on the law, the moving party "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). "[T]he specificity requirement is obligatory." *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012) (citation omitted). The initial motion for judgment as a matter of law "must at least identify the specific element that the defendant contends is insufficiently supported." *Tolbert*, 242 F.3d at 76. However, "[t]he ultimate question is whether the motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 287 (2d Cir. 1998); *see also Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 14 (2d Cir. 1993) ("[T]he rule gives the party against whom the motion for [JNOV]  is made notice of defects in its proof so that it can cure them before the case goes to the jury.").

Because Federal Rule of Civil Procedure 50(b) merely permits a party to "renew" its motion after an unfavorable verdict, "'[t]he posttrial motion is limited to those grounds that were

specifically raised in the prior motion for [JMOL]'; the movant is not permitted to add new grounds after trial." *Tolbert*, 242 F.3d at 70 (quoting *McCardle v. Haddad,* 131 F.3d 43, 51 (2d Cir.1997)).  "A Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter." *Lore*, 670 F.3d at 152–53; *see also Barkley v. Olympia Mortg. Co.*, 557 F. App'x 22, 27 (2d Cir. 2014) (summary order) ("A post-verdict motion for JMOL under Fed. R. Civ. P. 50(b) must be premised on grounds specified in a Rule 50(a) motion made prior to the submission of the case to the jury").  "The law is pellucid that a party's failure to move under Rule 50(a) has consequences.  If that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice." *ING Glob.*, 757 F.3d at 97.  "Manifest injustice exists where a jury's verdict is wholly without legal support." *Id.*

"The standard for granting a new trial under Rule 59 is less stringent, but still relatively high." *Starr Indem. & Liab. Co. v. Am. Claims Mgmt., Inc.*, 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015).  A court can grant a motion for a new trial "if the verdict is against the weight of the evidence." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012).  "A verdict was against the weight of the evidence if the jury reached a 'seriously erroneous result' or the verdict constitutes 'a miscarriage of justice.'" *Hughes v. Town of Bethlehem*, 644 F. App'x 49, 50 (2d Cir. 2016) (summary order) (quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002) (per curiam)); *see also Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003).  In adjudicating a motion for a new trial, "the court 'may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.'" *ING Global*, 757 F.3d at 99 (quoting *Raedle*, 670 F.3d at 418).  But a "high degree of

deference accorded to the jury's evaluation of witness credibility, and . . . jury verdicts should be disturbed with great infrequency." *Raedle*, 670 F.3d at 418.

A trial judge's discretion to grant a new trial "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984)). "Remittitur is appropriate in two situations: '(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.'" *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (quoting *Kirsch*, 148 F.3d at 165).

## DISCUSSION

### I.   Plaintiff's Motion for a JNOV or New Trial

Plaintiff moves for a JNOV or, alternatively, a new trial on her unequal pay claims under the federal Equal Pay Act ("EPA"), 29 U.S.C. 29 U.S.C. § 206(d)(1), and New York Labor Law ("NYLL") § 194(1).  Dkt. No. 272 at 1.  She asserts that she "indisputably established" the elements of those claims such that she is entitled to judgment in her favor or, at minimum, a new trial.  *Id.*

As an initial matter, Plaintiff did not move for JMOL pursuant to Federal Rule of Civil Procedure 50(a) on *any* ground, let alone the specific ones she now contends warrant a JNOV.

# SPA16

To the contrary, she argued that her unequal pay claims presented "very fact-intensive issue[s]," Trial Tr. 1310:17–18, that should be resolved by the jury, *id.* at 1311:2, 1312:19.  Accordingly, Plaintiff must establish a "manifest injustice" for the Court to award her a JNOV on her unequal pay claims.  *ING Glob.*, 757 F.3d at 97.  On the other hand, Plaintiff's argument that she is entitled to a new trial because the verdict is against the weight of the evidence requires her to show that the jury reached a "seriously erroneous result" or that the verdict amounts to "a miscarriage of justice."[1]  *Manley*, 337 F.3d at 245 (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1988)).

To establish a *prima facie* EPA claim, a plaintiff must demonstrate: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions."  *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 523 (2d Cir. 2023) (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)).  If the plaintiff establishes a *prima facie* case, the burden of persuasion shifts to the employer to show that the pay disparity is justified by one of the EPA's affirmative defenses.  *See id.*; *Hatzimihalis v. SMBC Nikko Sec. Am., Inc.*, 2023 WL 3764823, at *4 (S.D.N.Y. June 1, 2023).  "To establish the EPA's 'factor other than sex' defense, a defendant must prove only that the pay disparity in question results from a differential based on any factor except for sex."  *Eisenhauer*, 84 F.4th at 523–24.

NYLL § 194(1) "employs language extremely similar to the EPA."  *Hatzimihalis*, 2023 WL 3764823, at *4.  Generally, "[a]n equal pay claim under New York Labor Law § 194 is

---

[1] While "the sufficiency of the evidence is not the only ground to order a new trial," *Saleh v. Pretty Girl, Inc.*, 2022 WL 4078150, at *8 (E.D.N.Y. Sept. 6, 2022), that is the sole ground Plaintiff relies upon in moving for a new trial, *see* Dkt. No. 282 at 10 ("[T]his Court should find that the jury's verdict is against the weight of the evidence, such that a new trial is warranted for Dr. Edelman's EPA claims as they relate to Dr. Modi.").

analyzed under the same standards applicable to the federal Equal Pay Act." *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 581 n.5 (2d Cir. 2020) (summary order) (quoting *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 690 n.1 (2d Cir. 2017) (summary order)). But "the EPA and § 194(1) differ in at least one key respect." *Eisenhauer*, 84 F.4th at 525. To prevail on a "factor other than sex" affirmative defense under NYLL § 194(1), the employer "must prove that the pay disparity in question results from a differential based on a job-related factor." *Id.* "By contrast, the EPA's 'factor other than sex' defense imposes no such requirement." *Id.* Because the EPA and NYLL impose distinct requirements, the Second Circuit has admonished district courts to analyze a plaintiff's "§ 194(1) claim as altogether distinct from her EPA one." *Id.*

Plaintiff challenges the jury's finding that she did not perform equal work to Dr. Modi[2] for purposes of her *prima facie* EPA claim, *see* Dkt. No. 243 at 1, as she avers that the evidence at trial "established that she and Dr. Modi had jobs requiring substantially equal skill, effort, and responsibility," Dkt. No. 272 at 8. Defendants respond that Dr. Modi's greater experience, higher RVU target, and larger patient population amply support the jury's finding that he and Plaintiff did not perform equal work. Dkt. No. 277 at 15–17.

"While the equal work inquiry does not demand evidence that a plaintiff's job is 'identical' to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (quoting *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir.

---

[2] Although Plaintiff argued at trial that Dr. Goldberg and Dr. Porges were also appropriate male comparators for her unequal pay claims, her post-trial motion exclusively challenges the jury's findings as to Dr. Modi. *See* Dkt. No. 282 at 1 ("[E]vidence related to Drs. Andrew Goldberg and Andrew Porges . . . is beyond the scope of the instant motion and therefore not at all pertinent to the question before this Court." (cleaned up)).

2001)).  Equal skill, equal effort, and equal responsibility "constitute separate tests, each of which must be met in order for the equal pay standard to apply."  29 C.F.R. § 1620.14; *see Edwards v. Thomson Reuters (Tax & Acct.) Inc.*, 2020 WL 2132348, at *3 (S.D.N.Y. May 5, 2020); *see also Stopka v. All. of Am. Insurers*, 141 F.3d 681, 686 (7th Cir. 1998).  Equal effort "looks to 'the measurement of the physical or mental exertion needed for the performance of a job.'"  *Port Auth. of N.Y. & N.J.*, 768 F.3d at 256 (quoting 29 C.F.R. § 1620.16(a)); *see also Drury v. Waterfront Media, Inc.*, 2007 WL 737486, at *3 (S.D.N.Y. Mar. 8, 2007).  But "[s]o long as the ultimate degree of exertion remains comparable, the mere fact that two jobs call for effort different in kind will not render them unequal."  *Usery v. Columbia Univ.*, 568 F.2d 953, 959 (2d Cir. 1977).  Consequently, equal effort depends on "the quantum of effort necessarily expended, not on the kind of effort or the manner of exertion."  *Marshall v. Meyer Mem'l Hosp.*, 1982 WL 1991, at *13 (W.D.N.Y. July 21, 1982), *aff'd sub nom. EEOC v. Erie County*, 751 F.2d 79 (2d Cir. 1984).  In assessing the effort required for a position, courts must look to "actual job content," since "broad generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice."  *Port Auth. of N.Y. & N.J.*, 768 F.3d at 256.

Here, the evidence at trial establishes that Plaintiff did not perform equal work to Dr. Modi because their positions did not require substantially equal effort.  Several witnesses—including Plaintiff, Dr. Mehta, Swirnow, and Rubin—testified that RVUs are an important metric for healthcare providers such as NYU to quantify and track each physician's productivity by services rendered.  *See* Trial Tr. 85:18–20 (Plaintiff), 85:5–14, 331:9–11, 381:9–12, 407:25–408:13 (Dr. Mehta), 706:7–9 (Swirnow), 926:2–15 (Rubin).  As their testimony confirms, "RVUs are numbers representing, in relative terms, the time and effort required to perform a

particular medical procedure."[3] *Am. Soc. of Dermatology v. Shalala*, 962 F. Supp. 141, 143 (D.D.C. 1996), *aff'd*, 116 F.3d 941 (D.C. Cir. 1997); *see also* 42 U.S.C. § 1395w-4(c)(2)(C)(i) (stating RVUs must be "based on the relative resources incorporating physician time and intensity required in furnishing the service or group of services"). Plaintiff's initial contract with NYU provided that her compensation was "based on [her] maintaining a level of productivity as measured by work RVUs, which is 4,996 [RVUs] annually." Plaintiff's Ex. 8 at 8; *see also* Trial Tr. 88:7–10. Her renewed contract stipulated that her compensation was "based upon [her] maintaining a level of productivity as measured by work RVUS, which is 5,200 [RVUs] annually." Plaintiff's Ex. 9 at 4; *see also* Trial Tr. 108:2–4. By contrast, Dr. Modi's contract with NYU provided his compensation was "contingent upon [him] maintaining a level of productivity as measured by work RVUs, which is 6,108 [RVUs] annually." Plaintiff's Ex. 35 at 10; *see also* Trial Tr. 738:20–21. As such, Dr. Modi's RVU target was 22% greater than Plaintiff's initial target and 17% greater than her renewed target. The evidence at trial further demonstrates this RVU differential was significant. Dr. Modi stated that his RVU target was a "high bar" as it required him to fall within the "top tenth percentile as far as productivity for all rheumatologists in the country." Trial Tr. 1277:23–25. And when she learned Dr. Modi's RVU target was more than 6,000, Plaintiff texted Dr. Mehta: "Impossible he's seeing that many more visits year [sic]." Plaintiff's Ex. 108 at 3; *see also* Trial Tr. 439:18–23, 440:19–24. Consequently, Dr. Modi's position required him to expend significantly greater effort than Plaintiff's position did. *Cf. Savignac v. Day*, 539 F. Supp. 3d 107, 113 (D.D.C. 2021) (explaining "a difference in the number of hours the employee works . . . go[es] to the demands

---

[3] Plaintiff testified that RVUs are an imperfect measure of productivity because certain procedures, like venipuncture, have RVU values of zero. Trial Tr. 103:8–11.

of the job"). As Plaintiff did not prove that her job required equal effort to Dr. Modi's, she failed to demonstrate that she and he performed equal work for purposes of her *prima facie* EPA case.[4]

Plaintiff seeks to avoid that conclusion by arguing that she and Dr. Modi were required to expend substantially equal effort, because both of their contracts included a section entitled "Effort and Compensation" that required them to devote 100% of their effort to clinical activities, instead of educational leadership, research, or administration. Plaintiff's Exs. 8 at 5, 9 at 3, 108 at 6; *see* Dkt. No. 272 at 10; Dkt. No. 282 at 5. According to Plaintiff, the fact that she and Dr. Modi provided those same kind of services on behalf of NYU is dispositive. Dkt. No. 282 at 6 ("[T]he test is whether the comparators perform the same type of work."). She contends that looking instead to RVU targets to compare the effort required by Plaintiff and Dr. Modi's positions "confuse[s] the amount of work with the type of work." *Id.* But Plaintiff's arguments misstate the governing legal principles. Contrary to her assertion that kind, not degree, defines equality of effort, courts have determined that "[t]he focus is on the quantum of effort necessarily expended, not on the kind of effort or the manner of exertion." *Marshall*, 1982 WL 1991, at *13; *accord Savignac*, 539 F. Supp. 3d at 113. EEOC regulations similarly provide:

> Where substantial differences exist in the amount or degree of effort required to be expended in the performance of jobs, the equal pay standard cannot apply even though the jobs may be equal in all other respects. . . . [J]obs may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs. Differences only in the kind of effort required to be expended in such a situation will not justify wage differentials.

29 C.F.R. § 1620.16(a). Thus, the mere fact that Plaintiff and Dr. Modi both devoted their time to clinical services—as opposed to teaching, research, or administration—does not establish that

---

[4] Whether a plaintiff can "establish[] a *prima facie* case [under the EPA] by identifying a single male-comparator employee who earns more than her" remains an open question in the Second Circuit. *Eisenhauer*, 84 F.4th at 524 n.83. But the Court need not resolve that question here because, even assuming a single comparator would suffice, Plaintiff has not identified an appropriate comparator.

# SPA21

they were required to expend substantially similar amounts of effort in providing those services for purposes of Plaintiff's *prima facie* case.

Additionally, Plaintiff contends that the evidence shows she performed equal work to Dr. Modi notwithstanding his higher RVU target because "there is no correlation between compensation and the number of []RVUs." Dkt. No. 282 at 5. In support of that assertion, Plaintiff merely cites her own testimony that Dr. Louise Raminfard, a female rheumatologist at NYU, had a salary of $265,000 and RVU target of 3,900, *id.* (citing Trial Tr. 337:15–338:2), and a portion of Defendants' summation,[5] *id.* (citing Trial Tr. 1366:24–1367:10). If differences between two positions do not affect compensation, then "the facts as a whole [may] support the conclusion that the differences are too insubstantial to prevent the jobs from being equal in all significant respects under the law." *EEOC v. Port Auth. of N.Y. & N.J.*, 2012 WL 1758128, at *6 (S.D.N.Y. May 17, 2012) (alteration in original) (quoting 29 C.F.R. § 1620.14(a)), *aff'd*, 768 F.3d 247 (summary order). Plaintiff is correct that salaries at NYU were not perfectly correlated with rheumatologists' RVU outputs. As Rubin testified, NYU does "not pay dollars per RVU." Trial Tr. 990:11. But that is not the test. For many rheumatologists, including Plaintiff and Dr. Modi, their RVU outputs affected their compensation: exceeding one's RVU target resulted in additional incentive pay, whereas falling short of that target resulted in a deduction from the rheumatologist's base salary. Plaintiff's Exs. 8 at 8–9, 9 at 4, 108 at 10–11. Thus, the evidence establishes that differences in RVUs affected

---

[5] *But see United States v. Arboleda*, 20 F.3d 58, 61 (2d Cir. 1994) ("A summation is not evidence.").

compensation in a not insubstantial manner.  That is sufficient to show that Plaintiff and Dr. Modi did not perform equal work.[6]

Even if Plaintiff had established a *prima facie* EPA claim, that claim would still fail because the evidence at trial demonstrates that the difference between Plaintiff's pay and Dr. Modi's pay is attributable to a factor other than sex.  The Second Circuit recently held that to establish the affirmative defense that a pay differential for equal work is "based on any other factor other than sex," *Eisenhauer*, 84 F.4th at 517 (quoting 29 U.S.C. § 206(d)(1)(iv)), the employer "must prove only that a pay disparity in question results from a differential based on any factor except for sex," regardless of whether that factor is "job related," *id.* at 513. Defendants established that affirmative defense here.  First, Rubin testified that Dr. Modi's salary reflected NYU's geographical demand for "a very strong and capable rheumatologist" to "fill a hole we had in our network" by serving the "very large medical group in Huntington, Long Island, with a huge patient population."  Trial Tr. 937:23–938:3; *see also id.* at 938:4–7. He also testified that geographical coverage was an important consideration for NYU in setting the compensation of its physicians generally.  *Id.* at 922:10–12 ("[D]o we have a need in the community that we can't meet?  Do we have a geography that we can't cover?  So there are all sorts of factors that go into compensation of how we pay a physician.").  NYU's geographical

---

[6] At oral argument Plaintiff challenged the significance of RVUs by emphasizing that the Court had declined to instruct the jury on systems which measure earnings by quantity or quality of production.  Oral Arg. Tr. 33:5–12; *see also* Dkt. No. 272 at 15.  Because such a system is an affirmative defense, *see Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 524 (2d Cir. 1992), that doctrine has no bearing on the Jury's finding that Plaintiff did not establish her *prima facie* case.  Nor was the Court's omission of that instruction an implicit rejection of the relevance of RVUs to Plaintiff's equal pay claims.  Defendants consented to the deletion of that instruction at the charge conference.  Trial Tr. 1154:17.  And the Court permitted extensive testimony on the role RVUs played in compensation at NYU, demonstrating the Court's abiding view that RVUs *were* relevant to Plaintiff's equal pay claims.

interest in hiring a well-respected rheumatologist to serve patients at NYU's Huntington facility is a "factor other than sex" that justifies the pay differential between Dr. Modi and Plaintiff for purposes of the EPA.  Second, Dr. Modi had more experience than Plaintiff, as he graduated medical school and completed his residency and fellowship two years before Plaintiff did.  Trial Tr. 328:8–9.  And Rubin testified that NYU takes seniority into account when setting physicians' base salaries.  *Id.* at 908:2–15.  Dr. Modi's additional two years practicing rheumatology constitute another "factor other than sex" that defeats Plaintiff's EPA claim, even if she had established her *prima facie* case.[7]

Thus, the Jury's verdict comports with the weight of the evidence and Plaintiff has not shown that the Jury reached a seriously erroneous result or that the verdict amounts to a miscarriage of justice.  *See Manley*, 337 F.3d at 245.  Having independently weighed the evidence adduced at trial, the Court concludes the Jury correctly found that Plaintiff did not perform equal work to Dr. Modi and that the disparity between their pay reflected a factor other than sex.  A new trial on Plaintiff's EPA claim is therefore unwarranted.  And given that Plaintiff has not satisfied the "less stringent" standard for a new trial under Rule 59, *Starr Indem. & Liab. Co.*, 131 F. Supp. 3d at 188, *a fortiori* she has not shown a "manifest injustice" for purposes of her JNOV motion pursuant to Rule 50(b).  Accordingly, the Court denies Plaintiff's motion for a JNOV or new trial on her EPA claims.

Plaintiff's NYLL claim fares no better.  NYLL § 194(1) forbids employers from paying an "employee with status within one or more protected class or classes" less for "(a) equal work

---

[7] Because Dr. Modi's location and seniority adequately support the verdict as to Defendants' affirmative defense, the Court need not address their arguments that Dr. Modi's pay also reflected two additional factors other than sex—namely, his managerial background and higher salary before joining NYU.  Dkt. No. 277 at 21, 23.

on a job the performance of which requires equal skill, effort and responsibility, and which is

performed under similar working conditions, or (b) substantially similar work, when viewed as a

composite of skill, effort, and responsibility, and performed under similar working conditions."

NYLL § 194(1).  "To establish a violation of New York Equal Pay Act, the plaintiff must show

that (1) the employer pays different wages to members of the opposite sex, (2) the employees

perform equal work on jobs requiring equal skill, effort, and responsibility, and (3) the jobs are

performed under similar working conditions."  *Quinn v. JPMorgan Chase & Co.*, 819 N.Y.S.2d

212 (Sup. Ct. 2006).  Consequently, the "equal work inquiry" is "[c]ritical" for unequal pay

claims under the NYLL.  *Woods-Early v. Corning Inc.*, 2023 WL 4598358, at *4 (W.D.N.Y. July

18, 2023); *see Kent v. Papert Cos., Inc.*, 764 N.Y.S.2d 675, 684 (1st Dep't 2003).  As explained

above, Plaintiff failed to show that her position required equal effort to Dr. Modi's, given his

significantly higher RVU target.  Plaintiff therefore has not shown that her job and Dr. Modi's

job demanded equal work for purposes of her NYLL claim.[8]  Even if she had, Defendants have

proven that the pay disparity between Plaintiff and Dr. Modi was pursuant to a "bona fide factor

other than status within one or more protected class or classes, such as education, training, or

experience."  NYLL § 194(1)(iv).  New York law specifies that such a factor must "be job-

related with respect to the position in question and . . . be consistent with business necessity."

NYLL § 194(1)(iv)(B).  NYU's interest in recruiting a respected rheumatologist like Dr. Modi to

expand its offerings in Huntington is clearly related to Dr. Modi's position, which required him

to provide rheumatology services to patients in Huntington.  Furthermore, Dr. Modi's distinctive

geographical role is consistent with business necessity, as Rubin testified that NYU had "patients

---

[8] Because Plaintiff has not identified any appropriate comparators, the Court need not address "how many comparators are necessary to establish a *prima facie* case under [NYLL] § 194(1)." *Eisenhauer*, 84 F.4th at 524 n.83.

that we needed to take care of" in Huntington, "so we needed to get someone in there." Trial Tr. 938:6–7. Dr. Modi's lengthier experience as a rheumatologist is another bona fide factor other than sex that justifies his higher pay. Indeed, "experience" is one of the three paradigmatic bona fide factors other than status enumerated in NYLL § 194(1)(iv). His additional years practicing rheumatology were evidently related to Dr. Modi's job as a rheumatologist at NYU and consistent with the business necessity, as Rubin testified NYU sought a "very strong and capable rheumatologist" to launch the new rheumatology practice at NYU's Huntington facility. Trial Tr. 937:23–24. Thus, Plaintiff has not shown that the Jury's verdict on her NYLL unequal pay claims was against the weight of the evidence for purposes of Rule 59, let alone that it amounted to a manifest injustice for purposes of Rule 50(b).

In sum, neither a JNOV nor a new trial is warranted on Plaintiff's unequal pay claims under the EPA and NYLL. The Court therefore denies Plaintiff's motion.

## II.   Defendants' Motion for a JNOV or Remittitur

Defendants move for a JNOV on Plaintiff's retaliation claims against NYU and Antonik under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-3(a), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(1)(e), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(7). Dkt. No. 270 at 1. According to Defendants, Plaintiff cannot prevail on her retaliation claims because there is "no evidence that Antonik was aware that Plaintiff was engaged in 'protected activity.'" *Id.* at 9. They also argue that there is insufficient evidence to conclude NYU's decision not to renew her contract was retaliatory because Rubin rendered that decision based on the clinical concerns of Drs. Porges and Goldberg, rather than any information gathered by Antonik, and Rubin exercised good faith and due care in doing so. *Id.* at 13. Finally, Defendants seek vacatur or remittitur of the Jury's front-pay award to Plaintiff, as they contend it is unsupported by the evidence. *Id.* at 1.

Unlike Plaintiff, Defendants moved for JMOL during the trial pursuant to Rule 50(a).

Trial Tr. 1298:6–1309:13.  In their motion, Defendants argued that all of Plaintiff's retaliation

claims should be dismissed.[9]  *Id.* at 1302:23–24 ("[R]etaliation should be dismissed against

everybody.").  They contended that Plaintiff had not engaged in protected activity "because the

complaints here were about office space, not about discrimination," despite Plaintiff's use of

"buzz words."  Trial Tr. 1301:20–1302:2.  Defendants similarly argued that her complaints did

not apprise Defendants that she was challenging gender discrimination.  *Id.* at 1302:3–11.

Additionally, Defendants averred that Plaintiff failed to establish causation, as the decision not to

renew her contract resulted from clinical concerns and was unrelated to Plaintiff's complaints.

*Id.* at 1302:12–23.  Plaintiff's evidence was also insufficient as to "the individual defendants

here," Defendants asserted.  *Id.* at 1302:24–1303:1.  When the Court asked whether Plaintiff's

could prevail by showing that "Rubin was manipulated," under a cat's paw theory, Defendants

responded that Rubin had made his decision in "good faith" and that such a theory would not

provide a basis for holding Rubin individually liable for retaliation.  *Id.* at 1304:1–15.

Defendants' JMOL motion sufficiently raised the arguments in their JNOV motion.  First,

Defendants stated:

> [P]laintiff's communications never said anything about anyone calling her a bitch.
> Her communications were that she felt slightly intimidated because a tall guy came
> into her office and waved his arms.  Those were not complaints about
> discrimination, fairly read.  They were not understood by NYU to be complaints
> about discrimination.

Trial Tr. 1302:3–8.  Defendants argued that no reasonable observer would—and no NYU

personnel did—understand Plaintiff's complaints to raise gender-based discrimination, as

---

[9] Defendants' JMOL motion also challenged: Plaintiff's claims against corporate entities other
than NYU Grossman School of Medicine, Trial Tr. 1298:17–1299:1; her equal pay claims, *id.* at
1298:17–1300:16; her discrimination claim, *id.* at 1304:16–1308:6; and her asserted damages, *id.*
at 1308:7–1309:12.

opposed to a mere interpersonal dispute between coworkers.  Defendants' present argument is

somewhat narrower: that a specific NYU employee, Antonik, did not understand Plaintiff's

complaint to allege gender-based discrimination.  But while Defendants "frame[] the argument

slightly differently," their JNOV argument is "closely enough related to the 'grounds specified in

[Defendants'] Rule 50(a) motion made prior to the submission of the case to the jury.'"[10]

*Casmento v. Volmar Constr., Inc.*, 2022 WL 15773966, at *6 (S.D.N.Y. Oct. 28, 2022) (quoting

*Barkley v. Olympia Mortg. Co.*, 557 F. App'x 22, 27 (2d Cir. 2014) (summary order)).  Indeed,

the assertion that *no one* at NYU understood Plaintiff's complaint to allege gender discrimination

necessarily entails the claim that Antonik did not understand her complaint that way.  "The

ultimate question is whether the motion . . . was sufficiently specific to alert the opposing party

to the supposed deficiencies in her proof."  *Galdieri-Ambrosini*,136 F.3d at 287.  And

Defendants' JMOL argument provided Plaintiff with ample "notice of defects in [her] proof so

that [she could] cure them before the case [went] to the jury."  *Samuels*, 992 F.2d at 14.  By

contending that Plaintiff failed to show that anyone at NYU realized her complaints alleged

gender discrimination, Defendants gave Plaintiff the opportunity to seek to introduce additional

evidence showing how her complaints conveyed discrimination and how they were received by

NYU personnel including Antonik, whom Plaintiff claimed was individually liable for

retaliation.  Under these circumstances, Defendants' JNOV argument is not a "trap" that

---

[10] The court in *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241 (S.D.N.Y. 2001)
concluded that a JMOL motion that raised "issues common to all [defendants,]" instead of
"suggest[ing] that evidence was wanting as to [two defendants] in particular" was inadequate to
preserve arguments specific to those two defendants for purposes of a JNOV motion.  *Id.* at 261.
But unlike Defendants here, the defendants in *Silivanch* sought to raise an entirely new legal
doctrine unique to a subset of the defendants by arguing vicarious liability was improper.  *Id.* at
260.  Accordingly, *Silivanch* did not address whether a JMOL argument as to several defendants
preserves an identical JNOV argument as to some of those defendants but not others.

countenances "'tactical victories at the expense of substantive interests.'"  *Id.* at 14 (quoting 5A James W. Moore et al., *Moore's Federal Practice* 50-89 (2d ed. 1993)).

Second, Defendants argued that the evidence established that when Rubin decided not to renew Plaintiff's contract, he "didn't take any of the prior complaints into consideration.  He was considering only the clinical factors."  Trial Tr. 1303:22–24; *see also id.* at 1302:18–21 ("[T]he testimony uniformly—every single witness—was that the prior complaints about office space had nothing to do with the decision to nonrenew the contract.").  In their colloquy with the Court, Defendants also contended that Rubin was not manipulated for purposes of a cat's paw theory, because "the evidence is just overwhelming that he was basing his decision, in good faith, on what he was told by the people he relies upon at NYU."  *Id.* at 1304:10–12.  Defendants' affirmative arguments and responses to the Court's questions gave Plaintiff adequate notice of the purported deficiencies in her proof that improper considerations influenced Rubin's non-renewal decision and that his decision did not reflect good faith and due care.  *See Galdieri-Ambrosini*, 136 F.3d at 287 ("We must, however, view the motion in the context of the ensuing colloquy between counsel and the trial court, and if that colloquy fleshes out the motion, it may provide the opposing party with the requisite notice.").  As such, the JMOL motion "preserved [Defendants'] right to make a Rule 50(b) motion" regarding the bases for Rubin's decision not to renew Plaintiff's contract.  *Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 211 (E.D.N.Y. 2009).

Because Defendants' JNOV motion renews arguments specifically raised in their JMOL motion at trial, the Court must determine whether Defendants have either identified "a complete absence of evidence supporting the verdict," such that the Jury must have based its verdict on "sheer surmise and conjecture," or shown that "the evidence in favor of the movant is so

# SPA29

overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against

[it]." *Wiercinski*, 787 F.3d at 112 (quoting *Brady*, 531 F.3d at 133).  In reviewing the evidence

adduced at trial, the Court must make all credibility assessments and draw all inferences against

Defendants as the moving parties.  *See id.* at 113.

      To prevail on a retaliation claim under Title VII, the plaintiff must show

"(1) participation in a protected activity; (2) that the defendant knew of the protected activity;

(3) an adverse employment action; and (4) a causal connection between the protected activity

and the adverse employment action."  *Littlejohn v. City of N.Y.*, 795 F.3d 297, 316 (2d Cir. 2015)

(quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).  "An employee's complaint may

qualify as protected activity, satisfying the first element of this test, 'so long as the employee has

a good faith, reasonable belief that the underlying challenged actions of the employer violated

the law.'"  *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14

(2d Cir. 2013) (per curiam) (quoting *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001)).  "As to

the second element [of the *prima facie* case], implicit in the requirement that the employer have

been aware of the protected activity is the requirement that it understood, or could reasonably

have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."

*Id.* (alteration in original) (quoting *Galdieri-Ambrosini*, 136 F.3d at 292).  A challenged action is

sufficiently "adverse" when it "well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination."  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663

F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

68 (2006)).  To establish causation, a plaintiff must show "that the unlawful retaliation would not

have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ.*

*of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  "[C]ausation does not require proof

that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). Accordingly, a "retaliatory purpose [is] necessary" to satisfy "causation." *Mehta v. City of N.Y.*, 2022 WL 280460, at *7 (E.D.N.Y. Jan. 31, 2022); *see also Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271 (2d Cir. 2016).

When "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no [retaliatory] motive," the employer can nevertheless be held liable for retaliation under a "cat's paw" theory if the supervisor was "manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez*, 835 F.3d at 272 (quoting *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012)). The cat's paw theory requires the plaintiff to show "an employer in effect adopt[ed] an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby afford[ed] that biased employee an outsize role in its own employment decision." *Id.* at 275. However, "an employer who negligently relies on a low-level employee's false accusations in making an employment decision will not be liable under Title VII unless those false accusations themselves were the product of discriminatory or retaliatory intent." *Id.*; *see id.* at 272 n.4; *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 37 (2d Cir. 2019) ("In a 'cat's paw' case . . . the *intent* of the agent is imputed to the employer.").

"The same standards govern retaliation claims under Title VII and the NYSHRL."[11] *Kraiem*, 571 F. Supp. 3d at 60 (quoting *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d

---

[11] Even if Plaintiff's NYSHRL retaliation claims were governed by the more liberal standards that apply to "claims that accrued on or after October 11, 2019," *Arazi v. Cohen Bros. Realty Corp.*, 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022), the Court would reach the same result for the reasons articulated in the NYCHRL discussion below, *see Matthew v. Tex. Comptroller of Pub. Accts.*, 2022 WL 4626511, at *14 n.10 (S.D.N.Y. Sept. 30, 2022); *Kraiem v.*

51, 66 (S.D.N.Y. 2020)).   Consequently, a plaintiff asserting a retaliation claim under the

NYSHRL must establish: participation in a protected activity; defendant's knowledge of the

protected activity; an adverse employment action; and a causal connection between the protected

activity and the adverse employment action.  *See Sanderson v. Leg Apparel LLC*, 2023 WL

2753200, at *16 (S.D.N.Y. Mar. 31, 2023).   The Second Circuit has also applied the cat's paw

doctrine to retaliation claims under the NYSHRL.  *See Vasquez*, 835 F.3d at 272 n.3.

The NYCHRL is sufficiently distinct from its federal and state counterparts that

"NYCHRL claims must be analyzed separately and independently."  *Mihalik v. Credit Agricole

Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).   NYCHRL retaliation requires a

plaintiff to show:

> (1) he or she engaged in a protected activity as that term is defined under the
> NYCHRL, (2) his or her employer was aware that he or she participated in such
> activity, (3) his or her employer engaged in conduct which was reasonably likely
> to deter a person from engaging in that protected activity, and (4) there is a causal
> connection between the protected activity and the alleged retaliatory conduct.

*Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (2d Dep't 2021); *Robinson v.

De Niro*, 2023 WL 4862772, at *40 (S.D.N.Y. May 25, 2023); *Rowe v. Google LLC*, 2022 WL

4467194, at *7 (S.D.N.Y. Sept. 26, 2022).   The third element requires a plaintiff to establish

merely that the challenged conduct was "reasonably likely to deter a person from engaging in

protected activity," N.Y.C. Admin. Code § 8–107(7), not that it was the type of materially

adverse employment action necessary for purposes of Title VII, *see Bermudez v. City of N.Y.*,

783 F. Supp. 2d 560, 588 (S.D.N.Y. 2011); *Heron v. Medrite Testing, LLC*, 2022 WL 1214179,

at *6 (S.D.N.Y. Apr. 25, 2022).   Also, the NYCHRL's causation element is more forgiving than

the Title VII's, since the plaintiff need not show but-for causation under the City law.  *See*

*JonesTrading Institutional Servs. LLC*, 571 F. Supp. 3d 53, 60 n.6 (S.D.N.Y. 2021).

*Santiago v. ACACIA Network, Inc.*, 634 F. Supp. 3d 143, 157 n.6 (S.D.N.Y. 2022).  Rather, causation is met so long as the action was motivated "at least in part" by a retaliatory motive.  *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018).  But an NYCHRL retaliation claim is inadequate if the plaintiff "fail[s] to offer *any* evidence of a retaliatory motive."  *Jones v. City of N.Y.*, 2023 WL 6205630, at *2 (2d Cir. Sept. 25, 2023) (summary order); *see also Aiossa v. Bank of Am., N.A.*, 538 F. App'x 8, 10 (2d Cir. 2013) (summary order).  Because the NYCHRL must be given the broadest construction that is reasonably possible, *see Robinson*, 2023 WL 4862772, at *40, the Court concludes that the cat's paw theory also applies to retaliation claims under the NYCHRL, *see Hornig v. Trs. of Columbia Univ. in City of N.Y.*, 2022 WL 976267, at *23 (S.D.N.Y. Mar. 31, 2022).

Finally, the NYSHRL and NYCHRL differ from Title VII in permitting individual liability.  "Title VII does not provide for individual liability."  *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 641 F. App'x 60, 62 (2d Cir. 2016) (summary order).  By contrast, the NYSHRL and NYCHRL "provide for individual liability—under the NYSHRL, for 'employers' who retaliate against the plaintiff or those who aided and abetted an employer, and under the NYCHRL for anyone who participated in retaliation, even if not an 'employer.'"  *Dodd v. City Univ. of N.Y.*, 541 F. Supp. 3d 318, 321 (S.D.N.Y. 2021).  "Under both the NYSHRL and the NYCHRL, though, 'individual liability . . . is limited to cases where an individual defendant . . . actually participates in the conduct giving rise to the plaintiff's [discrimination or] retaliation claim."  *Friederick v. Passfeed, Inc.*, 2022 WL 992798, at *9 (S.D.N.Y. Mar. 31, 2022) (alterations in original) (quoting *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012)).  "Such participation requires retaliatory 'intent'—and therefore necessarily requires an individual's knowledge of the protected activity at the time of his

participation." *Olaechea v. City of N.Y.*, 2022 WL 3211424, at *5 (S.D.N.Y. Aug. 9, 2022)

(quoting *Malena*, 886 F. Supp. 2d at 366)).

Making all credibility determinations and drawing all reasonable inferences in Plaintiff's

favor, there is a complete absence of evidence supporting the proposition that Antonik was aware

that Plaintiff's complaint concerned gender discrimination.  To the contrary, the evidence

favoring Defendants on that issue is so overwhelming that reasonable persons could not return a

verdict in Plaintiff's favor on her retaliation claims.  Plaintiff testified at trial that she first

reported the incident with Antonik to HR during a phone call with Pacina, Trial Tr. 116:24, in

which Plaintiff explained: "My complaint was about . . . the hostile and abusive behavior that

had occurred the day before with Mr. Antonik; that I didn't feel safe and I wanted it rectified;

that I felt that it was a sexist, discriminatory, chauvinistic attack and it needed to be addressed

with HR," *id.* at 117:2–6.  Plaintiff explained what had transpired with Antonik.  *Id.* at 117:6–7.

She stated that she believed "[t]he way he was speaking to me, telling me that nothing in that

office belongs to me" was sexist because "[t]here was no seniority that he had over me to say

that he, he had – that it belonged to him more than me.  The only difference was that he was a

male, and he was saying he owned me." *Id.* at 117:16–19.  Plaintiff neither testified nor adduced

any other evidence indicating she told Pacina that Antonik had called her a "bitch."

Pacina testified that she did not understand Plaintiff's complaint to concern the way she

was treated vis-à-vis her gender.  *Id.* at 1100:23–25; *see also id.* at 1109:24–1110:1 ("Q. Did it

occur to you, based on this complaint, that Dr. Edelman was complaining about gender or sex

discrimination?  A. No.").  Instead, Pacina testified that she understood Plaintiff's grievance to

concern "office space," *id.* at 1101:13, though Pacina acknowledged Plaintiff may have also

complained about "the way she was spoken to," *id.* at 1101:12–13.  Pacina stated that, while on

the phone with Plaintiff, Pacina memorialized their conversation in notes on NYU's HR system.

*Id.* at 1106:19–24.  Those notes provide:

> [E]mployee wants to make a complaint against Joe Antanik. at the end of patient hours yesterday, she had a conversation with Joe around 3:30-3:35 on 9/16 on in her office. she was on the office on the phone with her daughter, he came into her office and said that directive above was that they wanted to move the rhum into 1 space and that he had a specific request - that another doctor would be using her personal consult office during Thursday and Friday. laying down the foundation - he insinuated who was moving where and he didnt dictate who made the decision. she said that she uses the office on Friday to do clinical work and he said "how often are you really here". He was sitting and he was pointing at things in her office and was intimidating. He said you really think this (office) is yours - throwing his arms and pointing at things. she stated that contractually the office is designated for her and he replied that he will bring this up to the powers that be. then he left, walked out. her heart was racing. was supposed to be calling patients back and she was very uncomfortable after this conversation.

Plaintiff's Ex. 21.

Following her call with Plaintiff, Pacina spoke to Antonik about the incident.  *See id.* at 1107:23–1108:2.  Antonik testified that during that conversation "[Pacina] had explained the nature of the complaint [and] I had explained my understanding of what happened, my version of it."  *Id.* at 523:23–25.  He also testified that this conversation was when he first learned about Plaintiff's complaint.  *Id.* at 523:16–18.  Pacina again memorialized the conversation in notes on NYU's HR system.  *Id.* at 1107:23–1108:2.  Her notes state:

> call with Joe - he didnt raise his arms. she doesnt come in fridays. maybe 1 friday a month for 2 hours. explained that there was a need to use the office. she defense and snide. she said i have a contract and you can have them call my lawyers. she said that she was promised the officer per her contract and he said thta he wasnt aware and that she would bring it up to the power that to be address. if the friday are no good then what about thursday. she was unwilling and not flexible to let others use this office. it wasn't personal to her or targeted to her because this happens often. advised that i would reach out to David Kaplan and that he should meet to Dr. Edelman.

Plaintiff's Ex. 21.  Both Pacina and Antonik testified that those notes reflected their discussion.

*Id.* at 524:10–18, 1107:24–1108:2.

Viewing the evidence at trial in Plaintiff's favor, she told Pacina about a dispute with
Antonik that began over office space but ended with Antonik waving his arms in an intimidating
manner and disrespecting Plaintiff by insisting that NYU owned her and her office.  Plaintiff
stated that she considered Antonik's behavior sexist because Antonik's administrative position
was subordinate to Plaintiff's as a rheumatologist, so she believed the only reason he spoke to
her the way he did was because he was a man.  Despite what Plaintiff may have hoped to convey
in her complaint, however, Pacina's testimony and contemporaneous notes indicate that Pacina
had a different understanding of Plaintiff's grievance: Pacina believed that Plaintiff objected to
Antonik's directive to share her office, his insinuation that she was seldom in the office, the
intimidating way in which he pointed at items in Plaintiff's office, and his threat to escalate the
issue to management.  Yet there is no evidence that Plaintiff told Pacina that Antonik called
Plaintiff a "bitch," nor that Pacina interpreted Plaintiff's complaint as raising gender-based
concerns.  When Antonik later learned about Plaintiff's complaint, he did so through a
conversation with Pacina, not Plaintiff.  Pacina relayed her understanding of Plaintiff's concerns
to Antonik.  And Pacina's notes illuminate what Antonik was told and how he responded.
Antonik and Pacina discussed how often Plaintiff used her office on Fridays, whether or not he
raised his arms, and why he said he would escalate the issue to the powers that be.  Antonik also
stated that he took exception to Plaintiff's tone, which he found defensive and snide.
Accordingly, there is no evidence that Pacina relayed any gender-based allegations or concerns
to Antonik when she conveyed the substance of Plaintiff's complaint to him; instead, all of the
evidence of Pacina's conversation with Antonik indicates that they understood and treated
Plaintiff's HR complaint as an interpersonal dispute about office space, aggressive pointing,
disrespectful tones of voice, and a threat to get management involved.  But an employee's

# SPA36

complaint regarding a colleague's aggressive or rude demeanor does not, on its own, constitute a complaint about gender discrimination—even if the coworkers differ in gender or size. Nor is there any evidence that Antonik was privy to Plaintiff's subsequent communications regarding her complaint with Antonik. Thus, the evidence at trial establishes that the sole occasion on which Antonik was told about the substance of Plaintiff's complaint, Pacina did not relay any gender-based grievances or concerns.

Although Plaintiff raises eight separate grounds from which the Jury could have inferred Antonik's awareness that she had complained to HR about gender discrimination, none is availing. Instead, they amount to an assertion that anyone who learns an employee has lodged a complaint is *ipso facto* aware that the complaint concerns discrimination. But law and logic alike require more. Without some indication that the plaintiff has challenged *discrimination*, a workplace complaint remains just that: a grievance about one's working conditions. Employers are not obligated to treat every complaint as reporting discrimination until shown otherwise. Much less are coworkers presumed to know that any complaint, no matter its content, opposes discrimination.

First, Plaintiff avers that the Jury could infer that Antonik knew Plaintiff's complaint alleged gender discrimination because Antonik knew he had acted in a sexist manner and called Plaintiff a "bitch." Dkt. No. 278 at 18. As a legal principle, Plaintiff's argument proves too much. The occurrence of sexist conduct and submission of a complaint cannot alone establish that the complaint is about discrimination—particularly where, as here, the complainant had grounds for complaint entirely apart from whether the conduct directed towards him or her was based on gender. While an "explicit" allegation of unlawfulness is not required, *Tulino v. City of N.Y.*, 2019 WL 3810975, at *5 (S.D.N.Y. Aug. 1, 2019), a complaint must at least "implicit[ly]

reference" discrimination, *Robinson*, 2023 WL 4862772, at *45. Were the law otherwise, the protected activity requirement would be a nullity. Every complaint would have to be treated as one about discrimination for fear that the complainant, later faced with adverse action, will claim that his complaint really was about discrimination. *Cf. Hamann v. Gates Chevrolet, Inc.*, 910 F.2d 1417, 1420 (7th Cir. 1990) ("[C]ausation must be proved in its own right; its existence cannot be bootstrapped from the existence of the other two elements" of opposing discrimination and an adverse employment action). Under Plaintiff's theory, a complaint that unquestionably does *not* raise or imply gender discrimination would constitute protected activity and be sufficient evidence to establish a defendant's awareness for purposes of retaliation, rendering an employer liable for any adverse action in the wake of a complaint even though the employer has no reason to know that the complaint concerned discrimination. *Contra Kelly*, 716 F.3d at 17 (explaining a complaint is insufficient "to put an employer on notice of a protected complaint . . . if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory"); *Rosioreanu v. City of N.Y.*, 526 F. App'x 118, 120 (2d Cir. 2013) (summary order) ("[Because] Rosioreanu's complaints could easily have described a conflict between co-workers of any sex—regardless of the presence or absence of discriminatory animus . . . the evidence was not sufficient for a jury to conclude that the City had notice (or should have had notice) that Rosioreanu believed that the conduct of which she complained was based on her sex."). Plaintiff's questionable principle is especially dubious here, as the dispute between Plaintiff and Antonik was not so manifestly gender based as to put Antonik on notice that any complaint against him would allege discrimination. Indeed, when Plaintiff described the dispute to Pacina, a seasoned HR professional, she did not understand the conflict as one involving potential gender discrimination. Trial Tr. 1109:24–1110:1. And in conveying Plaintiff's

# SPA38

complaint to Antonik, Pacina did not suggest that Plaintiff had alleged Antonik's actions were

discriminatory.  According to Plaintiff, the Jury could have reasonably inferred that Antonik was

aware Plaintiff had complained about gender discrimination despite his conversation with Pacina

to the contrary, given his actions on September 16, 2019.  But neither law nor evidence would

have supported that inference.

Second, Plaintiff observes that Antonik reported the dispute to Kaplan.  Dkt. No. 278 at

12 (citing Trial Tr. 568:7–569:18).  Plaintiff argues the Jury "could reasonably infer that he

escalated the situation because he realized that he acted unlawfully . . . and wanted to get ahead

of any fallout that might result for what he anticipated would be a complaint from [Plaintiff.]"

*Id.*  Just as he told Plaintiff he would, Antonik reported her unwillingness to share her office to

his superior.  Yet Plaintiff did not adduce any evidence suggesting Antonik did so because he

knew Plaintiff would lodge a gender-discrimination complaint with HR.  To infer that motivation

in the absence of such evidence would amount to the kind of "rank speculation and conjecture"

that is insufficient to support a jury verdict.  *Airday v. City of N.Y.*, 406 F. Supp. 3d 313, 321

(S.D.N.Y. 2019).

Third, because Pacina discussed Plaintiff's complaint with Antonik, Plaintiff contends the

Jury could have reasonably inferred that "Pacina, as an experienced HR manager, fully informed

Antonik about [Plaintiff's] complaint, including that he called her a bitch and that [Plaintiff]

complained that Antonik acted in a demeaning and harassing manner because of her sex."  Dkt.

No. 278 at 12.  But the only evidence of what Pacina and Antonik discussed—that is, their

testimony and Pacina's HR notes—is to the contrary.  Thus, it would be unduly "speculative" for

the jury to assume Antonik "must have been informed of [Plaintiff's] protected activity" during

his conversation with Pacina without any countervailing evidence to support that conclusion.

*Olaechea*, 2022 WL 3211424, at *8.  Nor would the mere fact of Pacina's involvement imply

that Plaintiff's complaint concerned gender-based discrimination, as Pacina was responsible for

resolving a wide array of HR issues unrelated to discrimination, including performance problems

and interpersonal disputes.  *See* Trial Tr. 1087:5–1088:8.

      Fourth, Plaintiff asserts that "Antonik even admitted that he understood [Plaintiff's]

complaint was not about office space but rather about him and his sexist conduct."  Dkt. No. 278

at 13.  However, the testimony Plaintiff cites in support of that contention belies her assertion.

Plaintiff directs the Court to Antonik's testimony that he understood Plaintiff's complaint was

not really about office space but rather about the way Antonik spoke to Plaintiff, Trial Tr. 530:5–

10, but Antonik's testimony does not mention sexism or gender nor suggest that the grievance

about his manner of speech was related to gender, *see also id.* at 570:3–25.  Consequently, the

Jury could not have treated those statements as an admission that Antonik knew Plaintiff's

complaint concerned gender-based discrimination.

      Fifth, Plaintiff notes Antonik's testimony that he was upset Plaintiff complained about

him.  Dkt. No. 278 at 13; *see* Trial Tr. 530:11–13.  Plaintiff argues that the Jury "could

reasonably infer that he was bothered because he knew that [Plaintiff] had logged [sic] a

discrimination and harassment complaint against him."  Dkt. No. 278 at 13.  Yet that reasoning

crosses the line from reasonable inference to conjectural leap.  Coworkers involved in an

interpersonal dispute will almost invariably dislike each other afterwards, particularly if one

coworker reports the other to HR.  Deeming such resentment sufficient to show an awareness of

protected activity would dilute that element of retaliation beyond recognition.  *Cf. Zacharowicz

v. Nassau Health Care Corp.*, 177 F. App'x 152, 155 (2d Cir. 2006) (summary order) ("Such

nondiscriminatory-grounded dislike, whether inappropriate, understandable, or neutral, does not,

of course, constitute a basis for a Title VII suit.").  Thus, Antonik's antipathy towards Plaintiff after she complained about their dispute was not adequate evidence for the Jury to conclude that Antonik believed her complaint alleged gender discrimination.

Sixth, Kaplan emailed Swirnow on September 18, 2019: "just received a call from Kathleen Pacina from Labor Relations, apparently Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours." Defendants' Ex. SS.  Plaintiff asserts that "[a]s the director of Antonik, and someone who works closely with him, it is reasonable for the jury to infer that Kaplan shared the contents of this email with Antonik."  Dkt. No. 278 at 13.  The Jury could not reasonably infer that Kaplan and Antonik discussed that email simply because they worked together.  *See Cardwell v. Davis Polk & Wardwell LLP*, 2023 WL 2049800, at *28 (S.D.N.Y. Feb. 16, 2023) (refusing to credit "unsupported speculation that Chudd or the Associate Development Department must have told Hudson about the complaint merely because they were in contact with each other").  Moreover, even if there were evidence that Kaplan shared his email with Antonik, the contents of Kaplan's email do not suggest gender-based discrimination.  A complaint that a coworker was aggressive or retaliated due to a dispute over hours does not on its face raise discrimination.  *See Hernandez v. N.Y.C. Dep't of Sanitation*, 2018 WL 5447540, at *4 (S.D.N.Y. Oct. 29, 2018) (concluding a complaint about "aggressive and harassing conduct towards him in retaliation for Plaintiff's request for an accommodation" did not "convey[] race-based mistreatment").  To the extent Plaintiff suggests the use of the term "retaliating" would have notified Antonik that Plaintiff had alleged discrimination, the use of such a buzzword does not transform an otherwise gender-neutral complaint into one that unmistakably raises discrimination.  *See Kelly*, 716 F.3d at 17; *Sutton v. Stony Brook Univ.*, 2022 WL 4479509, at *3 n.3 (2d Cir. Sept. 27, 2022) (summary

order); *Robinson*, 2023 WL 4862772, at *42; *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, 2012 WL 4483046, at *19 (E.D.N.Y. Sept. 27, 2012) (collecting cases). Accordingly, the Jury could not have reasonably inferred from Kaplan's September 18, 2019 email to Swirnow that Antonik was aware Plaintiff had complained about gender discrimination.

Seventh, because Plaintiff followed up with Pacina regarding the status of her complaint, Plaintiff argues the Jury could have reasonably inferred "HR followed up with Antonik about [Plaintiff's] subsequent emails." Dkt. No. 278 at 13. Yet Plaintiff does not identify testimony or documentary evidence suggesting HR had follow-up communications with Antonik regarding her complaint. In the absence of supportive evidence, a jury finding that such communications occurred could rest only on sheer surmise. *See Cardwell*, 2023 WL 2049800, at *27. Indeed, Plaintiff's resort to speculation about discussions that *could* have occurred between HR and Antonik underscores the limits of the evidence Plaintiff actually adduced at trial. Aside from the conversation between Pacina and Antonik, there is no evidence that anyone informed Antonik about the nature of Plaintiff's complaint to HR.

Eighth, Plaintiff argues that the Jury could have inferred Antonik was aware that her complaint concerned discrimination based on "Antonik's subsequent adverse actions against [her] after her complaint." Dkt. No. 278 at 14. Specifically, Plaintiff avers that Antonik's unwillingness to expand Plaintiff's hours, Ruiz's compilation of issues with Plaintiff beginning shortly after her complaint, and Antonik's "coordinating and encouraging her fellow employees to provide negative feedback about [Plaintiff]" evince an awareness that Plaintiff's complaint raised gender discrimination. *Id.* Indeed, after Kaplan asked Antonik to gather information on Plaintiff's issues, Trial Tr. 500:7–9, Antonik fulfilled that request with alacrity. He emailed colleagues at NYU's Lake Success office and solicited "recent examples of inappropriate

behavior and commucat[ions] between Edelman, staff and patients."  Plaintiff's Ex. 86 at 2.

Less than two hours later, Antonik had compiled a list of issues from Ruiz, Trial Tr. 823:7–15,

and sent them to Dr. Porges, Plaintiff's Ex. 86 at 1.  Once again, the jury could conclude that

Antonik's actions betray an obvious aversion to Plaintiff, but no evidence supports that that he

disliked Plaintiff and compiled the list of issues because she complained about gender

discrimination.  Permitting Plaintiff to treat adverse actions as sufficient to show an awareness of

protected activity would deprive the awareness requirement of independent meaning.  Under that

theory, a plaintiff who suffered an adverse employment action but took no steps to inform his

employer that the adverse action was based on gender would automatically be able to proceed to

and prevail at trial, notwithstanding the absence of evidence that the adverse action was based on

gender.  Yet courts have time and again *granted* summary judgment under precisely those

circumstances.[12]  In doing so, courts have implicitly rejected Plaintiff's conflation of a

defendant's adverse action and awareness of protected activity.  Plaintiff's argument is also

factually infirm.  While Antonik's actions reflect his admitted dislike for Plaintiff, the further

inference that Antonik disliked Plaintiff because he knew she filed a discrimination complaint

against him is based on sheer conjecture, rather than evidence or sound reasoning.

     The complete absence of evidence that Antonik was aware that Plaintiff had complained

about gender discrimination is fatal to her retaliation claims against NYU.  Plaintiff's theory at

---

[12] *See, e.g.*, *Concha v. Purchase Coll. State Univ. of N.Y.*, 2019 WL 3219386, at *10 (S.D.N.Y. July 17, 2019); *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 383 (S.D.N.Y. 2013); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007); *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006); *see also Arizmendi v. Rich Prod. Corp.*, 2023 WL 4246106, at *2 (2d Cir. June 29, 2023) (summary order) ("Since 'one cannot . . . [be] motivated to retaliate by something he was unaware of,' Arizmendi has failed to demonstrate that her termination occurred under circumstances giving rise to an inference of retaliatory intent." (quoting *Ameen v. Amphenol Printed Cirs., Inc.*, 777 F.3d 63, 70 (1st Cir. 2015))).

trial relied on the cat's paw doctrine:  She argued that Antonik, acting out of retaliatory animus, had manipulated Rubin to ensure her contract was not renewed.  Trial Tr. 1402:20–25 ("Kaplan forwards the email to Swirnow, who passes the information on to Rubin, who ultimately makes the decision, based on all of this information.  If a factor—if a factor—1 percent, again, was motivated by Joe Antonik in this, that's sufficient under the law for a retaliation claim."); *see also id.* at 29:3–25, 1401:18–24.  As a result, the Court instructed the Jury on the cat's paw doctrine for each of Plaintiff's retaliation claims against NYU.  *Id.* at 1453:17–1454:8, 1459:8–24, 1466:14–18.  And Plaintiff maintains that cat's paw theory in her post-trial briefing, contending that "Antonik was the catalyst and primary actor behind Dr. Edelman's termination, and admitted that he was the first to complain about her."  Dkt. No. 278 at 16.  She reiterated that theory at oral argument.[13]  But the cat's paw theory permits an "employee's motivation [to] be imputed to the employer and used to support a claim" of retaliation.  *Vasquez*, 835 F.3d at 275; *see Menaker*, 935 F.3d at 37–38.  As a result, a plaintiff cannot prevail on a cat's paw theory if the manipulating employee lacks a retaliatory intent.  *See Campbell v. Nat'l Fuel Gas Distribution Corp.*, 252 F. Supp. 3d 205, 214 (W.D.N.Y. 2017), *aff'd*, 723 F. App'x 74 (2d Cir. 2018) (summary order); *Vaughn v. Empire City Casino at Yonkers Raceway*, 2017 WL 3017503, at *22 (S.D.N.Y. July 14, 2017).  Here, there is no evidence that Antonik knew Plaintiff's complaint alleged gender discrimination.  Without that knowledge, Antonik could not have intended to retaliate against Plaintiff for reporting gender discrimination.[14]  *See Olaechea*, 2022

---

[13] Oral Arg. Tr. 23:21–24 ("I think the jury could reasonably conclude that there was more than just office space or just about yelling because of what [Antonik] did.  He's the one that instigated this whole exercise."), 26:22–23 ("NYU clearly gave effect to Antonik's retaliatory intent.").

[14] Plaintiff's assertion at oral argument that general corporate knowledge could suffice is misplaced.  Oral Arg. Tr. 16:12–18, 17:17–19.  While general corporate knowledge can satisfy the knowledge requirement in a plaintiff's *prima facie* case of retaliation, *see Zann Kwan*, 737 F.3d at 844, a plaintiff pursuing cat's paw liability must also show that the manipulating

WL 3211424, at *5 (explaining retaliatory intent "necessarily requires . . . knowledge of the protected activity"); *see also* EEOC, *Enforcement Guidance on Retaliation and Related Issues*, No. 915.004 (Aug. 25, 2016) ("Absent knowledge, there can be no retaliatory intent."); *accord Romero v. Allstate Ins. Co.*, 3 F. Supp. 3d 313, 328 (E.D. Pa. 2014), *aff'd sub nom. EEOC v. Allstate Ins. Co.*, 778 F.3d 444 (3d Cir. 2015); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 957–58 (N.D. Ga. 1995); *Downey v. Isaac*, 622 F. Supp. 1125, 1132 (D.D.C. 1985), *aff'd*, 794 F.2d 753 (D.C. Cir. 1986).  Thus, given the complete absence of evidence that Antonik knew Plaintiff complained about gender discrimination, no reasonable jury could find that Antonik formed a retaliatory intent that NYU adopted when it decided not to renew Plaintiff's contract.

At oral argument, Plaintiff suggested in passing that Pacina, Porges, or Rubin could have instead supplied the retaliatory intent for cat's paw liability.  *See* Oral Arg. Tr. 16:5–9, 17:13–16. Plaintiff did not raise that argument in her post-trial briefing, so the Court deems it waived. *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 369 (S.D.N.Y. 2022) ("[T]his argument was raised for the first time at oral argument and so was waived in terms of this motion." (quoting *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008))).  But "[e]ven if the Court were to consider this argument on the merits, Plaintiff[] would not prevail."  *Id.*  The record is bereft of evidence that Pacina harbored retaliatory intent towards Plaintiff or played any part in the decision not to renew her contract.  Consequently, the Jury could not have found that Pacina provided retaliatory animus that NYU adopted in reaching that decision.  *See Larnard v. McDonough*, 578 F. Supp. 3d 371, 391 (W.D.N.Y. 2022); *Petronio v. Nat'l R.R. Passenger Corp.*, 2019 WL 4857579, at *6 (S.D.N.Y. Oct. 2, 2019), *aff'd*, 836 F.

employee knew that the plaintiff engaged in protected activity in order to form a "retaliatory intent," *Vasquez*, 835 F.3d at 273 n.4.

# SPA45

App'x 39 (2d Cir. 2020) (summary order).  Dr. Porges participated in discussions with Swirnow

and Rubin regarding whether to renew Plaintiff's contract.  Trial Tr. 967:24–25.  And Dr. Porges

testified that he knew Plaintiff had complained about harassment.  *Id.* at 1133:14–19.  However,

he also testified that the concerns he relayed to Swirnow and Rubin "had nothing to do with any

HR complaints."  *Id.* at 1237:7.  The parties have not cited—nor the Court identified—any

evidence to support that Dr. Porges intended to retaliate against Plaintiff because she complained

about discrimination.  Given that total absence, Plaintiff cannot prevail on a cat's paw theory

based on Dr. Porges's intent.  *See Oliver v. N.Y. State Police*, 2020 WL 1989180, at *43

(N.D.N.Y. Apr. 27, 2020) ("Captain Nigrelli and Major Cerretto had some knowledge of

Plaintiff's EEO complaints, but there is no evidence from which a factfinder could infer that they

acted with retaliatory intent."); *Campbell v. Nat'l Fuel Gas Distribution Corp.*, 252 F. Supp. 3d

205, 214 (W.D.N.Y. 2017) ("[I]nformation Jandreau provided to senior management provided

the basis for [the] decision to terminate Plaintiff.  However, Plaintiff has failed to establish that

Jandreau was motivated by [unlawful] intent."), *aff'd*, 723 F. App'x 74 (2d Cir. 2018) (summary

order); *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 2007 WL 2261652, at *7 (E.D.N.Y. Aug. 2,

2007), *aff'd*, 353 F. App'x 621 (2d Cir. 2009) (summary order).  Rubin made the ultimate

decision not to renew Plaintiff's contract.  Trial Tr. 905:13–15.  Because it would be nonsensical

to find that Rubin "manipulate[d]" himself, *Vasquez*, 835 F.3d at 272, Rubin cannot also supply

the retaliatory intent under a cat's paw theory.  But, in any event, there is no evidence that Rubin

was aware that Plaintiff had complained about gender discrimination,[15] or that he intended to retaliate against her for lodging such a complaint.[16]  Accordingly, the evidence at trial was insufficient for the Jury to conclude that Rubin provided the intent for Plaintiff's retaliation claims.  *See Wallen v. Teknavo Grp.*, 2019 WL 1435879, at *22 (E.D.N.Y. Mar. 30, 2019).

Plaintiff's failure to adduce any evidence of retaliatory intent to support her cat's paw theory requires the Court to grant a JNOV in NYU's favor on each of her retaliation claims.  *See Wiercinski*, 787 F.3d at 112.  A retaliatory intent is indispensable for a Title VII retaliation claim. *See Nassar*, 570 U.S. at 352 ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *Zann Kwan*, 737 F.3d at 846; *Campbell*, 93 F. Supp. 3d at 178–79.  Retaliatory intent is likewise necessary for a NYSHRL retaliation claim.  *See Hawkins v. N.Y. State Off. of Mental Health*, 845 F. App'x 9, 10 (2d Cir. 2021) (summary order); *Brown v. City of N.Y.*, 622 F. App'x 19, 20 (2d Cir. 2015) (summary order).  Finally, notwithstanding the NYCHRL's liberal standards, a plaintiff cannot prevail on a NYCHRL retaliation claim without establishing a retaliatory intent.  *See Aiossa*, 538 F. App'x at 10 ("[E]ven where Appellant may be entitled to the NYCHRL's broader protections, there is no genuine issue as to whether discriminatory or retaliatory intent motivated Defendants' actions."); *Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 390 (S.D.N.Y. 2014) ("[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory

---

[15] *See* Trial Tr. 941:10–16 ("Q. At the time [the renewal process] was going on, did you have personal knowledge of any complaint by Dr. Edelman pending in the employee and labor relations department?  A. None whatsoever.  Q. Had you ever heard of such a complaint at this time or previously?  A. None whatsoever."); *see also id.* at 885:10–13 ("Q. You were made aware of a complaint, right?  A. You asked me an HR complaint. I was not made aware of an HR complaint.  I was aware of a complaint relating to an office dispute.").

[16] *See* Trial Tr. 944:25–945:6 ("Q. Did that nonrenewal of the contract have anything to do with any animus you held against Dr. Edelman? . . .  A. I had no animus against Dr. Edelman.  I was, as I am today, saddened by the situation.").

motives" (alterations in original) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)).  The Court therefore grants Defendant's motion for a JNOV on Plaintiff's retaliation claims against NYU.

JNOV is also warranted on Plaintiff's retaliation claims against Antonik.  Individual liability for aiding and abetting retaliation under the NYSHRL "requires that the aider and abettor share the [retaliatory] intent or purpose of the principal actor." *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020) (quoting *Fried v. LVI Servs., Inc.*, 2011 WL 2119748, at *7 (S.D.N.Y. May 23, 2011)); *McHenry*, 510 F. Supp. 3d at 68.  The defendant's "retaliatory intent" is likewise required for individual liability under the NYCHRL, whether for a direct violation or aiding and abetting retaliation.  *Olaechea*, 2022 WL 3211424, at *5 (internal quotation marks omitted); *see also Cardwell*, 2023 WL 2049800, at *26.  Given the utter lack of evidence supporting the conclusion that Antonik knew Plaintiff complained about discrimination, no reasonable jury could conclude Antonik intended to retaliate against Plaintiff because she reported discrimination.  Without a retaliatory intent, Antonik cannot be held individually liable for aiding and abetting retaliation under the NYSHRL.  *See Dodd*, 489 F. Supp. 3d at 272.  Plaintiff's failure to adduce evidence that Antonik knew Plaintiff reported discrimination and therefore formed an intent to retaliate against her similarly precludes individual liability against Antonik under the NYCHRL.  *See Cardwell*, 2023 WL 2049800, at *26; *Carmody v. N.Y. Univ.*, 2023 WL 5803432, at *10 (S.D.N.Y. Sept. 7, 2023).  Thus, the Court grants a JNOV in favor of Antonik on Plaintiff's retaliation claims against him under the NYSHRL and NYCHRL.

In sum, the complete absence of evidence that Antonik was aware that Plaintiff's complaint against him alleged gender discrimination requires a JNOV in Defendants' favor on

her retaliation claims for lack of retaliatory intent.[17]  Because the Court directs a verdict in

Defendants' favor on all of Plaintiff's retaliation claims, the Court also vacates the Jury's

corresponding award of compensatory damages.  Consequently, the Court does not address

Defendants' motion for remittitur.

## CONCLUSION

Plaintiff's motion for judgment as a matter of law or a new trial, Dkt. No. 271, is

DENIED.  Defendants' motion for judgment as a matter of law, Dkt. No. 267, is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 267 and 271, enter

judgment in favor of Defendants, and close this case.

---

[17] By contrast, Defendants are not entitled to a JNOV on Plaintiff's retaliation claims on the grounds that the "overwhelming and uncontradicted evidence shows" that Rubin decided not to renew Plaintiff's contract based on the clinical concerns of Drs. Porges and Goldberg, rather than the information compiled by Antonik. Dkt. No. 270 at 13.  The standard for judgment as a matter of law requires the Court to view the evidence in the light most favorable to Plaintiff and not to examine the weight of conflicting evidence.  And, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that, at the time he made the decision not to renew Plaintiff's contract, Rubin was aware of the "recent examples of inappropriate behavior and commucat[ions] between Edelman, staff and patients," Plaintiff's Ex. 86 at 2, that had been compiled by Antonik and included in the email that Dr. Porges sent to Kaplan, in which Dr. Porges also expressed clinical concerns with Plaintiff's use of tests and x-rays, Plaintiff's Ex. 1 at 1–2.  In particular, Kaplan forwarded Dr. Porges's email to Swirnow, *id.* at 1, and there is evidence Swirnow shared the substance of the email with Rubin, Trial Tr. 761:14–15.  Rubin testified that the concerns in Dr. Porges's email were "the only thing that led to the nonrenewal" of Plaintiff's contract.  *Id.* at 907:7.  From the timing of the email with Antonik's information, as well as from the fact that Rubin could not recall the specific issues Dr. Porges raised, *id.* at 939:6–8 ("Dr. Porges went through me with what the clinical issues were – practice style, and just rattled off a whole bunch of stuff."); *id.* at 889:23–25 ("Q. Now, the issues that were raised were too many blood tests, right?  A. Amongst other things.  I don't recall all the details."), there is at least some evidence that the issues raised by Antonik were both a contributing factor and a but-for factor in the decision not to renew Plaintiff's contract.  The Court does not decide whether the conclusion that Antonik influenced Rubin's decision not to renew Plaintiff's contract was against the weight of the evidence for purposes of Federal Rule of Civil Procedure 59, however, because Defendants are entitled to judgment for the other reasons stated in this Opinion and Order.

SO ORDERED.

Dated: December 26, 2023
     New York, New York

                                       LEWIS J. LIMAN
                              United States District Judge

# SPA50

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
DR. SARI EDELMAN,

                  Plaintiff,               21 **CIVIL** 0502 (LJL)

      -against-                                **JUDGMENT**

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF MEDICINE,
NYU GROSSMAN SCHOOL OF MEDICINE, NYU
HOSPITALS CENTER, ANDREW T. RUBIN, DAVID
KAPLAN, JOSEPH ANTONIK, and JOSHUA
SWIRNOW,

                  Defendant.
-----------------------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:**    That for the reasons

set forth in the Court's Opinion and Order dated December 26, 2023, Plaintiff's motion for

judgment as a matter of law or a new trial, Dkt. No. 271, is DENIED. Defendants' motion for

judgment as a matter of law, Dkt. No. 267, is GRANTED. Judgment is entered in favor of

Defendants, and the case is closed.

**Dated:** New York, New York

      December 26, 2023

                                   **RUBY J. KRAJICK**
                                   **Clerk of Court**

              **BY:**

                            _____
                                   **Deputy Clerk**