# 24-0251-CV

# United States Court of Appeals

*for the*

# Second Circuit

DR. SARI EDELMAN,

*Plaintiff-Appellant,*

– v. –

NYU LANGONE HEALTH SYSTEM, NYU LANGONE HOSPITALS, NYU
LANGONE MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF MEDICINE, NYU GROSSMAN
SCHOOL OF MEDICINE, NYU HOSPITALS CENTER, ANDREW T. RUBIN,
DAVID KAPLAN, JOSEPH ANTONIK, JOSHUA SMIRNOW,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL JOINT APPENDIX
## Volume 4 of 4 (Pages SJA-701 to SJA-921)

JOSEPH MARTIN LABUDA
MILMAN LABUDA LAW GROUP PLLC
*Attorney for Plaintiff-Appellant*
3000 Marcus Avenue Suite 3W8
Lake Success, New York 11042
(516) 328-8899

RICHARD LANE STEER
RICHARD S. SCHOENSTEIN
JUSTIN Y.K. CHU
INGRID JULIETH CARDONA
TARTER KRINSKY & DROGIN LLP
*Attorneys for Defendants-Appellees*
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000

CP COUNSEL PRESS    (800) 4-APPEAL • (330222)

i

# TABLE OF CONTENTS

**Page**

**Volume 1**

Final Pretrial Conference Transcript, dated
July 6, 2023 ............................................................ SJA-1

Plaintiff's Trial Exhibit 11 (August 01-06, 2014,
E-mail thread re NYU negotiations with Mehta
and Plaintiff re NYU employment contract) .......... SJA-43

Plaintiff's Trial Exhibit 19 (Patient visit log for
Plaintiff) ................................................................ SJA-48

Plaintiff's Trial Exhibit 21 (September 15, 2019
Pacina Salesforce Notes/Comments) ..................... SJA-236

Plaintiff's Trial Exhibit 33 (Porges' First
Amendment to Employment Agreement dated
March 20, 2018) ..................................................... SJA-237

**Volume 2**

Plaintiff's Trial Exhibit 34 (Porges' Renewal and
Amendment of Employment Agreement dated
December 8, 2020) ................................................. SJA-239

Plaintiff's Trial Exhibit 38 (Mehta's Renewal of
Employment Agreement dated
November 21, 2017) .............................................. SJA-246

Plaintiff's Trial Exhibit 39 (Dr. Mehta's February 1,
2021 compensation documents) ............................ SJA-250

Plaintiff's Trial Exhibit 40 (Dr. Mehta's Renewal
and Amendment of Employment Agreement
dated November 24, 2020) .................................... SJA-251

Page

Plaintiff's Trial Exhibit 42 (Dr. Mehta's curriculum vitae) ................................................................ SJA-256

Plaintiff's Trial Exhibit 47 (NYU Human Resources Policies and Procedures – Chapter 4: Workplace Conduct - Revised September, 2020) ................... SJA-259

Plaintiff's Trial Exhibit 50 (E-mail correspondence concerning space issue and Plaintiff's alleged discrimination complaint to Human Resources).... SJA-280

Plaintiff's Trial Exhibit 58 (E-mail from Plaintiff to Kathleen Pacina dated September 26, 2019) ......... SJA-282

Plaintiff's Trial Exhibit 68 (E-mails between Plaintiff and Pacina dated September-November 2019) ................................................................ SJA-283

Plaintiff's Trial Exhibit 70 (E-mail correspondence between Pacina and Tisa Hall regarding Plaintiff's office space issue) ................................ SJA-286

Plaintiff's Trial Exhibit 71 (E-mail correspondence between Pacina and Plaintiff dated September-November 2019) ..................................................... SJA-288

Plaintiff's Trial Exhibit 74 (E-mail correspondence between Pacina and Plaintiff dated September 2019) ................................................................ SJA-290

Plaintiff's Trial Exhibit 75 (E-mail correspondence between Pacina and Tisa Hall regarding Plaintiff's office space issue dated September 2019) ................................................................ SJA-292

Plaintiff's Trial Exhibit 77 (E-mail correspondence between Pacina and Claudia Rose regarding Plaintiff's complaint dated September 2019) ........ SJA-293

**iii**

**Page**

Plaintiff's Trial Exhibit 89 (Plaintiff's wRVU
reports for December, 2017-November, 2019)...... SJA-295

Plaintiff's Trial Exhibit 117 (Plaintiff's office space
at NYU) ................................................................ SJA-317

Plaintiff's Trial Exhibit 121 (E-mail between
Swirnow, Mehta, and Plaintiff regarding updating
offer letter) ........................................................... SJA-321

Defendants' Trial Exhibit X (Raminfard's Renewal
and Amendment of Employment Agreement
dated February 12, 2020)...................................... SJA-323

Defendants' Trial Exhibit BB (Li's Renewal and
Amendment of Employment Agreement dated
January 24, 2020)................................................. SJA-329

Defendants' Trial Exhibit DD (Given's Initial
Employment Agreement dated May 10, 2019)...... SJA-334

Defendants' Trial Exhibit OO (September 16, 2019
E-mail thread regarding Rheum Consolidation
Updated – Edelman Joe's interaction with
Edelman re using her office on Thurs/Fri when
she isn't there)...................................................... SJA-349

Defendants' Trial Exhibit PP (September 17-18,
2019, E-mail regarding matter raised by Dr.
Edelman re Dr. Edelman Contracts and space
information in contract) ........................................ SJA-351

Defendants' Trial Exhibit QQ (E-mail thread
regarding space issue and Plaintiff's alleged
discrimination complaint)...................................... SJA-355

Defendants' Trial Exhibit RR (September 18, 2019,
E-mail from Pacina regarding issue raised by
Edelman re Antonik)............................................. SJA-451

iv                                              Page

Defendants' Trial Exhibit VV (October 16-17, 2019,
    E-mail thread re Dr. Sari Edelman's Hours re her
    move back to Marcus) ............................................ SJA-453

Defendants' Trial Exhibit WW (November 13,
    2019, E-mail thread re Ruiz conversation with
    Dr. Edelman re schedule at Marcus Avenue -
    Edelman was rude) ............................................... SJA-456

Defendants' Trial Exhibit XX (November 18, 2019
    E-mail from Rashidat to Plaintiff following up
    with Plaintiff re investigating Plaintiff's
    concerns)............................................................... SJA-459

Defendants' Trial Exhibit YY (March 11, 2020, E-
    mail from Ruiz to Antonik and Lucca re Incident
    with Tiffany and Plaintiff) .................................... SJA-461

Defendants' Trial Exhibit BBB (August 5-6, 2020
    E-mail thread between Edelman and Ruiz re
    Workflow)............................................................. SJA-464

Defendants' Trial Exhibit GGG ................................ SJA-466

**Volume 3**

Defendants' Trial Exhibit III (6 Patient Records
    (291 pages) reviewed by Dr. Porges).................... SJA-469

**Volume 4**

Defendants' Trial Exhibit III (6 Patient Records
    (291 pages) reviewed by Dr. Porges)
    [Continued in Volume 4]....................................... SJA-701

Defendants' Trial Exhibit OOO ................................ SJA-760

Dkt. No. 201 MEMORANDUM OF LAW in
    Opposition re: 186 MOTION *in Limine*.
    Document filed by Sari Edelman........................... SJA-762

**Page**

Dkt. No. 270 MEMORANDUM OF LAW in
    Support re: 267 MOTION for Judgment NOV.
    MOTION for Judgment as a Matter of Law.
    MOTION to Set Aside Judgment. MOTION to
    Vacate. MOTION to Set Aside Verdict.
    Document filed by NYU and individual
    defendants ............................................................... SJA-779

Dkt. No. 272 MEMORANDUM OF LAW in
    Support re: 271 MOTION for Judgment as a
    Matter of Law pursuant to Fed. R. Civ. P. 50.
    MOTION for New Trial pursuant to Fed. R. Civ.
    P. 59. Document filed by Sari Edelman ................. SJA-805

Dkt. No 277 MEMORANDUM OF LAW in
    Opposition re: 271 MOTION for Judgment as a
    Matter of Law pursuant to Fed. R. Civ. P. 50.
    MOTION for New Trial pursuant to Fed. R. Civ.
    P. 59. Document filed by NYU and individual
    defendants ............................................................. SJA-830

Dkt. No. 278 MEMORANDUM OF LAW in
    Opposition re: 267 MOTION for Judgment NOV.
    MOTION for Judgment as a Matter of Law.
    MOTION to Set Aside Judgment. MOTION to
    Vacate. MOTION to Set Aside Verdict.
    Document filed by Sari Edelman ........................... SJA-860

Dkt. No. 281 REPLY MEMORANDUM OF LAW
    in Support re: 267 MOTION for Judgment NOV.
    MOTION for Judgment as a Matter of Law.
    MOTION to Set Aside Judgment. MOTION to
    Vacate. MOTION to Set Aside Verdict.
    Document filed by NYU and individual
    defendants ............................................................. SJA-892

vi                                             **Page**

Dkt. No. 282 REPLY MEMORANDUM OF LAW
    in Support re: 271 MOTION for Judgment as a
    Matter of Law pursuant to Fed. R. Civ. P. 50.
    MOTION for New Trial pursuant to Fed. R. Civ.
    P. 59. Document filed by Sari Edelman ................. SJA-907

SJA-701

DREDACTED TREDACTED (MRN REDACTED) DOB: REDACTED

Encounter Date: 09/24/2020
D001427

CONFIDENTIAL

URINALYSIS (NO CULTURE)
WITH REFLEX TO MICROSCOPY
CPK
MYOGLOBIN
CYCLIC CITRULLINATED
PEPTIDE ANTIBODY, IGG
RHEUMATOID FACTOR
NUCLEAR ANTIBODY (ANA)
SCREEN WITH REFLEX PANEL
THYROID STIMULATING
HORMONE
T4, FREE, NON-DIALYSIS
HEPATITIS C VIRUS ANTIBODY,
REFLEX TO RNA QUANT
HEPATITIS B SURFACE
ANTIBODY, QUALITATIVE
IMMUNOGLOBULINS,
QUANTITATIVE (IGA, IGG, IGM)
PROTEIN ELECTROPHORESIS
WITH REFLEX TO
IMMUNOFIXATION
VITAMIN D 25-HYDROXY
(SCREENING FOR DEFICIENCY)
XR HAND PA LATERAL AND
OBLIQUE BILATERAL
XR WRIST AP AND LATERAL
BILATERAL
XR KNEE AP AND LATERAL
BILATERAL
XR PELVIS AP AND FROG
BILATERAL 5 VIEWS
XR SHOULDER INTERNAL AND
EXTERNAL BILATERAL
XR LUMBAR SPINE AP AND
LATERAL WITH FLEXION AND
EXTENSION 4 VIEWS
VITAMIN D 25-HYDROXY
(SCREENING FOR DEFICIENCY)
PROTEIN ELECTROPHORESIS
WITH REFLEX TO
IMMUNOFIXATION
IMMUNOGLOBULINS,
QUANTITATIVE (IGA, IGG, IGM)
HEPATITIS B SURFACE
ANTIBODY, QUALITATIVE
HEPATITIS C VIRUS ANTIBODY,
REFLEX TO RNA QUANT
T4, FREE, NON-DIALYSIS
THYROID STIMULATING
HORMONE
NUCLEAR ANTIBODY (ANA)
SCREEN WITH REFLEX PANEL
RHEUMATOID FACTOR

REDACTED

SJA-702

D█████, T██ (MRN ████ DOB: ████

Encounter Date: 09/24/2020

CONFIDENTIAL

D001428

| | | | | |
|---|---|---|---|---|
| | | | | CYCLIC CITRULLINATED PEPTIDE ANTIBODY, IGG |
| | | | | MYOGLOBIN |
| | | | | CPK |
| | | | | URINALYSIS (NO CULTURE) WITH REFLEX TO MICROSCOPY |
| | | | | PROTEIN, RANDOM URINE WITH CREATININE |
| | | | | ERYTHROCYTE SEDIMENTATION RATE |
| | | | | C-REACTIVE PROTEIN |
| | | | | COMPREHENSIVE METABOLIC PANEL |
| | | | | CBC WITH DIFFERENTIAL |
| | | | | VITAMIN B12 |
| | | | | IRON BINDING GROUP |
| | | | | FOLATE, RBC |
| | | | | FERRITIN |
| 3. | Myalgia | M79.10 | 729.1 | FERRITIN |
| | | | | FOLATE, RBC |
| | | | | IRON BINDING GROUP |
| | | | | VITAMIN B12 |
| | | | | CBC WITH DIFFERENTIAL |
| | | | | COMPREHENSIVE METABOLIC PANEL |
| | | | | C-REACTIVE PROTEIN |
| | | | | ERYTHROCYTE SEDIMENTATION RATE |
| | | | | PROTEIN, RANDOM URINE WITH CREATININE |
| | | | | URINALYSIS (NO CULTURE) WITH REFLEX TO MICROSCOPY |
| | | | | CPK |
| | | | | MYOGLOBIN |
| | | | | CYCLIC CITRULLINATED PEPTIDE ANTIBODY, IGG |
| | | | | RHEUMATOID FACTOR |
| | | | | NUCLEAR ANTIBODY (ANA) SCREEN WITH REFLEX PANEL |
| | | | | THYROID STIMULATING HORMONE |
| | | | | T4, FREE, NON-DIALYSIS |
| | | | | HEPATITIS C VIRUS ANTIBODY, REFLEX TO RNA QUANT |
| | | | | HEPATITIS B SURFACE ANTIBODY, QUALITATIVE |
| | | | | IMMUNOGLOBULINS, QUANTITATIVE (IGA, IGG, IGM) |
| | | | | PROTEIN ELECTROPHORESIS WITH REFLEX TO IMMUNOFIXATION |
| | | | | VITAMIN D 25-HYDROXY (SCREENING FOR DEFICIENCY) |

SJA-703

CONFIDENTIAL

D⬛⬛⬛, T⬛⬛ (MRN ⬛⬛) DOB: ⬛⬛

Encounter Date: 09/24/2020

D001429

XR HAND PA LATERAL AND OBLIQUE BILATERAL
XR WRIST AP AND LATERAL BILATERAL
XR KNEE AP AND LATERAL BILATERAL
XR PELVIS AP AND FROG BILATERAL 5 VIEWS
XR SHOULDER INTERNAL AND EXTERNAL BILATERAL
XR LUMBAR SPINE AP AND LATERAL WITH FLEXION AND EXTENSION 4 VIEWS
VITAMIN D 25-HYDROXY (SCREENING FOR DEFICIENCY)
PROTEIN ELECTROPHORESIS WITH REFLEX TO IMMUNOFIXATION
IMMUNOGLOBULINS, QUANTITATIVE (IGA, IGG, IGM)
HEPATITIS B SURFACE ANTIBODY, QUALITATIVE
HEPATITIS C VIRUS ANTIBODY, REFLEX TO RNA QUANT
T4, FREE, NON-DIALYSIS
THYROID STIMULATING HORMONE
NUCLEAR ANTIBODY (ANA) SCREEN WITH REFLEX PANEL
RHEUMATOID FACTOR
CYCLIC CITRULLINATED PEPTIDE ANTIBODY, IGG
MYOGLOBIN
CPK
URINALYSIS (NO CULTURE) WITH REFLEX TO MICROSCOPY
PROTEIN, RANDOM URINE WITH CREATININE
ERYTHROCYTE SEDIMENTATION RATE
C-REACTIVE PROTEIN
COMPREHENSIVE METABOLIC PANEL
CBC WITH DIFFERENTIAL
VITAMIN B12
IRON BINDING GROUP
FOLATE, RBC
FERRITIN

| | | | | |
|---|---|---|---|---|
| 4. | Chronic pain of both knees | M25.561 | 719.46 | FERRITIN |
| | | M25.562 | 338.29 | FOLATE, RBC |
| | | G89.29 | | IRON BINDING GROUP |
| | | | | VITAMIN B12 |
| | | | | CBC WITH DIFFERENTIAL |

REDACTED

SJA-704

D[REDACTED], T[REDACTED] (MRN [REDACTED]) DOB: [REDACTED]

Encounter Date: 09/24/2020

D001430

CONFIDENTIAL

COMPREHENSIVE METABOLIC PANEL
C-REACTIVE PROTEIN
ERYTHROCYTE SEDIMENTATION RATE
PROTEIN, RANDOM URINE WITH CREATININE
URINALYSIS (NO CULTURE) WITH REFLEX TO MICROSCOPY
CPK
MYOGLOBIN
CYCLIC CITRULLINATED PEPTIDE ANTIBODY, IGG
RHEUMATOID FACTOR
NUCLEAR ANTIBODY (ANA) SCREEN WITH REFLEX PANEL
THYROID STIMULATING HORMONE
T4, FREE, NON-DIALYSIS
HEPATITIS C VIRUS ANTIBODY, REFLEX TO RNA QUANT
HEPATITIS B SURFACE ANTIBODY, QUALITATIVE
IMMUNOGLOBULINS, QUANTITATIVE (IGA, IGG, IGM)
PROTEIN ELECTROPHORESIS WITH REFLEX TO IMMUNOFIXATION
VITAMIN D 25-HYDROXY (SCREENING FOR DEFICIENCY)
XR HAND PA LATERAL AND OBLIQUE BILATERAL
XR WRIST AP AND LATERAL BILATERAL
XR KNEE AP AND LATERAL BILATERAL
XR PELVIS AP AND FROG BILATERAL 5 VIEWS
XR SHOULDER INTERNAL AND EXTERNAL BILATERAL
XR LUMBAR SPINE AP AND LATERAL WITH FLEXION AND EXTENSION 4 VIEWS
VITAMIN D 25-HYDROXY (SCREENING FOR DEFICIENCY)
PROTEIN ELECTROPHORESIS WITH REFLEX TO IMMUNOFIXATION
IMMUNOGLOBULINS, QUANTITATIVE (IGA, IGG, IGM)
HEPATITIS B SURFACE ANTIBODY, QUALITATIVE
HEPATITIS C VIRUS ANTIBODY, REFLEX TO RNA QUANT

SJA-705

DREDACTED, T (MRN REDACTED) DOB: REDACTED

CONFIDENTIAL

Encounter Date: 09/24/2020
D001431

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  | T4, FREE, NON-DIALYSIS |
|  |  |  |  | THYROID STIMULATING |
|  |  |  |  | HORMONE |
|  |  |  |  | NUCLEAR ANTIBODY (ANA) |
|  |  |  |  | SCREEN WITH REFLEX PANEL |
|  |  |  |  | RHEUMATOID FACTOR |
|  |  |  |  | CYCLIC CITRULLINATED |
|  |  |  |  | PEPTIDE ANTIBODY, IGG |
|  |  |  |  | MYOGLOBIN |
|  |  |  |  | CPK |
|  |  |  |  | URINALYSIS (NO CULTURE) |
|  |  |  |  | WITH REFLEX TO MICROSCOPY |
|  |  |  |  | PROTEIN, RANDOM URINE |
|  |  |  |  | WITH CREATININE |
|  |  |  |  | ERYTHROCYTE |
|  |  |  |  | SEDIMENTATION RATE |
|  |  |  |  | C-REACTIVE PROTEIN |
|  |  |  |  | COMPREHENSIVE METABOLIC |
|  |  |  |  | PANEL |
|  |  |  |  | CBC WITH DIFFERENTIAL |
|  |  |  |  | VITAMIN B12 |
|  |  |  |  | IRON BINDING GROUP |
|  |  |  |  | FOLATE, RBC |
|  |  |  |  | FERRITIN |
| 5. | Other obesity | E66.8 | 278.00 | VITAMIN D 25-HYDROXY |
|  |  |  |  | (SCREENING FOR DEFICIENCY) |
|  |  |  |  | VITAMIN D 25-HYDROXY |
|  |  |  |  | (SCREENING FOR DEFICIENCY) |

Polyarthralgia with myalgia involving the upper and lower extremities. Clinical examination most suggestive of osteoarthritis more advanced involving the left shoulder as well as the left hip region. Previous x-ray imaging of the knees in November 2019 revealed mild to moderate osteoarthritis. X-ray imaging requested today of the bilateral hips, follow-up studies for the bilateral knees, shoulders and hands. On examination there is some mild synovial thickening involving the left MCP joints, evaluate for possible inflammatory arthropathies as well. Pain relief to try Mobic once daily. He is aware to discontinue other NSAID therapy.

New medications potential risks and benefits reviewed at length, if any additional concerns to notify me. He expresses full understanding of these risks.

Further therapeutic recommendations to be determined pending completion of evaluation. I have asked Mr. Durnan to contact me if any changes in his
rheumatic condition immediately.

Consultation was 40 minutes, of which over 50% of this time was spent in reviewing clinical history, medications, laboratory findings, examinations, assessment and plan.

## Instructions

  Return in about 2 weeks (around 10/8/2020).

After Visit Summary (Automatic SnapShot taken 9/24/2020)

REDACTED

SJA-706

REDACTED T■■ (MRN REDACTED) DOB: REDACTED

Encounter Date: 09/24/2020
**D001432**

CONFIDENTIAL

## BSA Data
Body Surface Area: 2.46 m²

## Created by
Encounter creation information not available

## Orders Placed
Labs
**C-REACTIVE PROTEIN** (Resulted 9/24/2020, Abnormal)
**CBC WITH DIFFERENTIAL** (Resulted 9/24/2020, Abnormal)
**ERYTHROCYTE SEDIMENTATION RATE** (Resulted 9/24/2020, Abnormal)
**HEPATITIS B SURFACE ANTIBODY, QUALITATIVE** (Resulted 9/24/2020, Abnormal)
**IRON BINDING GROUP** (Resulted 9/24/2020, Abnormal)
**PROTEIN ELECTROPHORESIS WITH REFLEX TO IMMUNOFIXATION** (Resulted 9/24/2020, Abnormal)
COMPREHENSIVE METABOLIC PANEL (Resulted 9/24/2020)
CPK (Resulted 9/24/2020)
CYCLIC CITRULLINATED PEPTIDE ANTIBODY, IGG (Resulted 9/24/2020)
FERRITIN (Resulted 9/24/2020)
FOLATE, RBC (Resulted 9/24/2020)
HEPATITIS C VIRUS ANTIBODY, REFLEX TO RNA QUANT (Resulted 9/24/2020)
IMMUNOGLOBULINS, QUANTITATIVE (IGA, IGG, IGM) (Resulted 9/24/2020)
MYOGLOBIN (Resulted 9/24/2020)
NUCLEAR ANTIBODY (ANA) SCREEN WITH REFLEX PANEL (Resulted 9/24/2020)
RHEUMATOID FACTOR (Resulted 9/24/2020)
T4, FREE, NON-DIALYSIS (Resulted 9/24/2020)
THYROID STIMULATING HORMONE (Resulted 9/24/2020)
VITAMIN B12 (Resulted 9/24/2020)
VITAMIN D 25-HYDROXY (SCREENING FOR DEFICIENCY) (Resulted 9/24/2020)
PROTEIN, RANDOM URINE WITH CREATININE
URINALYSIS (NO CULTURE) WITH REFLEX TO MICROSCOPY

Imaging
XR HAND PA LATERAL AND OBLIQUE BILATERAL (Resulted 9/24/2020)
XR KNEE AP AND LATERAL BILATERAL (Resulted 9/24/2020)
XR PELVIS HIP FROG BILATERAL 3 VIEWS (Resulted 9/24/2020)
XR SHOULDER INTERNAL AND EXTERNAL BILATERAL (Resulted 9/24/2020)
XR WRIST AP AND LATERAL BILATERAL (Resulted 9/24/2020)

## Medication Changes
As of 9/24/2020 10:19 AM

| | Refills | Start Date | End Date |
|---|---|---|---|
| **Added: meloxicam (MOBIC) 15 mg tablet** | 0 | 9/24/2020 | 9/24/2020 |
| Take 1 tablet by mouth daily. - Oral | | | |

SJA-707

D̶REDACTED̶, T̶REDACTED̶ (MRN REDACTED) DOB: REDACTED

Encounter Date: 09/24/2020

D001433

CONFIDENTIAL

## Medication List at End of Visit

As of 9/24/2020 10:19 AM

| | Refills | Start Date | End Date |
|---|---|---|---|
| albuterol sulfate 90 mcg/actuation HFA inhaler | 5 | 9/17/2019 | 12/3/2020 |
| Inhale 2 Puffs into the lungs every 6 hours as needed for Wheezing. - Inhalation | | | |
| amLODIPine (NORVASC) 10 mg tablet | 2 | 6/24/2020 | 12/28/2020 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| Notes to Pharmacy: please send new rx | | | |
| calcium-vitamin D (OS-CAL PLUS D) 500 mg (1,250mg) -200 unit per tablet | | | |
| Take 1 Tab by mouth 2 (two) times daily with meals. - Oral | | | |
| Patient-reported medication | | | |
| cholecalciferol (VITAMIN D3) 1,000 unit tablet | | | |
| Take 1,000 Units by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| diphenoxylate HCl/atropine | | | |
| DIPHENOXYLATE HCL/ATROPINE (LOMOTIL ORAL) | | | 12/3/2020 |
| Take 2 tablets by mouth 2 (two) times daily. - Oral | | | |
| Patient-reported medication | | | |
| diphenoxylate-atropine (LOMOTIL) 2.5-0.025 mg per tablet | | 1/6/2020 | |
| Take 1 tablet by mouth 4 (four) times daily. - Oral | | | |
| Patient-reported medication | | | |
| dupilumab (DUPIXENT) 300 mg/2 mL injection | 5 | 5/21/2020 | 12/28/2020 |
| Inject 2 mL into the skin every 14 (fourteen) days. Starting on day 15 - SubCutaneous | | | |
| EPINEPHrine (EPIPEN) 1:1000 (0.3 mg/0.3 mL) injection | 2 | 4/30/2019 | |
| Inject 0.3 mL into the muscle once as needed for up to 1 dose. - IntraMuscular | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| fenofibrate (LOFIBRA) 160 mg tablet | 1 | 5/4/2020 | 11/2/2020 |
| TAKE ONE TABLET BY MOUTH ONCE DAILY | | | |
| fluticasone-vilanterol (BREO ELLIPTA) 200-25 mcg/dose dry powder inhaler | 5 | 6/2/2020 | 12/11/2020 |
| Inhale 1 Puff into the lungs daily. - Inhalation | | | |
| insulin glargine (LANTUS SOLOSTAR U-100 INSULIN) 100 unit/mL (3 mL) injection | 2 | 6/12/2020 | 12/3/2020 |
| INJECT 7 UNITS SUBCUTANEOUSLY ONCE DAILY AT BEDTIME | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| ipratropium (ATROVENT) 0.02 % nebulizer solution | 0 | 6/10/2019 | |
| USE 1 VIAL VIA NEBULIZER EVERY SIX HOURS AS NEEDED FOR WHEEZING | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| VICTOZA 3-PAK 0.6 mg/0.1 mL (18 mg/3 mL) PnIj | 2 | 8/4/2020 | 11/4/2020 |
| INJECT 1.8MG SUBCUTANEOUSLY ONCE A DAY AS DIRECTED | | | |
| losartan (COZAAR) 100 mg tablet | 2 | 6/3/2020 | 3/10/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| meloxicam (MOBIC) 15 mg tablet | 0 | 9/24/2020 | 9/24/2020 |

SJA-708

D REDACTED , T ■■■ (MRN REDACTED ) DOB: REDACTED

Encounter Date: 09/24/2020

**CONFIDENTIAL**

**D001434**

| | Refills | Start Date | End Date |
|---|---|---|---|
| Take 1 tablet by mouth daily. - Oral | | | |
| metFORMIN (GLUCOPHAGE-XR) 500 mg XR XR tablet | 2 | 3/3/2020 | 12/1/2020 |
| TAKE 2 TABLETS BY MOUTH TWICE A DAY | | | |
| multivitamin capsule | | | |
| Take 1 Cap by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| nystatin (MYCOSTATIN) 100,000 unit/gram powder | 1 | 1/14/2020 | |
| Apply topically 3 times daily as needed. - Topical | | | |
| rosuvastatin (CRESTOR) 5 mg tablet | 2 | 7/10/2020 | 12/28/2020 |
| Take 1 tablet by mouth 5 days per week. | | | |
| torsemide (DEMADEX) 20 mg tablet | 3 | 8/5/2020 | 12/3/2020 |
| Take 1 tablet by mouth as needed (swelling in the legs). - Oral | | | |
| venlafaxine XR (EFFEXOR XR) 75 mg capsule | 1 | 8/3/2020 | 2/2/2021 |
| TAKE TWO CAPSULES BY MOUTH DAILY | | | |
| vitamin E 100 unit capsule | | | |
| Take 100 Units by mouth daily. - Oral | | | |
| Patient-reported medication | | | |

## Visit Diagnoses

Primary: Chronic pain of both shoulders M25.511, G89.29, M25.512
Chronic pain of both hips M25.551, M25.552, G89.29
Myalgia M79.10
Chronic pain of both knees M25.561, M25.562, G89.29
Other obesity E66.8

SJA-709

D[REDACTED] T[REDACTED] (MRN [REDACTED]) DOB: [REDACTED]          Encounter Date: 10/27/2020
CONFIDENTIAL                                                      D001435

D[REDACTED] T[REDACTED]                                           MRN: [REDACTED]

**Office Visit** 10/27/2020          Provider: Sari Dawn Edelman, DO (Medicine, Rheumatology)
NYU LANGONE LI                       Primary diagnosis: Chronic pain of both shoulders
RHEUMATOLOGY                         Reason for Visit: Leg Pain

## Additional Documentation

Vitals:          BP 128/80 Pulse 89 SpO2 98%
Flowsheets:      Patient-Reported Data
Encounter Info:  Billing Info, History, Allergies, Detailed Report

## Progress Notes

Sari Dawn Edelman, DO (Physician) • Medicine, Rheumatology

**Subjective:**

Thomas Durnan is a 69 y.o. male who presents with a chief complaint of Leg Pain

He presents for evaluation of joint pain involving multiple areas. Symptoms have been present for approximately 1 year though he reports that this has progressed over the past several weeks. He continues to describe most difficulty involving walking noting his gait is altered due to left lower extremity pain. There is discomfort involving the left hip as well as the left knee. He had cortisone injection to the left hip in recent weeks, noting no improvement in joint discomfort. He is having difficulty walking and placing weight on the left lower extremity. He denies fever or chills. He denies any trauma since his last visit.

He continues to be unable to raise his left arm over his head. There is pain involving both shoulders. He is a retired police detective for many years now. He denies any swelling with the exception of the bilateral ankles. His cardiologist has initiated a diuretic. He denies any previous orthopedic evaluations. Imaging of the knees was done in November 2019 revealing mild to moderate osteoarthritis.

There is history of asthma. He denies any active dyspnea or wheezing. He denies any dysphagia.

He is on statin therapy for hyperlipidemia. He denies any known association of onset of muscle discomfort with statin use. Other known history of hypertension and diabetes which he reports is well controlled.

For pain relief he has been taking 1 naproxen daily with food. He denies any gastrointestinal upset. There is known history of transaminitis related to fatty liver.

HPI

**Past Medical History:**
Diagnosis                                        Date
• Asthma
• BPH (benign prostatic hyperplasia)
• Bronchitis
• Depression
• Hypercholesterolemia
• Hypertension

REDACTED                                          Page 1 of 8

SJA-710

REDACTED, T▆▆ (MRN REDACTED) DOB: REDACTED

Encounter Date: 10/27/2020

CONFIDENTIAL

D001436

- IBS (irritable bowel syndrome)
  *Diarrhea Predominant*
- Morbid obesity with BMI of 40.0-44.9, adult                                11/18/2019
- Obstructive sleep apnea
  *AHI 124, s/p UPPP, CPAP 12 cm H2O*
- Steroid-induced diabetes
  *Insulin requiring*
- Tinea cruris
- Tracheomalacia

### Past Surgical History:

| Procedure | Laterality | Date |
|---|---|---|
| • CHOLECYSTECTOMY | | 1995 |
| • IR THERAPEUTIC INJECTION HIP FL GUIDED LEFT | | 10/15/2020 |
| *IR THERAPEUTIC INJECTION HIP FL GUIDED LEFT 10/15/2020 Michael K Brooks, MD LI NW 222 SP RAD IR* | | |
| • LAP BAND | | 2009 |
| *removal in 2011* | | |
| • PILONIDAL CYST DRAINAGE | | 1977 |
| • UVULOPALATOPLASTY | | 2002 |

### Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • Heart Failure | Mother | |
| • Diabetes | Mother | |
| • Heart Failure | Father | |
| • Diabetes | Father | |

Social History
  Socioeconomic History
    Marital status: Married
    Spouse name: Annalise
    Number of children: 2
    Years of education: None
    Highest education level: None
  Occupational History
    Occupation: Retired police
  Tobacco Use
    Smoking status: Never Smoker
    Smokeless tobacco: Never Used
  Substance and Sexual Activity
    Alcohol use: No
    Drug use: No
    Sexual activity: None
  Other Topics
    Concerns:
      None
  Social History Narrative
    None

### Social Determinants of Health

Financial Resource Strain: Not on file
Food Insecurity: Not on file

SJA-711

D█████, T█ (MRN █████) DOB: █████          Encounter Date: 10/27/2020
CONFIDENTIAL                                          D001437

Transportation Needs: Not on file
Physical Activity: Not on file
Stress: Not on file
Social Connections: Not on file
Intimate Partner Violence: Not on file

## Current Outpatient Medications

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • meloxicam (MOBIC) 15 mg tablet | Take 1 tablet by mouth daily. | 30 tablet | 0 |
| • torsemide (DEMADEX) 20 mg tablet | Take 1 tablet by mouth as needed (swelling in the legs). | 90 tablet | 3 |
| • VICTOZA 3-PAK 0.6 mg/0.1 mL (18 mg/3 mL) Pnlj | INJECT 1.8MG SUBCUTANEOUSLY ONCE A DAY AS DIRECTED | 9 mL | 2 |
| • venlafaxine XR (EFFEXOR XR) 75 mg capsule | TAKE TWO CAPSULES BY MOUTH DAILY | 180 capsule | 1 |
| • rosuvastatin (CRESTOR) 5 mg tablet | Take 1 tablet by mouth 5 days per week. | 60 tablet | 2 |
| • amLODIPine (NORVASC) 10 mg tablet | ONE TABLET BY MOUTH ONCE DAILY | 90 tablet | 2 |
| • insulin glargine (LANTUS SOLOSTAR U-100 INSULIN) 100 unit/mL (3 mL) injection | INJECT 7 UNITS SUBCUTANEOUSLY ONCE DAILY AT BEDTIME (Patient not taking: Reported on 7/28/2020) | 5 Injection Pen | 2 |
| • losartan (COZAAR) 100 mg tablet | ONE TABLET BY MOUTH ONCE DAILY | 90 tablet | 2 |
| • fluticasone-vilanterol (BREO ELLIPTA) 200-25 mcg/dose dry powder inhaler | Inhale 1 Puff into the lungs daily. | 1 Each | 5 |
| • dupilumab (DUPIXENT) 300 mg/2 mL injection | Inject 2 mL into the skin every 14 (fourteen) days. Starting on day 15 | 2 mL | 5 |
| • fenofibrate (LOFIBRA) 160 mg tablet | TAKE ONE TABLET BY MOUTH ONCE DAILY | 90 tablet | 1 |
| • metFORMIN (GLUCOPHAGE-XR) 500 mg XR XR tablet | TAKE 2 TABLETS BY MOUTH TWICE A DAY | 360 tablet | 2 |
| • diphenoxylate-atropine (LOMOTIL) 2.5-0.025 mg per tablet | Take 1 tablet by mouth 4 (four) times daily. | | |
| • nystatin (MYCOSTATIN) 100,000 unit/gram powder | Apply topically 3 times daily as needed. | 1 Bottle | 1 |

REDACTED

SJA-712

D⟨REDACTED⟩, T⟨REDACTED⟩ (MRN ⟨REDACTED⟩) DOB: ⟨REDACTED⟩          Encounter Date: 10/27/2020

CONFIDENTIAL                                                      D001438

| | | | |
|---|---|---|---|
| • albuterol sulfate 90 mcg/actuation HFA inhaler | Inhale 2 Puffs into the lungs every 6 hours as needed for Wheezing. | 1 Inhaler | 5 |
| • ipratropium (ATROVENT) 0.02 % nebulizer solution | USE 1 VIAL VIA NEBULIZER EVERY SIX HOURS AS NEEDED FOR WHEEZING | 150 mL | 0 |
| • EPINEPHrine (EPIPEN) 1:1000 (0.3 mg/0.3 mL) injection | Inject 0.3 mL into the muscle once as needed for up to 1 dose. | 1 Injection Pen | 2 |
| • calcium-vitamin D (OS-CAL PLUS D) 500 mg(1,250mg) -200 unit per tablet | Take 1 Tab by mouth 2 (two) times daily with meals. | | |
| • cholecalciferol (VITAMIN D3) 1,000 unit tablet | Take 1,000 Units by mouth daily. | | |
| • multivitamin capsule | Take 1 Cap by mouth daily. | | |
| • vitamin E 100 unit capsule | Take 100 Units by mouth daily. | | |
| • DIPHENOXYLATE HCL/ATROPINE (LOMOTIL ORAL) | Take 2 tablets by mouth 2 (two) times daily. | | |

No current facility-administered medications for this visit.

**Allergies**

| Allergen | Reactions |
|---|---|
| • Iv Contrast, Iodine Containing | Anaphylaxis |
| • Keflex [Cephalexin] | Anaphylaxis and Rash |

Review of Systems
Constitutional: Negative for chills, fever and unexpected weight change.
HENT: Negative for congestion, facial swelling and mouth sores.
Eyes: Negative for redness and visual disturbance.
Respiratory: Negative for cough, chest tightness and shortness of breath.
Cardiovascular: Negative for chest pain, palpitations and leg swelling.
Gastrointestinal: Negative for abdominal distention, diarrhea, nausea and vomiting.
Genitourinary: Negative for dysuria.
Musculoskeletal: Positive for arthralgias, joint swelling and myalgias. Negative for back pain, neck pain and neck stiffness.
Skin: Negative for color change and rash.
Neurological: Positive for weakness. Negative for dizziness, light-headedness and headaches.
Hematological: Negative for adenopathy.

**Objective:**

**Visit Vitals**
BP          128/80
Pulse       89

REDACTED

SJA-713

DREDACTED, TREDACTED (MRN REDACTED) DOB: REDACTED          Encounter Date: 10/27/2020

CONFIDENTIAL                                              D001439

SpO2               98%

<u>Physical Exam</u>
Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished.
HENT:
Mouth/Throat: Oropharynx is clear and moist.
Eyes: Pupils are equal, round, and reactive to light. Conjunctivae and EOM are normal. Right eye exhibits no discharge. No scleral icterus.
Neck: No thyromegaly present.
Cardiovascular: Normal rate, regular rhythm and normal heart sounds.
Pulmonary/Chest: Effort normal and breath sounds normal. No respiratory distress. He has no rales. He exhibits no tenderness.
Abdominal: Soft. He exhibits no distension. There is no abdominal tenderness.
Musculoskeletal:
  General: No edema.
  Right shoulder: Tenderness present. Decreased range of motion.
  Left shoulder: Tenderness and crepitus present. Decreased range of motion.
  Arms:



  Lumbar back: Tenderness present.
  Left hip: Tenderness present. Decreased range of motion.
  Right knee: Decreased range of motion. Tenderness present.
  Left knee: Decreased range of motion. Tenderness present.
Lymphadenopathy:
  He has no cervical adenopathy.
Neurological: He is alert and oriented to person, place, and time. He has normal reflexes. No cranial nerve deficit. He exhibits normal muscle tone.
Skin: Skin is warm and dry. No rash noted.
Psychiatric: He has a normal mood and affect. His behavior is normal.
Walking with an antalgic gait favoring the left hip. Unable to bear weight on the left lower extremity independently without the assist of holding onto the counter

**Assessment/Plan:**
 This is a 69 y.o. male who has a past medical history of Asthma, BPH (benign prostatic hyperplasia), Bronchitis, Depression, Hypercholesterolemia, Hypertension, IBS (irritable bowel syndrome), Morbid obesity with BMI of 40.0-44.9, adult (11/18/2019), Obstructive sleep apnea, Steroid-induced diabetes, Tinea cruris, and Tracheomalacia. presents for evaluation of

SJA-714

D[REDACTED], T[REDACTED] (MRN [REDACTED]) DOB: [REDACTED]      Encounter Date: 10/27/2020
CONFIDENTIAL                                                    **D001440**

|   |   | ICD-10-CM | ICD-9-CM |
|---|---|---|---|
| 1. | **Chronic pain of both shoulders** | **M25.511** | **719.41** |
|   |   | **G89.29** | **338.29** |
|   |   | **M25.512** |   |
| 2. | Chronic pain of both hips | M25.551 | 719.45 |
|   |   | M25.552 | 338.29 |
|   |   | G89.29 |   |
| 3. | Myalgia | M79.10 | 729.1 |

Polyarthralgia with myalgia involving the upper and lower extremities. Clinical examination most suggestive of osteoarthritis more advanced involving the left shoulder as well as the left hip region. Imaging studies reviewed with him at length today, and revealing moderate bilateral hip osteoarthritis, more pronounced on the left. There is also findings of mild bilateral knee osteoarthritis, and more advanced bilateral shoulder arthritis. There is also calcification seen involving the shoulders.

Left hip discomfort at present time is most problematic. Imaging reveals moderate osteoarthritis. Local cortisone provided for relief without improvement. To send for MRI at this time to exclude complications from the injection itself, AVN, or possible internal derangement.

For general osteoarthritis discomfort and for intense hip to add tramadol 1 tablet twice daily as needed. For chronic management of arthritis pain Cymbalta cannot be introduced as he is presently on Effexor. At his last visit it was determined to do more localized approach, however this may need to be readdressed after the hip discomfort improves. Physical therapy to address the bilateral hips as well as the shoulders, and try to improve range of motion involving the left shoulder. Hand films did not reveal any evidence of inflammatory arthritis, with osteoarthritis involving the left CMC most prominent.

Further therapeutic recommendations to be determined pending completion of evaluation. I have asked Mr. Durnan to contact me if any changes in his rheumatic condition immediately.

Consultation was 40 minutes, of which over 50% of this time was spent in reviewing clinical history, medications, laboratory findings, examinations, assessment and plan.

## Instructions

📅 Return in about 2 weeks (around 11/10/2020).

After Visit Summary (Automatic SnapShot taken 10/27/2020)

## Created by

Encounter creation information not available

## Orders Placed

**C-REACTIVE PROTEIN** (Resulted 10/27/2020, Abnormal)
**CBC WITH DIFFERENTIAL** (Resulted 10/27/2020, Abnormal)
**COMPREHENSIVE METABOLIC PANEL** (Resulted 10/27/2020, Abnormal)
ERYTHROCYTE SEDIMENTATION RATE (Resulted 10/27/2020)
MRI HIP WITHOUT IV CONTRAST LEFT (Resulted 11/2/2020)

REDACTED

SJA-715

D̶REDACTED̶, T̶REDACTED̶ (MRN REDACTED) DOB: REDACTED          Encounter Date: 10/27/2020

CONFIDENTIAL                                                  **D001441**

MRI KNEE WITHOUT IV CONTRAST LEFT (Resulted 11/6/2020)

## Medication Changes
As of 10/27/2020  3:32 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| Added: traMADoL (ULTRAM) 50 mg tablet | 0 | 10/27/2020 | 11/25/2020 |

Take 1 tablet by mouth every 8 hours as needed for Breakthrough pain. Max Daily Amount: 150 mg - Oral

## Medication List at End of Visit
As of 10/27/2020  3:32 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| albuterol sulfate 90 mcg/actuation HFA inhaler | 5 | 9/17/2019 | 12/3/2020 |

Inhale 2 Puffs into the lungs every 6 hours as needed for Wheezing. - Inhalation

| | | | |
|---|---|---|---|
| amLODIPine (NORVASC) 10 mg tablet | 2 | 6/24/2020 | 12/28/2020 |

ONE TABLET BY MOUTH ONCE DAILY
Notes to Pharmacy: please send new rx

calcium-vitamin D (OS-CAL PLUS D) 500 mg (1,250mg) -200 unit per tablet

Take 1 Tab by mouth 2 (two) times daily with meals. - Oral
Patient-reported medication

cholecalciferol (VITAMIN D3) 1,000 unit tablet

Take 1,000 Units by mouth daily. - Oral
Patient-reported medication

diphenoxylate HCl/atropine

| DIPHENOXYLATE HCL/ATROPINE (LOMOTIL ORAL) | | | 12/3/2020 |
|---|---|---|---|

Take 2 tablets by mouth 2 (two) times daily. - Oral
Patient-reported medication

| diphenoxylate-atropine (LOMOTIL) 2.5-0.025 mg per tablet | | 1/6/2020 | |
|---|---|---|---|

Take 1 tablet by mouth 4 (four) times daily. - Oral
Patient-reported medication

| dupilumab (DUPIXENT) 300 mg/2 mL injection | 5 | 5/21/2020 | 12/28/2020 |
|---|---|---|---|

Inject 2 mL into the skin every 14 (fourteen) days. Starting on day 15 - SubCutaneous

| EPINEPHrine (EPIPEN) 1:1000 (0.3 mg/0.3 mL) injection | 2 | 4/30/2019 | |
|---|---|---|---|

Inject 0.3 mL into the muscle once as needed for up to 1 dose. - IntraMuscular
Patient not taking: Reported on 9/8/2021

| fenofibrate (LOFIBRA) 160 mg tablet | 1 | 5/4/2020 | 11/2/2020 |
|---|---|---|---|

TAKE ONE TABLET BY MOUTH ONCE DAILY

| fluticasone-vilanterol (BREO ELLIPTA) 200-25 mcg/dose dry powder inhaler | 5 | 6/2/2020 | 12/11/2020 |
|---|---|---|---|

Inhale 1 Puff into the lungs daily. - Inhalation

| insulin glargine (LANTUS SOLOSTAR U-100 INSULIN) 100 unit/mL (3 mL) injection | 2 | 6/12/2020 | 12/3/2020 |
|---|---|---|---|

REDACTED

SJA-716

D⬛REDACTED⬛, T⬛ (MRN ⬛REDACTED⬛) DOB: ⬛REDACTED⬛    Encounter Date: 10/27/2020

CONFIDENTIAL    D001442

|  | Refills | Start Date | End Date |
|---|---|---|---|
| INJECT 7 UNITS SUBCUTANEOUSLY ONCE DAILY AT BEDTIME | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| ipratropium (ATROVENT) 0.02 % nebulizer solution | 0 | 6/10/2019 | |
| USE 1 VIAL VIA NEBULIZER EVERY SIX HOURS AS NEEDED FOR WHEEZING | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| VICTOZA 3-PAK 0.6 mg/0.1 mL (18 mg/3 mL) PnIj | 2 | 8/4/2020 | 11/4/2020 |
| INJECT 1.8MG SUBCUTANEOUSLY ONCE A DAY AS DIRECTED | | | |
| losartan (COZAAR) 100 mg tablet | 2 | 6/3/2020 | 3/10/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| meloxicam (MOBIC) 15 mg tablet | 0 | 9/24/2020 | 12/3/2020 |
| Take 1 tablet by mouth daily. - Oral | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| metFORMIN (GLUCOPHAGE-XR) 500 mg XR XR tablet | 2 | 3/3/2020 | 12/1/2020 |
| TAKE 2 TABLETS BY MOUTH TWICE A DAY | | | |
| multivitamin capsule | | | |
| Take 1 Cap by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| nystatin (MYCOSTATIN) 100,000 unit/gram powder | 1 | 1/14/2020 | |
| Apply  topically 3 times daily as needed. - Topical | | | |
| rosuvastatin (CRESTOR) 5 mg tablet | 2 | 7/10/2020 | 12/28/2020 |
| Take 1 tablet by mouth 5 days per week. | | | |
| torsemide (DEMADEX) 20 mg tablet | 3 | 8/5/2020 | 12/3/2020 |
| Take 1 tablet by mouth as needed (swelling in the legs). - Oral | | | |
| traMADoL (ULTRAM) 50 mg tablet | 0 | 10/27/2020 | 11/25/2020 |
| Take 1 tablet by mouth every 8 hours as needed for Breakthrough pain. Max Daily Amount: 150 mg - Oral | | | |
| venlafaxine XR (EFFEXOR XR) 75 mg capsule | 1 | 8/3/2020 | 2/2/2021 |
| TAKE TWO CAPSULES BY MOUTH DAILY | | | |
| vitamin E 100 unit capsule | | | |
| Take 100 Units by mouth daily. - Oral | | | |
| Patient-reported medication | | | |

## Visit Diagnoses

Primary: **Chronic pain of both shoulders** M25.511, G89.29, M25.512
Chronic pain of both hips M25.551, M25.552, G89.29
Myalgia M79.10

SJA-717

D~~REDACTED~~, T~~REDACTED~~ (MRN ~~REDACTED~~)

Encounter Date: 11/02/2020

CONFIDENTIAL

**D001443**

D~~REDACTED~~, T~~REDACTED~~

MRN: ~~REDACTED~~

**Patient Message** 11/2/2020   Provider: Sari Dawn Edelman, DO (Medicine, Rheumatology)
NYU LANGONE LI
RHEUMATOLOGY

## Conversation: Scheduling Question

(Oldest Message First)

November 2, 2020


D~~REDACTED~~, T~~REDACTED~~ to Edelman, Sari D, DO

I am getting my MRI 11/2 & 11/3.  One for left upper leg & one   3:27 PM
for left knee.
When  should I schedule a followup  appointment with you?

Patricia Fesolowich, RN routed this conversation to Sari Dawn Edelman, DO    4:03 PM    PF

Sari Dawn Edelman, DO  to Durnan, Tom

Let's wait results, once I review determine next follow up.  Are you going   4:21 PM
NYU?



Last read by T~~REDACTED~~ D~~REDACTED~~ at 1:46 PM on 11/3/2020.

D~~REDACTED~~, T~~REDACTED~~ to Edelman, Sari D, DO

The MRI was the longest 1/2 hr. of my life.   5:56 PM
I experienced such pain with charlie-horses in my left upper leg
during the test.
I rescheduled the knee MRI for Friday in a closed MRI.  They said it
is half the time.
I need serious pain med for the test.  Not much but heavy for test.
Please call me.  PLEASE
516-369-7964.

November 5, 2020

Sari Dawn Edelman, DO  to Patricia Fesolowich, RN

Note   12:15 PM



Give him a call as requested.  It went to voicemail left a message.  Reviewed
MRI, with some degenerative labral tear as well as moderate arthritis and joint
effusion present.  Awaiting call back to review these findings.

As for the closed MRI of the knee, he has tramadol at home.  He can take 2
tramadol together prior to the test, or if he prefers I can give him something like

D~~REDACTED~~, T~~REDACTED~~ (MRN ~~REDACTED~~) ~~REDACTED~~.   Page 1 of 4

SJA-718

 (MRN REDACTED) Encounter Date: 11/02/2020

CONFIDENTIAL D001444

a Valium which will help him just to sleep. If he does this he would need to have someone drive him home.

November 6, 2020

Patricia Fesolowich, RN  to Sari Dawn Edelman, DO ↑

Note 3:45 PM PF

Spoke with patients wife he is currently getting the MRI of his knee She provided him with xanax to help him relax. She stated they didn't get your message I told her you would call back once you have results from the MRI of the knee

## Additional Documentation

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Patient Demographics

| Patient Name | Legal Sex | DOB | SSN | Address | Phone |
|---|---|---|---|---|---|
| D REDACTED, T REDACTED | Male | 6/11/1951 | xxx-xx-5641 | 709 The Plain Road Westbury NY 11590 | 516-334-2180 (Home) 516-369-7964 (Mobile) *Preferred* |

## Orders Placed

None

## Medication Renewals and Changes

As of 11/6/2020 10:00 PM

None

## Medication List at End of Visit

As of 11/6/2020 10:00 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| albuterol sulfate 90 mcg/actuation HFA inhaler | 5 | 9/17/2019 | 12/3/2020 |
| Inhale 2 Puffs into the lungs every 6 hours as needed for Wheezing. - Inhalation | | | |
| amLODIPine (NORVASC) 10 mg tablet | 2 | 6/24/2020 | 12/28/2020 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| Notes to Pharmacy: please send new rx | | | |
| calcium-vitamin D (OS-CAL PLUS D) 500 mg (1,250mg) -200 unit per tablet | | | |
| Take 1 Tab by mouth 2 (two) times daily with meals. - Oral | | | |
| Patient-reported medication | | | |
| cholecalciferol (VITAMIN D3) 1,000 unit tablet | | | |
| Take 1,000 Units by mouth daily. - Oral | | | |

SJA-719

D[REDACTED], T[REDACTED] (MRN [REDACTED])

CONFIDENTIAL

Encounter Date: 11/02/2020

D001445

| | Refills | Start Date | End Date |
|---|---|---|---|
| Patient-reported medication | | | |
| diphenoxylate HCl/atropine | | | |
| DIPHENOXYLATE HCL/ATROPINE (LOMOTIL ORAL) | | | 12/3/2020 |
| Take 2 tablets by mouth 2 (two) times daily. - Oral | | | |
| Patient-reported medication | | | |
| diphenoxylate-atropine (LOMOTIL) 2.5-0.025 mg per tablet | | 1/6/2020 | |
| Take 1 tablet by mouth 4 (four) times daily. - Oral | | | |
| Patient-reported medication | | | |
| dupilumab (DUPIXENT) 300 mg/2 mL injection | 5 | 5/21/2020 | 12/28/2020 |
| Inject 2 mL into the skin every 14 (fourteen) days. Starting on day 15 - SubCutaneous | | | |
| EPINEPHrine (EPIPEN) 1:1000 (0.3 mg/0.3 mL) injection | 2 | 4/30/2019 | |
| Inject 0.3 mL into the muscle once as needed for up to 1 dose. - IntraMuscular | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| fenofibrate (LOFIBRA) 160 mg tablet | 1 | 11/2/2020 | 5/3/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| fluticasone-vilanterol (BREO ELLIPTA) 200-25 mcg/dose dry powder inhaler | 5 | 6/2/2020 | 12/11/2020 |
| Inhale 1 Puff into the lungs daily. - Inhalation | | | |
| insulin glargine (LANTUS SOLOSTAR U-100 INSULIN) 100 unit/mL (3 mL) injection | 2 | 6/12/2020 | 12/3/2020 |
| INJECT 7 UNITS SUBCUTANEOUSLY ONCE DAILY AT BEDTIME | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| ipratropium (ATROVENT) 0.02 % nebulizer solution | 0 | 6/10/2019 | |
| USE 1 VIAL VIA NEBULIZER EVERY SIX HOURS AS NEEDED FOR WHEEZING | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| VICTOZA 3-PAK 0.6 mg/0.1 mL (18 mg/3 mL) Pnlj | 2 | 11/4/2020 | 2/21/2021 |
| INJECT 1.8MG SUBCUTAEOUSLY ONCE A DAY AS DIRECTED | | | |
| losartan (COZAAR) 100 mg tablet | 2 | 6/3/2020 | 3/10/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| meloxicam (MOBIC) 15 mg tablet | 0 | 9/24/2020 | 12/3/2020 |
| Take 1 tablet by mouth daily. - Oral | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| metFORMIN (GLUCOPHAGE-XR) 500 mg XR XR tablet | 2 | 3/3/2020 | 12/1/2020 |
| TAKE 2 TABLETS BY MOUTH TWICE A DAY | | | |
| multivitamin capsule | | | |
| Take 1 Cap by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| nystatin (MYCOSTATIN) 100,000 unit/gram powder | 1 | 1/14/2020 | |
| Apply topically 3 times daily as needed. - Topical | | | |
| rosuvastatin (CRESTOR) 5 mg tablet | 2 | 7/10/2020 | 12/28/2020 |
| Take 1 tablet by mouth 5 days per week. | | | |
| torsemide (DEMADEX) 20 mg tablet | 3 | 8/5/2020 | 12/3/2020 |

SJA-720

D[REDACTED], T[REDACTED] (MRN [REDACTED])

Encounter Date: 11/02/2020

CONFIDENTIAL

**D001446**

| | Refills | Start Date | End Date |
|---|---|---|---|
| Take 1 tablet by mouth as needed (swelling in the legs). - Oral | | | |

**traMADoL (ULTRAM) 50 mg tablet**   0   10/27/2020   11/25/2020
Take 1 tablet by mouth every 8 hours as needed for Breakthrough pain. Max Daily Amount: 150 mg - Oral

**venlafaxine XR (EFFEXOR XR) 75 mg capsule**   1   8/3/2020   2/2/2021
TAKE TWO CAPSULES BY MOUTH DAILY

**vitamin E 100 unit capsule**
Take 100 Units by mouth daily. - Oral
Patient-reported medication

## Visit Diagnoses

None



SJA-721

D̅REDACTED̅, T̅REDACTED̅ (MRN REDACTED)

CONFIDENTIAL

Encounter Date: 11/09/2020
**D001447**

D̅REDACTED̅, T̅REDACTED̅

MRN: REDACTED

**Telephone** 11/9/2020
NYU LANGONE LI
RHEUMATOLOGY

Provider: Sari Dawn Edelman, DO (Medicine, Rheumatology)

## Conversation

(Oldest Message First)

Sari Dawn Edelman, DO



Note

11/9/20 12:06 PM

I reviewed mri knee, and there is medial meniscal tear. There is small baker's cyst, and joint fluid, and cartilage fissuring consistent with osteoarthritis.

Based on these findings, feel likely majority pain coming from hip, which shows labral tear and moderate OA, moderate joint effusion with inflammation synovium.

Reviewed findings with patient, and referred to Dr. Barzideh.

## Additional Documentation

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Encounter Messages

No messages in this encounter

## Pharmacy Benefits

No pharmacy benefits eligibility data found for this visit.

## Visit Pharmacy

CARMAN DRUGS 829B CARMAN AVE, WESTBURY, NY 11590 516-333-4545 516-307-1383

## ⑦ Questionnaires

No completed forms available for this encounter.

## Created by

Sari Dawn Edelman, DO on 11/09/2020 11:39 AM

## Orders Placed

None

## Medication Renewals and Changes

As of 11/9/2020 12:06 PM

SJA-722

D̶REDACTED̶ T̶REDACTED̶ (MRN REDACTED)　　　　　　　CONFIDENTIAL　　　　　Encounter Date: 11/09/2020
**D001448**

None

## Medication List at End of Visit
As of 11/9/2020 12:06 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| albuterol sulfate 90 mcg/actuation HFA inhaler | 5 | 9/17/2019 | 12/3/2020 |
| Inhale 2 Puffs into the lungs every 6 hours as needed for Wheezing. - Inhalation | | | |
| amLODIPine (NORVASC) 10 mg tablet | 2 | 6/24/2020 | 12/28/2020 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| Notes to Pharmacy: please send new rx | | | |
| calcium-vitamin D (OS-CAL PLUS D) 500 mg (1,250mg) -200 unit per tablet | | | |
| Take 1 Tab by mouth 2 (two) times daily with meals. - Oral | | | |
| Patient-reported medication | | | |
| cholecalciferol (VITAMIN D3) 1,000 unit tablet | | | |
| Take 1,000 Units by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| diphenoxylate HCl/atropine | | | |
| DIPHENOXYLATE HCL/ATROPINE (LOMOTIL ORAL) | | | 12/3/2020 |
| Take 2 tablets by mouth 2 (two) times daily. - Oral | | | |
| Patient-reported medication | | | |
| diphenoxylate-atropine (LOMOTIL) 2.5-0.025 mg per tablet | | 1/6/2020 | |
| Take 1 tablet by mouth 4 (four) times daily. - Oral | | | |
| Patient-reported medication | | | |
| dupilumab (DUPIXENT) 300 mg/2 mL injection | 5 | 5/21/2020 | 12/28/2020 |
| Inject 2 mL into the skin every 14 (fourteen) days. Starting on day 15 - SubCutaneous | | | |
| EPINEPHrine (EPIPEN) 1:1000 (0.3 mg/0.3 mL) injection | 2 | 4/30/2019 | |
| Inject 0.3 mL into the muscle once as needed for up to 1 dose. - IntraMuscular | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| fenofibrate (LOFIBRA) 160 mg tablet | 1 | 11/2/2020 | 5/3/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| fluticasone-vilanterol (BREO ELLIPTA) 200-25 mcg/dose dry powder inhaler | 5 | 6/2/2020 | 12/11/2020 |
| Inhale 1 Puff into the lungs daily. - Inhalation | | | |
| insulin glargine (LANTUS SOLOSTAR U-100 INSULIN) 100 unit/mL (3 mL) injection | 2 | 6/12/2020 | 12/3/2020 |
| INJECT 7 UNITS SUBCUTANEOUSLY ONCE DAILY AT BEDTIME | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| ipratropium (ATROVENT) 0.02 % nebulizer solution | 0 | 6/10/2019 | |
| USE 1 VIAL VIA NEBULIZER EVERY SIX HOURS AS NEEDED FOR WHEEZING | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| VICTOZA 3-PAK 0.6 mg/0.1 mL (18 mg/3 mL) PnIj | 2 | 11/4/2020 | 2/21/2021 |
| INJECT 1.8MG SUBCUTANEOUSLY ONCE A DAY AS DIRECTED | | | |

SJA-723

D̶̶, T̶ (MRN REDACTED)

CONFIDENTIAL

Encounter Date: 11/09/2020

**D001449**

|  | Refills | Start Date | End Date |
|---|---|---|---|
| losartan (COZAAR) 100 mg tablet | 2 | 6/3/2020 | 3/10/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| meloxicam (MOBIC) 15 mg tablet | 0 | 9/24/2020 | 12/3/2020 |
| Take 1 tablet by mouth daily. - Oral | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| metFORMIN (GLUCOPHAGE-XR) 500 mg XR XR tablet | 2 | 3/3/2020 | 12/1/2020 |
| TAKE 2 TABLETS BY MOUTH TWICE A DAY | | | |
| multivitamin capsule | | | |
| Take 1 Cap by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| nystatin (MYCOSTATIN) 100,000 unit/gram powder | 1 | 1/14/2020 | |
| Apply  topically 3 times daily as needed. - Topical | | | |
| rosuvastatin (CRESTOR) 5 mg tablet | 2 | 7/10/2020 | 12/28/2020 |
| Take 1 tablet by mouth 5 days per week. | | | |
| torsemide (DEMADEX) 20 mg tablet | 3 | 8/5/2020 | 12/3/2020 |
| Take 1 tablet by mouth as needed (swelling in the legs). - Oral | | | |
| traMADoL (ULTRAM) 50 mg tablet | 0 | 10/27/2020 | 11/25/2020 |
| Take 1 tablet by mouth every 8 hours as needed for Breakthrough pain. Max Daily Amount: 150 mg - Oral | | | |
| venlafaxine XR (EFFEXOR XR) 75 mg capsule | 1 | 8/3/2020 | 2/2/2021 |
| TAKE TWO CAPSULES BY MOUTH DAILY | | | |
| vitamin E 100 unit capsule | | | |
| Take 100 Units by mouth daily. - Oral | | | |
| Patient-reported medication | | | |

## Visit Diagnoses

None



SJA-724

D<span style="background:black;color:white">REDACTED</span>, T<span style="background:black;color:white">REDACTED</span> (MRN <span style="background:black;color:white">REDACTED</span>)

**CONFIDENTIAL**

Encounter Date: 11/24/2020
**D001450**

D<span style="background:black;color:white">REDACTED</span>, T<span style="background:black;color:white">REDACTED</span>

MRN: <span style="background:black;color:white">REDACTED</span>

**Patient Message**
11/24/2020
NYU LANGONE LI
RHEUMATOLOGY

Provider: Sari Dawn Edelman, DO (Medicine, Rheumatology)

## Conversation: Medication Question

(Oldest Message First)

November 24, 2020

D<span style="background:black;color:white">REDACTED</span>, T<span style="background:black;color:white">REDACTED</span> to Edelman, Sari D, DO

I have now made my third request for a refill of tramadol. I took my last pills yesterday. What gives. ABSOLUTELY NO RESPONSE.

7:45 PM

November 25, 2020

Tiffany Benjamin routed this conversation to Sari Dawn Edelman, DO

9:27 AM

TB

Sari Dawn Edelman, DO to D<span style="background:black;color:white">REDACTED</span>, T<span style="background:black;color:white">REDACTED</span>

This was sent in at least twice. Please check with your pharmacy. For refill requests I just send it in. I do not reply back to you as well as get over 100 scripts day, which mean sending additional 100 messages back to patient to confirm sent, on top of sending 100 scripts. If not at pharmacy let me know, but should be there. Dr. Edelman

4:52 PM



Last read by T<span style="background:black;color:white">REDACTED</span> D<span style="background:black;color:white">REDACTED</span> at 5:22 PM on 11/25/2020.

## Additional Documentation

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Patient Demographics

| Patient Name | Legal Sex | DOB | SSN | Address | Phone |
|---|---|---|---|---|---|
| D<span style="background:black;color:white">REDACTED</span>, T<span style="background:black;color:white">REDACTED</span> | Male | <span style="background:black;color:white">REDACTED</span> | xxx-xx-<span style="background:black;color:white">REDACTED</span> | <span style="background:black;color:white">REDACTED</span> <br> <span style="background:black;color:white">REDACTED</span> | <span style="background:black;color:white">REDACTED</span> (Home) <br> <span style="background:black;color:white">REDACTED</span> (Mobile) <br> *Preferred* |

## Orders Placed

None

## Medication Renewals and Changes

SJA-725

D[REDACTED], T[REDACTED] (MRN [REDACTED])

CONFIDENTIAL

Encounter Date: 11/24/2020
**D001451**

As of 11/28/2020 10:10 PM

None

## Medication List at End of Visit
As of 11/28/2020 10:10 PM

| | Refills | Start Date | End Date |
|---|---|---|---|
| **albuterol sulfate 90 mcg/actuation HFA inhaler** | 5 | 9/17/2019 | 12/3/2020 |
| Inhale 2 Puffs into the lungs every 6 hours as needed for Wheezing. - Inhalation | | | |
| **amLODIPine (NORVASC) 10 mg tablet** | 2 | 6/24/2020 | 12/28/2020 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| Notes to Pharmacy: please send new rx | | | |
| **calcium-vitamin D (OS-CAL PLUS D) 500 mg** | | | |
| **(1,250mg) -200 unit per tablet** | | | |
| Take 1 Tab by mouth 2 (two) times daily with meals. - Oral | | | |
| Patient-reported medication | | | |
| **cholecalciferol (VITAMIN D3) 1,000 unit tablet** | | | |
| Take 1,000 Units by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| **diphenoxylate HCl/atropine** | | | |
| DIPHENOXYLATE HCL/ATROPINE (LOMOTIL ORAL) | | | 12/3/2020 |
| Take 2 tablets by mouth 2 (two) times daily. - Oral | | | |
| Patient-reported medication | | | |
| diphenoxylate-atropine (LOMOTIL) 2.5-0.025 mg per tablet | | 1/6/2020 | |
| Take 1 tablet by mouth 4 (four) times daily. - Oral | | | |
| Patient-reported medication | | | |
| **dupilumab (DUPIXENT) 300 mg/2 mL injection** | 5 | 5/21/2020 | 12/28/2020 |
| Inject 2 mL into the skin every 14 (fourteen) days. Starting on day 15 - SubCutaneous | | | |
| **EPINEPHrine (EPIPEN) 1:1000 (0.3 mg/0.3 mL) injection** | 2 | 4/30/2019 | |
| Inject 0.3 mL into the muscle once as needed for up to 1 dose. - IntraMuscular | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| **fenofibrate (LOFIBRA) 160 mg tablet** | 1 | 11/2/2020 | 5/3/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| **fluticasone-vilanterol (BREO ELLIPTA) 200-25 mcg/dose dry powder inhaler** | 5 | 6/2/2020 | 12/11/2020 |
| Inhale 1 Puff into the lungs daily. - Inhalation | | | |
| **insulin glargine (LANTUS SOLOSTAR U-100 INSULIN) 100 unit/mL (3 mL) injection** | 2 | 6/12/2020 | 12/3/2020 |
| INJECT 7 UNITS SUBCUTANEOUSLY ONCE DAILY AT BEDTIME | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| **ipratropium (ATROVENT) 0.02 % nebulizer solution** | 0 | 6/10/2019 | |
| USE 1 VIAL VIA NEBULIZER EVERY SIX HOURS AS NEEDED FOR WHEEZING | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| **VICTOZA 3-PAK 0.6 mg/0.1 mL (18 mg/3 mL) PnIj** | 2 | 11/4/2020 | 2/21/2021 |

SJA-726

D████, T████ (MRN REDACTED)            Encounter Date: 11/24/2020

CONFIDENTIAL                                         D001452

|  | Refills | Start Date | End Date |
|---|---|---|---|
| INJECT 1.8MG SUBCUTANEOUSLY ONCE A DAY AS DIRECTED | | | |
| losartan (COZAAR) 100 mg tablet | 2 | 6/3/2020 | 3/10/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| meloxicam (MOBIC) 15 mg tablet | 0 | 9/24/2020 | 12/3/2020 |
| Take 1 tablet by mouth daily. - Oral | | | |
| Patient not taking: Reported on 11/10/2020 | | | |
| metFORMIN (GLUCOPHAGE-XR) 500 mg XR XR tablet | 2 | 3/3/2020 | 12/1/2020 |
| TAKE 2 TABLETS BY MOUTH TWICE A DAY | | | |
| multivitamin capsule | | | |
| Take 1 Cap by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| nystatin (MYCOSTATIN) 100,000 unit/gram powder | 1 | 1/14/2020 | |
| Apply topically 3 times daily as needed. - Topical | | | |
| rosuvastatin (CRESTOR) 5 mg tablet | 2 | 7/10/2020 | 12/28/2020 |
| Take 1 tablet by mouth 5 days per week. | | | |
| torsemide (DEMADEX) 20 mg tablet | 3 | 8/5/2020 | 12/3/2020 |
| Take 1 tablet by mouth as needed (swelling in the legs). - Oral | | | |
| traMADoL (ULTRAM) 50 mg tablet | 0 | 11/25/2020 | 3/5/2021 |
| ONE TABLET BY MOUTH EVERY EIGHT HOURS AS NEEDED FOR BREAKTHROUGH PAIN | | | |
| Patient not taking: Reported on 2/11/2021 | | | |
| venlafaxine XR (EFFEXOR XR) 75 mg capsule | 1 | 8/3/2020 | 2/2/2021 |
| TAKE TWO CAPSULES BY MOUTH DAILY | | | |
| vitamin E 100 unit capsule | | | |
| Take 100 Units by mouth daily. - Oral | | | |
| Patient-reported medication | | | |

## Visit Diagnoses

None

SJA-727

D⟨REDACTED⟩ T⟨REDACTED⟩ (MRN ⟨REDACTED⟩) DOB: ⟨REDACTED⟩          Encounter Date: 12/03/2020

CONFIDENTIAL          **D001453**

D⟨REDACTED⟩, T⟨REDACTED⟩          MRN: ⟨REDACTED⟩

**Office Visit** 12/3/2020          Provider: Sari Dawn Edelman, DO (Medicine, Rheumatology)
NYU LANGONE LI          Primary diagnosis: Chronic pain of both hips
RHEUMATOLOGY

## Additional Documentation

Vitals:          BP 134/82 Pulse 88 SpO2 98%

Flowsheets:          Patient-Reported Data

Encounter Info: Billing Info, History, Allergies, Detailed Report

## Progress Notes

Sari Dawn Edelman, DO (Physician) • Medicine, Rheumatology

**Subjective:**

T⟨REDACTED⟩ D⟨REDACTED⟩ is a 69 y.o. male who presents with a chief complaint of No chief complaint on file.

He presents for evaluation of joint pain involving multiple areas.  He is taking two Advil, one Tramadol in morning, and then another Tramadol later in day.  He finds this manages the pain.  There is no abdominal upset or dark stools.

Symptoms have been present for approximately 1 year though he reports that this has progressed over the past several weeks.  He is seeing Dr. Barzideh tomorrow.  There is discomfort involving the left hip as well as the left knee. He had cortisone injection to the left hip in recent weeks, noting no improvement in joint discomfort.  MRI spine now completed.

He continues to be unable to raise his left arm over his head.  There is pain involving both shoulders.  He is a retired police detective for many years now.  He denies any swelling with the exception of the bilateral ankles.  His cardiologist has initiated a diuretic.   Imaging of the knees was done in November 2019 revealing mild to moderate osteoarthritis.

Historical:
There is history of asthma.  He denies any active dyspnea or wheezing.  He denies any dysphagia.

He is on statin therapy for hyperlipidemia.  He denies any known association of onset of muscle discomfort with statin use.  Other known history of hypertension and diabetes which he reports is well controlled.

For pain relief he has been taking 1 naproxen daily with food.  He denies any gastrointestinal upset.  There is known history of transaminitis related to fatty liver.

HPI

**Past Medical History:**
Diagnosis          Date
 • Asthma
 • BPH (benign prostatic hyperplasia)
 • Bronchitis

REDACTED          Page 1 of 9

SJA-728

D███████, T██ (MRN ████████) DOB: ████████          Encounter Date: 12/03/2020

CONFIDENTIAL          D001454

- Depression
- Hypercholesterolemia
- Hypertension
- IBS (irritable bowel syndrome)
  *Diarrhea Predominant*
- Morbid obesity with BMI of 40.0-44.9, adult          11/18/2019
- Obstructive sleep apnea
  *AHI 124, s/p UPPP, CPAP 12 cm H20*
- Steroid-induced diabetes
  *Insulin requiring*
- Tinea cruris
- Tracheomalacia

**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • CHOLECYSTECTOMY | | 1995 |
| • IR THERAPEUTIC INJECTION HIP FL GUIDED LEFT | | 10/15/2020 |
| *IR THERAPEUTIC INJECTION HIP FL GUIDED LEFT 10/15/2020 Michael K Brooks, MD LI NW 222 SP RAD IR* | | |
| • LAP BAND | | 2009 |
| *removal in 2011* | | |
| • PILONIDAL CYST DRAINAGE | | 1977 |
| • UVULOPALATOPLASTY | | 2002 |

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| • Heart Failure | Mother | |
| • Diabetes | Mother | |
| • Heart Failure | Father | |
| • Diabetes | Father | |

Social History
  Socioeconomic History
    Marital status: Married
    Spouse name: Annalise
    Number of children: 2
    Years of education: None
    Highest education level: None
  Occupational History
    Occupation: Retired police
  Tobacco Use
    Smoking status: Never Smoker
    Smokeless tobacco: Never Used
  Substance and Sexual Activity
    Alcohol use: No
    Drug use: No
    Sexual activity: None
  Other Topics
    Concerns:
      None
  Social History Narrative
    None

**Social Determinants of Health**

REDACTED

SJA-729

D⬛, T⬛ (MRN ⬛) DOB: ⬛                    Encounter Date: 12/03/2020
CONFIDENTIAL                                                     D001455

Financial Resource Strain:
• Difficulty of Paying Living Expenses: Not on file
Food Insecurity:
• Worried About Running Out of Food in the Last Year: Not on file
• Ran Out of Food in the Last Year: Not on file
Transportation Needs:
• Lack of Transportation (Medical): Not on file
• Lack of Transportation (Non-Medical): Not on file
Physical Activity:
• Days of Exercise per Week: Not on file
• Minutes of Exercise per Session: Not on file
Stress:
• Feeling of Stress : Not on file
Social Connections:
• Frequency of Communication with Friends and Family: Not on file
• Frequency of Social Gatherings with Friends and Family: Not on file
• Attends Religious Services: Not on file
• Active Member of Clubs or Organizations: Not on file
• Attends Club or Organization Meetings: Not on file
• Marital Status: Not on file
Intimate Partner Violence:
• Fear of Current or Ex-Partner: Not on file
• Emotionally Abused: Not on file
• Physically Abused: Not on file
• Sexually Abused: Not on file

**Current Outpatient Medications**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • metFORMIN (GLUCOPHAGE-XR) 500 mg XR XR tablet | TAKE TWO TABLETS BY MOUTH TWICE A DAY | 360 tablet | 2 |
| • traMADoL (ULTRAM) 50 mg tablet | ONE TABLET BY MOUTH EVERY EIGHT HOURS AS NEEDED FOR BREAKTHROUGH PAIN | 60 tablet | 0 |
| • VICTOZA 3-PAK 0.6 mg/0.1 mL (18 mg/3 mL) PnIj | INJECT 1.8MG SUBCUTANEOUSLY ONCE A DAY AS DIRECTED | 9 mL | 2 |
| • fenofibrate (LOFIBRA) 160 mg tablet | ONE TABLET BY MOUTH ONCE DAILY | 90 tablet | 1 |
| • venlafaxine XR (EFFEXOR XR) 75 mg capsule | TAKE TWO CAPSULES BY MOUTH DAILY | 180 capsule | 1 |
| • rosuvastatin (CRESTOR) 5 mg tablet | Take 1 tablet by mouth 5 days per week. | 60 tablet | 2 |

SJA-730

D‌REDACTED‌, T‌██‌ (MRN REDACTED) DOB: REDACTED          Encounter Date: 12/03/2020

CONFIDENTIAL                                              D001456

| | | | |
|---|---|---|---|
| • amLODIPine (NORVASC) 10 mg tablet | ONE TABLET BY MOUTH ONCE DAILY | 90 tablet | 2 |
| • losartan (COZAAR) 100 mg tablet | ONE TABLET BY MOUTH ONCE DAILY | 90 tablet | 2 |
| • fluticasone-vilanterol (BREO ELLIPTA) 200-25 mcg/dose dry powder inhaler | Inhale 1 Puff into the lungs daily. | 1 Each | 5 |
| • dupilumab (DUPIXENT) 300 mg/2 mL injection | Inject 2 mL into the skin every 14 (fourteen) days. Starting on day 15 | 2 mL | 5 |
| • diphenoxylate-atropine (LOMOTIL) 2.5-0.025 mg per tablet | Take 1 tablet by mouth 4 (four) times daily. | | |
| • nystatin (MYCOSTATIN) 100,000 unit/gram powder | Apply topically 3 times daily as needed. | 1 Bottle | 1 |
| • ipratropium (ATROVENT) 0.02 % nebulizer solution | USE 1 VIAL VIA NEBULIZER EVERY SIX HOURS AS NEEDED FOR WHEEZING | 150 mL | 0 |
| • EPINEPHrine (EPIPEN) 1:1000 (0.3 mg/0.3 mL) injection | Inject 0.3 mL into the muscle once as needed for up to 1 dose. | 1 Injection Pen | 2 |
| • calcium-vitamin D (OS-CAL PLUS D) 500 mg(1,250mg) -200 unit per tablet | Take 1 Tab by mouth 2 (two) times daily with meals. | | |
| • cholecalciferol (VITAMIN D3) 1,000 unit tablet | Take 1,000 Units by mouth daily. | | |
| • multivitamin capsule | Take 1 Cap by mouth daily. | | |
| • vitamin E 100 unit capsule | Take 100 Units by mouth daily. | | |

No current facility-administered medications for this visit.

**Allergies**

Allergen                                                 Reactions
  • Iv Contrast, Iodine Containing                       Anaphylaxis
  • Keflex [Cephalexin]                                  Anaphylaxis and Rash

Review of Systems
Constitutional: Negative for chills, fever and unexpected weight change.
HENT: Negative for congestion, facial swelling and mouth sores.
Eyes: Negative for redness and visual disturbance.
Respiratory: Negative for cough, chest tightness and shortness of breath.
Cardiovascular: Negative for chest pain, palpitations and leg swelling.
Gastrointestinal: Negative for abdominal distention, diarrhea, nausea and vomiting.
Genitourinary: Negative for dysuria.

SJA-731

DEDACTED, T... (MRN REDACTED) DOB: REDACTED

Encounter Date: 12/03/2020

CONFIDENTIAL

D001457

Musculoskeletal: Positive for arthralgias, joint swelling and myalgias. Negative for back pain, neck pain and neck stiffness.
Skin: Negative for color change and rash.
Neurological: Positive for weakness. Negative for dizziness, light-headedness and headaches.
Hematological: Negative for adenopathy.

**Objective:**

**Visit Vitals**
BP              134/82
Pulse           88
SpO2            98%

Physical Exam
Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished.
HENT:
Mouth/Throat: Oropharynx is clear and moist.
Eyes: Pupils are equal, round, and reactive to light. Conjunctivae and EOM are normal. Right eye exhibits no discharge. No scleral icterus.
Neck: No thyromegaly present.
Cardiovascular: Normal rate, regular rhythm and normal heart sounds.
Pulmonary/Chest: Effort normal and breath sounds normal. No respiratory distress. He has no rales. He exhibits no tenderness.
Abdominal: Soft. He exhibits no distension. There is no abdominal tenderness.
Musculoskeletal:
  General: No edema.
  Right shoulder: Tenderness present. Decreased range of motion.
  Left shoulder: Tenderness and crepitus present. Decreased range of motion.
    Arms:



  Lumbar back: Tenderness present.
  Left hip: Tenderness present. Decreased range of motion.
  Right knee: Decreased range of motion. Tenderness present.
  Left knee: Decreased range of motion. Tenderness present.
Lymphadenopathy:
  He has no cervical adenopathy.
Neurological: He is alert and oriented to person, place, and time. He has normal reflexes. No cranial nerve deficit. He exhibits normal muscle tone.

REDACTED



SJA-732

D<span>REDACTED</span>, T<span></span> (MRN <span>REDACTED</span>) DOB: <span>REDACTED</span>          Encounter Date: 12/03/2020

<span style="color:red">CONFIDENTIAL</span>          **D001458**

Skin: Skin is warm and dry. No rash noted.
Psychiatric: He has a normal mood and affect. His behavior is normal.
Walking with an antalgic gait favoring the left hip. Unable to bear weight on the left lower extremity independently without the assist of holding onto the counter

**Assessment/Plan:**
This is a 69 y.o. male who has a past medical history of Asthma, BPH (benign prostatic hyperplasia), Bronchitis, Depression, Hypercholesterolemia, Hypertension, IBS (irritable bowel syndrome), Morbid obesity with BMI of 40.0-44.9, adult (11/18/2019), Obstructive sleep apnea, Steroid-induced diabetes, Tinea cruris, and Tracheomalacia. presents for evaluation of

| | | ICD-10-CM | ICD-9-CM |
|---|---|---|---|
| 1. | Chronic pain of both hips | **M25.551** | **719.45** |
| | | **M25.552** | **338.29** |
| | | **G89.29** | |
| 2. | Myalgia | M79.10 | 729.1 |
| 3. | Chronic pain of both knees | M25.561 | 719.46 |
| | | M25.562 | 338.29 |
| | | G89.29 | |

Polyarthralgia with myalgia involving the upper and lower extremities. Clinical examination most suggestive of osteoarthritis more advanced involving the left shoulder as well as the left hip region. Imaging studies reviewed with him at length today, and revealing moderate bilateral hip osteoarthritis, more pronounced on the left. There is also findings of mild bilateral knee osteoarthritis, and more advanced bilateral shoulder arthritis. There is also calcification seen involving the shoulders.

Left hip discomfort at present time is most problematic. Imaging reveals moderate osteoarthritis. Local cortisone provided for relief without improvement. Seeing orthopedist now, and MRI reveals discogenic changes, foraminal stenosis multiple levels. Pain controlled on Tramadol, combination with Advil.

For general osteoarthritis discomfort and for intense hip to add tramadol 1 tablet twice daily as needed. For chronic management of arthritis pain Cymbalta cannot be introduced as he is presently on Effexor. At his last visit it was determined to do more localized approach, however this may need to be readdressed after the hip discomfort improves. Physical therapy to address the bilateral hips as well as the shoulders, and try to improve range of motion involving the left shoulder. Hand films did not reveal any evidence of inflammatory arthritis, with osteoarthritis involving the left CMC most prominent.
Compression fracture T12. To send DEXA, and send serologies secondary bone loss.
Further therapeutic recommendations to be determined pending completion of evaluation. I have asked Mr. Durnan to contact me if any changes in his rheumatic condition immediately.

## Instructions

📅 Return in about 2 months (around 2/3/2021).

After Visit Summary (Automatic SnapShot taken 12/3/2020)

## Created by

Encounter creation information not available

SJA-733

D█████, T████ (MRN █████) DOB: █████        Encounter Date: 12/03/2020

CONFIDENTIAL        **D001459**

## Orders Placed

Labs
**CBC WITH DIFFERENTIAL** (Resulted 12/3/2020, Abnormal)
**COMPREHENSIVE METABOLIC PANEL** (Resulted 12/3/2020, Abnormal)
**ERYTHROCYTE SEDIMENTATION RATE** (Resulted 12/3/2020, Abnormal)
**PROTEIN ELECTROPHORESIS, SERUM** (Resulted 12/3/2020, Abnormal)
**TESTOSTERONE, FREE, TOTAL, MALE** (Resulted 12/3/2020, Abnormal)
C-REACTIVE PROTEIN (Resulted 12/3/2020)
IMMUNOFIXATION, SERUM (Resulted 12/3/2020)
PTH, INTACT WITHOUT CALCIUM (Resulted 12/3/2020)
THYROID STIMULATING HORMONE (Resulted 12/3/2020)
VITAMIN D 25-HYDROXY (SCREENING FOR DEFICIENCY) (Resulted 12/3/2020)

Imaging
XR DEXA BONE DENSITY SPINE AND HIPS (Resulted 12/7/2020)

## Medication Changes

As of 12/3/2020 11:25 AM

| | Refills | Start Date | End Date |
|---|---|---|---|
| diphenoxylate HCl/atropine | | | |
| Discontinued or Completed: DIPHENOXYLATE HCL/ATROPINE (LOMOTIL ORAL) | | | |
| Patient-reported medication | | | |
| Unchanged: diphenoxylate-atropine (LOMOTIL) | | 1/6/2020 | |
| 2.5-0.025 mg per tablet | | | |
| Take 1 tablet by mouth 4 (four) times daily. - Oral | | | |
| Patient-reported medication | | | |

Discontinued or Completed: albuterol sulfate 90 mcg/actuation HFA inhaler
Discontinued or Completed: insulin glargine (LANTUS SOLOSTAR U-100 INSULIN) 100 unit/mL (3 mL) injection
Discontinued or Completed: meloxicam (MOBIC) 15 mg tablet
Discontinued or Completed: torsemide (DEMADEX) 20 mg tablet

## Medication List at End of Visit

As of 12/3/2020 11:25 AM

| | Refills | Start Date | End Date |
|---|---|---|---|
| amLODIPine (NORVASC) 10 mg tablet | 2 | 6/24/2020 | 12/28/2020 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| Notes to Pharmacy: please send new rx | | | |
| calcium-vitamin D (OS-CAL PLUS D) 500 mg (1,250mg) -200 unit per tablet | | | |
| Take 1 Tab by mouth 2 (two) times daily with meals. - Oral | | | |
| Patient-reported medication | | | |
| cholecalciferol (VITAMIN D3) 1,000 unit tablet | | | |
| Take 1,000 Units by mouth daily. - Oral | | | |

REDACTED

SJA-734

D‹REDACTED›, T‹REDACTED› (MRN ‹REDACTED›) DOB: ‹REDACTED›          Encounter Date: 12/03/2020

CONFIDENTIAL                              D001460

| | Refills | Start Date | End Date |
|---|---|---|---|
| Patient-reported medication | | | |
| diphenoxylate-atropine (LOMOTIL) 2.5-0.025 mg per tablet | | 1/6/2020 | |
| Take 1 tablet by mouth 4 (four) times daily. - Oral | | | |
| Patient-reported medication | | | |
| dupilumab (DUPIXENT) 300 mg/2 mL injection | 5 | 5/21/2020 | 12/28/2020 |
| Inject 2 mL into the skin every 14 (fourteen) days. Starting on day 15 - SubCutaneous | | | |
| EPINEPHrine (EPIPEN) 1:1000 (0.3 mg/0.3 mL) injection | 2 | 4/30/2019 | |
| Inject 0.3 mL into the muscle once as needed for up to 1 dose. - IntraMuscular | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| fenofibrate (LOFIBRA) 160 mg tablet | 1 | 11/2/2020 | 5/3/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| fluticasone-vilanterol (BREO ELLIPTA) 200-25 mcg/dose dry powder inhaler | 5 | 6/2/2020 | 12/11/2020 |
| Inhale 1 Puff into the lungs daily. - Inhalation | | | |
| ipratropium (ATROVENT) 0.02 % nebulizer solution | 0 | 6/10/2019 | |
| USE 1 VIAL VIA NEBULIZER EVERY SIX HOURS AS NEEDED FOR WHEEZING | | | |
| Patient not taking: Reported on 9/8/2021 | | | |
| VICTOZA 3-PAK 0.6 mg/0.1 mL (18 mg/3 mL) Pnlj | 2 | 11/4/2020 | 2/21/2021 |
| INJECT 1.8MG SUBCUTANEOUSLY ONCE A DAY AS DIRECTED | | | |
| losartan (COZAAR) 100 mg tablet | 2 | 6/3/2020 | 3/10/2021 |
| ONE TABLET BY MOUTH ONCE DAILY | | | |
| metFORMIN (GLUCOPHAGE-XR) 500 mg XR XR tablet | 2 | 12/1/2020 | 9/2/2021 |
| TAKE TWO TABLETS BY MOUTH TWICE A DAY | | | |
| multivitamin capsule | | | |
| Take 1 Cap by mouth daily. - Oral | | | |
| Patient-reported medication | | | |
| nystatin (MYCOSTATIN) 100,000 unit/gram powder | 1 | 1/14/2020 | |
| Apply  topically 3 times daily as needed. - Topical | | | |
| rosuvastatin (CRESTOR) 5 mg tablet | 2 | 7/10/2020 | 12/28/2020 |
| Take 1 tablet by mouth 5 days per week. | | | |
| traMADoL (ULTRAM) 50 mg tablet | 0 | 11/25/2020 | 3/5/2021 |
| ONE TABLET BY MOUTH EVERY EIGHT HOURS AS NEEDED FOR BREAKTHROUGH PAIN | | | |
| Patient not taking: Reported on 2/11/2021 | | | |
| venlafaxine XR (EFFEXOR XR) 75 mg capsule | 1 | 8/3/2020 | 2/2/2021 |
| TAKE TWO CAPSULES BY MOUTH DAILY | | | |
| vitamin E 100 unit capsule | | | |
| Take 100 Units by mouth daily. - Oral | | | |
| Patient-reported medication | | | |

## Visit Diagnoses

Primary: **Chronic pain of both hips** M25.551, M25.552, G89.29
Myalgia M79.10

REDACTED

SJA-735

D REDACTED , T REDACTED (MRN REDACTED ) DOB: REDACTED          Encounter Date: 12/03/2020

CONFIDENTIAL          D001461

Chronic pain of both knees M25.561, M25.562, G89.29
Vitamin D deficiency, unspecified E55.9
Compression fracture of T12 vertebra, sequela S22.080S
Age-related osteoporosis with current pathological fracture, vertebra(e), initial encounter for fracture
M80.08XA

SJA-736

[REDACTED], [REDACTED] [REDACTED] - DOB: [REDACTED] - Review Flowsheets

| Component | [CONFIDENTIAL] | 9/24/2020 | 9/24/2020 1462 |
|---|---|---|---|
| | | 10:15 AM | 10:15 AM |
| WHITE BLOOD CELL COUNT | 3.6 - 11.0 THDS/CMM | | 6.0 |
| RED BLOOD CELL COUNT | 4.40 - 6.10 MILL/CMM | | 4.57 |
| HEMOGLOBIN | 13.0 - 18.0 G/DL | | 13.0 |
| HEMATOCRIT | 39 - 52 % | | 40.0 |
| MEAN CORPUSCULAR VOLUME | 75 - 100 fL | | 88 |
| MEAN CORPUSCULAR HEMOGLOBIN | 26.0 - 32.0 pg | | 28.4 |
| MEAN CORPUSCULAR HEMOGLOBIN CONC | 32.0 - 35.0 g/dl | | 32.5 |
| RED CELL DISTRIBUTION WIDTH | 11.2 - 14.8 % | | 12.8 |
| PLATELET COUNT | 140 - 440 THOUS/CMM | | 255 |
| POLYS | 45 - 75 % | | 50.2 |
| LYMPHOCYTES % | 20 - 45 % | | 29.7 |
| MONOCYTES % | 0 - 13 % | | 12.8 |
| EOSINOPHILS % | 0 - 5 % | | 6.0 (H) |
| BASOPHILS % | 0 - 2 % | | 1.0 |
| IMMATURE GRANULOCYTES | 0 - 2 % | | 0.3 |
| NEUTROPHILS ABSOLUTE | 1.9 - 8.0 K/uL | | 3.01 |
| ABSOLUTE LYMPHS | 0.9 - 5.2 K/uL | | 1.78 |
| MONOCYTES ABSOLUTE | 0.1 - 1.0 K/uL | | 0.77 |
| EOSINOPHILS, ABSOLUTE | 0.0 - 0.80 K/uL | | 0.36 |
| BASOPHILS ABSOLUTE | 0.0 - 0.2 K/uL | | 0.06 |
| ABSOLUTE IMMATURE GRANULOCYTES | 0.00 - 0.06 K/uL | | 0.02 |
| GLUCOSE | 70 - 100 mg/dL | | 96 |
| BLOOD UREA NITROGEN | 8 - 23 mg/dL | | 22 |
| SODIUM | 135 - 148 mmol/L | | 142 |
| CREATININE | 0.40 - 1.40 mg/dL | | 0.95 |
| GFR CALCULATION(CKD-EPI) | >59 ml/min/1.73m2 | | 81 |
| GFR IN AFRICAN AMERICAN(CKD-EPI) | >59 | | 94 |
| POTASSIUM | 3.5 - 5.4 mmol/L | | 4.7 |
| CHLORIDE | 96 - 107 mmol/L | | 105 |
| CARBON DIOXIDE | 18 - 32 mmol/L | | 22 |
| CALCIUM | 8.6 - 10.5 mg/dL | | 9.4 |
| PROTEIN, TOTAL | 6.0 - 8.3 g/dL | 6.7 | 6.7 |
| ALBUMIN | 3.5 - 5.2 g/dL | 3.4 (L) | 4.2 |
| GLOBULIN | 1.8 - 3.8 g/dL | | 2.5 |
| A/G RATIO | 1.0 - 2.5 RATIO | | 1.7 |
| ALKALINE PHOSPHATASE | 39 - 118 U/L | | 45 |
| AST | 9 - 50 U/L | | 30 |
| ALT | 5 - 50 U/L | | 28 |
| BILIRUBIN TOTAL | <1.3 mg/dL | | 0.2 |
| ALPHA-1-GLOBULIN | 0.10 - 0.40 G/DL | 0.3 | |
| ALPHA-2-GLOBULIN | 0.40 - 1.20 G/DL | 0.8 | |
| BETA GLOBULIN | 0.60 - 1.30 G/DL | 1.3 | |
| GAMMA GLOBULIN | 0.50 - 1.60 G/DL | 0.9 | |
| M-SPIKE | 0.0 G/DL | No M-Spike detected | |
| REMARKS | | See Notes | |
| IRON | 59 - 158 ug/dL | | 71 |
| UIBC | 112 - 347 ug/dL | | 407 (H) |
| IRON BINDING CAPACITY,TOT | 250 - 450 ug/dL | | 478 (H) |
| IRON % SATURATION | 13 - 45 % | | 15 |
| IMMUNOGLOBULIN G | 700 - 1,600 mg/dL | | 1,034 |
| IMMUNOGLOBULIN A | 70 - 400 mg/dL | | 192 |
| IMMUNOGLOBULIN M | 40 - 230 mg/dL | | 99 |

SJA-737

[REDACTED] [REDACTED] [REDACTED] - DOB: [REDACTED] - Review Flowsheets

| Component | Lab Ref Range & Units | 9/24/2020 | | 9/24/2020 1463 IU | |
|---|---|---|---|---|---|
| | | | 10:15 AM | | 10:15 AM |
| VITAMIN D 25-HYDROXY TOTAL | 30.0 - 100.0 ng/mL | | | 54.7 | |
| HEPATITIS B SURFACE ANTIBODY | NEGATIVE | | | POSITIVE (A) | |
| HEPATITIS C VIRUS ANTIBODY VERIFICATION | NEGATIVE | | | NEGATIVE | |
| T4, FREE, DIRECT | 0.80 - 1.90 ng/dL | | | 1.18 | |
| THYROID STIMULATING HORMONE | 0.270 - 4.200 uIU/mL | | | 1.23 | |
| ANTINUCLEAR ANTIBODIES | Negative | | | Negative | |
| RHEUMATOID FACTOR | <14 IU/mL | | | 10 | |
| CCP ANTIBODY | <3.0 U/mL | | | <0.5 | |
| Myoglobin (Polyclonal) | <96 mcg/L | | | 60 | |
| CREATINE KINASE TOTAL | 20 - 200 U/L | | | 186 | |
| ERYTHROCYTE SEDIMENTATION RATE | 0 - 19 MM/HR | | | 21 (H) | |
| C-REACTIVE PROTEIN | <0.5 mg/dL | | | 0.5 (H) | |
| VITAMIN B12 | 232 - 1,245 pg/mL | | | 406 | |
| FOLATE, RBC | >280 ng/mL RBC | | | 690 | |
| FERRITIN | 30 - 400 ng/mL | | | 54 | |

SJA-738

REDACTED, REDACTED [REDACTED] - DOB: REDACTED - Review Flowsheets

| Component | Lab Normal Ranges | 12/3/2020 | 12/3/2020 |
|---|---|---|---|
| | | 11:44 AM | 11:44 AM |
| WHITE BLOOD CELL COUNT | 3.6 - 11.0 THDS/CMM | | 5.5 |
| RED BLOOD CELL COUNT | 4.40 - 6.10 MILL/CMM | | 4.53 |
| HEMOGLOBIN | 13.0 - 18.0 G/DL | | 12.9 (L) |
| HEMATOCRIT | 39 - 52 % | | 39.3 |
| MEAN CORPUSCULAR VOLUME | 75 - 100 fL | | 87 |
| MEAN CORPUSCULAR HEMOGLOBIN | 26.0 - 32.0 pg | | 28.5 |
| MEAN CORPUSCULAR HEMOGLOBIN CONC | 32.0 - 35.0 g/dl | | 32.8 |
| RED CELL DISTRIBUTION WIDTH | 11.2 - 14.8 % | | 12.6 |
| PLATELET COUNT | 140 - 440 THOUS/CMM | | 280 |
| POLYS | 45 - 75 % | | 56.0 |
| LYMPHOCYTES % | 20 - 45 % | | 26.6 |
| MONOCYTES % | 0 - 13 % | | 10.4 |
| EOSINOPHILS % | 0 - 5 % | | 5.3 (H) |
| BASOPHILS % | 0 - 2 % | | 1.3 |
| IMMATURE GRANULOCYTES | 0 - 2 % | | 0.4 |
| NEUTROPHILS ABSOLUTE | 1.9 - 8.0 K/uL | | 3.07 |
| ABSOLUTE LYMPHS | 0.9 - 5.2 K/uL | | 1.46 |
| MONOCYTES ABSOLUTE | 0.1 - 1.0 K/uL | | 0.57 |
| EOSINOPHILS, ABSOLUTE | 0.0 - 0.80 K/uL | | 0.29 |
| BASOPHILS ABSOLUTE | 0.0 - 0.2 K/uL | | 0.07 |
| ABSOLUTE IMMATURE GRANULOCYTES | 0.00 - 0.06 K/uL | | 0.02 |
| GLUCOSE | 70 - 100 mg/dL | | 124 (H) |
| BLOOD UREA NITROGEN | 8 - 23 mg/dL | | 22 |
| SODIUM | 135 - 148 mmol/L | | 140 |
| CREATININE | 0.40 - 1.40 mg/dL | | 0.97 |
| GFR CALCULATION(CKD-EPI) | >59 ml/min/1.73m2 | | 79 |
| GFR IN AFRICAN AMERICAN(CKD-EPI) | >59 | | 92 |
| POTASSIUM | 3.5 - 5.4 mmol/L | | 4.5 |
| CHLORIDE | 96 - 107 mmol/L | | 103 |
| CARBON DIOXIDE | 18 - 32 mmol/L | | 25 |
| CALCIUM | 8.6 - 10.5 mg/dL | | 10.1 |
| PROTEIN, TOTAL | 6.0 - 8.3 g/dL | 6.6 | 6.6 |
| ALBUMIN | 3.5 - 5.2 g/dL | 3.3 (L) | 4.2 |
| GLOBULIN | 1.8 - 3.8 g/dL | | 2.4 |
| A/G RATIO | 1.0 - 2.5 RATIO | | 1.8 |
| ALKALINE PHOSPHATASE | 39 - 118 U/L | | 45 |
| AST | 9 - 50 U/L | | 26 |
| ALT | 5 - 50 U/L | | 26 |
| BILIRUBIN TOTAL | <1.3 mg/dL | | 0.2 |
| ALPHA-1-GLOBULIN | 0.10 - 0.40 G/DL | 0.2 | |
| ALPHA-2-GLOBULIN | 0.40 - 1.20 G/DL | 0.9 | |
| BETA GLOBULIN | 0.60 - 1.30 G/DL | 1.2 | |
| GAMMA GLOBULIN | 0.50 - 1.60 G/DL | 1.0 | |
| M-SPIKE | 0.0 G/DL | No M-Spike detected | |
| REMARKS | | See Notes | |
| Testosterone, Adult Male | 300.0 - 720.0 ng/dL | | 148.3 (L) |
| TESTOSTERONE, FREE | 47.0 - 244.0 pg/mL | | 21.1 (L) |
| IMMUNOFIXATION | | | See Notes |
| THYROID STIMULATING HORMONE | 0.270 - 4.200 uIU/mL | | 0.861 |
| PTH, INTACT | 12 - 65 pg/mL | | 12 |
| VITAMIN D 25-HYDROXY TOTAL | 30.0 - 100.0 ng/mL | | 60.0 |
| ERYTHROCYTE SEDIMENTATION RATE | 0 - 19 MM/HR | | 27 (H) |

SJA-739

D[REDACTED],T[REDACTED] [REDACTED] - DOB: [REDACTED] Review Flowsheets

| Component | Last Filed Results | 12/3/2020 | 12/3/2020 14 (cont) |
|---|---|---|---|
| | | 11:44 AM | 11:44 AM |
| C-REACTIVE PROTEIN | <0.5 mg/dL | | 0.4 |

SJA-740

D̶REDACTED̶ T̶REDACTED̶ (MRN: REDACTED) DOB: REDACTED    CONFIDENTIAL    D001466

**NYU Langone Health**
NYU Langone Radiology-Metropolitan Diagnostic Imaging
224 Seventh Street
Garden City, NY 11530
516-747-0161

**Pt Name:** D̶REDACTED̶, T̶REDACTED̶
**DOB:** REDACTED
**MRN:** REDACTED
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** REDACTED

| Procedure(s) | Accession Number(s) | Date of Service |
|---|---|---|
| XR DEXA BONE DENSITY SPINE AND HIPS | REDACTED | 12/7/20 |

=================================================================

## Bone Density Report
=================================================================

Name:       D̶REDACTED̶ T̶REDACTED̶
Patient ID: REDACTED
Age:        69
Sex:        Male
Ethnicity:  White
Date of Birth: REDACTED

-------------------------------------------------------------

Referring Provider: EDELMAN, SARI DAWN

Exam Date: December 07, 2020

Accession number: REDACTED

Bone Density:
-------------------------------------------------------------
| Region | BMD | T-score | Z-score | Classification |
|---|---|---|---|---|
| AP Spine (L1-L4) | 1.484 | 3.6 | 4.4 | Normal |

REDACTED

SJA-741

D̶REDACTED̶, T̶REDACTED̶ (MRN: REDACTED) DOB: REDACTED    CONFIDENTIAL                          D001467

| Femoral Neck (Left) | | | | |
|---|---|---|---|---|
| | 1.027 | 0.7 | 1.9 | Normal |
| Total Hip (Left) | | | | |
| | 1.156 | 0.8 | 1.5 | Normal |

------------------------------------------------------------

World Health Organization criteria for BMD impression
classify patients as:
Normal (T-score at or above -1.0),
Osteopenia (T-score between -1.0 and -2.5), or
Osteoporosis (T-score at or below -2.5).

10-year Fracture Risk:
------------------------------------------------------------
FRAX not reported because:
  All T-scores at or above -1.0
------------------------------------------------------------

TECHNICAL LIMITATIONS: None.
Indication: Postmenopausal

IMPRESSION:
------------------------------------------------------------------

**DIAGNOSIS:**
**NORMAL based on the lowest T-score using the World Health Organization criteria
and ISCD guidelines for diagnosis.**

------------------------------------------------------------------

Electronic Signature: I personally reviewed the images and agree with this report. Final
Report: Dictated by  and Signed by Attending Mehool Shukla MD 12/7/2020 12:23 PM

------------------------------------------------------------------

REDACTED

SJA-742

D‌REDACTED, T‌REDACTED (MRN: REDACTED) DOB: REDACTED   CONFIDENTIAL                    D001468



**NYU Langone Health**
NYU Langone Radiology-NRAD
6 Ohio Drive Suite 104
Lake Success, NY 11042-1129
516-632-7575

**Pt Name:** D‌REDACTED, T‌REDACTED
**DOB:** REDACTED
**MRN:** REDACTED
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** REDACTED

**Procedure(s)**                **Accession Number(s)**    **Date of Service**
MRI KNEE WITHOUT IV CONTRAST LEFT    REDACTED                11/6/20

IMPRESSION:

Nondisplaced medial meniscus tear.

Patellofemoral arthrosis.

FINDINGS:

MRI OF THE LEFT KNEE

Magnetic Resonance Imaging of the knee was performed utilizing a multi-planar, multisequence technique.

CLINICAL HISTORY: Pain for greater than 6 weeks

Correlation is made with radiographs obtained on 9/24/2020

There is a nondisplaced radial tear at the junction of the posterior horn and root of the medial meniscus. The lateral meniscus is intact. The anterior and posterior cruciate ligaments are normal in course, signal, and morphology. The medial and lateral collateral ligament complex are intact.

There is fissuring of articular cartilage overlying the lateral patellar facet and opposing femoral trochlea where there is small subchondral cyst formation. There is similar fissuring of articular cartilage overlying the lateral tibial plateau. The extensor mechanism is intact. There is a small joint effusion and small popliteal cyst. There is prepatellar edema.

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Christopher Foresto MD 11/7/2020 8:55 AM

REDACTED                                          Page 1 of 2

SJA-743

D̶REDACTED T̶REDACTED (MRN: REDACTED) DOB: REDACTED

<span style="color:red">CONFIDENTIAL</span>

**D001469**

---

D̶REDACTED, T̶REDACTED      MRN: REDACTED      DOB: REDACTED      Date of Service: 11/6/20      Page: 1 of 1

REDACTED

Page 2 of 2

SJA-744

D<sub>REDACTED</sub>, T<sub>REDACTED</sub> (MRN: REDACTED DOB: REDACTED)

CONFIDENTIAL

D001470



**NYU Langone Health**
NYU Langone Radiology-NRAD
6 Ohio Drive Suite 104
Lake Success, NY 11042-1129
516-632-7575

**Pt Name:** D<sub>REDACTED</sub>, T<sub>REDACTED</sub>
**DOB:** REDACTED
**MRN:** REDACTED
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** REDACTED

| **Procedure(s)** | **Accession Number(s)** | **Date of Service** |
|---|---|---|
| MRI HIP WITHOUT IV CONTRAST LEFT | REDACTED | 11/2/20 |

IMPRESSION: MR examination of the left hip demonstrating:

Mild to moderate left hip arthrosis with concomitant acetabular labral degeneration and nondisplaced degenerative tearing. Small to moderate-sized left hip joint effusion with mild synovitis presumed reactive.

Mild right hip arthrosis.

Incompletely imaged discogenic degenerative disease of the lumbar spine.

Bilateral hamstring origin and distal gluteal insertional tendinosis without tear.

FINDINGS:

History: Left hip pain and difficulty with ambulation. Evaluate for labral tear.

MRI of the left hip

Technique: Multiplanar, multisequential images were obtained on a 1.2T scanner according to standard protocol.

Prior studies: 9/24/2020 radiographs

Findings:

Bones/Joints: No acute fracture or osseous stress reaction. Pelvic rings are intact.

REDACTED

SJA-745

D<span>REDACTED</span> T<span>REDACTED</span> (MRN: REDACTED) DOB: REDACTED   CONFIDENTIAL                D001471

Evaluation of the left hip on small field of view images demonstrates mild to moderate arthrosis with chondral thinning and fibrillation preferential to the superior and anterosuperior acetabular labrum. There is localized full-thickness chondral fissuring along the posterior superior acetabulum with subjacent mild to moderate bone marrow edema pattern and tiny developing fibrocystic change. Small marginal femoral acetabular osteophytosis. Labral degeneration with degenerative nondisplaced tearing anterosuperiorly. Small to moderate hip joint effusion with mild synovitis presumed reactive.

Large field-of-view images of the pelvis demonstrate mild arthrosis of the right hip with concomitant small effusion. No avascular necrosis. Symphysis pubis and sacroiliac articulations congruent. Partially imaged discogenic degenerative disease lower lumbar spine. Normal background marrow signal intensity.

Tendons: Mild bilateral hamstring origin tendinosis without tear. Distal iliopsoas insertions intact. Mild distal gluteus minimus and lateral gluteus medius insertional tendinosis also noted.

Muscles: Unremarkable.

Nerves: Unremarkable.

Pelvis: Unremarkable.

Subcutaneous tissues: Unremarkable.

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Kevin Dunham MD 11/3/2020 8:24 AM

---

D<span>REDACTED</span> T<span>REDACTED</span>        MRN: REDACTED      DOB: REDACTED      Date of Service: 11/2/20   Page: 1 of 1

REDACTED

SJA-746

D REDACTED, T REDACTED (MRN: REDACTED) DOB: REDACTED    CONFIDENTIAL                    D001472

**NYU Langone Health**
NYU Langone Radiology at NYU Langone Hospital Long Island
222 Station Plaza North
Mineola, NY 11501
516-663-4648

**Pt Name:** D REDACTED, T REDACTED
**DOB:** REDACTED
**MRN:** REDACTED
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** REDACTED

| Procedure(s) | Accession Number(s) | Date of Service |
|---|---|---|
| IR THERAPEUTIC INJECTION HIP | REDACTED | 10/15/20 |

IMPRESSION: Technically successful fluoroscopically guided left hip anesthetic and steroid injection.

FINDINGS:

PROCEDURE: Fluoroscopically guided left hip anesthetic and steroid Injection

INDICATION: Osteoarthritis, presenting with persistent left hip pain

TECHNIQUE: The risks, benefits, and alternatives of the procedure (including bleeding, infection, and contrast reaction) were explained to the patient, questions answered, and written informed consent was obtained. The patient was then placed supine on the fluoroscopy table and a suitable site for needle insertion was marked using fluoroscopic guidance. The left hip was prepped and draped in the usual sterile fashion. 5 mL of 1% lidocaine was used for skin, subcutaneous and deep soft tissue anesthesia. Under intermittent fluoroscopic guidance, a 22 gauge x 3 1/2 inch spinal needle was inserted into the joint. Given the patient's contrast allergy, air was injected into the joint, which confirmed intra-articular position. Then, 40mg of Depo-medrol in 1mL was injected into the joint, followed by 5 cc of 0.25% Bupivacaine.   The needle was then removed. There were no apparent complications.

Fluoroscopy time: 12.1 seconds.
Dose: 2.15 mGy

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Michael K Brooks MD 10/15/2020 10:40 AM

REDACTED

SJA-747

D██████, T█████ (MRN: ████████) DOB: ████████ <span style="color:red">CONFIDENTIAL</span>   **D001473**

| D█████, T████ | | MRN: █████ | DOB: █████████ | Date of Service: 10/15/20 | Page: 1 of 1 |

REDACTED

SJA-748

D███████, T██████ (MRN: ████████) DOB: ████████  **CONFIDENTIAL**  D001474



**NYU Langone Health**
NYU LANGONE RADIOLOGY ASSOCIATES - LONG ISLAND
1999 Marcus Avenue
New Hyde Park, NY 11042-1034

**Pt Name:** D██████, T██████
**DOB:** ████████
**MRN:** ████████
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** ████████

| Procedure(s) | Accession Number(s) | Date of Service |
|---|---|---|
| XR SHOULDER INTERNAL AND EXTERNAL BILATERAL | ████████ | 9/24/20 |

IMPRESSION:
Moderate bilateral glenohumeral arthrosis.
Moderate to severe bilateral AC arthropathy.

FINDINGS:

History: Bilateral shoulder pain

Technique: XR SHOULDER INTERNAL AND EXTERNAL BILATERAL

Comparison: None.

Findings:
Right shoulder: Moderate narrowing glenohumeral joint with diffuse glenohumeral sclerosis, as well as glenoid rim and humeral head osteophytes. There is calcification along the posterior aspect of the humeral head, compatible with infraspinatus calcific tendinosis. There is moderate to severe AC joint arthrosis with prominent undersurface osteophytes and subacromial enthesophyte formation. Visualized right upper lobe is clear.

Left shoulder: Moderate narrowing glenohumeral joint with diffuse glenohumeral sclerosis, as well as glenoid rim and humeral head osteophytes. There is enthesopathy at the infraspinatus tendon insertion with probable superimposed calcific deposits. There is moderate to severe AC joint arthrosis with prominent undersurface osteophytes and subacromial enthesophyte formation. Visualized left upper lobe is clear.

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Michael K Brooks MD 9/24/2020 11:53 AM

REDACTED

SJA-749

D̶REDACTED̶ T̶REDACTED̶ (MRN: REDACTED) DOB: REDACTED

<span style="color:red">CONFIDENTIAL</span>

**D001475**

---

D̶REDACTED, T̶REDACTED    MRN: REDACTED    DOB: REDACTED    Date of Service: 9/24/20    Page: 1 of 1

REDACTED

Page 2 of 2

SJA-750

D⟨REDACTED⟩, T⟨REDACTED⟩ (MRN: ⟨REDACTED⟩) DOB: ⟨REDACTED⟩

CONFIDENTIAL

D001476



**NYU Langone Health**
NYU LANGONE RADIOLOGY ASSOCIATES - LONG ISLAND
1999 Marcus Avenue
New Hyde Park, NY 11042-1034

**Pt Name:** D⟨REDACTED⟩, T⟨REDACTED⟩
**DOB:** ⟨REDACTED⟩
**MRN:** ⟨REDACTED⟩8
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** ⟨RED,REDACTED⟩

| Procedure(s) | Accession Number(s) | Date of Service |
|---|---|---|
| XR KNEE AP AND LATERAL BILATERAL | ⟨REDACTED⟩ | 9/24/20 |

IMPRESSION: Mild bilateral tricompartmental osteoarthritis.

FINDINGS:

History: Bilateral knee pain

Technique: XR KNEE AP AND LATERAL BILATERAL

Comparison: Radiographs 11/22/2019

Findings:
Right knee: Mild medial and lateral tibiofemoral narrowing. No fracture or dislocation. Small tricompartmental marginal osteophytes. No joint effusion.

Left knee:  Mild medial and lateral tibiofemoral narrowing. No fracture or dislocation. Small tricompartmental marginal osteophytes. No joint effusion.

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Michael K Brooks MD 9/24/2020 11:55 AM

---

REDACTED

SJA-751

D̶ᴿᴱᴰᴬᶜᵀᴱᴰ, T̶ᴿᴱᴰᴬᶜᵀᴱᴰ (MRN: REDACTED) DOB: REDACTED

<span style="color:red">CONFIDENTIAL</span>

D001477



**NYU Langone Health**
NYU LANGONE RADIOLOGY ASSOCIATES - LONG ISLAND
1999 Marcus Avenue
New Hyde Park, NY 11042-1034

**Pt Name:** D̶ᴿᴱᴰᴬᶜᵀᴱᴰ, T̶ᴿᴱᴰ
**DOB:** REDACTED
**MRN:** REDACTED
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** REDACTED

| <u>Procedure(s)</u> | <u>Accession Number(s)</u> | <u>Date of Service</u> |
|---|---|---|
| XR LUMBAR SPINE AP AND LATERAL 2 VIEWS | REDACTED | 9/24/20 |
| XR PELVIS HIP FROG BILATERAL 3 VIEWS | REDACTED | 9/24/20 |

IMPRESSION:
Multilevel degenerative disc disease of the lumbar spine, moderate at L5-S1.
Mild to moderate osteoarthritis of the right and left hip.

FINDINGS:

History: Back pain, difficulty walking.

Technique: XR LUMBAR SPINE AP AND LATERAL 2 VIEWS, XR PELVIS HIP FROG BILATERAL 3 VIEWS

Comparison: None

Findings:
Lumbar spine/pelvis: There are 5 nonrib-bearing lumbar-type vertebral bodies, demonstrating preserved alignment on the lateral film. There is anterior wedging of the T12 vertebral body. Otherwise, vertebral body heights are preserved. There is subchondral endplate sclerosis and disc level osteophytes at multiple levels with bridging anterior osteophytes at L2-3. There is mild to moderate narrowing at L5-S1, demonstrating subchondral endplate sclerosis and osteophyte formation. There is also multilevel facet arthropathy. Iliopectineal and ilioischial lines are smooth. There is enthesopathy at the origin the common hamstring complex tendons, as well as along the iliac crests. SI joints are preserved.

Right hip: Mild to moderate superolateral joint space narrowing with acetabular hypertrophic lipping, acetabular sclerosis, cystic change, and small femoral head-neck junction osteophytes.

Left hip: Mild to moderate superolateral joint space narrowing with acetabular hypertrophic lipping, acetabular sclerosis, cystic change, and small femoral head-neck junction osteophytes.

SJA-752

D[REDACTED], T[REDACTED] (MRN: [REDACTED]) DOB: [REDACTED]

CONFIDENTIAL

D001478

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Michael K Brooks MD 9/24/2020 12:00 PM

D[REDACTED], T[REDACTED]  MRN: [REDACTED]  DOB: [REDACTED]  Date of Service: 9/24/20  Page: 1 of 1

REDACTED

SJA-753

D, T (MRN: REDACTED) DOB: REDACTED    CONFIDENTIAL                    D001479

**NYU Langone Health**
NYU LANGONE RADIOLOGY ASSOCIATES - LONG ISLAND
1999 Marcus Avenue
New Hyde Park, NY 11042-1034

**Pt Name:** D T
**DOB:** REDACTED
**MRN:** REDACTED
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** REDACTED

| Procedure(s) | Accession Number(s) | Date of Service |
|---|---|---|
| XR LUMBAR SPINE AP AND LATERAL 2 VIEWS | REDACTED | 9/24/20 |
| XR PELVIS HIP FROG BILATERAL 3 VIEWS | REDACTED | 9/24/20 |

IMPRESSION:
Multilevel degenerative disc disease of the lumbar spine, moderate at L5-S1.
Mild to moderate osteoarthritis of the right and left hip.

FINDINGS:

History: Back pain, difficulty walking.

Technique: XR LUMBAR SPINE AP AND LATERAL 2 VIEWS, XR PELVIS HIP FROG BILATERAL 3 VIEWS

Comparison: None

Findings:
Lumbar spine/pelvis: There are 5 nonrib-bearing lumbar-type vertebral bodies, demonstrating preserved alignment on the lateral film. There is anterior wedging of the T12 vertebral body. Otherwise, vertebral body heights are preserved. There is subchondral endplate sclerosis and disc level osteophytes at multiple levels with bridging anterior osteophytes at L2-3. There is mild to moderate narrowing at L5-S1, demonstrating subchondral endplate sclerosis and osteophyte formation. There is also multilevel facet arthropathy. Iliopectineal and ilioischial lines are smooth. There is enthesopathy at the origin the common hamstring complex tendons, as well as along the iliac crests. SI joints are preserved.

Right hip: Mild to moderate superolateral joint space narrowing with acetabular hypertrophic lipping, acetabular sclerosis, cystic change, and small femoral head-neck junction osteophytes.

Left hip: Mild to moderate superolateral joint space narrowing with acetabular hypertrophic lipping, acetabular sclerosis, cystic change, and small femoral head-neck junction osteophytes.

REDACTED                                                         Page 1 of 2

SJA-754

D REDACTED, T REDACTED MRN: REDACTED DOB: REDACTED

CONFIDENTIAL

**D001480**

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Michael K Brooks MD 9/24/2020 12:00 PM

D REDACTED, T REDACTED        MRN: REDACTED     DOB: REDACTED     Date of Service: 9/24/20    Page: 1 of 1

REDACTED

Page 2 of 2

SJA-755

 D█████, T█ (MRN REDACTED)          CONFIDENTIAL                    D001481

# XR HAND PA LATERAL AND OBLIQUE BILATERAL [IMG1318]
# XR WRIST AP AND LATERAL BILATERAL [IMG11722]

Status: **Final result**

## Result Information

Status: **Final result** (Exam End: 9/24/2020 11:30)          Provider Status: Open

## Exam Images

(Link Unavailable) Show images for XR WRIST AP AND LATERAL BILATERAL

## Result History                                                          Order 436559836

## Patient Recommendations

## Signed By

| Signed | Date/Time | | Phone | Pager |
|---|---|---|---|---|
| **BROOKS, MICHAEL K** | Sep 24, 2020 | 12:04 PM | 516-663-3686 | |

## Full Report

IMPRESSION:
Multifocal DIP and first CMC joint osteoarthritis.
Left third MCP joint arthrosis, which may be posttraumatic or inflammatory. Clinical correlation is suggested.

History: Bilateral hand pain and swelling.

Technique: XR HAND PA LATERAL AND OBLIQUE BILATERAL, XR WRIST AP AND LATERAL BILATERAL

Comparison: None

Findings:
Right hand/wrist: Bone mineralization is preserved. There is no periarticular osteopenia. There is narrowing of the distal interphalangeal joints and first IP joints with marginal osteophyte formation, compatible with osteoarthritis. MCP joints are preserved. No fracture, subluxation, or osseous erosion. Small osteophytes at the first CMC joint.

Left hand/wrist: Bone mineralization is preserved. There is no periarticular osteopenia. There is narrowing of the distal interphalangeal joints and first IP joints with marginal osteophyte formation, compatible with osteoarthritis. There is narrowing at the third MCP joint with associated bony productive change remodeling of the metacarpal head, which may reflect nonspecific arthrosis versus posttraumatic arthropathy. There is moderate osteoarthritis at the first CMC and triscaphe joints.

SJA-756

D̶E̶D̶A̶C̶T̶E̶D̶ T̶E̶R̶M̶S̶ (MRN REDACTED    CONFIDENTIAL    D001482

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by  and Signed by Attending Michael K Brooks MD 9/24/2020 12:04 PM

## External Result Report
External Result Report

### ⚥ XR WRIST AP AND LATERAL BILATERAL: Patient Communication

☒ Released                    ✔ Seen

## Indications
Chronic pain of both shoulders [M25.511, G89.29, M25.512 (ICD-10-CM)]
Chronic pain of both hips [M25.551, M25.552, G89.29 (ICD-10-CM)]
Myalgia [M79.10 (ICD-10-CM)]
Chronic pain of both knees [M25.561, M25.562, G89.29 (ICD-10-CM)]

## Order Report
▣ Order Details

## Weight/Height
Weight: 125.6 kg (277 lb)
125.6 kg (277 lb)
Height: 1.702 m (5' 7")
1.702 m (5' 7")

## Weight/Height
Weight: 125.6 kg (277 lb)
125.6 kg (277 lb)
Height: 1.702 m (5' 7")
1.702 m (5' 7")

## BMI and BSA Data
Body Mass Index: 44.17 kg/m²        Body Surface Area: 2.46 m²

## Printable Result Report
Result Report

## Begin Exam Questions

|  | Answer | Comment |
|---|---|---|
| How did you verify patient name and DOB? | Verbal and Armband |  |
| Did you confirm the exam(s) and protocol(s) with a valid Epic order or prescription? | Yes |  |
| Anatomic site(s) to be imaged: | WRISTS |  |
| What are the patient's symptoms? | JT PAIN |  |
| Laterality: | Bilateral |  |

## End Exam Questions

|  | Answer | Comment |
|---|---|---|
| Images checked for QA? | Yes |  |

## Exam Information

SJA-757

D‑REDACTED, T‑REDAC (MRN REDACTED)

<span style="color:red">CONFIDENTIAL</span>    **D001483**

| Status | Exam Begun | Exam Ended |
|--------|------------|------------|
| Final | 9/24/2020 11:08 | 9/24/2020 11:30 |

SJA-758

Dᴿᴱᴰᴬᶜᵀᴱᴰ, Tᴿᴱᴰᴬᶜᵀᴱᴰ (MRN: REDACTED) DOB: REDACTED

**CONFIDENTIAL**

D001484



**NYU Langone Health**
NYU Langone Radiology at NYU Langone Hospital Long Island
222 Station Plaza North
Mineola, NY 11501
516-663-4648

**Pt Name:** Dᴿᴱᴰᴬᶜᵀᴱᴰ Tᴿᴱᴰᴬᶜ
**DOB:** REDACTED
**MRN:** REDACTED
**Referring:** Sari D Edelman
**CC Recipient(s):**
**Pt Phone:** REDACTED

| Procedure(s) | Accession Number(s) | Date of Service |
|---|---|---|
| IR THERAPEUTIC INJECTION HIP | REDACTED | 10/15/20 |

**IMPRESSION:** Technically successful fluoroscopically guided left hip anesthetic and steroid injection.

**FINDINGS:**

**PROCEDURE:** Fluoroscopically guided left hip anesthetic and steroid Injection

**INDICATION:** Osteoarthritis, presenting with persistent left hip pain

**TECHNIQUE:** The risks, benefits, and alternatives of the procedure (including bleeding, infection, and contrast reaction) were explained to the patient, questions answered, and written informed consent was obtained. The patient was then placed supine on the fluoroscopy table and a suitable site for needle insertion was marked using fluoroscopic guidance. The left hip was prepped and draped in the usual sterile fashion. 5 mL of 1% lidocaine was used for skin, subcutaneous and deep soft tissue anesthesia. Under intermittent fluoroscopic guidance, a 22 gauge x 3 1/2 inch spinal needle was inserted into the joint. Given the patient's contrast allergy, air was injected into the joint, which confirmed intra-articular position. Then, 40mg of Depo-medrol in 1mL was injected into the joint, followed by 5 cc of 0.25% Bupivacaine.   The needle was then removed. There were no apparent complications.

Fluoroscopy time: 12.1 seconds.
Dose: 2.15 mGy

Electronic Signature: I personally reviewed the images and agree with this report. Final Report: Dictated by and Signed by Attending Michael K Brooks MD 10/15/2020 10:40 AM

**REDACTED**

SJA-759

D[REDACTED], T[REDACTED] (MRN: [REDACTED]) DOB: [REDACTED]

CONFIDENTIAL

D001485

| D[REDACTED] T[REDACTED] | MRN: [REDACTED] | DOB: [REDACTED] | Date of Service: 10/15/20 | Page: 1 of 1 |
|---|---|---|---|---|

REDACTED

SJA-760

# EXHIBIT OOO

SJA-761

# SARI D. EDELMAN, D.O.

## EXPERIENCE

### RHEUMATOLOGIST, NYU LANGONE RHEUMATOLOGY; LAKE SUCCESS, NEW YORK – 2014-PRESENT

Full time attending rheumatologist for NYU Langone Faculty Group Practice. Provide outpatient ambulatory care services and hospital consultations. Oversee patient care for on site infusion services. Attend and present at monthly educational seminars with rheumatology team at Lake Success. Attend seminars and conferences at NYU Langone Hospital, Manhattan.

### RHEUMATOLOGIST, RHEUMATOLOGY ASSOCIATES OF NEW YORK; LAKE SUCCESS, NEW YORK – 2008-2014

Established and operated private rheumatology practice providing outpatient and inpatient hospital consultations. Additional services included on site infusion suite, bone densitometry, sonography. As owner/director attended to all business aspects of rheumatology practice including employee hiring, training, billing, regulatory practices and ancillary patient services (educational seminars).

## EDUCATION

### WINTHROP UNIVERSITY HOSPITAL, MINEOLA, NEW YORK
#### JULY, 2006- JUNE, 2008

- Rheumatology Fellowship
- Board Certified Rheumatology, 2008
- Board Recertification Rheumatology, 2018

### WINTHROP UNIVERSITY HOSPITAL, MINEOLA, NEW YORK
#### JULY, 2003- JUNE, 2006

- Internal Medicine Residency
- Board Certified Internal Medicine, 2006
- Board Recertification Internal Medicine, 2016

### NEW YORK COLLEGE OF OSTEOPATHIC MEDICINE, OLD WESTBURY, NEW YORK
#### AUGUST, 1999- JUNE, 2003

- Doctor of Osteopathic Medicine
- Honors, Dean's List

D000038

SJA-762

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DR. SARI EDELMAN,

                                **Case No.:** 1:21-cv-502 (LGS) (GWG)

                  Plaintiff,

       -against-

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF
MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER,
ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH
ANTONIK, and JOSHUA SWIRNOW,

                  Defendants.
-----------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE***

**MILMAN LABUDA LAW GROUP PLLC**
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff
Dr. Sari Edelman*

I.      **PRELIMINARY STATEMENT**

Faced with the potential of a large judgment for their indefensible pay practices in compensating female rheumatologists substantially less than what male rheumatologists are paid, Defendants resort to legal, procedural, "gotcha" maneuvers in an attempt to deprive Plaintiff of her ability to submit evidence concerning her damages – evidence which Defendants maintained exclusively in their possession and which Plaintiff first obtained in discovery in this case – because Plaintiff did not have the omniscience to provide a precise computation of her damages.

Indeed, rather than move to compel the Plaintiff to provide evidence of her damages or a computation thereof, Defendants lay in wait until trial to raise the instant argument, much like Defendants Joseph Antonik and David Kaplan lay in wait to non-renew her contract in retaliation for Plaintiff's complaint against them for discrimination and harassment based on her gender.

Defendants suffer no prejudice from Plaintiff's inability to precisely compute and calculate her damages; because Defendants held the records necessary to do so, they had every opportunity to learn about Plaintiff's damages before Plaintiff could ever compute them.  As such, any failure to supplement was harmless.  Notwithstanding, in an abundance of caution, and to appease the Defendants' resort to procedural arguments, Plaintiff amends her initial disclosures to provide a computation.  Indeed, there is no specific time period established for the duty to supplement, and parties may supplement their initial disclosures even after discovery ends.

Finally, Defendants waived any objection to Plaintiff's initial disclosures by failing to object in the Rule 26(f) discovery plan or at any Rule 26(f) discovery conference, and no disclosures were required after except as ordered by the Court, for which there were no such Orders.  As such, Defendants' ploy to deprive Plaintiff of her ability to submit evidence on damages is as belated as it is misguided.

Plaintiff has no objection to Defendants' motions *in limine* numbered 2 and 6, except – as to 2 – that Defendants similarly concede that they may not utilize any expert testimony on the grounds that they, too, failed to disclose any expert.

Defendants' motion *in limine* to preclude evidence concerning the extent of Plaintiff's emotional distress as a result of Defendants' non-renewal flies in the face of well-settled law requiring a trier of fact to conduct a fact intensive inquiry with a view toward the totality of the circumstances and ignores the eggshell skull rule that Defendants are required to take the Plaintiff as they find her.  Similarly, Defendants' quest to preclude Plaintiff from introducing evidence concerning her trip to Ecuador to treat patients is confounding given that it speaks to her qualifications and the evidence adduced in the record establishes that it reflected greatly on NYU's mission, serving as evidence that Plaintiff performed well in her capacity as a rheumatologist at NYU, which Defendants challenge despite the overwhelming weight of evidence to the contrary. Defendants cannot have it both ways; they cannot manufacture after-the-fact arguments that Plaintiff had poor interpersonal skills and posed a risk to patients, then deprive her of the ability to rebut those arguments.

Defendants' motion *in limine* concerning tuition is even more befuddling.  There is no question that the tuition benefits Dr. Andrew Porges received for his child to matriculate at NYU constitutes compensation under the law and that Plaintiff has young children who are on their way to becoming college-aged.  For this reason alone, Defendants' motion must be denied.

Defendants' motion *in limine* seeking preclusion of evidence concerning Dr. Kavini Mehta's malpractice suits similarly fails.  In this case, Defendants seek to argue that Plaintiff's alleged interpersonal conflicts and supposed unorthodox clinical practices were the reasons they decided not to renew her contract.

2

However, only two such alleged interpersonal conflicts were recorded, in November 2019 and March 2020, respectively, and both were after her September 2019 complaint to Human Resources.  There is no other documented evidence of such conflicts.  Moreover, Defendants seek to introduce evidence that Plaintiff purportedly ordered unnecessary tests and x-rays, without any comparative data, and conclusorily argue that it was determined these clinical practices could not be remediated.  In essence, Defendants argue that they were unable to tell the Plaintiff to stop running so many tests, as there is no evidence in the record that anyone apprised Plaintiff of this alleged issue prior to her termination.  Defendants also seek to introduce evidence that one patient complained that Plaintiff did not timely return a message over the weekend while Plaintiff was on vacation, and that Plaintiff's daughter appeared on the screen during a tele-health visit with a patient who complained about same as evidence that Plaintiff posed a risk to patients.

Juxtaposing the foregoing against Defendants' decision to retain a rheumatologist who has twice been sued for malpractice is necessary for a jury to determine how seriously Defendants consider the complaints of patients in making their decisions to terminate doctors.  After all, a malpractice complaint is indisputably one of the highest forms of a complaint that a patient can make.

Defendants' motion *in limine* to preclude certain comments "that are not inherently discriminatory" is problematic given the well-established precedent that because there is rarely direct, smoking gun, evidence of discrimination, a plaintiff may rely on bits and pieces of information to support an inference of discrimination such as these comments.

Defendants' motion *in limine* concerning the existence of a law prohibiting the use of past salary history to determine compensation is also misguided.  Defendants essentially argue that this practice cannot be discriminatory because it was not expressly outlawed until 2020.

3

But whether a practice is prohibited by law does not mean that the practice cannot be utilized to perpetuate pay disparity between men and women performing substantially equal work. As such, this evidence must go to the jury.

Finally, Defendants seek to preclude Defendants' business records – patient communications maintained with their medical records provider, Epic Systems – which overwhelmingly establish that patients were both fond of and greatly respected Plaintiff as a capable rheumatologist. This evidence is offered to establish that patients expressed their satisfaction with Plaintiff's services which is relevant to NYU's decision not to renew her contract. To the extent that concerns regarding the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") exist, the records can be redacted to replace patient names with ID numbers.

## II.   STANDARD

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." See Gorbea v. Verizon N.Y., Inc., No. 11-CV-3758 (KAM), 2014 WL 2916964, at *1 (E.D.N.Y. June 25, 2014) (citing Luce v. United States, 469 U.S. 38, 40 n.2 (1984); Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996); Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co., 937 F. Supp. 276, 283 (S.D.N.Y. 1996)).

"Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." See United States v. Paredes, 176 F. Supp. 2d 179, 181 (S.D.N.Y. 2001). "[C]ourts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context." See Jean-Laurent v. Hennessy, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (citing Nat'l Union Fire Ins. Co., 937 F. Supp. at 287). Further, a district court's ruling on a motion *in limine* is preliminary and "subject to change when the case unfolds." See Luce, 469 U.S. at 41.

4

SJA-767

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." See Federal Rule of Evidence ("FRE") 401.

Evidence that is not relevant is not admissible. See FRE 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See FRE 403.

District courts have broad discretion in making a determination on the admissibility of evidence. See United States v. Urso, No. 03-CIV.-1382, 2006 WL 681204, at *2 (E.D.N.Y. Mar. 16, 2006) (quoting Bickerstaff v. Vassar College, 196 F.3d 435, 449 (2d Cir. 1999)).

Pursuant to Rule 37(c)(1), "[i]f a party fails to provide information…as required by Rule 26(a) or (e), the party is not allowed to use that information…to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." See Fed. R. Civ. P. 37(c)(1). "Preclusion of evidence … is a harsh remedy that should be imposed only in rare situations, and the court should proceed cautiously before imposing such severe sanctions." See United States v. N.Y. City Transit Auth., 2006 U.S. Dist. LEXIS 21110 (E.D.N.Y. 2006). "Before the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes and must consider less drastic responses." See Outley v. City of New York, 837 F.2d 587, 591 (2nd Cir. 1988)).

In assessing whether preclusion is an appropriate remedy for a failure to provide discovery, courts consider the following factors: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness [or of the precluded evidence]; (3) the prejudice suffered by the opposing party as a result of having to

prepare to meet the new testimony [or evidence]; and (4) the possibility of a continuance." See Id.; see also Jung v. Neschis, 2007 U.S. Dist. LEXIS 97173 (S.D.N.Y. Oct. 23, 2007).

Crucially, courts in this circuit recognize that preclusion of evidence pursuant to Rule 37 is a drastic remedy and should be exercised with discretion and caution." See Martinez v. Port Auth., 2005 U.S. Dist. LEXIS 19141, *42, 2005 WL 2143333 (S.D.N.Y. 2005).

## III.   ARGUMENT

### A. Motion No. 1 – Exclusion of Damages Evidence

Courts should exclude evidence on a motion *in limine* only if it is "clearly inadmissible on all potential grounds." See Nat'l Union Fire Ins. Co. of Pittsburgh v. L.E. Myers Co., 937 F. Supp. 276, 287 (S.D.N.Y. 1996) (citation omitted).

Rule 26 provides that a party must make the initial disclosures at or within fourteen (14) days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court order, *or unless a party objects during the conference that initial disclosures are not appropriate in this action and states the objection in the proposed discovery plan.* In ruling on the objection, the court must determine what disclosures, if any, are to be made and must set the time for disclosure.  See Fed. R. Civ. P. 26(a)(1)(C).

In this case, the parties submitted a joint letter enclosing a civil case management plan and scheduling Order (the "Proposed Scheduling Order") on March 11, 2021.  See ECF Docket Entry 15.  The Proposed Scheduling Order provided that Initial Disclosures shall be completed no later than April 1, 2021.  See ECF Docket Entry 15 at 7 ¶ 7.  Upon review of same, this Court cancelled the initial pretrial conference scheduled for March 18, 2021 as no significant issues were raised therein, but nonetheless directed the parties to inform the Court immediately if the parties believe that a conference would nevertheless be useful.  See ECF Docket Entry 17.

6

SJA-769

This Court then entered the Civil Case Management Plan & Scheduling Order (the "Scheduling Order") on March 15, 2021. See ECF Docket Entry 18.

On April 1, 2021, Plaintiff timely and duly served Defendants with her initial disclosures. See ECF Docket Entry 186-1. There, Plaintiff claimed damages for: (i) wages consisting of the differential in pay between herself and that of her male counterparts, for past and future loss of wages and benefits, in an amount to be determined at trial; (ii) back pay and front pay in an amount to be determined at trial; (iii) liquidated damages; (iv) compensatory damages for emotional distress in an amount to be determined at trial; (v) loss of good will and loss of Plaintiff's medical practice which amounts to no less than $10,000,000.00; and (vi) for attorneys' fees currently totaling $10,400.00 as well as costs currently totaling $959.50. Id. at 3.

On May 19, 2021, the parties submitted a joint letter concerning discovery. There, the *only* objection Defendants raised with Plaintiff's initial disclosures was that "Plaintiff has not identified any potential comparator in her Complaint, in her Initial Disclosures or in her Initial Discovery responses pursuant to Part 3(3) of the Protocols." See ECF Docket Entry 21 at 2. This was, of course, because Defendants held all the cards in discovery and were in possession of that information such that *they* could compute the damages due to Plaintiff before she ever could.

Up until March 23, 2023, Defendants rested on their laurels and raised no objections to Plaintiff's disclosures concerning damages, even after deposing Plaintiff concerning same. Given their failure to object and decision to hold this objection in their pocket, Defendants have waived their right to object and cannot now seek this relief. See Fed. R. Civ. P. 26(e)(1)(B) (providing that a party who has made a disclosure must supplement or correct is disclosure or response as ordered by the court).

SJA-770

Further, although Rule 26 also requires supplementation or correction if a party learns the disclosure is incomplete or incorrect, Plaintiff submits that she did come to know this. <u>See</u> Fed. R. Civ. P. 26(e)(1)(A). Moreover, Rule 26 provides that supplementation of disclosures must be made if a party learns that the disclosure is incomplete or incorrect, *and* if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. <u>Id.</u> Plaintiff respectfully submits that her damages were made known during the discovery process, by and through Defendants' production of the compensation details of her comparators, as was her methodology and computations thereafter, albeit that submission was made for settlement purposes only. Plaintiff also notes that her damages were disclosed in the joint pretrial Order. <u>See</u> ECF Docket Entry 179.

As such, Defendants suffer no prejudice and, to the extent this Court finds that supplementation was required (which Plaintiff submits it was not), any such failure was harmless, requiring that Defendants' motion *in limine* be denied. <u>See</u> <u>Cates v. Trustees of Columbia U. in City of New York</u>, 330 F.R.D. 369, 374 (S.D.N.Y. 2019) (denying motion to preclude evidence related to damages because, "[n]otwithstanding the timing of Plaintiffs' damages disclosures, … [Defendant] suffered no demonstrable harm"); <u>Id.</u> ("If there truly were any prejudice, the Court expects that Columbia would have raised an issue regarding Plaintiffs' damages disclosures in the weeks after receiving Plaintiffs' expert report, and certainly prior to Columbia submitting its own responsive expert report"); <u>see also</u> <u>Holsum de P.R., Inc. v. Compass Indus. Group LLC</u>, 530 F. Supp. 3d 228, 234 (D.P.R. 2021) (finding late disclosure of the revision to its calculation of damages is harmless). Notwithstanding the foregoing, and in an abundance of caution, Plaintiff amends her initial disclosures setting forth the computations. <u>See</u> Declaration of Emanuel Kataev, Esq. ("<u>Kataev</u> <u>Decl.</u>") at ¶ 3, Exhibit ("<u>Ex.</u>") A.

8

Notably, there is no specific time frame for amending disclosures.  See e.g., Jama v. City and County of Denver, 304 F. Supp. 2d 289, 299-300 (D. Col. 2014).  Moreover, the closure of discovery does not forestall amendment of disclosures.  See Hernandez v. Polanco Enterprises, Inc., 19 F. Supp. 2d 918, 923 (N.D. Cal. 2013).  As such, setting aside the fact that Plaintiff was unable to compute her damages until after Defendants produced the required discovery to enable her to do so, Defendants cannot claim any prejudice.  See Assaf v. Trinity Med. Ctr., 696 F.3d 681, 686-87 (7th Cir. 2012) ("The bottom line here is that [Plaintiff] did provide a computation of his damages before the preparation of any pretrial order, and although this came after the close of discovery, we have held that litigation is not limited to information obtained through discovery only. … [Defendant] was aware well before the discovery deadline … that [Plaintiff] would be seeking some amount in lost professional fees. … The district court believed that [Defendant] would be prejudiced by the 'late' (post-discovery) disclosure of [Plaintiff's] full computation … but this is difficult to understand; the trial was still at least a month away,[1] and [Defendant] had access to the [relevant] information … all along. There is no need for [Plaintiff] to reveal to [Defendant], through discovery, knowledge already in the hospital's own files") (citing Krolnik v. Prudential Insurance Co., 570 F.3d 841, 843 (7th Cir.2009)).

Based on the foregoing authority, there is no merit to Defendant's maneuver and the motion in limine must be denied.

### B.  Motion No. 2 – Exclusion of Expert Testimony

Plaintiff does not object to the exclusion of expert testimony, so long as Defendants do not seek to introduce any expert testimony.

_____

[1] Notably, the trial in this case is also currently a month away.  See ECF Docket Entry 156.

9

SJA-772

### C.  Motion No. 3 – Exclusion of Plaintiff's Child's Medical Condition & Volunteer Work

A defendant takes a "plaintiff as he finds him." See Carter v. United States, 760 F. Supp. 2d 281, 283 (E.D.N.Y. 2011) (citing Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 908 (2d Cir. 1993)). Although the Second Circuit in Ragin noted that this principle only applies to "physical injuries," that holding "addressed damages in a federal civil-rights case and it is unclear that New York follows the same rule." See Conti v. Doe, 17-CV-9268 (VEC), 2020 WL 6162104, at *11 (S.D.N.Y. Oct. 21, 2020).

Under New York state law, the so-called eggshell plaintiff doctrine has been "recognized in cases involving the exacerbation of psychological and emotional defects, as well as physical injuries." See Partridge v. State, 107 N.Y.S.3d 813 (N.Y. Ct. Cl. 2017), aff'd, appeal dismissed, 173 A.D.3d 86 (1st Dept. 2019); see also Tobin v. Steisel, 64 N.Y.2d 254, 259 (1965); Boodram v. Brooklyn Developmental Ctr., 773 N.Y.S.2d 817, 832 (Civ. Ct. 2003) (explaining that the eggshell plaintiff principle "will apply even when the precipitating or aggravating factor is not physical, sudden or otherwise, as in the case of harassment"); Bartolone v. Jeckovich, 103 A.D.2d 632, 634-635 (4th Dep't 1984) (explaining that the eggshell plaintiff principle applied to a plaintiff who was suffering from a "quiescent psychotic illness" until the accident "aggravated his schizophrenic condition"); Bialik v. E.I. Dupont de Nemours & Co., 539 N.Y.S.2d 605, 608 (Sup. Ct. 1988) (describing plaintiff as a "mental eggshell ready to be cracked").

Here, Plaintiff will present evidence that her emotional distress was exacerbated by Defendants' unlawful retaliatory conduct because she was terminated during COVID and was unable to find a comparable job within the New York metropolitan area.  Because she was forced to accept work in Florida, she uprooted her entire family, including her special needs child.

SJA-773

Because her child was uprooted, she suffered from behavioral issues due to a regression of her autism spectrum disorder.  Naturally, this caused Plaintiff emotional distress, as no parent wishes to see their child suffer.  Accordingly, Plaintiff is entitled to present this evidence to the jury, and Defendants cannot rely on the notion that this evidence is prejudicial because they must take her as they find her, and there is evidence in the record that Defendants knew Plaintiff has a special needs child.  See Hart v. RCI Hospitality Holdings, Inc., 90 F. Supp. 3d 250 (S.D.N.Y. 2015) (citing Old Chief v. United States, 519 U.S. 172, 193 (1997) ("[T]he question under Rule 403 is one of 'unfair prejudice-not of prejudice alone"… "unfair prejudice as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair'")).  Plaintiff respectfully submits that, because Defendants knew Plaintiff has a special needs child and learned about this in discovery, there can be no finding that there exists unfair prejudice by presenting such testimony.

Accordingly, Defendants' motion *in limine* concerning the circumstances with her child must be denied.

Separately, Defendants seek to preclude evidence concerning her humanitarian trip to Ecuador to treat patients in need.  However, because this fact shows Plaintiff's qualifications, and because the evidence adduced in discovery establishes that Defendants supported her endeavor as it reflected well on NYU's mission, their motion must be denied.  Defendants cannot have it both ways; they cannot mar Plaintiff's track record as a successful rheumatologist who is sought after by her patients to justify their unlawful discriminatory and retaliatory conduct, then seek to preclude evidence of her achievements, accolades, and qualifications.  It is in that regard their motion *in limine* stands at the height of hypocrisy.

Accordingly, Defendants' motion *in limine* on this issue must be denied.

11

SJA-774

**D.  Motion No. 4 – Exclusion of Plaintiff's Evidence Related to Comparator's Tuition**

Defendants seek to preclude the admission of evidence concerning a high-value benefit a male comparator received: free tuition for children of physicians employed by NYU.

Defendants' motion must be denied because this benefit constitutes a form of wages under the Equal Pay Act.  See ABA Model Jury Instructions, Employment Cases § 2.04[1][b] ("As defined under the Equal Pay Act, wages include *all forms of compensation*, including those *other than cash wages, such as fringe benefits*. You should consider *all evidence* you have heard concerning the wages the defendant pays employees in determining whether the plaintiff has been paid a lower wage than an employee of the opposite sex") (emphasis added); see also 29 C.F.R. § 1620.10 ("Under the EPA, the term 'wages' generally includes *all payments made to [or on behalf of] an employee as remuneration for employment*. The term includes *all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment*") (emphasis added).

Because Dr. Andrew Porges ("Dr. Porges"), a male rheumatologist who is a comparator to the Plaintiff, received this benefit, Plaintiff is entitled to present evidence concerning this fact.

Plaintiff is also entitled to use this fact to establish Dr. Porges' bias and predisposition towards NYU in carrying out its wishes, as evidence adduced in the record during discovery evinces that Defendant Joseph Antonik wrote the e-mail complaining about Plaintiff and submitted it to Dr. Porges to cover up his involvement.  Indeed, based on the testimony adduced during discovery, some witnesses were surprised to hear or otherwise unaware that Dr. Porges "reviewed" the performance of other doctors with whom he worked at NYU.

12

Defendants' motion *in limine* concerning Dr. Porges' receipt of tuition as a benefit must therefore be denied on two grounds, that tuition is considered compensation under the EPA, and that his receipt of that benefit is a ground upon which bias or prejudice can be established such that he may be impeached.

**E. Motion No. 5 – Exclusion of Malpractice Suits Against A Retained Rheumatologist**

Defendants justify the termination of the Plaintiff, who indisputably met and exceeded all performance targets and once had her contract renewed, on the grounds that there were temporally scattered and virtually undocumented complaints concerning her alleged poor interpersonal skills and that she ordered too many tests such that there was a risk to patients.

Setting aside the fact that Defendants permitted Plaintiff to work for an additional six (6) months following notice of her non-renewal, and that the physicians who "reviewed" Plaintiff's practices failed to report her to the New York State Department of Health's Office of Professional Conduct as they are required to, Defendants seek to preclude evidence that another doctor who was sued *twice* for malpractice was <u>not</u> terminated.

The benign complaints Defendants seek to introduce must be juxtaposed against the institution of malpractice suits, which is arguably the highest form of a patient complaint, to show that Defendants' proffered reasons for terminating her are pretextual.  Indeed, because there is rarely "direct, smoking gun, evidence of discrimination," a plaintiff may rely on "bits and pieces of information to support an inference of discrimination."  <u>See</u> <u>Miller-Sethi v. City U. of New York</u>, 21-CV-8591 (JPO), 2023 WL 419277, at *4 (S.D.N.Y. Jan. 26, 2023).

Accordingly, Plaintiff must be permitted to present evidence concerning Defendants' decision to retain an employee who was sued twice for malpractice (while terminating Plaintiff over minor and curable issues), and Defendants' motion *in limine* must thus be denied.

13

### F.  Motion No. 6 – Exclusion of News Articles and Opinion Pieces

Plaintiff does not object to Defendants' motion.

### G.  Motion No. 7 – Exclusion of Certain Comments

Defendants seek to preclude Plaintiff from testifying that Defendant Andrew T. Rubin ("Rubin") told her to "smile more" and to "fake it 'till you make it" despite the fact that Dr. Kavini Mehta – the doctor with whom Plaintiff negotiated her employment terms at NYU with (and with whom she partnered with in Plaintiff's private practice prior to joining NYU) – corroborated Plaintiff's testimony that Rubin made these comments.

Again, because there is rarely "direct, smoking gun, evidence of discrimination," a plaintiff may rely on "bits and pieces of information to support an inference of discrimination." See Miller-Sethi, 2023 WL 419277, at *4.  Indeed, "[t]he reasonableness of the plaintiff's belief [that she was discriminated and/or retaliated against] is to be assessed in light of the totality of the circumstances." See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).

In light of the foregoing, because the jury is entitled to hear all the evidence to determine what really happened, Defendants' motion *in limine* on this ground must be denied.

### H.  Motion No. 8 – Exclusion of Evidence Concerning NYLL § 194-a

Defendants seek to preclude evidence that a pay practice which can be utilized to perpetuate pay disparity between men and women has been outlawed.   However, Defendants cannot be unfairly prejudiced by the presentation of this evidence.  See Hart, 90 F. Supp. 3d 250 ("[T]he question under Rule 403 is one of 'unfair prejudice-not of prejudice alone'"… "unfair prejudice … is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair'") (citation omitted)).

14

Moreover, any prejudice that exists can be resolved by a curative instruction that the law was passed in January 2020. However, Defendants' motion *in limine* must otherwise be denied, as Plaintiff should be permitted to present evidence concerning the existence of this law and the fact that Defendants allegedly used past salaries to determine compensation.

## I. Motion No. 9 – Exclusion of Patient Communications Which are Business Records

Defendants seek to exclude patient communications using the Epic System platform with which they manage patient relationships despite the fact this evidence constitutes a business record. Under the "business records exception," a record is not excluded by the rule against hearsay if:

> (a) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (b) the record was kept in the course of a regularly conducted activity; (c) making the record was a regular practice of that activity; (d) the custodian certifies the record; and (e) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

See Abascal v. Fleckenstein, 820 F.3d 561, 565 (2d Cir. 2016) (citing Fed. R. Evid. 803(6)(a–e)).

To lay a proper foundation for a business record, "a custodian or other qualified witness must testify that the document was kept in the course of a regularly conducted business activity and also that it was the regular practice of that business activity to make the record." See United States v. Komasa, 767 F.3d 151, 156 (2d Cir. 2014) (citation, internal quotation markets, and brackets omitted).

Here, there is no question that the patient communications are a business record and that Defendants maintain these records in order to monitor the care their physicians provide to patients. Plaintiff intends to introduce this evidence concerning her skills and qualifications, as patient's statements concerning her level of care are relevant to that issue.

15

SJA-778

Indeed, the best indicator of Plaintiff's skill and qualifications comes directly from the patients, as the expression of satisfaction by a patient would indicate a physician is skilled and qualified while complaints about a physician indicate otherwise.  Again, Defendants cannot have it both ways; they cannot seek to introduce benign patient complaints concerning Plaintiff, then object to records of patients' praise of her.

To the extent that concerns regarding HIPAA exist, the records can be redacted to replace patient names with ID numbers.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully submits that Defendants' motions *in limine* be denied in their entirety.

Dated: Lake Success, New York
      April 3, 2023

                          Respectfully submitted,

                          **MILMAN LABUDA LAW GROUP PLLC**

                          __*/s/ Emanuel Kataev, Esq.*_____
                          Joseph M. Labuda, Esq.
                          Emanuel Kataev, Esq.
                          3000 Marcus Avenue, Suite 3W8
                          Lake Success, NY 11042-1073
                          (516) 328-8899 (office)
                          (516) 328-0082 (facsimile)
                          joe@mllaborlaw.com
                          emanuel@mllaborlaw.com

                          *Attorneys for Plaintiff*
                          *Dr. Sari Edelman*

cc:     Defendants (via ECF).

SJA-779

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DR. SARI EDELMAN,

　　　　　Plaintiff,

　　– against –

NYU LANGONE HEALTH SYSTEM, NYU LANGONE
HOSPITALS, NYU LANGONE MEDICAL CENTER, NYU
LANGONE NASSAU RHEUMATOLOGY, NYU SCHOOL
OF MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER, ANDREW T.
RUBIN, DAVID KAPLAN, JOSEPH ANTONIK, and
JOSHUA SWIRNOW,

　　　　　Defendants.

**ORAL ARGUMENT REQUESTED**

Case No. 1:21-cv-502 (LJL)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) AND TO
ALTER OR AMEND THE JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)**

SJA-780

## TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................. 1

Background ................................................................................................................... 2

    Retaliation ............................................................................................................ 3

    Damages ............................................................................................................... 6

Argument ..................................................................................................................... 6

I.     Defendants' Motion for Judgment as a Matter of Law on Remaining Claim for Retaliation under Title VII, the SHRL, and the CHRL ........................................... 6

    A.   Legal Standard .......................................................................................... 6

    B.   Retaliation ................................................................................................. 7

    C.   Discussion ................................................................................................. 8

        1.   Insufficient evidence that Antonik had knowledge of Plaintiff's purported activity prior to NYU's non-renewal of Plaintiff's employment ................................................................................. 9

        2.   Insufficient evidence that Antonik actually participated in the non-renewal and termination of Plaintiff's employment ........................... 10

        3.   Insufficient evidence that NYU acted negligently in any reliance on information provided by Antonik ...................................................... 12

II.     Defendants' Motion for Remittitur of the Jury's Front Pay Award ...................... 14

    A.   Legal Standard ........................................................................................ 14

    B.   Discussion ............................................................................................... 15

        1.   The Jury's Front Pay Award ............................................................. 15

            a.   The Jury Instruction ............................................................... 15

            b.   The Jury's Front Pay Award ................................................... 15

        2.   The Front Pay Award Should be Vacated .......................................... 16

            a.   There is zero evidence of the damages the jury awarded ............ 16

            b.   Plaintiff's damages were capped by her pretrial filings ................ 19

Conclusion ................................................................................................................. 21

i

SJA-781

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advance Pharm., Inc. v. United States*,
    391 F.3d 377 (2d Cir. 2004)......................................................................................7

*Anderson Grp., LLC v. City of Saratoga Springs*,
    805 F.3d 34 (2d Cir. 2015)......................................................................................14

*Bergerson v. N.Y. State Off. of Mental Health*,
    652 F.3d 277 (2d Cir. 2011)....................................................................................18

*Campbell v. Nat'l Fuel Gas Distrib. Corp.*,
    723 F. App'x 74 (2d Cir. 2018)...............................................................................12

*Casmento v. Volmar Constr., Inc.*,
    No. 20-cv-0944, 2022 WL 15773966 (S.D.N.Y. Oct. 28, 2022)..............................6

*Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*,
    824 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................18, 19

*Dudley v. City of New York*,
    No. 18 CIV. 10015 (AKH), 2020 WL 3791848 (S.D.N.Y. July 7, 2020) ...............12

*Dunlap-McCuller v. Riese Org.*,
    980 F.2d 153 (2d Cir. 1992)....................................................................................20

*Edwards v. Rochester Inst. of Tech.*,
    794 F. App'x 65 (2d Cir. 2019)...............................................................................13

*Exodus Partners, LLC v. Cooke*,
    2007 WL 120053 (S.D.N.Y. Jan. 17, 2007) ...........................................................14

*Feingold v. New York*,
    366 F.3d 138 (2d Cir. 2004)....................................................................................11

*Hornig v. Trs. of Columbia Univ. in City of New York*,
    No. 17 CIV. 3602 (ER), 2022 WL 976267 (S.D.N.Y. Mar. 31, 2022).....................12

*Krasner v. HSH Nordbank AG*,
    680 F. Supp. 2d 502 (S.D.N.Y. 2010)..................................................................7, 8

*Kregler v. City of New York*,
    987 F. Supp. 2d 357 (S.D.N.Y. 2013)....................................................................13

*Luca v. Cnty. of Nassau*,
  No. 04-cv-4898, 2008 WL 2435569 (E.D.N.Y. June 16, 2008), *rev'd on other
  grounds*, 344 Fed. Appx. 637 (2d Cir. 2009)..........................................................19

*Malena v. Victoria's Secret Direct, LLC*,
  886 F. Supp. 2d 349 (S.D.N.Y. 2012)....................................................................11

*Melof v. New York Life Ins. Co.*,
  240 F.3d 138 (2d Cir. 2001)....................................................................................7

*Menaker v. Hofstra Univ.*,
  935 F.3d 20 (2d Cir. 2019)....................................................................................12

*Olaechea v. City of New York*,
  No. 17-cv-4797, 2022 WL 3211424 ................................................................ *passim*

*Olivares v. Brentwood Indus.*,
  822 F.3d 426 (8th Cir. 2016) ................................................................................19

*Press v. Concord Mortg. Corp.*,
  No. 08-cv-9497, 2010 WL 3199684 (S.D.N.Y. Aug. 11, 2010).............................20

*Robinson v. De Niro*,
  No. 19-CV-09156 (LJL), 2023 WL 4862772 (S.D.N.Y. May 25, 2023) ............4, 8

*Rossbach v. Montefiore Med. Ctr.*,
  No. 19CV5758 (DLC), 2021 WL 930710 (S.D.N.Y. Mar. 11, 2021) ....................12

*Schupbach v. Shinseki*,
  905 F. Supp. 2d 422 (E.D.N.Y. 2012) ...................................................................10

*Smith v. Farmstand*,
  No. 11-cv-9147, 2016 WL 5912886 (N.D. Ill. Oct. 11, 2016) ..............................17

*Thomas v. iStar Fin., Inc.*,
  508 F. Supp. 2d 252 (S.D.N.Y. 2007)........................................................17, 18, 19

*Tingley Sys., Inc. v. Norse Sys., Inc.*,
  49 F.3d 93 (2d Cir. 1995)......................................................................................14

*Torres v. Metro-North R.R. Co.*,
  No. 20-cv-10782, 2023 WL 4487726 (July 12, 2023)...........................................14

*Trademark Rsch. Corp. v. Maxwell Online, Inc.*,
  995 F.2d 326 (2d Cir. 1993)............................................................................14, 17

*Tse v. UBS Fin. Servs., Inc.*,
  568 F. Supp. 2d 274 (S.D.N.Y. 2008)...............................................................14, 17

002528\5\170338760.v1

*Vasquez*, 835 F.3d at 275 ...............................................................12

**Statutes**

CHRL ...............................................................................................2, 6

Civil Rights Act Title VII ...................................................... *passim*

Federal Equal Pay Act, New York Labor Law Section 194, Title VII ...........................................2

New York City Human Rights Law.........................................................1

SHRL .......................................................................................2, 6, 10

State Human Rights Law ......................................................................1

State Human Rights Law ....................................................................12

**Other Authorities**

Fed. R. Civ. P. 50(a) ..........................................................................6

Fed. R. Civ. P. 50(a)(1) ......................................................................6

Fed. R. Civ. P. 50(a)(2) ......................................................................7

Federal Rule of Civil Procedure 50 ......................................................6

Federal Rule of Civil Procedure 50(b).............................................1, 7

 "NYU Hospitals Center" (the "NYU Corporate Defendants").................1

Rule 26 .......................................................................................19, 20

Rule 59 .............................................................................................7

002528\5\170338760.v1

## Preliminary Statement

Defendants renew their oral motion, of July 18, 2023[1], for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) on Plaintiff's claim for retaliation under Title VII of the Civil Rights Act (Title VII), the New York State Human Rights Law (SHRL), or the New York City Human Rights Law (CHRL), against the NYU corporate defendants[2] and individual defendant Joseph Antonik and the jury's award for front pay.

There was insufficient evidence for a jury to determine that Plaintiff was engaged in protected activity or that NYU and/or Antonik were aware of protected activity on the part of Plaintiff. Nor is there evidence that Antonik participated in the decision not to renew Plaintiff's expiring employment agreement; or that NYU was negligent in relying on any information it received in connection with its decision not to renew Plaintiff's expiring employment agreement.

The jury's award of front pay to Plaintiff is also unsupported by the evidence. Indeed, the evidence shows the contrary, to wit: Plaintiff received more compensation at her job after NYU and thus did not sustain a loss requiring front pay. The award should be vacated or at the very least remitted in and limited to the amount she sought in her pretrial filings.

---

[1] Declaration of Richard L. Steer executed August 16, 2023 ("Steer Decl."), Ex. A (July 18 Court Tr. 1298:6-1309:13)).

[2] The evidence presented at trial shows that the only entity defendant that is a proper defendant is NYU Grossman School of Medicine ("NYU"), which was the entity that employed Plaintiff. All of the other entity defendants, NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University, f/k/a "NYU Hospitals Center" s/h/a "NYU Langone Medical Center," "NYU Langone Nassau Rheumatology," "NYU School of Medicine," and "NYU Hospitals Center" (the "NYU Corporate Defendants"), either are without legal existence and thus not susceptible to being sued or were not proper party defendant with regard to Plaintiff's claims as there is no evidence that they took any action with regard to Plaintiff.

1

SJA-785

## Background

Plaintiff brought various claims, including discrimination and retaliation, against NYU Corporate Defendants, and individual defendants, Antonik, Andrew Rubin, Joshua Swirnow, and David Kaplan.

On July 18, 2023, the Court granted Defendants' motion for judgment as a matter of law for Kaplan on all claims and for Kaplan, Rubin, and Swirnow on the discrimination claims. (July 18 Court Tr. 1342:21-22; 1343:1-3.) The Court also granted Defendants judgment on the claim for punitive damages, as "there is no evidence from which a reasonable jury could find that defendants engaged in gross misbehavior or conduct that willfully or wantonly caused hurt to another or engaged in willful or wanton negligence or reckless conduct or consciously disregarded the rights of the plaintiff." (*Id.* at 1343:16-22.)

On July 19, 2023, following an eight-day trial, the jury returned a verdict finding that Defendants had <u>not</u> violated the Federal Equal Pay Act, New York Labor Law Section 194, Title VII, the SHRL, or the CHRL with respect to Plaintiff's discrimination claim; and that Defendants Rubin and Swirnow had <u>not</u> retaliated against Plaintiff in violation of Title VII, SHRL or the CHRL.

The jury, however, returned a verdict finding that Plaintiff engaged in protected activity and that the NYU Corporate Defendants committed an adverse act against her because of her protected conduct in violation of Title VII, the SHRL, and the CHRL and that Antonik aided or abetted an adverse act against Plaintiff because of her protected conduct in violation of the SHRL and the CHRL. The verdict is without evidentiary support – indeed, contrary to the evidence – and should be vacated.

2

Judgment notwithstanding the verdict is appropriate here because the evidence in favor of the movant Defendants is so overwhelming that reasonable and fair-minded persons could not arrive at a verdict against them.  Further, there is such a complete lack of evidence supporting the verdict that the verdict could only have resulted from sheer surmise and conjecture on the part of the jury.

Retaliation

First, Plaintiff's first "complaint" to Human Resources, the only one that Antonik had knowledge of, was not protected activity.  That complaint was about office space.  And while the complaint included purported conduct on the part of Antonik, even if it did occur as Plaintiff alleges, Antonik's conduct was gender neutral as opposed to anything that could amount to discrimination.  As reflected by the notes taken by the investigator of that complaint: Antonik had come into Plaintiff's office, informing her that the directive above was that they wanted to move the Rheumatology practice into one space and requested that another doctor be able to use Plaintiff's office on the two days a week that she was not using it.  (Steer Decl., Ex. B (Pl's. Trial Ex. 21).)  Plaintiff complained that Antonik was sitting in her office and waving his arms questioning how often she is really there and whether she thinks the office is really hers. (Steer Decl., Exs. L (July 11 Court Tr. 112:22-25), C (July 12 Court Tr. 343:15-17).)  Plaintiff further complained that she was very uncomfortable after the conversation.  (Pl's. Trial Ex. 21.)  None of the complained of conduct was discriminatory or should be perceived as discriminatory, as opposed to being gender neutral.  As stated by the Court, "It's not gender discrimination for somebody to be intimidating, whether that person is a male or a female."  (Steer Decl., Ex. A (July 18 Court Tr. 1317:3-4).)  "Put another way, the fact that somebody happens to have genetic features of a male and the physical features of a male doesn't make the threatening activity to be gender

3

discrimination." (*Id*. at 1317:5-8.)  Thus, there was nothing in Plaintiff's complaint that NYU or Antonik could have perceived as having been about her gender or discriminatory on any other basis.  Further, it is undisputed that the discrimination laws do not create a general civility code. *Robinson v. De Niro*, No. 19-CV-09156 (LJL), 2023 WL 4862772, at *53 (S.D.N.Y. May 25, 2023).  Plaintiff's complaint therefore does not constitute protected activity required to establish a retaliation claim.

Second, the alleged protected activity did not cause an adverse employment action.  All iterations of retaliation claims, be they Title VII, state law, or city law, require proof of causation.  There is no such proof in this case.  Temporally, it is not close.  The complaints end in November of 2020, approximately 14 months before the alleged adverse employment action.  And the testimony uniformly – from every single witness – was that the prior complaints about office space had nothing to do with the contract nonrenewal decision.

The decision was made based on the assessment of Plaintiff's clinical practice initiated by Dr. Porges. Therefore, the retaliation claim should be dismissed.  Antonik, who is not a clinician, did not do anything to retaliate. The evidence is clear that he neither had the power to do so nor did he participate in the decision not to renew Plaintiff's expiring employment agreement. Dr. Porges initiated the clinical review of Plaintiff's performance, and Kaplan directed the production of documents.  Antonik was asked to put forward some emails, and he did.  At most, his involvement was ministerial.  There is no evidence that Antonik ever communicated, in any way, directly with Swirnow or the ultimate decision maker, Rubin, concerning Plaintiff's non-renewal. (*See e.g.,* Steer Decl., Exs.  C (July 12 Court Tr. 493:20-22; 494:1-3; 512:10-13), D (July 13 Court Tr. 680; 21-24), and E (July 17 Court Tr. 980:9-12).)  Moreover, there was no evidence that Antonik directed Ruiz to begin a log concerning issues specific to Plaintiff in response to Plaintiff's

4

complaint. (Steer Decl., Ex. F (July 14 Court Tr. 857:22-25; 858:1-2).)  Ruiz, a non-party witness, testified that she had kept logs for the doctors in the suite as part of her job since she started working at NYU prior to 2019.   (July 14 Court Tr. 839:11-18; 852:8-15; 857:17-19) Plaintiff's case is based solely her conclusory surmise and insinuation which are contradicted squarely by the evidence admitted at trial. The evidence showed that Antonik was merely responding to instructions from his superior when he took Ruiz's log and passed it to somebody else.  Moreover, there was no showing whatsoever that the content of the log maintained by Ruiz and forwarded on by Antonik at Kaplan's request was in any way inaccurate or false.  Accordingly, there was no basis to find retaliation.

Rubin was the ultimate decision maker concerning the non-renewal of Plaintiff's employment agreement and termination of her employment.  The evidence is overwhelming that Rubin based his decision, in good faith, on what he was told by the clinicians, including Drs. Porges and Goldberg (who are not parties to this litigation).  Moreover, there is no evidence that the information provided was inaccurate, or that NYU or Rubin was negligent in such reliance, or that they were manipulated by anyone, let alone Antonik, who never directly communicated to Rubin about Plaintiff.

No one, including NYU and Antonik, was found to have discriminated against Plaintiff. And Swirnow and Rubin, the ultimate decision maker, were not found by the jury to have discriminated or retaliated against Plaintiff.

Based on the evidence, NYU and Antonik are entitled to the same result and should be granted judgment as a matter of law on all of Plaintiff's retaliation claims.

002528\5\170338760.v1

Damages

Plaintiff's purported claims for damages are equally lacking evidence to support the jury's award of front pay.

There is no back pay proof in the case and the jury did not award any backpay damages. There is no loss of revenue. Plaintiff did not go a day unemployed or miss a check when she left NYU. Rather, she earns and has earned more income at her new job than she did while employed at NYU. So, she likewise has no front pay damages. To the extent her front pay award is purportedly based on retirement benefits – there are no documents or other evidence supporting such an award. There is no documentary proof that Plaintiff does not get retirement benefits now. Her very short, unspecific testimony is insufficient and failed to even provide dollar amounts received from NYU or her new employer upon which an award could be calculated, let alone testimony that would support damages in the amount of $700,000. Plaintiff merely states that after her first year, there was a typical 401K to which she could contribute but there was purportedly no matching. Accordingly, her claim for front pay should be vacated.

## Argument

### I.  Defendants' Motion for Judgment as a Matter of Law on Remaining Claim for Retaliation under Title VII, the SHRL, and the CHRL

#### A.  Legal Standard

"Federal Rule of Civil Procedure 50 provides that, after 'a party has been fully heard on an issue' but 'before the case is submitted to the jury,' it may move for judgment as a matter of law on the ground that 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party.'" *Olaechea v. City of New York*, No. 17-cv-4797, 2022 WL 3211424, at *4 (citing Fed. R. Civ. P. 50(a)); *Casmento v. Volmar Constr., Inc.*, No. 20-cv-0944, 2022 WL 15773966, at *3 (S.D.N.Y. Oct. 28, 2022) (citing Fed. R. Civ. P. 50(a)(1)). "The movant 'must

6

specify the judgment sought and the law and facts that entitle the movant to the judgment.'" *Olaechea*, 2022 WL 3211424, at *4 (citing Fed. R. Civ. P. 50(a)(2).) "Where, as here, the issue has been reserved, the moving party 'may file a renewed motion for judgment as a matter of law and include an alternative or joint request for a new trial under Rule 59.'" *Olaechea*, 2022 WL 3211424, at *4 (citing Fed. R. Civ. P. 50(b).) "In ruling on a renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

"The Second Circuit has explained that judgment as a matter of law may be granted when '(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.'" *Olaechea*, 2022 WL 3211424, at *5 (citing *Melc₀f v. New York L₁fe Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001)). "In assessing the sufficiency of evidence to support a jury verdict, [the Court] must view the record in the light most favorable to the opposing party, assuming all reasonable inferences were drawn and all credibility disputes resolved in its favor." *Olaechea*, 2022 WL 3211424, at *5 (citing *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004)).

**B. Retaliation**

Title VII "protects employees [who] … make[] informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010) (citation omitted). "Reasonable also plays a role in the second element, for 'implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have

7

understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Krasner*, 680 F. Supp. 2d 502, 520 (citations omitted).  Even if an employee has a good faith belief that she was complaining of gender discrimination, but the employer had no way to understand complaints as such, the complaint will not sustain a retaliation claim.  *Krasner*, 680 F. Supp. 2d at 521-22.  So, even though Antonik may not have been happy about Plaintiff complaining about him, he had no reason to believe she had complained about discrimination. And even if NYU, arguendo, terminated Plaintiff's employment based on Antonik's displeasure with the complaint (which it did not), her termination nevertheless does not amount to unlawful retaliation.  *See Krasner*, 680 F. Supp. 2d at 521-22 (gender neutral complaints did not amount to protected activity).

Moreover, her subsequent email to Human Resources using buzz words like "harassment" and "toxic work environment" also does not amount to protected activity.  *Robinson*, 2023 WL 4862772, at *90-91.  Like the first complaint, her subsequent communications to Human Resources are also not understood by NYU to be complaints about discrimination.  There is no testimony that NYU regarded those as actual discrimination, so it was not protected activity, which is a predicate for the retaliation claim.  Further, there is no evidence that Antonik was even made aware of those subsequent communications from Plaintiff.  Accordingly, because there was no proof presented at trial that Antonik was aware of the subsequent complaints as being related to discrimination, there is no basis to find retaliation under the law.

**C. Discussion**

There was insufficient evidence presented at trial for the jury to conclude that: (1) Antonik was aware of protected activity on the part of Plaintiff prior to NYU's non-renewal of Plaintiff's expiring employment agreement; (2) Antonik actually participated in the non-renewal of Plaintiff's expiring employment agreement; or (3) NYU acted negligently in any reliance on

8

information Antonik provided to Dr. Porges at the direction of Kaplan, to whom he reported. (*See* Steer Decl., Ex. C (July 12 Court Tr. 500:7-9.)

>   1.   Insufficient evidence that Antonik had knowledge of Plaintiff's purported activity prior to NYU's non-renewal of Plaintiff's employment

There is no evidence that Antonik or the Human Resources representative who spoke with him about Plaintiff's first complaint (the only one that Antonik had knowledge of) were aware or had reason to be aware that Plaintiff was purportedly making a discrimination complaint, as opposed to what NYU and Antonik perceived as merely a dispute about office space, prior to NYU's non-renewal of Plaintiff's expiring employment agreement.

The jury was instructed that, *inter alia* –

-   "Protected activity includes an employee's conduct in opposing in good faith unlawful discrimination by complaining about discrimination to the employer."  (Steer Decl., Ex. G (July 19 Court Tr. 1457:16-18).)
-   "The second element of a retaliation claim under the state human rights law is that the defendant whose conduct you are considering must have known that Dr. Edelman was engaged in protected activity."  (July 19 Court Tr. 1457:19-22.)

Here, there is no evidence that Antonik was aware that Plaintiff was engaged in "protected activity."  The evidence reflects that Antonik merely knew about Plaintiff's complaint concerning NYU's request to permit another doctor to use Plaintiff's office on the days that she was not using it and his purported hand gestures during their meeting concerning the use of her office.  (Steer Decl., Exs. B (Pl's. Trial Ex. 21); C (July 12 Court Tr. 530:8-10).)  There is no evidence that he knew about her subsequent complaint containing buzz words or any allegation of any purported discrimination until after Plaintiff's non-renewal.  In addition, prior to Plaintiff's non-renewal, Antonik had not seen her employment contract and was not aware that her contract was expiring. (July 12 Court Tr. 534:4-10.)  Antonik was not even aware of the reasons for which Plaintiff could be terminated.  (*See* July 12 Court Tr. 528:15-21.)

Plaintiff "cannot simply substitute utter speculation for the competent proof that would

9

be necessary to permit rational inferences by a jury" of Antonik's purported knowledge of alleged protected activity or retaliatory motive. *Olaechea*, 2022 WL 3211424, at *6 (citing *Schupbach v. Shinseki*, 905 F. Supp. 2d 422, 437 (E.D.N.Y. 2012)).

> 2. Insufficient evidence that Antonik actually participated in the non-renewal and termination of Plaintiff's employment

The jury was also instructed that they may find employees individually liable under an aiding and abetting theory to an employer who has retaliated in violation of the SHRL. (Steer Decl., Ex. G (July 19 Court Tr. 1462:7-12).) They were further instructed that if they "find that the individual defendants actually participated in the decision to not renew plaintiff's contract and to terminate her employment, then [they] may find them liable under an aider-and-abettor theory, even if they did not have hiring or firing authority." (July 19 Court Tr. 1462:20-24.)

Antonik, as the Site Director, had no hiring or firing authority with respect to Plaintiff or any of the doctors. There is also no evidence that he participates in any firing decisions with respect to any doctors. (Steer Decl., Ex. D (July 13 Court Tr. 564: 21-25.) There is no evidence that Antonik actually participated in the decision to renew her contract in 2017, or in the decision not to renew Plaintiff's contract upon its expiration and to terminate her employment. Evidence shows that Antonik did not see, nor was he familiar with, the terms of Plaintiff's contract, nor did he even have access to it to understand the possible bases for her termination as per the contract. (Steer Decl., Ex. C (July 12 Court Tr. 534:2-13).) Indeed, the evidence shows that Antonik did not even know that a decision to non-renew Plaintiff's contract was being considered or that it could be considered. (*Id.* at 534:2-13; 535:13-17.)

The evidence showed that Antonik played a ministerial role in the gathering of information concerning Plaintiff. (*Id.* at 500:4-6; 534:2-13; 535:13-17.) As part of her job, Miriam Ruiz, the office manager, had been compiling a list of "issues" concerning Plaintiff as she did for all doctors

10

in the suite where Plaintiff was located.  There is no evidence whatsoever that Antonik requested or

directed Ruiz to compile this list for Plaintiff or any other physician.  Rather, Ruiz testified that

since she first started working for NYU, prior to 2019, she kept records of anything that happened

in the suite including creating spreadsheets of all types of complaints concerning the doctors. (Steer

Decl., Ex. F (July 14 Court Tr. 839:10-18).)  Ruiz testified that "before 2019 when [she] first started

working for NYU, [she] kept spreadsheets of all types of complaints."  (July 14 Court Tr. 839:17-

18).  She also testified that she kept "similar logs" for other doctors, including "patient complaints,

workflow issues, … if the doctor didn't complete something that needed to be completed, just

keeping track of things so that [she] had a recollection of what was going on." (*Id.* 857:8-16.)  Ruiz

further testified that she kept the logs in the "same format for the other doctors in the suite."  (*Id.*

857:17-19.)   When Dr. Porges requested that Antonik provide him with information concerning

Plaintiff, Antonik, in response, merely sent an email including the information that he gathered

concerning Plaintiff to Dr. Porges.  (Steer Decl., Ex. C (July 12 Court Tr. 504:24-25; 505:1-2).)

There was no evidence adduced that the evidence he conveyed was in any way false or inaccurate.

It was merely the observations of his subordinate, Ms. Ruiz, a non-party, who had no involvement

in the underlying complaint or alleged retaliation.

     "For an individual defendant to be liable for retaliation under the NYCHRL, he must

have 'actually participated in the conduct giving rise to the plaintiff's' claims.'" *Olaechea*, 2022

WL 3211424, at *5 (citing *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366

(S.D.N.Y. 2012); *accord, Feingold v. New York*, 366 F.3d 138, 158-59 (2d Cir. 2004)

("Employees may be held personally liable under the NYSHRL and the NYCHRL if they

participate in the conduct giving rise to a discrimination claim.")).  "Such participation requires

retaliatory "intent." *Olaechea*, 2022 WL 3211424, at *5 (citing *Malena*, 886 F. Supp. 2d at 366).

11

It "therefore necessarily requires an individual's knowledge of the protected activity at the time of his participation." *Olaechea*, 2022 WL 3211424, at *5.

> 3.  Insufficient evidence that NYU acted negligently in any reliance on information provided by Antonik

The jury was charged with the following Cat's Paw instruction:

> Like under Title VII, NYU's retaliatory intent may be imputed from a subordinate under New York State Human Rights Law if NYU's decision to terminate was proximately caused by a subordinate who had a retaliatory motive and intended to bring about the adverse employment action.  The same standard applies here as under Title VII.  NYU must have been negligent or reckless in giving effect to the retaliatory intent of its low-level employees, which requires NYU to have known or reasonably should have known about the retaliatory motivation.  Again, you must also find that the false accusations themselves were the product of retaliatory intent.

> Like under Title VII, an employer may not be held liable simply because it acts on information provided by a biased coworker.  Thus, if NYU, non-negligently and in good faith, relies on a false and malign report of an employee who acted out of an unlawful animus, it cannot be held accountable or said to have been motivated by the employee's animus.

(Steer Decl., Ex. G (July 19 Court Tr. 1459:8-24.)

This Cat's Paw theory will succeed "[o]nly when an employer in effect adopts an employee's unlawful animus by acting negligently with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision." *Campbell v. Nat'l Fuel Gas Distrib. Corp.*, 723 F. App'x 74, 76 (2d Cir. 2018) (citing *Vasquez*, 835 F.3d at 275); *Hornig v. Trs. of Columbia Univ. in City of New York*, No. 17 CIV. 3602 (ER), 2022 WL 976267, at *23 (S.D.N.Y. Mar. 31, 2022) (citing *Vasquez*, 835 F.3d at 274–75); *Rossbach v. Montefiore Med. Ctr.*, No. 19CV5758 (DLC), 2021 WL 930710, at *5 (S.D.N.Y. Mar. 11, 2021) (citing *Vasquez*, 835 F.3d 267, 272); *Dudley v. City of New York*, No. 18 CIV. 10015 (AKH), 2020 WL 3791848, at *10 (S.D.N.Y. July 7, 2020) (Cat's Paw principles provide for liability where employer was negligent in relying on agent when it knew or should have known of agent's discriminatory motivation) (citing *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir.

12

2019); *see also, e.g.*, *Edwards v. Rochester Inst. of Tech.*, 794 F. App'x 65, 67 (2d Cir. 2019) (summary judgment finding no liability under Cat's Paw theory affirmed where, *inter alia*, that "[a]lthough [the employer] consulted with [the discriminatory employee] before terminating [plaintiff], [the employer] also spoke with four other [ ] employees" and found the "evidence was consistent") (citations omitted)).

Rubin was the ultimate decision maker.  There is no evidence that he was negligent in such reliance or that he was manipulated by anyone.  Rather, he was not found by the jury to have discriminated or retaliated against Plaintiff.  The overwhelming and uncontradicted evidence shows that he based his decision, in good faith, on the evaluations by the clinicians, *i.e.*, Dr. Porges and Dr. Goldberg, who were not defendants in the case, and not because of any input from Antonik or any other facilities managers.  Furthermore, the information provided by Ruiz through Antonik was not shown to be either "false" or "malign," but rather were her observations recorded in the course of her duties as Office Manager.

"Moreover, unlike the typical cat and monkey roles, here there were additional layers of attenuation between [Antonik] and [the decision makers]."  *Kregler v. City of New York*, 987 F. Supp. 2d 357, 369 (S.D.N.Y. 2013).  Like in *Kregler*, plaintiff's theory that one person gave information to a second person that was tainted by retaliatory animus, and that person in turn provided information to a third person which was also tainted, "strains the cat's paw theory beyond existing case law."  *Id*.  Such is the case here.  Kaplan asked Dr. Porges to gather information, who in turn instructed Antonik to gather information. (*See e.g.,* Steer Decl., Ex. A (July 18 Court Tr. 1184:8-14,19-25; 1193:18-24).) In response to that instruction, Antonik merely pushed forward a document that was prepared by someone else, Ruiz, and nonetheless was not shown to be inaccurate.

13

## II. **Defendants' Motion for Remittitur of the Jury's Front Pay Award**

### A. **Legal Standard**

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or under, the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Torres v. Metro-North R.R. Co.*, No. 20-cv-10782, 2023 WL 4487726, at *6 (July 12, 2023) (citing *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995)). It may "be warranted where it can be demonstrated that the jury awarded specific amounts of damages that were not supported by the record." *Olaechea*, at *8 (citing *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 287 (S.D.N.Y. 2008) (citing *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993))).

The Court may determine that remittitur, as opposed to a new trial on damages, is appropriate with respect to a jury's award for lost wages. *Torres*, 2023 WL 4487726, at *13 (remitting award for lost wages which was not supported by the record and was unduly speculative) (citing *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (remitting award after concluding "our detailed assessment of the trial evidence bearing on damages convinces us that the jury's inclusion in its award of $900,000 for the lost developer's fee was impermissibly speculative"); *Olaechea*, 2022 WL 3211424, at *9 ("[T]he jury's front pay award must be remitted in its entirety for a 'specific error'—namely, that it was 'impermissibly speculative.' (citation omitted)); *Exodus Partners, LLC v. Cooke*, 2007 WL 120053, at *13 (S.D.N.Y. Jan. 17, 2007) ("A close analysis of the record, however, reveals that the jury awarded certain damages for the breach of contract without adequate support in the record. The Court will therefore require a $240,000 remittitur, bringing the breach-of-contract award to $90,000.")). Assuming arguendo that the Court does not grant judgment as a matter of law with regard to

14

Plaintiff's retaliation claims, given the jury's excessive and speculative award of damages, remittitur rather than a new trial on damages would be appropriate.

## B.  Discussion

### 1.   The Jury's Front Pay Award

#### a.   The Jury Instruction

The following is the instruction that was given to the jury concerning any front pay award.

Here, if you find for Dr. Edelman on her claims for retaliation under state human rights law or city human rights law, you should consider her damages for front pay.  Front pay damages, if any, represent a plaintiff's lost salary and benefits, caused by an unlawful discharge or other adverse action, accruing from the time of trial through some point in the future.  If you find that Dr. Edelman will be unable to earn in the future what she would have earned at NYU, then you may award her, as additional compensation, the amount she would have earned during the time period between the date of your verdict and either: 1) the date you believe she would have worked at NYU absent any discriminatory conduct or 2) the date you can reasonably predict that she has a reasonable prospect of obtaining comparable employment.  Factors to be considered in determining front pay include the age of the plaintiff and her reasonable prospects of obtaining comparable employment.  In doing so, you should bear in mind that the purpose of front pay is to make a plaintiff whole—that is, to put Plaintiff in the position she would have been in if Defendants had not discriminated against her.

That said, Dr. Edelman has the burden of proving that she actually incurred a loss of front pay.  Please note that Dr. Edelman is only entitled to be compensated once for any alleged front pay that arose from the retaliation claims that she has prevailed upon.

(Steer Decl., Ex. G (July 19 Court Tr. 1473:9-25; 1474:1-20).)

#### b.   The Jury's Front Pay Award

The jury found that Dr. Edelman suffered monetary damages because of retaliation and awarded Plaintiff $700,000 in front pay. (*See* Steer Decl., Ex. H (ECF Doc. No. 243 (Jury Verdict Form, at 6-7).)  This award is not only without evidentiary support, but also directly against the evidence that Plaintiff made more money after she left NYU.  Put simply, Plaintiff failed to meet her evidentiary burden because the evidence presented showed that she did not suffer any loss in pay after she left NYU and instead made more money.  The verdict is therefore contrary to the

15

Court's instructions that: "Front pay damages, if any, represent a plaintiff's lost salary and benefits, caused by an unlawful discharge or other adverse action, accruing from the time of trial through some point in the future." Here, Plaintiff suffered no loss in salary and benefits when compared to her new compensation. The award of $700,000 is an unwarranted windfall if sustained and should therefore be vacated.

> ## 2.    The Front Pay Award Should be Vacated
>
> ### a.    There is zero evidence of the damages the jury awarded

Plaintiff was employed with NYU from December 1, 2014 (*See* Steer Decl., Ex. I (Pl's. Trial Ex. 8, at 5)) through May 31, 2021. (*See* Steer Decl., Ex. J (Pl's. Trial Ex. 7).)

On December 1, 2020, Plaintiff was notified of the non-renewal of her employment agreement expiring on December 31, 2020, and NYU advised Plaintiff that her employment would terminate on May 31, 2021. (*Id.*) Just prior to Plaintiff's non-renewal, her compensation was $278,000. (Steer Decl., Exs. K (Pl.'s Trial Ex. 9), L (July 11 Court Tr. 107:19-24).)

Prior to the anticipated May 31, 2021, termination date, by February 16, 2021, Plaintiff had secured a job with Arthritis & Rheumatism Associates, PL, in Florida. (Steer Decl., Ex. M (Pl's. Trial Ex. 88, P1-P13).) Plaintiff continued working at NYU until May 2021. (July 11 Court Tr. 87:21-23).) She began working at Arthritis & Rheumatism Associates, PL, on May 1, 2021. (July 11 Court Tr. 210:10-11).) In contrast to her salary at NYU, Plaintiff's salary at her new job was higher with Arthritis & Rheumatism Associates, PL was $300,000 for the first year, and she received a $25,000 moving expense allowance. (*See* Steer Decl., Exs. M (Pl's. Trial Ex. 88, at P4, Par. 14), L (July 11 Court Tr. 210:12-14).) During her second year of employment, her salary increased to $325,000. (*Id.* at P4, Par. 14.) In addition to her salary, Plaintiff also received a 20% incentive compensation in the form of a bonus of her gross collection in excess of 200% of her base salary for the first completed year of employment, and then 25% for the following years. (*Id.*

16

at P4, Par. 15.)  Plaintiff is earning approximately $71,000 more a year with her new employer

than she did while working for NYU.  (*See* Steer Decl., Exs. K (Pl's Trial Ex. 9, at 3), M (Pl's.

Trial Ex. 88, at P4).)

> The jury was instructed that -

> If you find that Dr. Edelman will be unable to earn in the future what she would
> have earned at NYU, then you may award her, as additional compensation, the
> amount she would have earned during the time period between the date of your
> verdict and either: 1) the date you believe she would have worked at NYU absent any
> discriminatory conduct or 2) the date you can reasonably predict that she has a
> reasonable prospect of obtaining comparable employment.

(Steer Decl., Ex. G (July 19 Court Tr. 1474:2-9.)

Here, the evidence reflects that Plaintiff has had no lost compensation since the end of her

employment with NYU by which to compute an award of front pay.  Plaintiff did not go a day

unemployed and she made more money at her new job. Plaintiff further failed to demonstrate

through testimony or documentary evidence the amount of salary and benefits she received from

NYU such that, by comparison, her overall salary and benefits in Florida yielded a deficit.  The

evidence therefore requires that no front pay be awarded.  "Front pay must consider the ability of

the plaintiff to mitigate damages in the future."  *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252,

260 (S.D.N.Y. 2007) (citation omitted).  Plaintiff successfully mitigated her damages as she has

made more in compensation since she left NYU than she made while employed without any gap

in employment. Therefore, her award of front pay should be vacated as not supported by the record

as contrary to the Court's instructions above, and as the award puts her in a better position than

had she stayed employed by NYU. *See Olaechea*, at *8 (citing *Tse*, 568 F. Supp. 2d at 287) (citing

*Trademark Rsch. Corp.*, 995 F.2d at 337)); *see Smith v. Farmstand*, No. 11-cv-9147, 2016 WL

5912886, at *24 (N.D. Ill. Oct. 11, 2016) (court concluded that plaintiff was not entitled to front

pay because he had successfully mitigated damages where plaintiff maintained comparable job for

more than 12 months that afforded him a salary equal or greater than what plaintiff was likely to earn at former employer). "The purpose of an award of front pay is to make the victim of unlawful retaliation whole, *see Bergerson v. N.Y. State C.f. cf Mental Health*, 652 F.3d 277, 285 (2d Cir. 2011), and should not place the plaintiff in a better position than [she] would have occupied had [she] not been fired." *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 576-77 (S.D.N.Y. 2011) (citing *Thomas*, 508 F. Supp. 2d at 260). "The purpose of an award of front pay is to make the victim of unlawful retaliation whole, *see Bergerson v. N.Y. State C.f. cf Mental Health*, 652 F.3d 277, 285 (2d Cir. 2011), and should not place the plaintiff in a better position than [she] would have occupied had [she] not been fired." *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 576-77 (S.D.N.Y. 2011) (citing *Thomas*, 508 F. Supp. 2d at 260).

Plaintiff's only claim for front pay is based on an alleged lack of contribution to her retirement plan by her new employer. (Steer Decl., Ex. L (July 11 Court Tr. 210:19-25).) But Plaintiff has no documentary proof that she does not receive retirement benefits now. Her very short, unspecific testimony is insufficient. Based on her testimony, she has a 401k option in her present position just as she did at NYU. (Steer Decl., Exs. L (July 11 Court Tr. 210:20-25), M (Pl's Trial Ex. 88, at P6, Par. 20).) It is clear from her testimony and the evidence in the record that Plaintiff is only basing her front pay claim on her alleged loss of a matching retirement benefit plan contribution from NYU. However, Plaintiff never testified that she contributed to her retirement plan at NYU let alone that NYU provided any corresponding matching amount, and there is no evidence in the record to that effect. There is also no evidence concerning the 401k option or Plaintiff's election or contribution or lack thereof at her new employer. Furthermore, even had she proven that she does not separately receive contribution to her retirement plan now, she did not suffer any loss because her new compensation alone is above the combined level of

18

salary and retirement benefits she received at NYU.  "While a district court may consider lost

pension benefits in calculating a front pay award, *see Luca v. Cnty. cf Nassau*, No. 04-cv-4898,

2008 WL 2435569, at *5 (E.D.N.Y. June 16, 2008), *rev'd on other grounds*, 344 Fed. Appx. 637

(2d Cir. 2009), any such award must be supported by the evidence."  *Chisholm*, 824 F. Supp. 2d at

578; *see, Olivares v. Brentwood Indus.*, 822 F.3d 426, 430 (8th Cir. 2016) (district court declined

to speculate about a front pay award solely on plaintiff's testimony).  Any award of front pay is

therefore unwarranted.

Moreover, it is illogical to look at only one component of her compensation as the basis for

a front pay award.  Otherwise, if at her new job, Plaintiff's compensation increased to $1 million

more a year than she made at NYU (but with no benefits), under her theory, she would still be

entitled to the $26,000 maximum match from NYU (Steer Decl., Ex. K (Pl's. Trial Ex. 9, Scheule

A, n. 1)) to purportedly make her whole for no longer being employed by NYU.  Accordingly,

Plaintiff should not be placed in a better position than she would have occupied had her

employment not ended at NYU.  *See Chisholm*, 824 F. Supp. 2d at 576-77 (citing *Thomas*, 508 F.

Supp. 2d at 260).

b.  Plaintiff's damages were capped by her pretrial filings

If Plaintiff's damages award is not vacated, it should be capped at an amount of $137,400,

which is the amount she claimed on the eve of trial in her Plaintiff's First Amended Rule 26

Disclosures (Steer Decl., Ex. N (ECF Doc. No. 202-1, at 3, C(ii)))[3] and the Joint Final Pretrial

---

[3] In Plaintiff's First Amended Rule 26 Disclosures, she submitted that she lost $27,800 per year in 2022, 2023, and 2024 for NYU's 10% match into her retirement account. (*See also* July 11 Court Tr. 79: 24-25-80:2, 9-15 (Plaintiff testified that NYU would contribute up to a 10% match of what Plaintiff contributed each year).)  However, there is no evidence in the record that Plaintiff contributed to a retirement plan while at NYU and if so, how much.  Additionally, Plaintiff introduced no evidentiary support that her current employer was not providing a match with

19

SJA-803

Order (ECF Doc. No. 197).  In those filings, Plaintiff calculated an amount of lost compensation in both backpay and front pay in the amount of $137,400, consisting of what she claimed she would have received from NYU by way of retirement plan contribution for 2022, 2023 and 2024. Thus, even putting aside the fact that she had not suffered a loss as shown above and failed to demonstrate same at trial, there is no basis to award anything above the $137,400 amount she calculated for alleged backpay and front pay damages.  Any amount awarded above what Plaintiff claimed is not only speculative, but also without evidentiary support, and against the instructions of the Court and, indeed, common sense.  *See Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 159 (2d Cir. 1992) ("An award of front pay cannot be unduly speculative") (citing *Press v. Concord Mortg. Corp.*, No. 08-cv-9497, 2010 WL 3199684, at *2 (S.D.N.Y. Aug. 11, 2010)).

Therefore, the front pay award must be vacated or alternatively remitted for an amount of no more than $137,400.

---

respect retirement benefit contributions.  However, assuming, *arguendo,* that Plaintiff lost the amount of the 10% match from NYU as alleged, the jury's $700,000 verdict would award her $27,800 per year in front pay for the next 25 years.  Such an award is not supported by the evidence and is speculative, excessive, and improper, and exceeds the match cap of $26,000 per annum permitted under her NYU contract.  (Steer Decl., Ex. K (Pl's. Trial Ex. 9, Scheule A, n. 1).)

SJA-804

**Conclusion**

For the reasons set forth herein above, Defendants respectfully request that their motion for judgment as a matter of law be granted and the front pay award be vacated or, alternatively, at the very least remitted and limited to the amount Plaintiff sought in her pretrial filings. Defendants respectfully request oral argument.

Dated: New York, New York
       August 23, 2023

                         **TARTER KRINSKY & DROGIN LLP**
                         *Attorneys for Defendants*


                         By:   */s/ Richard L. Steer*
                                 Richard L. Steer
                                 Richard C. Schoenstein
                                 Ingrid J. Cardona
                                 1350 Broadway, 11th Floor
                                 New York, New York 10018
                                 (212) 216-8000
                                 rsteer@tarterkrinsky.com
                                 rschoenstein@tarterkrinsky.com
                                 icardona@tarterkrinsky.com

SJA-805

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DR. SARI EDELMAN,

                        Plaintiff,

          -against-

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF
MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER,
ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH
ANTONIK, and JOSHUA SWIRNOW,

                       Defendants.

-----------------------------------------------------------------X

**Case No.:** 1:21-cv-502 (LJL) (GWG)

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR
JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL**

**MILMAN LABUDA LAW GROUP PLLC**
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff
Dr. Sari Edelman*

SJA-806

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ...............................................................1

II.   PROCEDURAL BACKGROUND .........................................................2

III.   FACTS PRESENTED AT TRIAL ........................................................3

IV.   STANDARD .......................................................................................6

    i. Judgment as a Matter of Law under Fed. R. Civ. P. 50 ..................6

    ii. Motion for a New Trial under Fed. R. Civ. P. 59 (in the alternative).....................8

V.   ARGUMENT .......................................................................................8

  A.   THE JURY'S VERDICT ON PLAINTIFF'S EPA CLAIMS MUST BE REVERSED.......................................................................................8

    i. Plaintiff Established That She and Dr. Modi Performed Equal Work ...................8

        a. Skill....................................................................................10

        b. Effort .................................................................................10

        c. Responsibility....................................................................11

        d. Similar Working Conditions..............................................12

    ii. Plaintiff Established Unequal Pay as Between Her & Dr. Modi............................12

    iii. Defendants Failed to Establish a *Bona Fide* Factor Other Than Sex ...................14

    iii. Plaintiff is entitled to judgment as a matter of law on her New York EPA claims ...............................................................................18

VI.   CONCLUSION .................................................................................20

i

### TABLE OF AUTHORITIES

**Cases**

Aldrich v. Randolph Cent. Sch. Dist.,
 963 F.2d 520 (2d Cir. 1992) ..................................................................... 14, 16

Belfi v. Prendergast,
 191 F.3d 129 (2d Cir. 1999) ..................................................................... 14, 16

Casmento v. Volmar ConsTr., Inc.,
 No. 20-CIV-00944 (LJL), 2022 WL 15773966 (S.D.N.Y. Oct. 28, 2022) ............... 7 n. 32

Corning Glass Works v. Brennan,
 417 U.S. 188 (1974) ................................................................... 17 n. 68, 19 n. 76

Cweklinsky v. Mobil Chem. Co.,
 364 F.3d 68 (2d Cir. 2004) ..................................................................... 8 n. 35

Deloreto v. Karengekis,
 104 Fed. Appx. 765 (2d Cir. 2004) .......................................................... 7 n. 31

DLC Mgmt. Corp. v. Town of Hyde Park,
 163 F.3d 124 (2d Cir. 1998) ..................................................................... 8 n. 35

Dupree v. Younger,
 598 U.S. 729 (2023) ............................................................................... 2 n. 2

E.E.O.C. v. Port Auth. of N.Y. & N.J.,
 768 F.3d 247 (2d Cir. 2014) ..................................................................... 9 n. 39

EEOC v. J.C. Penney Co., Inc.,
 843 F.2d 249 (6th Cir. 1988) .......................................................................... 16

Harris v. O'Hare,
 770 F.3d 224 (2d Cir. 2014) ..................................................................... 8 n. 35

Hernandez v. Keane,
 341 F.3d 137 (2d Cir. 2003) ..................................................................... 6 n. 27

ING Glob. v. United Parcel Serv. Oasis Supply Corp.,
 757 F.3d 92 (2d Cir. 2014) ..................................................................... 7 n. 31

Irby v. Bittick,
 44 F.3d 949 (11th Cir. 1995) ................................................................... 17 n. 67

SJA-808

Jamilik v. Yale Univ.,
    362 Fed. Appx. 148 (2d Cir. 2009)........................................................ 16 n. 63

Jones v. Town of East Haven,
    691 F.3d 72 (2d Cir. 2012)..................................................................... 7 n. 29

Meloff v. New York Life Ins. Co.,
    240 F.3d 138 (2d Cir. 2001)........................................................ 3 n. 6, 8 n. 36

Minnette v. Warner Amex Cable Commun., Inc.,
    No. 89-CIV.-8225 (CMM), 1992 WL 373483 (S.D.N.Y. Nov. 30, 1992) ............... 9 n. 40

Minnette v. Warner Amex Cable,
    993 F.2d 1534 (2d Cir. 1993).................................................................. 9 n. 40

Morse v. Fusto,
    804 F.3d 538 (2d Cir. 2015)................................................................... 6 n. 25

Munafo v. Metro. Transp. Auth.,
    381 F.3d 99 (2d Cir. 2004)..................................................................... 8 n. 34

Rizo v. Yovino,
    950 F.3d 1217 (9th Cir. 2020) .............................................................. 17 n. 67

Rizo v. Yovino,
    141 S. Ct. 189 (2020)........................................................................... 17 n. 67

Rose v. Goldman, Sachs & Co.,
    163 F.Supp.2d 238 (S.D.N.Y.2001)...................................................... 18 n. 73

Ryduchowski v. Port Auth. of New York & New Jersey,
    203 F.3d 135 (2d Cir. 2000)................................................................. 16 n. 63

S.E.C. v. Ginder,
    752 F.3d 569 (2d Cir. 2014)........................................................ 3 n. 6, 7 n. 29

Starr Indem. & Liab. Co. v. Am. Claims Mgmt., Inc.,
    131 F. Supp. 3d 185 (S.D.N.Y. 2015)..................................................... 8 n. 36

Tepperwien v. Entergy Nuclear Operations, Inc.,
    663 F.3d 556 (2d Cir. 2011)................................................................... 7 n. 30

Tolbert v. Queens Coll.,
    242 F.3d 58 (2d Cir. 2001)..................................................................... 7 n. 31

Tomka v. Seiler Corp.,
    66 F.3d 1295 (2d Cir. 1995) ............................................................................. 14

Triolo v. Nassau Cty,
    24 F.4th 98 (2d Cir. 2022) ..................................................................... 7 n. 30

Volpe v. Nassau County,
    915 F. Supp. 2d 284 (E.D.N.Y. 2013) .................................................. 18 n. 73

Usery v. Columbia Univ.,
    568 F.2d 953 (2d Cir. 1977)................................................................. 10 n. 45

**Statutes**

29 U.S.C. § 206............................................................................................. 14, 15

New York Labor Law § 194... ............................................. 18 n. 74, 19 n. 75

New York Labor Law § 194-a... ........................................................ 20 n. 77

**Rules**

Fed. R. Civ. P. 50............................................... 1, 6, 6 n. 24, 6 n. 28, 7

Fed. R. Civ. P. 56................................................................................................. 6

Fed. R. Civ. P. 59.................................. 1, 6, 6 n. 24, 8, 8 n. 33

**Regulations**

29 C.F.R. § 1620.17... .......................................................................... 11 n. 46

**Other**

S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)............................... 17 n. 68

SJA-810

## I.      **PRELIMINARY STATEMENT**

At trial, Plaintiff Dr. Sari Edelman ("Dr. Edelman" or "Plaintiff") established a *prima facie* case under the federal and state Equal Pay Act ("EPA") and Defendants failed to establish that she was paid less due to a *bona fide* factor other than sex.   Plaintiff indisputably established she performed equal work to Dr. Anang Modi ("Dr. Modi") and was paid less than him for the same work.   Thus, as a matter of law, the Court must find for Plaintiff on her EPA claims as it relates to Dr. Modi, notwithstanding the jury's verdict to the contrary.

On July 19, 2023, following an eight (8) day trial, the jury rendered a verdict finding, *inter alia*, that:

(i) Dr. Edelman did not prove by a preponderance of the evidence that NYU employed her and Dr. Modi in a job requiring substantially equal skill, effort, and responsibility;

(ii) Dr. Edelman did not prove by a preponderance of the evidence that she was paid lower compensation than Dr. Modi for doing substantially equal work; and

(iii) Defendants proved by a preponderance of the evidence that the differences in pay between Dr. Edelman and Dr. Modi were based on factors other than sex, even though the evidence supported a verdict in Plaintiff's favor.

Accordingly, Plaintiff submits this memorandum of law in support of her motion for judgment as a matter of law or, alternatively, for a new trial.   For the reasons set forth below, and upon all the evidence adduced at trial, Plaintiff respectfully submits that this Court enter judgment against Defendants and in favor of Plaintiff reversing the jury's verdict on Plaintiff's EPA claim as it relates to Dr. Modi notwithstanding the verdict pursuant to Rule 50 of the Federal Rules of Civil Procedure (hereinafter "Rules" or "Rule") or, alternatively, for a new trial under Rule 59.

## II.    PROCEDURAL BACKGROUND

On January 20, 2021, Plaintiff filed a complaint against Defendants seeking, *inter alia*, damages under the EPA because she was paid less than her male comparators for the same work.[1]

On September 28, 2022, following discovery, the Hon. Lorna G. Schofield, U.S.D.J. ("Judge Schofield") found, in denying summary judgment to Defendants,[2] that Plaintiff established a *prima facie* case because she was paid less for the same clinical work performed by her and male comparators.[3]   Similarly, Judge Schofield found that Defendants' shifting explanations for how and why their "business plan" system was implemented was insufficient to explain the pay disparity.[4]   Crucially, Judge Schofield found that while Dr. Avram Goldberg's ("Dr. Goldberg") and Dr. Andrew Porges' ("Dr. Porges") administrative duties justify a pay differential, this fails to account for Dr. Modi.[5]

The parties selected a jury before this Court on July 10, 2023.   In their case-in-chief, Plaintiff called Dr. Edelman, Dr. Kavini Mehta, Joseph Antonik, David Kaplan, Joshua Swirnow, Andrew Rubin, Miriam Ruiz, Kathleen Pacina, Dr. Goldberg, and Dr. Porges.   Defendants presented their case-in-chief on cross-examination of the above witnesses.   On rebuttal, Plaintiff recalled Dr. Edelman as a witness.   The jury deliberated for three (3) hours.   On July 19, 2023, the jury unanimously decided, as relevant here, that:

---

[1] See ECF Docket Entry 1.

[2] The Rule 50 standard largely "mirrors" the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record.   See Dupree v. Younger, 598 U.S. 729, 731–32 (2023).

[3] See ECF Docket Entry 155 at 11.

[4] Id.  at 11-12.

[5] Id.  at 12.

**(i)** Dr. Edelman did not prove by a preponderance of the evidence that NYU employed her and Dr. Modi in a job requiring substantially equal skill, effort, and responsibility;

**(ii)** Dr. Edelman provide by a preponderance of the evidence that her job and that of Dr. Modi were performed under similar working conditions; and

**(iii)** Defendants proved by a preponderance of the evidence that the differences in pay between Dr. Edelman and Dr. Modi were based on factors other than sex.

See ECF Docket Entry 243.

### III.   FACTS PRESENTED AT TRIAL[6]

Dr. Edelman is a rheumatologist.[7]   She attended medical school at the New York College of Osteopathic Medicine in Old Westbury, New York, where she graduated from in 2003 and made dean's list every semester.[8]

Dr. Edelman then obtained a residency position at Winthrop University Hospital where she attended for three (3) years.[9]   After completing same, she began her rheumatology fellowship under the tutelage of Steve Carsons, who is one of the world-renowned experts in rheumatology.[10]

---

[6] The facts are presented in both the light most favorable to the Defendants, i.e., the non-moving party, in accordance with Rule 50 (S.E.C. v. Ginder, 752 F.3d 569, 574 (2d Cir. 2014)), and in a manner to permit this Court to weigh the evidence independently, in accordance with Rule 59 (Meloff v. New York Life Ins. Co., 240 F.3d 138, 147 (2d Cir. 2001)).

[7] Trial Transcript ("Tr.") at 49:24-50:9 (Edelman).   The entire trial transcript is annexed to the Declaration of Emanuel Kataev, Esq. ("Kataev Decl."), Exhibit A.   All exhibits hereinafter referenced are attached in the same Declaration in numerical order.

[8] Tr. at 52:2-9 (Edelman); see also Plaintiff's Exhibit ("Pl. Ex.") 5.

[9] Tr. at 52:10-16 (Edelman).

[10] Id. (Edelman)

After completing her fellowships, Dr. Edelman became a board-certified internist and rheumatologist.[11]  Dr. Edelman was involved in a lot of research during her fellowship and was previously published in Arthritis and Rheumatism, the largest and most recognized journal in rheumatology.[12]

Dr. Edelman then opened her own practice with Dr. Kavini Mehta ("Dr. Mehta"), whom she met in the fellowship program, and remained in private practice from 2008 to 2014.[13]  At Dr. Edelman's private practice, she had administrative staff, an office manager, billing staff, reception team, medical assistants, and infusion nurses.[14]

Drs. Edelman and Mehta started with zero patients and had approximately 6,000 patients by the time they joined NYU in 2014.[15]  Dr. Edelman invested a lot into building the practice, including placing her home up as collateral to obtain a small business loan.[16]

In 2014, while Dr. Edelman was in private practice, Dr. Goldberg reached out to her and Dr. Mehta to consider coming to NYU.[17]  Drs. Edelman and Mehta were then introduced to a recruiter, who then set up a meeting between them and Defendants Andrew Rubin ("Rubin") and Joshua Swirnow ("Swirnow").[18]

---

[11] Tr. at 52:17-24 (Edelman).

[12] Tr. at 53:19-54:2 (Edelman).

[13] Tr. at 54:8-12, 55:12-13, 57:8-16 (Edelman).

[14] Tr. at 58:1-6 (Edelman).

[15] Tr. at 58:7-12 (Edelman).

[16] Tr. at 58:15-59:2, 65:13-22 (Edelman).

[17] Tr. at 68:4-25 (Edelman).

[18] Tr. at 70:10-71:3 (Edelman).

4

Drs. Edelman and Mehta asked for a starting salary of around $280,000.00, as their salaries at that time were approximately $200,000.00.[19]  In addition, Defendants agreed to assume the lease as the space was built out and Defendants were looking to expand their footprint on Long Island.[20] Drs. Edelman and Mehta discussed the fact they were paid less than their male counterparts in October 2020 based on a conversation Dr. Edelman had with Dr. Modi.[21]

Defendants paid Dr. Edelman as follows: (i) $207,000.00 in 2014, 2015, 2016, and 2017; (ii) $278,000.00 in 2018, 2019, 2020, and 2021.  See Pl. Exs. 8 and 9.

Swirnow was involved in hiring Dr. Modi in 2017 and negotiated his contract.[22]  Swirnow learned that Dr. Modi was a very busy rheumatologist, had a good reputation in the community, and had held multiple leadership roles where he previously worked and at some organizations he was a part of.[23]  Defendants paid Dr. Modi as follows: (i) $360,000.00 in 2017, 2018, and 2019; and (ii) $370,000.00 in 2020 and 2021.  See Pl. Exs. 35 and 36.

Drs. Edelman and Modi were both full-time staff physicians at NYU.  See Pl. Ex. 8 at D50; compare Pl. Ex. 35 at D890; Tr. at 82:5-9, 95:6-10, 95:16-20 (Edelman), 1261:22-25 (Modi).  Drs. Edelman and Modi were contractually required and did put 100% of their work effort into clinical work at NYU. See Pl. Ex. 8 at D49; compare Pl. Ex. 35 at D888; see also Tr. at 1266:10-18 (Modi).

---

[19] Tr. at 71:16-21, 74:3-7 (Edelman); cf. Tr. at 302:22-303:23 (Edelman); see also Pl. Ex. 12.

[20] Tr. at 71:16-74:2 (Edelman).

[21] Tr. at 171:12-174:25 (Edelman), 442:8-14 (Mehta); see also Pl. Ex. 108 ("Yup. NYU will not disclose or be transparent about salaries. Gender and age discrimination in salary compensation exists, 100 percent, but so hard to prove since no one helping. I was hoping [Dr. Modi] would be more helpful").

[22] Tr. at 735:12-16 (Swirnow).

[23] Tr. at 735:22-736:2, 737:14-25 (Swirnow); see also Pl. Ex. 46.

Similarly, their clinical responsibilities at NYU – as defined in their agreements – were identical. See Pl. Ex. 8 at D52; compare Pl. Ex. 35 at D891-D892; see also Tr. at 313:17-315:16 (Edelman), 812:7-12 (Ruiz), 1008:5-7 (Rubin).  Both had prior experience with patients.  See Pl Exs. 5 & 46.

## IV.   **STANDARD**

Under Rule 50, a party may move for judgment as a matter of law following trial, and may include an alternative request for a new trial under Rule 59.[24]

### i.  **Judgment as a Matter of Law under Fed. R. Civ. P. 50**

Under Rule 50(a), judgment as a matter of law is warranted against a party where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[25]  In other words, "[t]he standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed. R. Civ. P. 56."[26]

"[A] Rule 50 motion for judgment as a matter of law must be granted where (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded men could not arrive at a verdict against him."[27]  The court may grant judgment as a matter of law only if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party."[28]

---

[24] See Fed. R. Civ. P. 50 and 59.

[25] See Morse v. Fusto, 804 F.3d 538, 546 (2d Cir. 2015).

[26] Id.

[27] See Hernandez v. Keane, 341 F.3d 137, 143-44 (2d Cir. 2003) (internal quotation marks omitted).

[28] See Fed. R. Civ. P. 50(a)(1).`

"The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'"[29] "A Rule 50 motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'"[30] "The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury."[31]

While "[t]he law is pellucid that a party's failure to move under Rule 50(a) has consequences[,] [i]f that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice,"[32] which "exists where a jury's verdict is wholly without legal support."

---

[29] See S.E.C. v. Ginder, 752 F3d 569, 574 (2d Cir. 2014) (quoting Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012)).

[30] Id. (quoting Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011)); see also Triolo v. Nassau Cty, 24 F.4th 98, 105 (2d Cir. 2022).

[31] See Deloreto v. Karengekis, 104 Fed. Appx. 765, 767 (2d Cir. 2004) (summary order) (quoting Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001)); see also ING Glob. v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 97 (2d Cir. 2014) ("'The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury,' and 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" (citation omitted)).

[32] See Casmento v. Volmar ConsTr., Inc., No. 20-CIV-00944 (LJL), 2022 WL 15773966, at *3-4 (S.D.N.Y. Oct. 28, 2022) (citation omitted).

### ii.   Motion for a New Trial under Fed. R. Civ. P. 59 (in the alternative)

Alternatively, a court may grant a motion for a new trial under Rule 59 "for any reason for which a new trial has heretofore been granted in an action at law in federal court."[33]  A new trial should be ordered where "the jury has reached a seriously erroneous result" or "the verdict is a miscarriage of justice,"[34] including where the jury's verdict is against the weight of the evidence or the jury relied on an invalid legal theory.[35]  In addition, in evaluating a motion for a new trial, the Court "need not view the evidence in the light most favorable to the nonmoving party; instead, the court may weigh the evidence—including the credibility of witnesses—independently."[36]

## V.   ARGUMENT

### A.   THE JURY'S VERDICT ON PLAINTIFF'S EPA CLAIMS MUST BE REVERSED

#### i.   Plaintiff Established That She and Dr. Modi Performed Equal Work

At trial, Plaintiff established that she and Dr. Modi had jobs requiring substantially equal skill, effort, and responsibility.[37]  Dr. Mehta, a fellow rheumatologist, testified as follows:

---

[33] See Fed. R. Civ. P. 59(a)(1)(A).

[34] See Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004).

[35] See Harris v. O'Hare, 770 F.3d 224, 238 (2d Cir. 2014) (remanding for new trial where "jury should not have been instructed on" legal theory for which there was "insufficient evidence" and which "the jury explicitly" embraced); see also Cweklinsky v. Mobil Chem. Co., 364 F.3d 68, 75-77 (2d Cir. 2004) (vacating verdict and remanding for new trial where verdict may have been based on invalid theory); DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998) (new trial should be granted when verdict is against weight of the evidence).

[36] See Starr Indem. & Liab. Co. v. Am. Claims Mgmt., Inc., 131 F. Supp. 3d 185, 185 (S.D.N.Y. 2015); see also Meloff v. New York Life Ins. Co., 240 F.3d 138, 147 (2d Cir. 2001) ("Freed from the constraints of review that bind a court when deciding whether to grant judgment as a matter of law," on a Rule 59 motion, "the district court [can] examine the evidence through its own eyes").

[37] Tr. at 200:21-201:4 (Edelman), 432:4-433:7 (Mehta); see also Pl. Exs. 8 and 9; compare with Pl. Ex. 35 (showing that Drs. Edelman's and Modi's faculty appointments, tenure status, employment titles, and full-time status were identical).

Q. Is it fair to say that you see patients as part of your duties as a rheumatologist?
**A. I see patients.**
Q. And you evaluate and consult with them, correct?
**A. Yes.**
Q. And to your knowledge, all the other rheumatologists do the same type of work, correct?
**A. Yes.**
Q. You did the same work that Dr. Edelman did when you were at NYU, correct -- when she was at NYU?
**A. We all saw patients, yes.**
Q. And you all diagnosed them, correct? And you discussed the cases together, isn't that right?
**A. We discussed some cases together.**
Q. And that forms the basis for your knowledge that the doctors that you worked with did the same work as you, correct?
**A. As rheumatologists, your practices are similar. You see a similar subset of patients.**
…
Q. Is it fair to say that the work that you did as doctors -- that's including you, Dr. Edelman, Dr. Porges, Dr. Modi and Dr. Goldberg -- that your work was substantially similar to each other?
**A. Yes.**

There is thus no dispute that both Plaintiff and Dr. Modi saw and treated patients.[38]

Under the Equal Pay Act, it is not necessary that the jobs be identical in every respect; the law requires proof that the performance of the jobs demand "substantially equal" skill, effort, and responsibility.[39]  It is the actual work or performance requirements of the jobs that is important.[40]

---

[38] Tr. at 313:17-315:16 (Dr. Edelman treated patients), 812:7-12 (Ruiz testimony regarding Dr. Edelman treating patients), 1008:5-7 (Rubin testimony regarding all rheumatologists treating patients); 1256:1-8, 1265:18-22 (Dr. Modi treated patients).

[39] See E.E.O.C. v. Port Auth. of N.Y. & N.J., 768 F.3d 247, 255 (2d Cir. 2014).

[40] See Minnette v. Warner Amex Cable Commun., Inc., No. 89-CIV.-8225 (CMM), 1992 WL 373483, at *2 (S.D.N.Y. Nov. 30, 1992), aff'd sub nom. Minnette v. Warner Amex Cable, 993 F.2d 1534 (2d Cir. 1993) ("The controlling factor in the comparison of the two jobs is the actual work performed, and not job title or classification").

a.      Skill

In assessing skill, the factors considered are level of education, experience, training, and ability necessary to meet the performance requirements of the job.[41]  In this case, Drs. Edelman and Modi had virtually identical education, experience, training, and ability in that they went to the same exact medical school and fellowship programs, albeit Dr. Modi started medical school two years earlier than Dr. Edelman did.[42]  Indeed, Dr. Edelman had over eight years of clinical experience at the time she joined NYU and was fully qualified to be a rheumatologist.[43]  In addition, only approximately 400 patients followed Dr. Modi when he went to NYU, while virtually all of Dr. Edelman's 6,000 patients did.[44]  Critically, Defendants offered no evidence that Dr. Edelman was less skilled than Dr. Modi.

b.      Effort

In assessing effort, the factors considered are the mental, physical, and emotional requirements for performing the job.[45]  The evidence adduced at trial established that Drs. Edelman and Modi's jobs required substantially equal effort.  See Pl. Ex. 8 at D49; compare Pl. Ex. 35 at D888 (requiring 100% of both Dr. Edelman's and Dr. Modi's efforts towards clinical work).

---

[41] Tr. at 908:2-910:16, 921:14-922:13, 1001:12-1003:6, 1007:11-24 (Rubin) ("… you can, in fact, pay someone *slightly more* if they bring other factors to the table") (emphasis added).

[42] Tr. at 181:2-182:21, 289:11-290:3 (Dr. Edelman's research experience), 451:12-452:5 (Mehta), 1008:11-1009:18 (Rubin), 1256:9-1258:2 (Modi).

[43] Tr. at 176:1-6 (Edelman), 1137:5-8 (Porges), 1268:11-14, 1269:1-12 (Modi).

[44] Tr. at 183:2-17 (Edelman), 1282:20-1283:15 (Modi).

[45] See Usery v. Columbia Univ., 568 F.2d 953, 959 (2d Cir. 1977) ("Under the Act, 'effort' is the physical or mental exertion required in performing a job").

10

Similarly, both Dr. Edelman and Dr. Modi were required to work for Defendants full-time. See Pl. Ex. 8 at D50; compare Pl. Ex. 35 at D890. Crucially, Defendants offered no evidence that Dr. Modi exerted a greater effort than Dr. Edelman. As such, there can be no dispute that Dr. Edelman and Dr. Modi were required to exert the same effort.

    c.   Responsibility

Finally, in assessing responsibility, there can be no disagreement that Drs. Edelman and Modi's work required substantially equal responsibility.[46] See Pl. Ex. 8 at D52; compare Pl. Ex. 35 at D891-D892 (showing the same exact responsibilities for both). Dr. Edelman was responsible for seeing patients and diagnosing and treating diseases, just like Dr. Modi.[47]

Her title was staff physician and her employment status was full time, just like Dr. Modi.[48] Her contract required her to perform the responsibilities set forth in her agreement like all physicians.[49] Dr. Edelman and Dr. Modi were required to have and obtained the same certifications.[50] Notably, Dr. Edelman's publications were not discussed with Defendants Rubin and Swirnow when she was being hired.[51]

---

[46] See 29 C.F.R. § 1620.17(a) ("The equal pay standard applies to jobs the performance of which requires equal responsibility. Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation. Differences in the degree of responsibility required in the performance of otherwise equal jobs cover a wide variety of situations")

[47] Tr. at 81:10-14, 95:21-24, 378:1-16 (Edelman), 1265:18-1266:18, 1267:17-19 (Modi).

[48] Tr. at 82:5-9, 95:6-10, 95:16-20 (Edelman), 1261:22-25 (Modi).

[49] Tr. at 89:3-10 (Edelman).

[50] Tr. at 96:5-14 (Edelman).

[51] Tr. at 381:17-23 (Edelman).

Nor was Dr. Edelman's level of experience or ability to produce discussed.[52]  These were thus not factors considered in setting doctors' compensation.

      d.     Similar Working Conditions

Similarly, the jury decided, and it was undisputed, that the jobs were performed under similar working conditions.  See ECF Docket Entry 243

      **ii.   Plaintiff Established Unequal Pay as Between Her & Dr. Modi**

Dr. Edelman was indisputably paid lower compensation than Dr. Modi, a male doctor, although they both performed substantially equal work.[53]  Dr. Edelman was initially paid only $207,000.00, and received $3,000.00 towards expenses, as well as retirement benefits, consisting of a ten percent match of salary, plus two other retirement funds that contributions could be made to, one of which was matched by Defendants.[54]  Meanwhile, Dr. Modi had no cap on the expenses in his contract.[55]  In addition, while Dr. Modi received $360,000.00 that he requested to beat his prior salary of $340,000.00, Defendants refused to negotiate with Drs. Edelman and Mehta – who negotiated their contracts together – when they sought $280,000.00 and only offered them the $207,000.00 they initially put on the table.[56]

---

[52] Tr. at 414:6-23 (Mehta).

[53] See Tr. at 188:18-19, 199:13-25, 200:4-15, 304:3-16, 329:13-21 (Edelman), 452:6-10 (Mehta); see also Pl. Exs. 8 and 9; compare with Pl. Exs. 35 (showing Dr. Edelman paid $207,000.00 and $278,000.00 for clinical work while Dr. Modi was paid $360,000.00).

[54] Id.; see also Tr. at 79:20-80:15, 107:22-24 (Edelman), 418:25-419:11 (Mehta).

[55] Tr. at 188:3-14 (Edelman).

[56] Tr. at 418:9-24, 420:14-421:12 (Mehta), 736:25-737:8, 738:8-19, 769:10-18 (Swirnow), 1260:9-13 (Modi); see also Pl. Ex.s 8, 9, and 35.  Defendants paid Drs. Edelman and Mehta less due to the loan and this was the sole reason for the increase in pay following the initial contract.  Tr. at 422:1-7 (Mehta).  However, the math does not add up.  Tr. at 454:2-456:18 (Mehta).  Moreover, this is not memorialized in their contracts.  Tr. at 487:13-15 (Mehta); see also Pl. Exs. 8 and 37.

The below chart summarizes Dr. Edelman's pay compared with Dr. Modi's pay:

| Year | Dr. Edelman | Dr. Modi | Disparity |
|------|-------------|----------|-----------|
| 2017 | $207,000.00 | $360,000.00 | $153,000.00 |
| 2018 | $278,000.00 | $360,000.00 | $82,000.00 |
| 2019 | $278,000.00 | $360,000.00 | $82,000.00 |
| 2020 | $278,000.00 | $370,000.00 | $82,000.00 |
| 2021 | $278,000.00 | $370,000.00 | $82,000.00 |

Moreover, Defendants insultingly offered Drs. Mehta and Edelman an initial salary of only $190,000.00, less than what they had been making, which does not jive with their stated proffered reason for paying Dr. Modi so much more.[57]  Similarly, when Drs. Edelman and Mehta sought to negotiate their renewal contracts, Defendants only agreed to an increase by removing business expense reimbursements altogether to add that amount to the salary.[58]  Defendants justify paying Dr. Edelman $207,000.00 from 2014 through 2017 because of the loans they had assumed. However, Defendants received the benefit of the lease and equipment which Dr. Edelman assigned to them in exchange for that assumption of debt.  Further, the amount of the loan assumed does not match the much-lower compensation Defendants offered Dr. Edelman.[59]  Thus, even accounting for the loan, Dr. Edelman was still paid less than Dr. Modi.  In addition, Defendants' argument concerning the loan is moot when comparing Dr. Edelman's compensation under her renewal contract in 2017 because the loan was paid off by then, and there is no justification provided by Defendants for paying Dr. Modi $82,000.00 more for the same work.

---

[57] Tr. at 695:6-12 (Swirnow).

[58] Tr. at 421:19-25 (Mehta).

[59] Tr. at 454:2-456:18  (Mehta) ($326,000.00 divided by two individuals, i.e., Dr. Edelman and Dr. Mehta, equals $163,000.00 divided by three (3) years equals $54,333.33, which – when subtracted from the $278,000.00 Defendants later increased Dr. Edelman's salary to – amounts to $ 223,666.67, not $207,000.00).

### iii.   **Defendants Failed to Establish a *Bona Fide* Factor Other than Sex**

Having established Plaintiff's *prima facie* case, Defendants bear the burden of establishing

a defense for their payment of higher wages to Dr. Modi as compared to Dr. Edelman.  See 29

U.S.C. § 206(d)(1).

The EPA provides that:

> No employer having employees subject to any provisions of this
> section shall discriminate, within any establishment in which such
> employees are employed, between employees on the basis of sex by
> paying wages to employees in such establishment at a rate less than
> the rate at which he pays wages to employees of the opposite sex in
> such establishment for equal work on jobs the performance of which
> requires equal skill, effort, and responsibility, and which are
> performed under similar working conditions, except where such
> payment is made pursuant to (i) a seniority system; (ii) a merit
> system; (iii) a system which measures earnings by quantity or
> quality of production; or (iv) a differential based on any other factor
> other than sex: Provided, That an employer who is paying a wage
> rate differential in violation of this subsection shall not, in order to
> comply with the provisions of this subsection, reduce the wage rate
> of any employee.

Id.  "[T]he burden of persuasion shifts to the defendant to show that the wage disparity is justified

by one of the affirmative defenses provided under the Act: … or (iv) a differential based on any

other factor other than sex."  See Belfi v. Prendergast, 191 F.3d 129, 136 (2d Cir. 1999); see also

Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 525 (2d Cir. 1992) ("we conclude that

employers cannot meet their burden of proving that a factor-other-than-sex is responsible for a

wage differential by asserting use of a gender-neutral classification system without more"); Tomka

v. Seiler Corp., 66 F.3d 1295, 1312 (2d Cir. 1995) ("In response to Tomka's assertions, Seiler

justifies Abrams' and the three account managers' higher salaries by alleging that the discrepancies

resulted from "factors other than sex." Seiler contended, and the district court agreed, that Abrams'

higher salary resulted from the fact that he had over ten years of experience with a Seiler

14

competitor. While Abrams' experience may very well explain the discrepancy, Seiler has the burden of persuasion to show both that it based Abrams' higher salary on this factor and that experience is a job-related qualification for the position in question. … Seiler's mere assertion that Abrams' salary was based on his experience is insufficient to meet this burden, and the district court therefore erred in holding that Seiler had established its "factor other than sex" affirmative defense").[60]

At the outset, it is important to note the Court found[61] that – and no instruction was given to the jury concerning[62] – a defense justifying the pay disparity based on either: (i) seniority; (ii) merit; and (iii) a system which measures earnings by quantity or quality of production.

Accordingly, any defense based on seniority, merit, or quality/quantity of production (such as wRVUs) could not have been considered by the jury.  There was no evidence presented regarding seniority or merit – none of these factors could have played a role in the jury's verdict.

However, while there was substantial evidence regarding quantity of production – i.e., wRVU production – this was not a viable defense as any evidence of a differential in wRVU production cannot form the basis for any pay disparity between Dr. Edelman and Dr. Modi since the jury was never instructed to consider "a system which measures compensation by quantity …." See 29 U.S.C. § 206(d)(1).

---

[60] Setting aside the fact that Dr. Modi's two (2) years of experience of Dr. Edelman's is insignificant, Defendants' compensation arrangements with doctors makes it evident that experience plays no role in setting of salaries.  Tr. at 984:20-986:13 (Rubin).

[61] Tr. at 255:9-256:7 (Defendants withdrawing defenses related to seniority and merit based on Court's finding) and 988:12-24 (Rubin's testimony confirming no seniority system or merit system).

[62] See Tr. at 1421:9-1480:4 (jury charge).

Thus, to the extent that the jury relied on any such evidence concerning seniority, merit, or quantity/quality of production, the verdict must be vacated as a matter of law because Defendants did not rely on any such systems.

In addition, Defendants have the burden to prove that they actually relied on a "factor other than sex" for the discrepancy in pay between Dr. Edelman and Dr. Modi.[63]  Employers must prove that the factor other than sex that led to the wage discrepancy was adopted and relied upon for a legitimate business purpose.  See Belfi, 191 F.3d at 136 ("Further, to successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential"); see also Aldrich, 963 F.2d at 525-27 & n. 1 ("Without a job-relatedness requirement, the factor-other-than-sex defense would provide a gaping loophole in the statute through which many pretexts for discrimination would be sanctioned"); EEOC v. J.C. Penney Co., Inc., 843 F.2d 249, 253 (6th Cir. 1988) ("[T]he 'factor other than sex' defense does not include literally any other factor, but a factor that, at a minimum, was adopted for a legitimate business reason")).

Here, there is no evidence presented by Defendants justifying why Dr. Modi's pay is substantially higher than Dr. Edelman's pay, except that Dr. Modi was earning $340,000.00 and that he sought $360,000.00 in order to come to NYU.[64]

---

[63] See Jamilik v. Yale Univ., 362 Fed. Appx. 148, 150 (2d Cir. 2009) ("This Court has previously determined that defendants face a heavy burden in establishing an affirmative defense to an EPA claim."); see also Ryduchowski v. Port Auth. of New York & New Jersey, 203 F.3d 135, 143 (2d Cir. 2000) ("The burden of establishing one of the four affirmative defenses is "a heavy one").

[64] Tr. at 330:1-9 (Edelman), 714:10-13 (Swirnow), 999:15-1000:3 (Rubin).  Meanwhile, Dr. Edelman sought $260,000.00 and only received $207,000.00.  Tr. at 81:7-9 (Edelman).

In fact, Rubin's only justification was the need to fill a role in Huntington and Dr. Modi's salary demand based on his compensation at his former employer.[65]  While Defendants offered evidence that there was a great need for a rheumatologist in Huntington, where Dr. Modi worked,[66] Dr. Edelman was available to do so and previously worked in Huntington for Defendants, but never offered her the job there full-time.  Tr. at 341:14-21 (Edelman), 986:22-987:20 (Rubin).  Therefore, that cannot be a *bona fide* factor other than sex justifying the pay disparity.

Further, prior pay – alone – is not a justification for the pay disparity.[67]  The Second Circuit has yet to rule on the issue, but this Court should adopt the rationale of both the Ninth and Eleventh Circuits that prior pay is not sufficient to justify a pay disparity between men and women performing substantially equal work.[68]

Moreover, although Defendants relied on "business plans" to determine compensation for doctors, there was no business plan for Dr. Modi.[69]

---

[65] Tr. at 937:19-938:7, 986:14-21 (Rubin).

[66] Tr. at 737:16-25 (Swirnow), 495:23-496:8 (Antonik), 937:19-938:7, 986:14-21 (Rubin)

[67] See Rizo v. Yovino, 950 F.3d 1217, 1226 (9th Cir. 2020), cert. denied, 141 S. Ct. 189 (2020) (holding that prior pay by itself is not a "factor other than sex"); Id. at 1228 ("[P]rior pay itself is not a factor related to the work an employee is currently performing, nor is it probative of whether sex played any role in establishing an employee's pay"); Irby v. Bittick, 44 F.3d 949, 955 (11th Cir. 1995) (stating that allowing prior pay as an affirmative defense "would swallow up the rule and inequality in pay among genders would be perpetuated").

[68] See Corning Glass Works v. Brennan, 417 U.S. 188 (1974) ("Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry -- the fact that the wage structure of "many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)")

[69] Tr. at 653:7-656:25, 661:18-24, 736:17-20 (Swirnow), 935:7-15, 937:13-17 (Rubin).

Although Defendants prepared a business plan for Dr. Edelman, they never shared one with her, and Defendants concede that the business plans are not always accurate because they contain projections.[70]

Because there is no excuse offered other than prior pay,[71] as a matter of law, Defendants did not establish a *bona fide* factor other than sex to justify any pay differential.[72]

### iv.   Plaintiff is entitled to judgment as a matter of law on her New York EPA claims

Plaintiff also seeks judgment as a matter of law for her New York Equal Pay Act claims. Because those claims are generally analyzed under the same standard as her federal EPA claims, Plaintiff respectfully incorporates by reference the foregoing arguments as if fully set forth herein.[73]  However, because the New York Equal Pay Act differs in some respects to the federal EPA, Plaintiff highlights below additional considerations raised as relevant to the instant motion.

As an initial matter, the New York Equal Pay Act (unlike the federal EPA) provides specific examples of what a *bona fide* factor other than sex includes, i.e., education, training, or experience.[74]  Prior pay is not listed as any such example, nor could it be.

---

[70] Tr. at 648:6-649:17 (Swirnow).

[71] See argument *supra* at 17.

[72] Tr. at 982:4-984:6, 987:21-988:11, 988:20-989:3 (Rubin) (no gender neutral system), 990:17-992:14; 992:25-993:15 (Rubin) (lack of training on setting salaries).

[73] See Volpe v. Nassau County, 915 F. Supp. 2d 284, 291-292 (E.D.N.Y. 2013) ("Since "[c]laims for violations of the Equal Pay Act and the New York State Equal Pay Law may be evaluated under the same standard," … the Court addresses defendants' motion to dismiss with respect to plaintiffs' EPA claim and plaintiffs' N.Y. EPA claim together") (citing Rose v. Goldman, Sachs & Co., 163 F.Supp.2d 238, 243 (S.D.N.Y.2001)).

[74] New York Labor Law ("NYLL") § 194(1)(b)(iv).

Education, training, and experience are all factors that bear some relationship to the work being performed; prior pay can never bear any such relationship.  As such, prior pay is not a *bona fide* factor other than sex that justifies a pay disparity under the New York Equal Pay Act.

Further, unlike the federal EPA, the New York Equal Pay Act requires, with respect to asserting the defense of a *bona fide* factor other than sex, that the factor shall not be based upon or derived from a differential in compensation based on status within one or more protected class or classes and shall be job-related with respect to the position in question and shall be consistent with business necessity, which is defined as a factor that bears a manifest relationship to the employment in question.[75]  Defendants failed to prove this defense for a multitude of reasons as it relates to the pay disparity between Dr. Edelman and Dr. Modi.

First, Defendants fail to meet the job-related requirement to support a justification for the pay disparity because  Dr. Modi's prior pay is not related to his job at NYU as a rheumatologist. Similarly, Dr. Modi's prior pay has no manifest relationship to the employment in question at NYU to support a business necessity for paying him nearly $100,000.00 more in compensation compared to Dr. Edelman.

Second, Permitting Defendants to justify their compensation practices will only perpetuate the pay disparity between men and women, as the Supreme Court long ago declared.[76]

---

[75] See NYLL §§ 194(1)(b)(iv) and 194(2)(a).

[76]  See Corning Glass Works v. Brennan, 417 U.S. 188 (1974); see also https://www.bls.gov/opub/reports/womens-earnings/2020/home.htm (finding by U.S. Bureau of Labor Statistics that in 2020, women who were full-time wage and salary workers had median usual weekly earnings that were 82 percent of those of male full-time wage and salary workers);   https://www.bls.gov/opub/ted/2022/median-earnings-for-women-in-2021-were-83-1-percent-of-the-median-for-men.htm (finding by U.S. Bureau of Labor Statistics that in 2021, median weekly earnings for wage and salary workers who usually worked full time were $998. Median earnings for women were $912, or 83.1 percent of men's earnings); and https://www.nytimes.com/2021/12/06/health/women-doctors-salary-pay-gap.html (New York

19

As such, prior pay cannot be a *bona fide* factor other than sex as a matter of law because it is based upon or derived from a differential in compensation based on status, since women are historically paid eighty percent (80%) of what their male counterparts earn.  This is especially the case where New York outlawed the use of salary history to determine compensation.[77]

Accordingly, as a matter of law, Plaintiff is entitled to judgment notwithstanding the verdict on her EPA claims under both federal and state law as to Dr. Modi.

## VI.   **CONCLUSION**

Based on the evidence adduced at trial, Plaintiff is entitled to judgment as a matter of law on her EPA claims as they relate to Dr. Modi.  For the foregoing reasons, Plaintiff is entitled to judgment as a matter of law on her EPA claim as it relates to Dr. Modi, together with costs and disbursements.

Dated: Lake Success, New York
      August 22, 2023

                                Respectfully submitted,

                                **MILMAN LABUDA LAW GROUP PLLC**

                                __/s/ Joseph M. Labuda, Esq.__
                                Joseph M. Labuda, Esq.
                                Emanuel Kataev, Esq.
                                3000 Marcus Avenue, Suite 3W8
                                Lake Success, NY 11042-1073
                                (516) 328-8899 (office)
                                (516) 328-0082 (facsimile)
                                emanuel@mllaborlaw.com
                                joe@mllaborlaw.com

                                *Attorneys for Plaintiff*
                                *Dr. Sari Edelman*

---

Times' survey of more than 80,000 physicians estimated that female physicians make 25 percent less than male physicians over a 40-year career).

[77] See NYLL § 194-a.

SJA-830

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. SARI EDELMAN,<br><br>　　　　　Plaintiff,<br><br>　　– against –<br><br>NYU LANGONE HEALTH SYSTEM, NYU LANGONE HOSPITALS, NYU LANGONE MEDICAL CENTER, NYU LANGONE NASSAU RHEUMATOLOGY, NYU SCHOOL OF MEDICINE, NYU GROSSMAN SCHOOL OF MEDICINE, NYU HOSPITALS CENTER, ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH ANTONIK, and JOSHUA SWIRNOW,<br><br>　　　　　Defendants. | Case No. 1:21-cv-502 (LJL) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, ALTERNATIVELY, FOR A NEW TRIAL**

**TARTER KRINSKY & DROGIN LLP**
Richard L. Steer
Richard C. Schoenstein
Justin Chu
Ingrid J. Cardona
1350 Broadway, 11th Floor
New York, NY 10018
(212) 216-8000
rsteer@tarterkrinsky.com
rschoenstein@tarterkrinsky.com
jchu@tarterkrinsky.com
icardona@tarterkrinsky.com

SJA-831

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 1

   The Evidence Adduced At Trial ......................................................................... 3

      As to Dr. Goldberg ........................................................................................ 4

      As to Dr. Porges ........................................................................................... 5

      As to Dr. Modi ............................................................................................. 6

   The Directed Verdict ......................................................................................... 9

   The Jury Verdict .............................................................................................. 10

   This Motion ..................................................................................................... 10

ARGUMENT .......................................................................................................... 10

     POINT I   Plaintiff Forfeited The Right To Move Under Rule 50(B) And
            There Is No Manifest Injustice In The Jury Verdict ......................... 11

     POINT II   There Is Sufficient Evidence To Support The Verdict That Dr. Modi
            Was Not A Valid Comparator Under The Equal Pay Claims ............. 12

        A.   Job Requiring The Same Skill, Effort, And Responsibility ..................... 13

           i.   As To Skill ..................................................................... 15

           ii.   As to Effort .................................................................. 16

           iii.   As to Responsibility ..................................................... 16

        B.   Equal Work ............................................................................... 17

        C.   Factor Other Than Sex .................................................................. 18

           i.   As To Gender Neutral Factors Generally ......................... 19

           ii.   As To Gender Neutral Factors Regarding Modi .............. 20

     POINT III   There Is No Basis For A New Trial ................................................. 24

CONCLUSION ....................................................................................................... 25

i

SJA-832

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Casmento v. Volmar Constr., Inc.*,
No. 20-cv-0944, 2022 WL 15773966 (S.D.N.Y. Oct. 28, 2022) (Liman, J.) ..............11, 12, 15

*Cunningham v. Town of Ellicott*,
No. 04-cv-301, 2007 WL 1756502 (W.D.N.Y. June 18, 2007), *aff'd*, 310 Fed.
Appx. 448 (2d Cir. 2009) ........................................................................................24, 25

*Hodgson v. Corning Glass Works*,
474 F.2d 226 (2d Cir. 1973) ...........................................................................................23

*Hughes v. Town of Bethlehem*,
No. 10-cv-1489, 2015 WL 2130905 (N.D.N.Y May 7, 2015) .......................................24

*Husser v. New York City Dept. of Ed.*,
137 F. Supp. 3d 253 (E.D.N.Y. 2015) ............................................................................23

*Lippa v. General Motors Corp.*,
107 F.3d 3, 1997 WL 62955 (2d Cir. 1997) ...................................................................18

*Malmsteen v. Berdon, LLP*,
369 Fed. Appx. 248 (2d Cir. 2010) .................................................................................12

*Manley v. AmBase*,
337 F.3d 237 (2d Cir. 2003) ...........................................................................................24

*Mazzella v. RCA Global Comm., Inc.*,
642 F. Supp. 1531 (S.D.N.Y. 1986) *aff'd*, 815 F.2d 653 (2d Cir. 1987) ......................19

*Mitchel v. Ceros, Inc.*,
21 Civ. 1570 (KPF), 2022 WL 748247 (S.D.N.Y. March 10, 2022)...............................24

*Ormerod v. County of Niagara*,
No. 06-cv-7248, 2010 WL 3304202 (W.D.N.Y. Aug. 19, 2010) ...................................11

*Osborn v. Home Depot U.S.A., Inc.*,
518 F. Supp. 2d 377 (D. Conn. 2007) .............................................................................24

*Pouncy v. Danka Off. Imaging Co.*,
393 Fed. Appx. 770 (2d Cir. 2010) .................................................................................25

*Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*,
No. 08-cv-931 (PKC)(JO), 2015 WL 3605143 (June 5, 2015) ......................................11

ii

*Reeves v. Sanderson Plumbing Prods, Inc.*,
530 U.S. 133 (2002)................................................................................................14

*Setelius v. Nat'l Grid Elec. Servs. LLC*,
No. 11 Civ. 5528, 2014 WL 4773975 (E.D.N.Y. Sept. 24, 2014)...........................24

*Woods-Early v. Corning Inc.*,
18-CV-6162-FPG, 2023 WL 4598358 (W.D.N.Y. July 18, 2023)...........................24

**Statutes**

CHRL ............................................................................................................................2

Equal Pay Act ............................................................................................................18

federal Equal Pay Act ..........................................................................................1, 2, 3

New York City Human Rights Law..............................................................................2

New York Labor Law Section 194 ..........................................................................1, 2

NYLL 194 ....................................................................................................................3

SHRL ...........................................................................................................................2

State Human Rights Law .............................................................................................2

**Other Authorities**

Rule 50...................................................................................................................12, 15

Rule 50(a)......................................................................................................11, 12, 25

Rule 50(b) ...............................................................................................1, 11, 13, 25

Rule 59(a)...........................................................................................................24, 25

<u>PRELIMINARY STATEMENT</u>

A litigant's opinion that "the jury reached the wrong result" is not a basis for overturning a verdict or granting a new trial. Yet, that is precisely the ground, and the only ground, for Plaintiff's motion. Plaintiff does not raise any challenges to the legal instructions, or the verdict form questions provided to the jury. Nor does Plaintiff otherwise contend that any errors of law were committed by the Court. Instead, Plaintiff seeks to substitute her own opinion in place of the jury's factual findings with respect to decisions now challenged by Plaintiff, which it made based on the legal instructions given and the evidence presented after an eight-day trial. Plaintiff's motion should be denied.[1]

Separately and independently, Plaintiff's motion for a judgment notwithstanding the verdict should be denied because it is procedurally defective, made without the requisite motion for a directed verdict before the submission of the case to the jury. As this Court noted, a post-trial Rule 50(b) motion for judgment as a matter of law is proper only if a motion for a directed verdict is made before submission of the case to the jury. Here, Plaintiff failed to submit the predicate motion for a directed verdict. Plaintiff's current motion, made as an afterthought, should therefore be denied on this separate and independent ground.

<u>BACKGROUND</u>

Plaintiff brought a slew of claims, including violation of the federal Equal Pay Act and New York Labor Law Section 194 ("NYLL 194"), discrimination, and retaliation against NYU and a host of individuals. She asserted that she was paid less than three male alleged comparators

---

[1] Unlike Plaintiff's motion, Defendants' post-trial application is a renewal of arguments they made for a directed verdict and challenges jury findings that are wholly unsupported by the evidentiary record. Plaintiff's motion, however, is not a renewal of any trial motion and is inconsistent with her own trial positions that the equal pay issues were solely for the jury to decide based on the "totality of the circumstances" presented at trial. Steer Decl., Ex. 5 (July 18 Tr. 1312:4-5, 1318:14-17, 1320:14-16).

1

at NYU because of her sex. She also asserted that the individual defendants discriminated against her and retaliated against her when she complained of discrimination.

This action was tried before a jury from July 10, 2023, through July 18, 2023. Numerous witnesses testified. They included Plaintiff, all four individual defendants, and six non-party witnesses. Seventy-three exhibits were admitted by the Parties. Plaintiff showed numerous demonstrative aids to the jury, including even a video of an Oscar award show. After hearing from this exhaustive list of witnesses and testimony concerning the many exhibits for eight days, the jury was charged and returned a verdict on the eighth day. The jury found that Defendants did not violate the Federal Equal Pay Act, or the equal pay provision of New York Labor Law Section 194. The jury also found that Defendants did not violate Title VII, the New York State Human Rights Law ("SHRL"), or the New York City Human Rights Law ("CHRL") with respect to Plaintiff's discrimination claim; and that Defendants Andrew Rubin and Joshua Swirnow did not retaliate against Plaintiff in violation of Title VII, SHRL or the CHRL.[2]

As to the alleged equal pay violations, the jury specifically rejected Plaintiff's claims, finding that, as a threshold matter, Plaintiff did not do equal work with her three alleged male comparators. Accordingly, none of the male physicians relied upon by Plaintiff were proper comparators. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243), Question No. 1). Similarly, the jury found that Plaintiff was not paid less for doing equal work. *Id.* (Question No. 3). The jury also found that the pay differences between Plaintiff and each of the three male employees were based on factors other than sex. *Id.* (Question Nos. 4, 6). Each of these determinations, alone, is fatal to

---

[2] The jury, however, returned a verdict that the NYU Corporate Defendants committed an adverse act against Plaintiff by not renewing her expiring employment contract leading to her termination in violation of Title VII, the SHRL, and the CHRL, and that Joseph Antonik, the facilities manager of the building where Plaintiff worked, aided, or abetted an adverse act against Plaintiff in violation of the SHRL and the CHRL. As that verdict is without evidentiary support – indeed, contrary to the evidence – the NYU Corporate Defendants and Antonik moved to vacate that portion of the verdict. (Dkt. Nos. 267, 269, 270).

2

Plaintiff's equal pay claims. The jury was asked to determine these questions as to each of the three male employees separately and found against Plaintiff as to all three and rejected her equal pay claims in total. *Id.* Having suffered a complete loss on that front, Plaintiff now seeks to reverse course and contends that only one of the three male employees is a proper comparator, contrary to what she told the Court and the jury at trial. Steer Decl., Ex. 2 (Plaintiff's summation, July 19 Tr.[3] 1407-1412).

**The Evidence Adduced At Trial**

Plaintiff contended at trial that she was paid less than three male physicians, Dr. Avram Goldberg, Dr. Andrew Porges, and Dr. Anang Modi because of her sex in violation of the federal Equal Pay Act and NYLL 194. Steer Decl., Ex. 3 (July 10 Tr. 31:2-3, 32:3-7, 33:23-24). She contended that she should be paid no less than these male physicians and sought to recover such pay difference. At trial, Plaintiff called all three male physicians as witnesses. Steer Decl., Ex. 4 (July 17 Tr. 1012 (Godberg), 1126 (Porges)); Ex. 5 (July 18 Tr. 1255 (Modi)). Plaintiff also called Andrew Rubin, who made the ultimate decisions on hiring, termination, and compensation (Steer Decl., Ex. 6 (July 14 Tr. 870:2-3, 884:5-7)), as well as Joshua Swirnow, who negotiated Plaintiff's compensation. Steer Decl., Ex. 7 (July 13 Tr. 689:19-22). Documents concerning Plaintiff and these male physicians were also introduced at the trial and presented to the jury. *E.g.*, Steer Decl., Exs. 3 (July 11 Tr. 284-285); 8 (Pl's Trial Ex. ("P") 8, P-15, P-24, P-31); 15 (P-35, P-41, P-46, P-48).

Based on the extensive evidence presented over eight days of trial, the jury properly determined that none of these male physicians was a proper comparator. As testified to by these witnesses, their work was unequal to Plaintiff's as measured by skill, effort, and responsibility,

---

[3] Unless otherwise indicated, all cites to "Tr." are references to the Court Trial Transcript.

3

and their different compensation was based on factors other than sex.

**As to Dr. Goldberg** – In deciding the question of equal pay, and who were the proper comparators, the jury was presented with documents and testimony concerning Dr. Goldberg.

NYU hired Dr. Goldberg to start and build a rheumatology practice as NYU did not even have such a practice on Long Island when he was hired. Steer Decl., Ex. 6 (July 14 Tr. 934:19-21). Prior to coming to NYU, Dr. Goldberg was a full-time Professor of Medicine at Hofstra Northshore-LIJ School of Medicine. Steer Decl., Exs. 15 (P-41); 4 (July 17 Tr. 1014:6-8). He was also a practicing physician at the North Shore University-LIJ Medical Center, where he was the Director of Scleroderma and Raynaud's Treatment Center and a member of the Performance Improvement Committee. Steer Decl., Ex. 15 (P-41). Dr. Goldberg also had twelve years more experience as a doctor than Plaintiff. Compare Steer Decl., Exs. 15 (P-41) and 8 (P-15). Dr. Goldberg's background reflects the prestige and value that he brought to NYU's start-up rheumatology practice which NYU wished to build and expand with his assistance Goldberg. Steer Decl., Exs. 6 (July 14 Tr. 934:19-25, 935:1); 4 (July 17 Tr. 1000:14-1001:8).

The evidence presented to the jury showed that Plaintiff did not bring such prestige or value, nor was she hired for the same purpose as Dr. Goldberg, to wit: start and build the rheumatology practice. Instead, she was hired solely for the purpose of patient care. While that role is unquestionably important, it is limited and dissimilar to Dr. Goldberg's multiple roles and duties. Thus, there is evidence that Dr. Goldberg had more responsibilities than Plaintiff. The evidence showed that Dr. Goldberg succeeded in building the Long Island rheumatology practice[4], as well as in his own patient care practice, where his production far exceeded Plaintiff's. Steer Decl., Ex. 7 (July 13 Tr. 716:11-25); Ex. 9 (P-9). He essentially doubled his production as measured

---

[4] Dr. Goldberg also recruited Plaintiff and Dr. Mehta. *See e.g.,* Steer Decl., Exs. 3 (July 11 Tr. 68:12-14); 4 (July 17 Tr. 1039:4-6).

4

by RVUs once he joined NYU. Steer Decl., Ex. 7 (July 13 Tr. 716:17-22). Evidence also was presented to the jury that, unlike Plaintiff, Dr. Goldberg did not have a business loan that NYU had to pay off, nor an office lease that NYU had to assume. Steer Decl., Ex. 4 (July 17 Tr. 1065:2-8).

There was thus ample evidence presented to the jury to evaluate and conclude that Dr. Goldberg was not a proper comparator.

**As to Dr. Porges -** The jury was also presented evidence showing that, like Dr. Goldberg, Dr. Porges performed leadership and administrative duties, which are important functions Plaintiff did not perform. Steer Decl., Exs. 7 (July 13 Tr. 732:17-24, 733:3-11), 10 (P-32). In addition, Dr. Porges performed a significant amount of research work for well-known pharmaceutical companies that generated additional revenues, as well as additional prestige and name recognition for NYU. Steer Decl., Exs. 4 (July 17 Tr. 1131:8-13, 1132:9-12, 21-25); 7 (July 13 Tr. 726:8-11); 6 (July 14 Tr. 918:22-25, 919:1-21); 8 (P-31). Plaintiff did not perform any research work, let alone research work that generated revenue. Steer Decl., Ex. 7 (July 13 Tr. 713:11-16). Indeed, Dr. Porges' contract presented at the trial showed that he had a separate revenue target for his research work, whereas there was no such revenue source or target for Plaintiff. Steer Decl., Ex. 7 (July 13 Tr. 730:6-13); Ex. 8 (P-31). Their job functions were therefore different.

Also like Dr. Goldberg, Dr. Porges had considerably more experience than Plaintiff. Dr. Porges's experience also far exceeded Plaintiffs. In fact, Plaintiff was still in grade school when Dr. Porges began his practice. Steer Decl., Exs. 11 (D-EE); 12 (D-HH). Further, while both Dr. Porges and Plaintiff were recruited from private practice, with patient bases that NYU expected to absorb upon hire, the evidence presented to the jury showed that their respective practices were far different. Dr. Porges' private practice generated $2 million in revenue (Steer Decl., Ex. 7 (July 13 Tr. 719:22-24); Ex. 11 (Defendants' Trial Ex. ("D") -EE)) compared to $726,151 that Plaintiff's

002528\5\170369063.v1

and Dr. Mehta's private practice generated. Steer Decl., Ex. 12 (D-HH). Dr. Porges' private practice was also more profitable than Plaintiff's private practice, which had to be supported by a business loan and was operating at a loss. *Id*. While Dr. Porges' RVU target was 6,524, he typically achieved more than 6,000 a year (which far exceeded Plaintiff's productivity). *E.g.*, Steer Decl., Exs. 5 (July 18 Tr. 1199:9-11) and 8 (P-31 (Porges' 6524 RVUs)) compared to Ex. 8 (P-8 (Plaintiff's 4966 RVUs)).

The jury was also presented with evidence including the difference in the economic value of Dr. Porges' and Plaintiff's respective private practices that it would assume when they joined NYU. Unlike Plaintiff, Dr. Porges did not have a business loan that NYU needed to pay off, and Dr. Porges office lease assumed by NYU expired several months after he joined NYU (Steer Decl., Ex. 5 (July 18 Tr. 1219:14-20)), whereas Plaintiff's office lease that NYU had to assume was to last for over a decade when NYU did not want and did not need the space. Steer Decl., Exs. 7 (July 13 Tr. 702:3-20); 6 (July 14 Tr. 930:25-931:15).

As a result of these differences, there is sufficient evidence on which the jury had a proper basis to believe and find Dr. Porges brought different, and more, economic value and contribution to NYU than Plaintiff.

**As to Dr. Modi -** While Plaintiff now alleges that the jury erred in rejecting Dr. Modi as a comparator, the evidence showed that he, similar to Dr. Goldberg, was hired to build out and expand NYU's rheumatology practice on Long Island, specifically its Huntington location. Steer Decl., Ex. 6 (July 14 Tr. 937:20-938:7). As Rubin testified at trial, NYU had a "large medical group" and a "huge patient population" in the Huntington location, but no rheumatology services there. *Id*. NYU therefore had to fill that "role." Steer Ex. 4 (July 17 Tr. 986:14-21). Like Dr. Goldberg, and unlike Plaintiff, the jury was presented with evidence that Dr. Modi had significant

6

leadership roles and responsibilities prior to joining NYU that made him a valuable asset and well-suited to build up the Huntington site. Dr. Modi was the Chief Rheumatologist for the Queens Long Island Medical Group, a multi-specialty group of 500 physicians. Steer Ex. 5 (July 18 Tr. 1271:23-1272:4). Dr. Modi then became a Medical Director at Advantage Care Physician when it took over the Queens Long Island Medical Group. *Id.* at 1273:1-3.

More specifically, as Dr. Modi testified, he had the following leadership and administrative responsibilities while at the Queens Long Island Medical Group:

> Q. And as the chief rheumatology, what were your duties?
> A. Be the liaison between the rheumatologists in the group and administration leadership to kind of discipline them or improve the quality of care standards, as well as a connection between the physicians and leadership if there was a need for any modern equipment, approve their CMEs, their vacation time, any connection between leadership and the rheumatology division.
> Q. And how many rheumatologists did you oversee, if any?
> A. Six.

*Id.* at 1272:5-13.

He also had subsequently larger leadership roles and duties while at Advantage Care Physicians, immediately prior to joining NYU:

> Q. And how many physicians did ACP, I'm going to call it, Advantage Care Physicians, ACP, how big was it at the time that you became the clinical director?
> A. The entire practice was approximately same as Queens Long Island Medical Group, 500 physicians.
> Q. How many physicians, if any, did you oversee?
> A. The practice had over 20 offices. I was the medical director of the Hempstead medical office, which comprised about 15 physicians, two PAs, two nurse practitioners, seven or eight RNs, and then the rest of it was front desk, receptionists, medical assistants.

*Id.* at 1273:4-14. The record included testimony by Mr. Swirnow that these and other qualities are what made Dr. Modi "attractive to NYU." Steer Decl., Ex. 7 (July 13 Tr. 737:14-15). As Swirnow testified:

> A. I remember him being a busy rheumatologist, I remember him having a good reputation in the community, and I remember him having had demonstrated leadership positions and that we

7

were recruiting him to our Huntington Medical Group practice, which was a large existing group, about 50 physicians in that practice. But we didn't have any rheumatology services at that practice and we wanted to add that because our patients in that area needed that service, so we identified Dr. Modi as someone that could help -- come in and help see those patients for us.
Q. In hiring Dr. Modi, did NYU have to assume any loans?
A. No.
Q. Did NYU have to take over an office lease?
A. No.
Q. Did NYU have any expenses that it had to take over for staff or office supplies or overhead?
A. No.

*Id*. at 737:14-738:7. These are leadership responsibilities and experiences that Plaintiff did not possess.

Dr. Modi further distinguished himself from Plaintiff in terms of productivity and effort. Prior to joining NYU, Dr. Modi already was more productive than Plaintiff, having produced 6,100 RVU in his last year at Advantage Care Physicians. Steer Decl., Ex. 5 (July 18 Tr. 1276:22-1277:25). Steer Decl., Ex. 15 (P-46). He consistently generated higher RVUs than Plaintiff during their employment. Moreover, the unrebutted evidence showed that Dr. Modi's production reflected effort that far exceeded that of Plaintiff. While at NYU, Dr. Modi saw patients five days a week (Steer Decl., Ex. 5 (July 18 Tr. 1281:2-5)), while Plaintiff saw patients less than four days a week (Steer Decl., Exs. 5 (July 18 Tr. 1280:11-15); 3 (July 11 Tr. 112:13)). Dr. Modi's RVU target of just over 6100 annually at NYU. Steer Decl., Ex. 5 (July 18 Tr. 1278:1-3, 1263:15-1264:1). That put Dr. Modi in the top ten percent of all rheumatologists in the country. *Id*. at 1277:3-1278:6. Plaintiff's effort was not even close. Plaintiff's RVU target was 5,200 in 2017. Steer Decl., Ex. 9 (P-9).

Dr. Modi also testified that he would not have joined NYU without a raise. Steer Decl., Ex. 5 (July 18 Tr. 1275:4-1276:12). As noted above, the evidence presented at trial also showed that, unlike Plaintiff, Dr. Modi did not have a business loan that NYU needed to pay off, nor an

8

office lease that NYU was forced to assume. Steer Decl., Ex. 7 (July 13 Tr. 737:14-25, 738:1-7). Dr. Modi also is more experienced than Plaintiff, having practiced two years longer than she. Steer Decl., Exs. 5 (July 18 Tr. 1256:19-1257:21; 15 (P-46)).

In sum, Dr. Modi was hired by NYU for the purposes of filling a specific need at its Huntington location and to accomplish its strategic goal of growing the rheumatology practice with a highly productive practitioner. He was more qualified and experienced than Plaintiff, both clinically and as a physician leader, and he greatly outworked Plaintiff both before and after arriving at NYU. The jury heard this unrebutted and undisputed evidence from which it properly concluded that, like Dr. Goldberg and Dr. Porges, Dr. Modi brought different and greater economic worth, more prestige, undertook more job functions, and made greater contributions of value to NYU than Plaintiff. The jury therefore received more than sufficient evidence upon which to conclude that Dr. Modi was not a proper comparator and that his higher salary was unrelated to his sex.

**The Directed Verdict**

At the close of evidence, Defendants moved for a directed verdict on all counts. Steer Decl., Ex. 5 (July 18 Tr. 1298-1309). In opposition, Plaintiff argued that all issues should be reserved for the jury, contending in particular as to the "EPA [claims], this is a very fact-intensive issue." *Id*. at 1310. Plaintiff also told the Court that the determination of other claims and issues are similarly fact intensive and that their determination must be made by the jury based on the "totality of the circumstances." *Id*. at 1312:4-5, 1318:14-17, 1320:14-16.

After hearing arguments from both sides, the Court granted judgment as a matter of law to Defendants on the issue of willfulness under the equal pay claims. *Id*. at 1342:7-9. The Court also granted defendants judgment on the claim for punitive damages. *Id*. at 1343:16-17. The Court

9

SJA-843

further granted judgment for defendants Kaplan, Rubin, and Swirnow on the discrimination claims (*Id*. at 1343:1-3), and judgment for Kaplan on the retaliation claims. *Id*. at 1342:21-22.

In contrast to Defendants, Plaintiff did not move for a direct verdict, a prerequisite for a motion for a judgment notwithstanding the verdict, which Plaintiff now seeks to make as an afterthought.

**<u>The Jury Verdict</u>**

After an eight-day trial, the jury returned a verdict and provided its answers to a special verdict form containing twenty-one questions concerning the different claims asserted by Plaintiff. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243)). As to the equal pay claims, the jury found that, contrary to Plaintiff's contention, none of the three male physicians is a proper comparator. *Id*. (Question No. 1). The jury similarly found that Plaintiff failed to prove that she was paid less for doing equal work. *Id*. (Question No. 3). It also found that the pay differences between Plaintiff and each of the three male physicians were based on factors other than sex. *Id*. (Question Nos. 4, 6). Each of these determinations on the separate questions, alone, doomed Plaintiff's equal pay claim.

**<u>This Motion</u>**

Unhappy with the result, Plaintiff now moves to vacate the jury verdict and seeks to have this Court supplant the findings of the jury verdict. Plaintiff's motion is both procedurally improper and without merit.

## <u>ARGUMENT</u>

Having failed to make the predicate motion for a directed verdict, Plaintiff forfeited her right to move for a judgment notwithstanding the verdict or the related motion for a new trial.

Even if the Court were to entertain the motion, it should be denied. As demonstrated above, there is ample evidence to support the jury's verdict. Having contended that all claims and issues

10

should be reserved for the jury because "fact-intensive" determinations were required (*Id.* at 1310:15-18), Plaintiff cannot now be heard that the Court should instead supplant the factual findings of the jury simply because she does not agree. For the same reasons, there is no justification for a new trial.

**POINT I**
**PLAINTIFF FORFEITED THE RIGHT TO MOVE UNDER RULE 50(B)**
**AND THERE IS NO MANIFEST INJUSTICE IN THE JURY VERDICT**

As this Court held, a "post-trial motion Rule 50(b) for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury." *Casmento v. Volmar Constr., Inc.*, No. 20-cv-0944, 2022 WL 15773966, at \*4 (S.D.N.Y. Oct. 28, 2022) (Liman, J.); *Ormerod v. County of Niagara*, No. 06-cv-7248, 2010 WL 3304202, at \*1 (W.D.N.Y. Aug. 19, 2010) (applying the same standard to a plaintiff). Moreover, such a post-trial motion "is limited to those grounds specifically raised in the prior motion [for a directed verdict]." *Casmento*, 2022 WL 15773966, at \*4; *Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-cv-931 (PKC)(JO), 2015 WL 3605143, at \*4 (June 5, 2015) (arguments not made on a pre-verdict Rule 50(a) motion are forfeited and cannot be made on a post-verdict Rule 50(b) motion). Here, Plaintiff did not make the predicate motion for a directed verdict under Rule 50(a) and is thus foreclosed from making a post-trial motion under Rule 50(b). While the Court may nonetheless grant a post-trial motion to a party that failed to make the requite predicate motion before submission of the case to the jury, the motion may not be granted "except to prevent manifest injustice." *Id.* As this Court further explained, "manifest injustice exists only when a jury's verdict is wholly without legal support." *Id.*

Plaintiff cites this standard in her brief, but then goes silent when required to apply it to the facts at issue. Plaintiff does not argue that letting the verdict stand would result in manifest

11

injustice, let alone that the verdict is wholly without legal support. Instead, she completely ignores her failure to make the predicate motion for a directed verdict, completely ignores the fact that she must meet the heightened "manifest injustice" standard, and simply declares her motion should be granted based upon her reassertion of her same failed arguments. For these reasons, Plaintiff's motion should be denied. *Malmsteen v. Berdon, LLP*, 369 Fed. Appx. 248, 250 (2d Cir. 2010) ("the forfeited issue may be reached if to ignore it would result in manifest injustice or if it is a purely legal error").

As this Court explained in *Casmento*, "a party's failure to move under Rule 50(a) has consequences." 2022 WL 15773966, at *4. The Court should give effect to this dictate, and should not countenance, let alone condone, Plaintiff's willful disregard of the legal requirements and standards. Otherwise, every losing litigant can come to court without regard to the requirements and standards of Rule 50, render them toothless, and relitigate every issue.

But even, *arguendo*, if the Court were to consider Plaintiff's motion absent the requisite motion for a directed verdict at trial and deem that the "manifest injustice" standard does not apply, the motion still should be denied because there is ample evidence to support the jury's verdict, as explained in further detail below.

**POINT II**
**THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE VERDICT THAT DR. MODI WAS NOT A VALID COMPARATOR UNDER THE EQUAL PAY CLAIMS**

"A Rule 50 motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Casmento*, 2022 WL 15773966, at *3. Moreover, as Plaintiff acknowledges (Pl. Memo., at p. 7 (Dkt. No. 272)), the evidence must be

12

considered in the light most favorable to the nonmovant, here Defendants, and the Court must give the non-movant the benefit of all reasonable inferences that the jury might have drawn in their favor from the evidence. *See id.* Plaintiff does not meet the stringent requirements of Rule 50(b), especially when all inferences are drawn in Defendants' favor.

Rather, the jury properly concluded that Plaintiff failed to prove the requisite elements of the equal pay claims. Indeed, even though it was Plaintiff's burden to prove that (a) she was employed in a job requiring the substantially the same skill, effort, and responsibility and (b) she was paid less for doing substantially equal work, the evidence presented at trial was sufficient for the jury to affirmatively conclude the opposite. Defendants, on the other hand, met their burden of proof that the difference in pay was due to factors other than sex.

A.  **Job Requiring The Same Skill, Effort, And Responsibility**

At trial, Plaintiff contended that three male physicians, Drs. Goldberg, Porges, and Modi were proper comparators for her equal pay claims. The jury heard from these physicians and found that, as to each of them, Plaintiff did not prove they were employed in a job requiring "substantially equal skill, effort, and responsibility" as hers. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243) Question No. 1). This finding, alone, doomed Plaintiff's equal pay claims. Completely defeated at trial, Plaintiff now changes tact and ignores her contention at trial as to who were the comparators. Instead, she seeks to effectively have this Court, instead of the jury, retry the case using solely Dr. Modi as the comparator. There is no such do-over under the rules. Nor is there any reason to supplant the jury's findings.

Plaintiff's attempt to isolate Dr. Modi fails in any event because there is evidence to support the verdict even as to him. As Plaintiff acknowledged in opposing Defendants' motion for a directed verdict, the determination of the claims and issues are "very fact-intensive" that must be

13

based on the "totality of the circumstances." Steer Dec., Ex. 5 (July 18 Tr. 1312:4-5, 1318:14-17, 1320:14-16); *see Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 149 (2002) ("in entertaining a motion for judgment as a matter of law, the court should review all of the evidence on the record" and "must draw all reasonable inferences in favor of the nonmovant").

After hearing extensive testimonial and documentary evidence in an eight-day trial, the jury rendered its verdict against Plaintiff. There is no justification to change the result in Plaintiff's favor. Rather, there is ample evidence to support the verdict as to each male physician on Questions Nos. 1, 3, 4, and 6 of the Verdict Form, including Dr. Modi. Steer Decl., Ex. 1 (Dkt. No. 243).

As to the legal standards on equal work (*Id.* (Question No. 1)), the Court's instructions to the jury included the following:

> [W]ork is not considered substantially equal if material differences in skill, effort, or responsibility exists." Steer Decl., Ex. 2 (July 19 Tr. 1441:19-20).
>
> First, in deciding whether jobs require substantially equal skill, you should consider such factors as the level of education, experience, training, and ability necessary to meet the performance requirements of their respective jobs. *Id.* at 1442:4-8.
>
> Second, in deciding whether the jobs require substantially equal effort, you should consider the mental or physical exertions in connection with the performance of the job. *Id.* at 1442:19-22.
>
> In deciding whether the jobs involve substantially equal responsibility, you should consider the degree of accountability expected by the employer for the person filling the jobs, as well as the amount of preparation required to perform the job duties. *Id.* at 1443:14-18.

Critically, the Court further instructed the jury, "[y]ou should note that 'skill,' 'effort,' and 'responsibility' constitute separate tests, each of which must be met in order for the equal pay requirement to apply." *Id.* at 1443:23-25. The jury determined that Plaintiff failed to carry this burden at trial.

14

SJA-848

Now, post-trial, Plaintiff has failed to carry her burden under Rule 50 showing that "the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Casmento*, 2022 WL 15773966, at *3. Rather than meeting this burden, Plaintiff's motion is mere repetition of what she believes to be her strongest evidence that she already pitched to the jury without success. Pl. Memo., at pp. 8-11 (Dkt. No. 272). But the jury is not bound to credit that evidence or consider only the evidence Plaintiff selects. This Court should decline to engage in the fact finding that Plaintiff urges upon it. *Id.* ("the court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury").

In contrast to Plaintiff's lack of evidence to carry her burden, Defendants presented ample evidence for the jury to find against Plaintiff on the following, even though Defendants did not bear any burden of proof on these issues.

### i.    As To Skill

The trial evidence showed that Dr. Modi was more experienced than Plaintiff by at least two years. Steer Decl., Exs. 5 (July 18 Tr. 1256:19-1257:21); 15 (P-46).

The evidence further showed Dr. Modi's significantly superior leadership and management experience and responsibilities before joining NYU, having served as the Chief Rheumatologist and Medical Director at his prior employer, where he supervised fifteen physicians, twelve non-physician medical professionals, and several support staff. Steer Decl., Exs. 5 (July 18 Tr. 1271:9-1273:14); 15 (P-46)). In contrast, Plaintiff came from a small two-physician practice that she ran at a deficit. Steer Decl., Exs. 12 (D-HH); 13 (July 12 Tr. 290:4-16).

In sum, Dr. Modi had greater skills, especially to meet NYU's business goal of expanding its rheumatology practice on Long Island, factors to which its business leaders testified were

15

relevant to their decision on hiring and compensation. Steer Decl., Exs. 5 (July 18 Tr. 1256:19-1257:21, 1271:9-1273:14); 6 (July 14 Tr. 937:20-938:7); 15 (P-46); 12 (D-HH); 13 (July 12 Tr. 290:4-16).

### ii.   As to Effort

Dr. Modi testified that he saw patients 5 days a week at NYU (Steer Decl., Ex. 5 (July 18 Tr. 1281:2-5)), compared to Plaintiff who generally saw patients less than four days a week (*Id.* 1280:11-15; Ex. 3 (July 11 Tr. 112:13)). Dr. Modi had a target of just over 6,100 RVUs annually at NYU. Steer Decl., Ex. 5 (July 18 Tr. 1278:1-3, 1263:15-1264:1). That put Dr. Modi in the top tenth percentile of all rheumatologists in the country. *Id.* at 1277:3-1278:6. Plaintiff's effort was not even close, never approaching the targets Dr. Modi regularly set and exceeded.[5] Plaintiff's RVU target was 5,200 in 2017. Steer Decl., Ex. 9 (P-9). Their levels of productivity were consistently disparate throughout their respective tenures at NYU, as well as prior to their recruitment. Simply put, Dr. Modi outworked and out produced Plaintiff, exerted more "effort" before and after he was hired, warranting greater compensation.

### iii.   As to Responsibility

NYU was building and expanding its rheumatology practice on Long Island when it hired Dr. Modi, just as it did when it hired Dr. Goldberg, albeit further along in that process.

---

[5] The term RVU (or wRVU) appears 460 times in the Trial Transcript, and Plaintiff's counsel questioned Plaintiff, all four individual defendants, and three non-party witnesses about RVUs. (*E.g.*, Steer Decl., Exs. 3 (July 11 Tr. 196:11-14) (Plaintiff); 13 (July 12 Tr. 426:17-18) (Mehta); 13 (July 12 Tr. 495:18-20) (Antonik); 7 (July 13 Tr. 609:3-5) (Kaplan); 7 (July 13 Tr. 663:9-12) (Swirnow); 6 (July 14 Tr. 912:20-22) (Rubin); 4 (July 17 Tr. 1026:23-1027:2) (Goldberg); 5 (July 18 Tr. 1199:9-11) (Porges); 5 (July 18 Tr. 1263:24-1264:5) (Modi).) However, despite this, and while admitting that "there was substantial evidence regarding quantity of production – *i.e.*, wRVU production," and citing to no authority, Plaintiff now claims, post-verdict, that the jury could not consider such evidence as the jury was not instructed to consider "a system which measures compensation by quantity…." Plaintiff's last-ditch effort is unavailing. The jury was properly permitted to consider the extensive testimony concerning production in returning its verdict for Defendants with respect to, for example, the value Plaintiff's alleged comparators brought to NYU, factors other than sex, and the amount and degree of effort presented by Plaintiff and her alleged comparators.

Steer Decl., Ex. 6 (July 14 Tr. 934:19-938:7).

Dr. Modi was responsible for virtually the entire rheumatology practice at the Huntington location, which had "a huge patient population" (*see Id*. at 937:13-938:7), whereas Plaintiff was one of several rheumatologists in the Lake Success location working under the leadership of Drs. Goldberg and Porges (*Id*. at 808:12-19).[6]  In sum, Dr. Modi had more responsibility than Plaintiff.

Thus, the mass of evidence on the separate tests of skill, effort, and responsibility heard by the jury provided sufficient evidence to conclude that Plaintiff failed to prove equal work. Plaintiff must satisfy each of the three individual tests to prove equal work – but instead she failed to meet any - therefore, the jury was entitled to conclude that Plaintiff did not prove her equal pay claims. Steer Decl., Ex. 2 (July 19 Tr. 1443:23-25 ("'skill,' 'effort,' and 'responsibility' constitute separate tests, each of which must be met in order for the equal pay requirement to apply")). The evidence presented at trial was more than sufficient for the jury to find that Plaintiff failed to meet any one, or in this case, all of these tests. This jury finding alone means Plaintiff does not have a cause of action for her equal pay claims.

**B. Equal Work**

Even if the jury had found for Plaintiff on whether NYU employed her and the alleged comparators in a job requiring substantially the same skill, effort, and responsibility, Plaintiff still loses her equal pay claims because the jury found that she failed to prove that she was paid less for doing substantially equal work. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243) Question No.

---

[6]   While Plaintiff spent a day during the week in the Huntington location, she only saw patients there for part of the day and spent the part of the day doing paperwork. Steer Decl., Ex. 5 (July 18 Tr. 1280:11-15). Though Plaintiff alleges that she was available to work full-time in Huntington but was not offered a full-time position there (Pl. Memo., at p. 17 (Dkt. No. 272)), it was Plaintiff's decision if and when to work at Huntington. Steer Decl., Exs. 7 (July 13 Tr. 745:1-5); 6 (July 14 Tr. 842:2-6). Her employment agreement did not restrict or assign where she had to provide services, and her salary did not vary depending on at what location she worked. Steer Decl., Exs. 8 (P-8), 9 (P-9).

17

3).

The Court gave the following instructions to the jury on equal work: "[w]ith respect to the third element of plaintiff's claim, plaintiff must prove she was paid a wage lower than male employees doing substantially equal work." Steer Decl., Ex. 2 (July 19 Tr. 1444:11-13.) The evidence on equal work presented to the jury as discussed above was sufficient for the jury to find against Plaintiff. The evidence included: (i) Dr. Modi saw patients five days a week, whereas Plaintiff saw patients less than four days a week; (ii) Dr. Modi's RVU target was just over 6100 RVUs annually, compared Plaintiff's highest RVU target of 5,200 per year; (iii) Dr. Modi was responsible for rheumatology care of virtually the entire Huntington location, which was "a huge patient population," whereas Plaintiff was one of several rheumatologists in the Lake Success location. Steer Decl., Exs. 5 (July 18 Tr. 1281:2-5, 1280:11-15, 1278:1-3, 1263:15-1264:1); 3 (July 11 Tr. 112:13); 9 (P-9); 6 (July 14 Tr. 808:12-18, 937:13-938:7).

Such evidence provides a sufficient basis for the jury to find that Plaintiff failed to prove that she was paid less for doing substantially equal work in comparison to Dr. Modi. This determination also, by itself, doomed Plaintiff's equal pay claims.

In sum, there is no basis to disturb the factual findings of the jury. As Plaintiff acknowledged in opposing Defendants' summary judgment motion, "the question of whether two employees are similarly situated is a question of fact for the jury." Steer Decl., Ex. 14 (Dkt. No. 129, at p. 9); *see Lippa v. General Motors Corp.*, 107 F.3d 3, 1997 WL 62955, at *2 (2d Cir. 1997) (a judge cannot "make a factual finding that differed from that of the jury" in a case involving Equal Pay Act claims). Plaintiff should not now be allowed to argue otherwise and ask the Court to make factual findings that wholly contradict what the jury determined.

**C.  Factor Other Than Sex**

18

In addition to finding that Plaintiff failed to prove equal work, the jury also found that Defendants proved that the difference in pay was based on factors other than sex. The jury finding for Defendants on this affirmative defense is a complete bar to the equal pay claims, even if Plaintiff had proven all elements of the claims, which she did not. *Mazzella v. RCA Global Comm., Inc.*, 642 F. Supp. 1531, 1551 (S.D.N.Y. 1986) *affʼd*, 815 F.2d 653 (2d Cir. 1987) (the "factor other than sex" affirmative defense, if proven, "is a complete defense to conduct that would otherwise violate the statute").

Evidence concerning the "factor other than sex" defense was presented at length during the trial. The evidence showed that those factors included: physician's credentials, years of experience, reputational status, productivity, the need of the NYU network, and whether a particular geographical location was being covered. Below is a sampling of that evidence.

### i. As To Gender Neutral Factors Generally

Rubin, the decision-maker on hiring and compensation, testified to the jury as to the gender-neutral factors that were considered by NYU in hiring physicians and determining their compensation.

Q. What is your role in determining what physicians are hired and how much they get paid?
A. I'm part of a team. So the business plan, which we've all seen - -
Q. No, no. What is your role?
A. My role? I hire the person. I make the offer.
Q. OK. And what is your process for determining what offer to make?
A. I'm going to look at the business plan that we've all seen. I'm going to look at their credentials. I'm going to look at the need in the network. I'm going to look at how many years' experience they have. I'm going to look at their external activities, if they have them. And again, some do, some don't. I'm going to look at the geography, where we're putting them. And then based on all those factors, when I meet with the physician, with that business plan as sort of the foundation, we would present an offer.
Q. That business plan gives you some of the economic information?
A. Business plan – I used the word "foundation" on purpose. It sets the baseline for what we think, you know, gives us the guide point, the starting point of where we think we need to go.
Q. Is it the only relevant factor?
A. No. That's what I was saying. There's lots of other factors, and those, again, can be academic

19

versus nonacademic; years of experience; the reputational status in the community; do we have a need in the community that we can't meet? Do we have a geography that we can't cover? So there are all sorts of factors that go into compensation of how we pay a physician beyond just the economics of a business plan.

Steer Decl., Ex. 6 (July 14 Tr. 921:8-922:13).

###    ii.    As To Gender Neutral Factors Regarding Modi

The testimonial and documentary evidence presented at trial showed not just one, but multiple, "factor other than sex" supporting the jury's finding that the difference in pay between Plaintiff and Dr. Modi's was not gender based. Indeed, there is no evidence in the trial record from which a jury could conclude that gender played any role in setting the compensation of physicians at NYU.

The jury was presented with evidence showing that, like Dr. Goldberg, Dr. Modi was hired to further NYU's goal of geographical expansion of its rheumatology practice on Long Island and to fill the needs of a particular location. As Rubin testified:

Q. Were you directly involved in hiring Dr. Modi?
A. Yes.
Q. And you were involved in negotiating his salary?
A. I was.
Q. And he did not have a business plan, correct?
A. He did not.
Q. So what do you recall about figuring out Dr. Modi's salary?
A. A couple, couple things. One, he had been referred to us from -- we had been having discussions at the time with Advantage Care Physicians about doing some collaboration services, and his name had come up as a very strong and capable rheumatologist. We have a large medical group, very large medical group in Huntington, Long Island, with a huge patient population. We did not have rheumatology services there, so we were looking to fill a hole that we had in our network to be able to provide that care. So that would be an example where I was telling you why another -- a salary may be different in that case is because we had a hole to fill, patients that we needed to take care of, so we needed to get someone in there.

*Id*. at 937:13-938:7. The jury therefore could consider this evidence and properly conclude that a gender neutral, bona fide business-related reason existed for the difference in pay, including NYU's goal of expanding its rheumatology practice on Long Island.

20

Furthermore, the evidence presented to the jury showed that, similar to Dr. Goldberg and unlike Plaintiff, Dr. Modi had significant leadership roles and responsibilities prior to joining NYU. For example, Dr. Modi testified he was the Chief Rheumatologist for the Queens Long Island Medical Group, a multi-specialty group of 500 physicians located in Queens and Long Island, where he supervised six rheumatologists. Steer Decl., Exs. 5 (July 18 Tr. 1271:9-1273:14); 15 (P-46). Dr. Modi then became a Medical Director at Advantage Care Physician when it took over the Queens Long Island Medical Group, where he supervised 15 physicians, twelve non-physician medical professionals, and several support staff. Steer Decl., Ex. 5 (July 18 Tr. 1273:9-14). These are the leadership responsibilities and experiences that Plaintiff did not possess. To the contrary, the evidence showed that Plaintiff had difficulty in maintaining a professional working relationship with the staff in the office she shared with other physicians and was counseled by leadership to interact successfully with her co-workers. Steer Decl., Ex. 7 (July 13 Tr. 646:12-14, 739:13-741:4).

The evidence presented to the jury also showed that Dr. Modi is otherwise more qualified based on his greater experience, having practiced two years longer than Plaintiff. Steer Decl., Exs. 5 (July 18 Tr. 1256:15-1257:21); 15 (P-46).

The evidence therefore allowed the jury to properly conclude that employing a more qualified and more prominent rheumatologist than Plaintiff, such as Dr. Modi, would bring prestige and value to NYU and help its goal of expanding and improving its rheumatology practice on Long Island. As Rubin testified at trial, "having a strong clinical leadership, strong clinician with good stature, reputations in the community, the health system benefits, and quite frankly, all the doctors who don't have that stature benefit." Steer Decl., Ex. 4 (July 17 Tr. 1001:4-8). Indeed, the evidence showed that NYU repeatedly sought and hired highly qualified rheumatologists with

21

SJA-855

significant reputational status in the community, from Dr. Goldberg, to Dr. Porges, to Dr. Modi, in the execution of its goals of expanding and improving its rheumatology practice.

Dr. Modi also distinguished himself from Plaintiff by outworking her, thus providing evidence to the jury of an additional factor other than sex. In this regard, the jury was presented with evidence showing that prior to joining NYU, Dr. Modi was already more productive than Plaintiff, having produced 6,100 RVU in his last year at Advantage Care Physicians. Steer Decl., Ex. 5 (July 18 Tr. 1276:22-1277:25). As Dr. Modi explained, the 6,100 RVU production put him in the top ten percent of all rheumatologists in the entire country. *Id*. at 1277:22-25. While at NYU, the evidence upon which the jury was entitled to rely showed that Dr. Modi's annual RVU target in 2017 was 6,108 (which he met or exceeded each year) (Steer Decl., Ex. 15 (P-35)), whereas Plaintiff's RVU target was 5,200 in 2017 (Steer Decl., Ex. 9 (P-9)). The evidence further showed that while at NYU, Dr. Modi saw patients five days a week (Steer Decl., Ex. 5 (July 18 Tr. 1281:2-5)), while Plaintiff saw patients less than four days a week (Steer Decl., Exs. 5 (July 18 Tr. 1280:11-15); 3 (July 11 Tr. 112:13)).

The jury was entitled to rely on, and credit, all or part of this vast amount of evidence, including that Dr. Modi was more qualified, worked harder, and was more productive than Plaintiff, even though they were both rheumatologists. The evidence at trial, therefore, provided the jury with a proper basis to determine that NYU proved that it actually paid based on bona factors other than sex, and that the factors were both job-related and consistent with business necessity, as they were properly charged to do.

Plaintiff's contention that the jury could not have considered the difference in quantity and production because it was not given instructions on it misses the point. (Pl. Mem. at p. 15 (Dkt. No. 272).) The Court in its "factor other than sex" instructions charged the jury that

22

"defendants must prove that plaintiff's sex played no part in the difference in wages" to successfully invoke this defense. Steer Decl., Ex. 2 (July 19 Tr. 1445:8-10). As the Second Circuit explained, "differentials based on any other factor other than sex" exclusion is a "broad general exception" to the prohibition against pay differences between women and men. *Hodgson v. Corning Glass Works*, 474 F.2d 226, 232 (2d Cir. 1973) (quoting Congressional Committee Report). The jury therefore certainly could have considered the difference in the efforts exerted by Plaintiff and Dr. Modi in concluding that Plaintiff's sex did not play a part in the pay difference. Plaintiff has no basis to contest the jury's determination in this regard.

The jury also was presented with evidence that, prior to joining NYU, Dr. Modi was making more money than Plaintiff and that he would not have joined NYU without a raise. Steer Decl., Ex. 5 (July 18 Tr. 1275:4-1276:12). The compensation that NYU offered Dr. Modi was necessary to lure him to the Huntington location in order to accomplish the business goals of geographical expansion of the rheumatology practice and to service the need of a large patient base in that location. Steer Decl., Ex. 6 (July 14 Tr. 937:19-938:7). Moreover, unlike Plaintiff, Dr. Modi did not have any loans, leases, or expenses that NYU had to assume. Steer Decl., Ex. 7 (July 13 Tr: 738:1-7). As the witnesses testified to the jury, NYU paid off Plaintiff's business loan and assumed her office lease, even though NYU did not want or need the space. Steer Decl., Exs. 7 (July 13 Tr. 702:3-20), 6 (July 14 Tr. 930:25-931:15). This, as well as the fact that Dr. Modi was more productive than Plaintiff, provided additional evidence for the jury to conclude that the pay difference was due to factors other than sex.[7]

In sum, the trial evidence provided a sufficient basis for the jury to conclude that Dr.

---

[7] Plaintiff's cited cases (at Pl. Memo., at p. 17, n.67) concerning whether prior pay by itself is a factor other than sex are irrelevant, as Defendants introduced probative evidence that prior salary in addition to numerous other bona fide factors were considered in setting salaries. Defendants never relied on prior salary alone.

002528\5\170369063.v1

Modi was paid more than Plaintiff because of one or more of these gender-neutral factors, and not because of Plaintiff's sex. *Husser v. New York City Dept. of Ed.*, 137 F. Supp. 3d 253, 269 (E.D.N.Y. 2015) ("an employer may properly decide to pay higher salaries to employees with greater experience, more advanced educational degrees, or objectively better credentials than their co-workers"); *Osborn v. Home Depot U.S.A., Inc.*, 518 F. Supp. 2d 377, 385 (D. Conn. 2007) ("market forces, previous experience, education, and inducement to hire the best person for the job have been held to be legitimate factors justifying pay differentials under the EPA"); *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11 Civ. 5528, 2014 WL 4773975, at *31 (E.D.N.Y. Sept. 24, 2014) (collecting cases).[8]

### POINT III
### THERE IS NO BASIS FOR A NEW TRIAL

While Plaintiff purports to move for a new trial under Rule 59(a), she perfunctorily recites the standard but does not even argue, let alone demonstrate, that she meets this standard, nor does she provide any basis for this extraordinary relief. In order to grant a new trial, the Court "must conclude that the jury has reached a seriously erroneous result, or the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase*, 337 F.3d 237, 234 (2d Cir. 2003). As the courts further explained, "the court may only grant a new trial if, after viewing all the evidence, it has a definite and firm conviction that a mistake has been committed." *Hughes v. Town of Bethlehem*, No. 10-cv-1489, 2015 WL 2130905,

---

[8] The standards for the determination of the equal pay claims under the federal and New York statutes are the same. *Woods-Early v. Corning Inc.*, 18-CV-6162-FPG, 2023 WL 4598358, at *4 (W.D.N.Y. July 18, 2023) ("plaintiff's EPA and NYLL claims—that she received unequal pay based on her gender—are analyzed under the same standards"); *Mitchel v. Ceros, Inc.*, 21 Civ. 1570 (KPF), 2022 WL 748247, at *5 (S.D.N.Y. March 10, 2022) (same). The Court gave essentially the same jury instructions under the two statutes. Tr. 1439-50. The Verdict Form questions for the two claims are identical. Steer Decl., Ex. 1 (Verdict Form (Dkt. No. 243) Question Nos. 1-7). Plaintiff does not contend otherwise.

at *2 (N.D.N.Y May 7, 2015); *Cunningham v. Town of Ellicott*, No. 04-cv-301, 2007 WL 1756502, at *4 (W.D.N.Y. June 18, 2007), *aff'd*, 310 Fed. Appx. 448 (2d Cir. 2009) (same). Where, as here, to justify setting aside a special verdict and hold a new trial, "the special verdict answers be ineluctably inconsistent." *Cunningham*, 2007 WL 1756502, at *4. Plaintiff has not come close to meeting this high hurdle.

As detailed above, there is ample evidence to support the jury verdict. Based on the same evidence and for the same reasons discussed under Rule 50(a), Plaintiff's motion for a new trial should be denied. This is particularly so since Plaintiff does not set forth separate reasons for its Rule 59(a) motion for a new trial, but rather indistinguishably seeks a Rule 50(b) judgment as a matter of law for the same reasons. *Pouncy v. Danka Off. Imaging Co.*, 393 Fed. Appx. 770, 773 (2d Cir. 2010) (affirming denial of both motions since movant's "arguments in support of his Rule 59(a) motion were identical to those in support of his Rule 50(b) motion" and concluding that there that jury verdict was not "seriously erroneous").

Simply put, Plaintiff did not demonstrate a "serious error" in the verdict or that the vacating of the verdict is necessary to prevent "manifest injustice." The jury was presented with ample evidence to conclude that Plaintiff did not perform equal work to Dr. Modi or the other two alleged comparators, Dr. Goldberg and Dr. Porges, as measured by skill, effort, or responsibility.

Similarly, Plaintiff failed to meet the test for a retrial on the "factor other than sex" defense. As discussed at length above, there was ample evidence for the jury to find that Defendants proved this defense. There is no "manifest injustice" in this determination by the jury that would warrant a new trial.

## CONCLUSION

For the reasons set forth herein above, Defendants respectfully request that Plaintiff's motion for judgment as a matter of law or, alternatively, for a new trial, be denied in its entirety.

25

Dated: New York, New York
September 21, 2023

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Defendants*

By:  */s/ Richard L. Steer*

Richard L. Steer
Richard C. Schoenstein
Justin Chu
Ingrid J. Cardona
1350 Broadway, 11th Floor
New York, New York 10018
(212) 216-8000
rsteer@tarterkrinsky.com
rschoenstein@tarterkrinsky.com
jchu@tarterkrinsky.com
icardona@tarterkrinsky.com

26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

DR. SARI EDELMAN,

                  **Case No.:** 1:21-cv-502 (LJL) (GWG)

               Plaintiff,

        -against-

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF
MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER,
ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH
ANTONIK, and JOSHUA SWIRNOW,

               Defendants.

-----------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) AND
TO ALTER OR AMEND THE JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)**

**MILMAN LABUDA LAW GROUP PLLC**

Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Ave., Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff
Dr. Sari Edelman*

i

SJA-861

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

ARGUMENT ...........................................................................................................................8

   I.   **DEFENDANTS' RULE 50(b) MOTION SHOULD BE DENIED ON MULTIPLE GROUNDS** ................................................................................................................ 8

     A. Defendants Failed to Preserve All of Their Instant 50(b) Arguments Because They Failed to Raise Them in Their Rule 50(a) Motion During Trial ........................ 8

     B. Defendants Failed to Establish that There was an Insufficient Evidentiary Basis for Finding that Defendants, Antonik, and NYU Retaliated Against Dr. Edelman. As Such, the Jury's Verdict on Plaintiff's Retaliation Claim Must Not be Disturbed. ................................................................................................................ 10

          Legal Standard ...................................................................................... 10

          i. Defendants Failed to Establish an Absence of Evidence that Antonik Had Knowledge of Plaintiff's Protected Activity ...................................... 11

          ii. Defendants Failed to Establish an Absence of Evidence that Antonik Participated in the Adverse Employment Action Against Plaintiff .............. 15

          iii. Defendants Failed to Establish an Absence of Evidence that NYU Acted Negligently in Relying on the Information Provided by Antonik .................. 18

  II. **THE COURT SHOULD DENY DEFENDANTS' MOTION FOR REMITTITUR OF THE JURY'S FRONT PAY AWARD** .......................................................... 22

     A. LEGAL STANDARD ...................................................................................... 22

     B. THE JURY'S FRONT PAY AWARD OF $700,000.00 SHOULD NOT BE DISTURBED ................................................................................................ 23

CONCLUSION.......................................................................................................................26

## TABLE OF AUTHORITIES

**Cases**

AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC,
    646 F. Supp. 2d 385 (S.D.N.Y. 2009) ................................................................. 9

AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC,
    386 Fed. Appx. 5 (2d Cir. 2010) ....................................................................... 9

Banister v. Davis,
    140 S. Ct. 1698 (2020) ................................................................................... 22

Barkley v. Olympia Mortg. Co.,
    557 Fed. Appx. 22 (2d Cir. 2014) ............................................................... 9, 10

Blanco v. Brogan,
    620 F. Supp. 2d 546 (S.D.N.Y. 2009) ............................................................. 21

Blum v. Witco Chem. Corp.,
    829 F.2d 367 (3d Cir. 1987) ........................................................................... 23

Bracey v. Bd. of Educ. of City of Bridgeport,
    368 F.3d 108 (2d Cir. 2004) ............................................................................. 9

Broadnax v. City of New Haven,
    141 Fed. Appx. 18, 23 (2d Cir. 2005) ........................................................ 23, 24

Cardwell v. Davis Polk & Wardwell LLP,
    2023 WL 2049800 (S.D.N.Y., 2023) ............................................................... 11

Cross v. N.Y.C. Trans. Auth.,
    417 F.3d 241 (2d Cir. 2005) ........................................................................... 10

CSX Transp., Inc. v. Hensley,
    556 U.S. 838 (2009) ....................................................................................... 25

Deloreto v. Karengekis,
    104 Fed. Appx. 765 (2d Cir. 2004) ................................................................. 11

Dunson v. Tri-Maintenance & Contractors, Inc.,
    171 F. Supp. 2d 103 (E.D.N.Y. 2001) ............................................................. 15

Edelman v. NYU Langone Health System,
    2022 WL 4537972 (S.D.N.Y. 2022) ............................................................... 14

EEOC v. Ethan Allen, Inc.,
    44 F.3d 116 (2d Cir. 1994) ............................................................................. 21

Feingold v. New York,
    366 F.3d 138 (2d Cir. 2004)...................................................................................... 15, 16

Fitchett v. City of New York,
    2021 WL 964972 (S.D.N.Y. 2021)............................................................................ 16

Grant v. Bethlehem Steel,
    622 F.2d 43 (2d Cir. 1980)........................................................................................ 21

Hartley v. Dillard's, Inc.,
    310 F.3d 1054 (8th Cir. 2002) .................................................................................. 22

Hayes v. SkyWest Airlines, Inc.,
    12 F.4th 1186 (10th Cir. 2021) ................................................................................. 22

ING Glob. v. United Parcel Serv. Oasis Supply Corp.,
    757 F.3d 92 (2d Cir. 2014)..................................................................................... 9, 11

Jones v. Town of East Haven,
    691 F.3d 72 (2d Cir. 2012)........................................................................................ 10

Kato v. Ishihara,
    239 F. Supp. 2d 359 (S.D.N.Y. 2002)...................................................................... 15

Krasner v. HSH Nordbank AG,
    680 F. Supp. 2d 502 (S.D.N.Y. 2010)...................................................................... 12

Kregler v. City of New York,
    987 F. Supp. 2d 357 (S.D.N.Y. 2013)...................................................................... 18

KT Group Limited v. NCR Corporation,
    412 F.Supp.3d 305 (S.D.N.Y. 2019)........................................................................ 25

Lore v. City of Syracuse,
    670 F.3d 127 (2d Cir. 2012)....................................................................................... 9

Malena v. Victoria's Secret Direct, LLC,
    886 F. Supp. 2d 349 (S.D.N.Y. 2012)...................................................................... 16

Martell v. Boardwalk Enters.,
    748 F.2d 740 (2d Cir. 1984)...................................................................................... 22

Martinez v. City of New York,
    2023 WL 4627739 (E.D.N.Y. 2023)........................................................................ 17

Massaro v. Bd. of Educ.,
 774 Fed. Appx. 18 (2d Cir. May 21, 2019) ........................................................ 21

Maxfield v. Sinclair Int'l,
 766 F.2d 788 (3d Cir. 1985) ............................................................................. 22

McCardle v. Haddad,
 131 F.3d 43 (2d Cir. 1997) ................................................................................. 9

McKenzie v. Big Apple Training Inc.,
 2023 WL 4866041, at *8 (S.D.N.Y., 2023) ..................................................... 11

Mohammadi v. Islamic Republic of Iran,
 782 F.3d 9 (D.C. Cir. 2015) ............................................................................. 22

Olaechea v. City of New York,
 2022 U.S. Dist. LEXIS 142037 ................................................................... 15, 24

Patane v. Clark,
 508 F.3d 106 (2d Cir. 2007) ............................................................................. 19

Rasmy v. Marriott International, Inc.,
 952 F.3d 379 (2d Cir. 2020) ............................................................................. 14

S.E.C. v. Ginder,
 752 F.3d 569 (2d Cir. 2014) .................................................................... 2, 10, 11

Santiago v. Crown Heights Center for Nursing and Rehabilitation,
 2017 WL 9482107 (E.D.N.Y., 2017) ............................................................... 25

Sass v. MTA Bus Co.,
 6 F. Supp. 3d 238 (E.D.N.Y. 2014) .................................................................. 25

Scala v. Moore McCormack Lines, Inc.,
 985 F.2d 680 (2d Cir. 1993) ............................................................................. 22

Seivright v. Montefiore Med. Ctr.,
 2014 WL 896744 (S.D.N.Y. Mar. 3, 2014) ...................................................... 11

Soto-Padro v. Public Bldgs. Authority,
 675 F.3d 1 (1st Cir. 2012) ................................................................................ 22

Stern v. State Univ. of N.Y.,
 No. 16-CIV.-5588, 2018 WL 4863588 (E.D.N.Y. Sept. 30, 2018) .................. 11

Tepperwien v. Entergy Nuclear Operations, Inc.,
  663 F.3d 556 (2d Cir. 2011) ................................................................. 11

Tolbert v. Queens Coll.,
  242 F.3d 58 (2d Cir. 2001) .............................................................. 9, 11

Tomka v. Seiler Corp.,
  66 F. 3d 1295(2d Cir. 1995) ................................................................ 15

Triolo v. Nassau Cty,
  24 F.4th 98 (2d Cir. 2022) .................................................................. 11

United States v. City of N.Y.,
  No. 07-CIV.-2067, 2015 WL 1800245 (E.D.N.Y. Apr. 16, 2015) ................................... 25

Vasquez v. Empress Ambulance Service, Inc.,
  835 F.3d 267 (2d Cir. 2016)................................................................. 18

Warmin v. New York City Dep't of Educ.,
  2019 U.S. Dist. LEXIS 125774, 2019 WL 3409900 (S.D.N.Y. 2019)............................ 21

White v. N.H. Dep't of Emp. Sec.,
  455 U.S. 445 (1982)........................................................................ 22

**Rules**

Fed. R. Civ. P. 50 .................................................................... 1, 8, 9, 10, 11, 21

Fed. R. Civ. P. 59 ................................................................................. 22

**Treatises**

11 Charles Alan Wright et al., Federal Practice & Procedure § 2810.1 (3d ed.2012)................. 22

## PRELIMINARY STATEMENT

Defendants' motion is procedurally defective and must be denied out-of-hand. Defendants never raised any of the issues in the instant motion in their previous motion for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure (hereinafter referred to as "Rules" or "Rule") at trial, and are now barred from bringing this motion under Rule 50(b) on these issues.

Even if Defendants were permitted to move forward with their Rule 50(b) motion on the merits, a jury verdict is generally sacrosanct, and there is absolutely no legal or factual basis to overturn it here. A jury verdict cannot be disturbed unless there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. Defendants cannot come close to meeting this extraordinary standard.

In moving for this relief, Defendants omit critical facts most favorable to Dr. Edelman, and fail to draw all favorable inferences in her favor. Further, Defendants engage in revisionist history, rewriting the facts and evidence adduced at trial to view through rose-colored glasses and serve their purposes, notwithstanding the fact that this Court may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury.

Because this court may grant such a motion only when there is either an utter lack of evidence supporting the verdict so that the jury's findings could only have resulted from pure guess-work, or the evidence is so overwhelming that reasonable and fair-minded persons could only have reached the opposite result, Defendants' motion for judgment as a matter of law ("JMOL") must be denied.

As will be evidenced below, Defendants fall far short of this standard, as there exists sufficient evidence in the trial record supporting Plaintiff's position which the jury undoubtedly accepted while rejecting Defendants' proffered evidence.

SJA-867

Similarly, Defendants' motion to alter the judgment must also be denied. Remittitur is only appropriate where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and – more generally – where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error. Here, there exists ample support for the jury's appropriate award of $700,000.00 in light of Plaintiff's inability to be placed in the same position she would have been in if Defendants did not retaliate against her. Accordingly, Defendants' motion must be denied in this respect as well.

## STATEMENT OF FACTS[1]

In 2014, NYU hired Dr. Sari Edelman ("Dr. Edelman" or "Plaintiff") as a rheumatologist with a three (3) year contract that only permitted her to be terminated "for cause."[2] Dr. Edelman did not only meet her contractual performance targets – she exceeded them.[3] NYU renewed Dr. Edelman's contract for another three (3) years for 2017-2020. Joseph Antonik ("Antonik") was a manager[4] at the suite where Dr. Edelman worked.[5] Dr. Edelman had very limited interaction with Antonik prior to September 16, 2019.[6] That night, Antonik came in to Dr. Edelman's office for an unscheduled meeting and said she would be required to share her office, to which Dr. Edelman stated she would have to review her contract to see whether that would be appropriate.[7]

---

[1] The facts are presented in the light most favorable to Dr. Edelman, who is the non-moving party, and all favorable inferences that may be made based on those facts are presented herein. "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" See S.E.C. v. Ginder, 752 F.3d 569, 574 (2d Cir. 2014).

[2] See Plaintiff's Exhibits ("Pl. Exs.") 8 and 9; see also ECF Docket Entry 273-1 ("Tr.") at 82:25-83:15, 904:24-905:12. All exhibits referenced are attached in Declaration of Emanuel Kataev, Esq. ("Kataev Decl.") in numerical order.

[3] Tr. at 905:8-12.

[4] Among other duties, Antonik was responsible for operations at four sites, including Dr. Edelman's site, and reviewing physicians' wRVUs earned to measure their performance. Tr. at 493:1-494:1, 495:11-22.

[5] Tr. at 110:2-5.

[6] Tr. at 110:6-111:1.

[7] Tr. at 111:2-23.

As soon as Dr. Edelman resisted Antonik's directive, his demeanor changed; he moved closer to her and stated words to the effect of:

> you think that because you put this stuff in your office -- Because you put all your stuff here, this doesn't belong to you. This all belongs to NYU. All of it belongs to NYU, this whole office. None of it's yours. We -- we own you

during which time he was pointing at items on Dr. Edelman's desk, flailing his arms, and getting very close to her in an intimidating way[8] such that he completely lost his composure.[9] Dr. Edelman told Antonik he had to leave, whereupon Antonik uttered, under his breath, "bitch" and left.[10] The episode lasted approximately ten minutes.[11]

Dr. Edelman was physically shaken and could not sleep that night.[12] The following morning, Dr. Edelman called Human Resources ("HR") and made a complaint to Kathleen Pacina ("Pacina"), a human resources representative.[13] Dr. Edelman complained about the hostile and abusive behavior by Antonik – including the fact that he called her a bitch – because she did not feel safe stating that she believed his conduct was a sexist, discriminatory, chauvinistic attack that must be addressed by Defendants.[14] Dr. Edelman explained that Antonik's conduct was sexist and chauvinistic because he stated that he owned her and directed her what she was going to do.[15] Dr. Edelman told Pacina all of the foregoing when she made her complaint.[16] Human Resources spoke with Antonik the following day.[17]

---

[8] Antonik was substantially physically larger than Dr. Edelman.  Tr. at 115:3-15.
[9] Tr. at 111:24-113:19, 343:12-17.
[10] Id.; see also Tr. at 345:14-16, 349:23-350:14.
[11] Tr. at 114:9-12.
[12] Tr. at 113:20-114:8.
[13] Id.; see also Tr. at 115:22-116:6, 116:15-118:9.
[14] Id.; see also Tr. at 350:19-351:9, 359:11-16.
[15] Id.
[16] Tr. at 118:7-9.
[17] See Pl. Ex. 55 ("I sent an invite for 1:00 p.m. for you to call us on *Joe's office phone* ... He already escalated to David Kaplan since the doctor asked Enid Papa for ELR's #").

When HR called him, Antonik was fully aware of the incident with Dr. Edelman and knew that that he had, in fact, called her a bitch the day before. Antonik also knew that Dr. Edelman made a complaint against him because, *inter alia*, he called her a bitch. Antonik knew that Dr. Edelman's complaint[18] had nothing to do with office space and was really about the way he spoke to her.[19] Further, just two (2) days after the incident, Kaplan wrote to Joshua Swirnow ("Swirnow") informing him that "Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours."[20] Antonik was bothered by Dr. Edelman's complaint against him.[21] When HR did not inform Dr. Edelman of any updates concerning her complaint, after she was cornered into a meeting with David Kaplan ("Kaplan") concerning the office space issue Antonik previously addressed with her, Dr. Edelman followed up on September 25, 2019 via email absent Antonik's harassment of her because of her sex.[22] Receiving no response as to any action taken to investigate her complaints, Dr. Edelman wrote to Pacina again on November 1, 2019 absent Antonik's sexual harassment.[23]

---

[18] In fact, Antonik was alerted to the fact that Dr. Edelman was going to make a complaint about him before she even complained.  Tr. at 568:7-569:18; see also Pl. Ex. 55.

[19] Tr. at 530:5-10, 570:3-25 (Q. It doesn't say here that it's about the office issue; correct? **A. No.** Q. It says that it's about you; correct? **A. Yes.**"); see also Pl. Ex. 49.

[20] Tr. at 576:6-578:6; see also Defendants' Exhibit ("Def. Ex.") SS.

[21] Tr. at 530:11-13.

[22] Tr. at 118:10-123:19; see also Pl. Ex. 59 ("I am following up on our discussion. … Kaplan requested to speak with me, and he apologized for Joe Antonik's behavior … This was … inappropriate conduct in the workplace … and has not been addressed as HR matter. … he said he would bring it to senior management … which … was done in manner to threaten any opinion I may have on the matter. There was no discussion as to my concerns of the request, it was presented as matter of fact with no regard for my professional opinion or contractual concerns. I consider this form of bullying in the workplace. … On completing my discussion … he took on similar mannerisms of condescending tone, raising his voice to child like manner to placate my disagreement with his request. … I need to be able to work in a non-hostile environment. As of female physician in the organization, I am disappointed that is 2019, approaching 2020 in a major hospital organization in New York, and I still have to contend with male chauvinism. … It remains unclear to my why I am being discriminated against to accommodate another physician, particularly a male physician …, which is the stated reason I will be "pushed" out to another space. … This is the first time in all these years where I feel my growth as a physician is being deliberately infringed on by senior male managers. …").

[23] See Pl. Ex. 52 ("Hi, The harassment complaint was … about treatment by manager using abusive and bullying behavior. … [it] was separate issue about treatment of females within workplace at NYU which is unacceptable …. There was … implicit bias in how I was "managed" and spoken to …. … Smirnow [sic] apologized for how they handled the situation  …. I am an educated female and I will not tolerate this treatment …. I do expect this to be addressed. …").

4

Pacina wrote down notes reflecting Dr. Edelman's discussion with her on September 17, 2019 regarding the events of the day prior, but the notes are dated March 13, 2020.  There were no subsequent notes, and the notes reflect a brief summary of a long conversation Dr. Edelman had with Pacina.[24]  Although Antonik was bothered by Dr. Edelman's complaint against him, Dr. Edelman was under contract with NYU until December 31, 2020 and could not be terminated without cause which NYU conceded did not exist.[25]  However, shortly after Dr. Edelman complained about Antonik's sexist behavior, for the first time in her then five (5) year tenure at NYU, a log was created about "Edelman issues" in November 2019.[26]  This was a little over a month after her late-September 2019 complaint to human resources.

Miriam Ruiz ("Ruiz"), the office manager who reported directly to Antonik, created the log and claimed that she kept logs for other doctors, but Defendants failed to produce any such logs.[27]  After Dr. Edelman's complaint, Antonik also raised clinical concerns about Dr. Edelman (even though he is not a doctor and has no clinical responsibilities) with Dr. Andrew Porges ("Dr. Porges") who, in turn, raised these concerns with Rubin.[28]  Thereafter, on November 6, 2020, Antonik used the contents of the Ruiz log to raise concerns with Dr. Edelman's performance with Kaplan and solicited several other NYU employees to provide him with "clear and convincing" evidence of Dr. Edelman's poor work performance, which ultimately precipitated her termination by Rubin.[29]  Although Defendants sent cryptic emails to each other about the November 6, 2020 email, nobody discussed any of these work issues directly with Dr. Edelman.[30]

---

[24] Tr. at 140:10-142:5; see also Pl. Ex. 21.
[25] Tr. at 810:20-811:13, 821:21-822:25, 904:22-905:4; see also Pl. Ex. 8.
[26] Tr. at 149:16-151:4; see also Pl. Ex. 84.
[27] Tr. at 822:17-19.
[28] Tr. at 498:17-502:20, 504:5-12, 1138:17-24..
[29] Tr. at 161:6-163:8; see also Pl. Exs. 86 and 1.
[30] Tr. at 163:9-164:21; see also Def. Ex. KKK.

5

Moreover, the November 6, 2020 email was drafted by Antonik at the request of Kaplan *after Antonik first made Kaplan aware of purported issues with Dr. Edelman*.[31]  Critically, Antonik did not have the power to terminate Dr. Edelman himself.[32]

On December 1, 2020, NYU terminated Dr. Edelman.[33]  Dr. Edelman subsequently had a conversation with Defendant Andrew Rubin ("Rubin"), who did not state anything about clinical performance concerns nor interpersonal conflicts as the reason for the termination.[34]  Instead, Rubin stated that she was a great doctor but that NYU was "going in a different direction" and offered to help her find a new job.[35]  In fact, on December 4, 2020, Rubin emailed a colleague in Florida about Plaintiff to help her with a job opportunity, and stated in that email that she is a very good doctor.[36]  Dr. Edelman sought to remain in New York following her termination, but was unable to secure a contract despite advancing in interviews.[37]  She ultimately accepted a position in Clearwater, Florida where she earned $300,000.00.[38]   No retirement plan was offered her first year at her new position, and following her anniversary date, Dr. Edelman had a typical 401(k) with no matching.[39]  When she worked for Defendants, Dr. Edelman enjoyed retirement benefits with a ten percent (10%) match by NYU of her salary.[40]  In addition, Dr. Edelman was able to contribute approximately $18,000.00 per year towards her 401(d) retirement account, plus there was a 403(b) retirement account that she had the ability to contribute monies to.[41]

---

[31] Tr. at 498:17-502:20, 504:5-12.
[32] Tr. at 507:5-9.
[33] Tr. at 147:16-148:5; see also Pl. Ex. 7.
[34] Tr. at 148:19-149:15.
[35] Id.; see also Tr. at 148:16-149:7.
[36] See Pl. Ex. 123.
[37] Tr. at 205:19-207:8, 208:22-209:1, 234:4-236:25, 367:14-23.
[38] Tr. at 209:18-210:14.  Dr. Edelman's current salary is $325,000.00, and she earned $330,000.00 in 2022 with bonuses.  Tr. at 218:16-219:1.
[39] Tr. at 210:15-25.
[40] Tr. at 79:20-80:15.  Thus, Dr. Edelman earned $20,700.00 per year in 2015, 2016, and 2017, and $27,800.00 per year in 2018, 2019, and 2020 in retirement benefits directly contributed by NYU.  See Pl. Exs. 8 and 9.
[41] Id.

Similarly, the health insurance plan she obtained in Florida was very expensive such that Dr. Edelman went on her husband's medical plan where she incurred high out-of-pocket expenses and deductibles.[42]   Also, Dr. Edelman enjoyed $3,000.00 in expense reimbursements at NYU which she did not have at her new job in Florida.[43]   Further, whereas Dr. Edelman enjoyed significant salary increases at NYU, she did not receive similar increases in Clearwater, Florida.[44] As such, the trajectory of Dr. Edelman's increases in salary were severely stunted at her new job, and Dr. Edelman was on a path to make less in Florida than she would have earned at NYU but for their unlawful termination of her.

Defendants' unlawful retaliation against Dr. Edelman impacted her life in a profound way.[45]   Despite searching for a position in New York, she was forced to relocate to Florida even though she wanted to remain in New York such that she was effectively exiled.[46]

Jury Verdict

Following the trial, the jury rendered a verdict in favor of Dr. Edelman's retaliation claims on July 19, 2023.[47]   They found that Dr. Edelman engaged in protected activity under Title VII, the NYSHRL, and NYCHRL.[48]   The jury also found that all of the Defendants committed an adverse act against Dr. Edelman because of her protected conduct under Title VII, NYSHRL, and the NYCHRL.[49]   In addition, the jury found that Antonik aided or abetted an adverse act against her because of her protected conduct under the NYSHRL and NYCHRL.[50]

---

[42] Tr. at 211:1-9.
[43] Tr. at 81:17-19.
[44] Tr. at 210:12-14, 218:16-219:1 (indicating $25,000.00 increases in Florida); see also Pl. Exs. 8 and 9 (indicating $71,000.00 increases at NYU).
[45] Tr. at 205:19-206:6.
[46] Id.
[47] See ECF Docket Entry 243.
[48] Id. at 3 § III(8).
[49] Id. at 3 §§ III(9) & V(10).
[50] Id. at 4 § IV(11).

Moreover, the jury found that all the Defendants – except Rubin and Swirnow – were motivated to terminate Dr. Edelman due to her protected activity.[51]  The jury also found that all the Defendants – except Rubin and Swirnow – engaged in conduct reasonably likely to deter a person from engaging in protected activity, and that Antonik aided or abetted conduct that was reasonably likely to deter a person from engaging in protected activity.[52]  Finally, the jury found that Dr. Edelman suffered monetary damages on her retaliation claim for complaining to Human Resources about alleged discrimination and awarded her $700,000.00 in front-pay.[53]  The jury was charged with respect to retaliation and determining damages for retaliation prior to rendering their verdict.[54]  Prior to the jury's verdict, when Plaintiff rested her case-in-chief, Defendants moved for a directed verdict.[55]  The issues raised by the Defendants in the instant motion are not the same issues raised at trial.

## ARGUMENT

### I.      DEFENDANTS RULE 50(b) MOTION SHOULD BE DENIED ON MULTIPLE GROUNDS

### A.      Defendants Failed to Preserve All of Their Instant 50(b) Arguments Because They Failed to Raise Them in Their Rule 50(a) Motion During Trial

Defendants did not raise Antonik's alleged lack of knowledge of protected activity, Antonik's lack of participation in Plaintiff's termination, or that NYU acted non-negligently in relying on information provided by Antonik when terminating Dr. Edelman in  their motion for a directed verdict pursuant to Rule 50(a) at trial.  As such, Defendants are now barred from raising these issues in the instant Rule 50(b) motion.

---

[51] Id. at 4 § V(12).
[52] Id. at 5 §§ V(13) and V(14).
[53] Id. at 6-7 §§ VII(B)(17) and VII(B)(18).
[54] Tr. at 1421:11-1480:4; see also Kataev Decl. ¶ 19 (quoting relevant portions of charge).  Crucially, Defendants did not object to these jury instructions.  Tr. at 243:4-283:7, 1332:3-1339:14, 1419:18-1421:9 (charging conferences).
[55] Tr. at 1301:9-1304:15, 1308:7-1309:1 (quoting the relevant portions of Defendants' motion for a directed verdict).

"A post-trial Rule 50(b) motion for [JMOL] is properly made only if a Rule 50(a) motion for [JMOL] has been made before submission of the case to the jury."[56]   In an initial motion for judgment on the law, the moving party "must specify the judgment sought and the law and facts that entitle the movant to the judgment."[57]  "[T]he specificity requirement is obligatory."[58]

A Rule 50(a) motion "must at least identify the *specific element* that the defendant contends is insufficiently supported."[59]  "The rationale is that the motion must be sufficient to inform the opposing party of the precise issue as to which more evidence is needed in order to warrant its submission to the jury."[60]  "A post-trial motion for [JMOL] 'is limited to those grounds that were "specifically raised in the prior motion for [JMOL]."'"[61]  "A Rule 50(a) motion requesting [JMOL] on one ground but omitting another is insufficient to preserve a [JMOL] argument based on the latter."[62]  "The law is pellucid that a party's failure to move under Rule 50(a) has consequences. If that party later moves under Rule 50(b), the standard for granting [JMOL] is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice."[63]  In this Rule 50(b) motion, Defendants argue there was insufficient evidence that: (i) Antonik had knowledge of Plaintiff's protected activity prior to NYU's non-renewal of Plaintiff's employment; (ii) Antonik actually participated in the termination of Plaintiff's employment; and (iii) NYU acted negligently in any reliance on information provided by Antonik.

---

[56] See Bracey v. Bd. of Educ. of City of Bridgeport, 368 F.3d 108, 117 (2d Cir. 2004).
[57] See Fed. R. Civ. P. 50(a)(2).
[58] See Lore v. City of Syracuse, 670 F.3d 127, 152 (2d Cir. 2012) (citation omitted).
[59] See Tolbert v. Queens Coll., 242 F.3d 58, 76 (2d Cir. 2001) (emphasis added).
[60] Id. at 76–77.
[61] See AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec. LLC, 646 F. Supp. 2d 385, 408 (S.D.N.Y. 2009), aff'd, 386 Fed. Appx. 5 (2d Cir. 2010) (quoting McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir. 1997)).
[62] See Lore, 670 F.3d at 152-53; see also Barkley v. Olympia Mortg. Co., 557 F. App'x 22, 27 (2d Cir. 2014) (summary order) ("A post-verdict motion for JMOL under Fed. R. Civ. P. 50(b) must be premised on grounds specified in a Rule 50(a) motion made prior to the submission of the case to the jury").
[63] See ING Glob. v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 97 (2d Cir. 2014) ("Manifest injustice exists where a jury's verdict is wholly without legal support").

This is different from their Rule 50(a) motion.  In fact, Defendants failed to raise any of the three (3) current issues in their motion for a directed verdict pursuant to Rule 50(a) at trial.[64] These arguments made in support of Defendants' motion for a directed verdict are simply not the same arguments made here. Indeed, at trial, Defendants did not argue any lack of awareness of Dr. Edelman's protected activity by Antonik.  There is absolutely no evidence of such an argument in the record.  Similarly, Defendants did not argue at trial that Antonik did not participate in the retaliatory conduct, only that Rubin was the decision-maker.  Finally, Defendants failed to argue at trial that NYU was not negligent in relying on the information provided by Antonik or in its investigation leading to Dr. Edelman's termination.  Because Defendants did not raise these arguments at trial, this Court may not consider them in their Rule 50(b) motion.[65]

**B.    Defendants Failed to Establish that There was an Insufficient Evidentiary Basis for Finding that Defendants, Antonik, and NYU Retaliated Against Dr. Edelman.  As Such, the Jury's Verdict on Plaintiff's Retaliation Claim Must Not be Disturbed.**

Legal Standard

Assuming *arguendo* Defendants complied with Rule 50(a), their burden on a Rule 50(b) motion for JMOL is "*particularly heavy*" when the "jury has deliberated in the case and actually returned its verdict."[66]  JMOL may only be granted if it "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party."[67]  "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'"[68]

---

[64] Instead, Defendants argued under Rule 50(a) at trial only the following relevant arguments: (i) there was no protected activity; (ii) any alleged protected activity did not cause an adverse employment action; (iii) Antonik did not retaliate because all he did was forward some emails upon the request of others. Tr. at 1298:3-1331:19. These arguments simply do not mirror the arguments Defendants now attempt to improperly raise under Rule 50(b).
[65] See Barkley v. Olympia Mortg. Co., 557 Fed. Appx. 22, 27 (2d Cir. 2014) (summary order).
[66] See Cross v. N.Y.C. Trans. Auth., 417 F.3d 241, 248 (2d Cir. 2005) (emphasis added).
[67] See Fed. R. Civ. P. 50(a)(1).
[68] See Ginder, 752 F.3d at 574 (quoting Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012)).

"A Rule 50 motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of *sheer surmise and conjecture*, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'"[69] "'The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury,' and 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'"[70]   As will be demonstrated below, Defendants fail to meet the extremely high standard under Rule 50(b) necessary to overturn the jury's verdict of Dr. Edelman's retaliation claim and their motion must be denied.

     i.    Defendants Failed to Establish an Absence of Evidence that Antonik Had Knowledge of Plaintiff's Protected Activity

In order to establish that an individual defendant had knowledge of protected activity, a plaintiff must show that the individual defendant *was aware* of the plaintiffs' protected activity.[71]

In their motion, Defendants failed to demonstrate the complete absence of evidence in the trial record about Antonik's lack of knowledge of protected activity needed to overturn the jury's verdict under Rule 50.   In fact, the trial record is replete with evidence and reasonable inferences the jury could easily make that Antonik had knowledge of Dr. Edelman's protected activity.   In support, Defendants rely on Krasner v. HSH Nordbank AG[72] to argue that lack of knowledge of protected activity requires dismissal retaliation claim.   But Krasner involved a plaintiff who never previously complained about discrimination, which is easily distinguishable from the facts here.

---

[69] Id. (emphasis added) (quoting Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011)); see also Triolo v. Nassau Cty, 24 F.4th 98, 105 (2d Cir. 2022).

[70] See ING Glob., 757 F.3d at 97 (citation omitted); see also Deloreto v. Karengekis, 104 Fed. Appx. 765, 767 (2d Cir. 2004) (summary order) (quoting Tolbert, 242 F.3d at 70).

[71] See Stern v. State Univ. of N.Y., No. 16-CIV.-5588, 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018) (emphasis added); see also Cardwell v. Davis Polk & Wardwell LLP, 2023 WL 2049800, at *32 (S.D.N.Y., 2023).

[72] See 680 F. Supp. 2d 502, 521 (S.D.N.Y. 2010); Seivright v. Montefiore Med. Ctr., 2014 WL 896744, at *12 (S.D.N.Y. Mar. 3, 2014); McKenzie v. Big Apple Training Inc., 2023 WL 4866041, at *8 (S.D.N.Y., 2023).

Here, based on the facts in the trial record most favorable to Plaintiff and drawing all reasonable inferences in her favor, the jury could reasonably infer that Antonik knew about Dr. Edelman's protected activity, because – unlike the plaintiff in Krasner – she unquestionably complained about harassment based on her sex.  The record is rife with ample evidence for the jury to reasonably infer that Antonik knew about her complaint to HR about his conduct.

*First*, during the September 16, 2019 incident in her office, Antonik called Dr. Edelman a bitch, yelled at her, and physically tried to intimidate her because of her sex.  Antonik did all of this and was well aware of his conduct against Dr. Edelman.  The jury could reasonably infer that Antonik understood that his conduct was sexist and that calling Dr. Edelman a bitch could be construed by Dr. Edelman as harassment based on her sex.

*Second*, the very next day, even before Dr. Edelman complained to HR, Antonik escalated the incident by reporting it to his superiors.[73]  Based on his own reporting, the jury could reasonably infer that he escalated the situation because he realized that he acted unlawfully, that calling Dr. Edelman a bitch was discriminatory and harassing, and wanted to get ahead of any fallout that might result for what he anticipated would be a complaint from Dr. Edelman given that the incident ended with Dr. Edelman kicking Antonik out of her office due to his conduct.

*Third*, on September 17, 2023 (the same day Antonik escalated the issue), he received a call from HR about the incident with Dr. Edelman.[74]  Pacina said that she discussed the incident with Antonik.  It is reasonable for the jury to infer that Pacina, as an experienced HR manager, fully informed Antonik about Dr. Edelman's complaint, including that he called her a bitch and that Dr. Edelman complained that Antonik acted in a demeaning and harassing manner because of her sex.

---

[73] Tr. at 568:7-569:18; see also Pl. Ex. 55.
[74] Tr. at 523:11-524:24.

Thus, it is reasonable for the jury to determine that Pacina fully and completely informed Antonik of the charges against him so that he, in turn, could fully respond.  As a result, by that point in time, again, the jury could reasonably infer that Antonik was aware of Dr. Edelman's protected activity.  Moreover, although neither Antonik nor Pacina recall their conversations with each other,[75] the jury could easily find that Pacina told Antonik about Dr. Edelman's harassment complaint because she called him right after speaking to Dr. Edelman as the complaint was fresh in Pacina's mind.

*Fourth*, Antonik even admitted that he understood Dr. Edelman's complaint was not about office space but rather about him and his sexist conduct against Dr. Edelman – another inference of Antonik's knowledge of Dr. Edelman's protected activity.[76]

*Fifth*, Antonik admitted that he was bothered by Dr. Edelman's complaint against him.  A jury could reasonably infer that he was bothered because he knew that Dr. Edelman had logged a discrimination and harassment complaint against him.  In contrast, a jury could reasonably infer that Antonik would not have been bothered if the dispute was just about "office space."

*Sixth*, just two (2) days after the incident, Kaplan wrote to Swirnow informing him that "Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours."[77]  As the director of Antonik, and someone who works closely with him, it is reasonable for the jury to infer that Kaplan shared the contents of this email with Antonik such that Antonik was aware of the complaint against him for being aggressive which included calling Dr. Edelman a bitch, demonstrating his awareness of her protected activity.

---

[75] Tr. at 523:19-524:1, 1100:4-5, 1108:12-15.
[76] Tr. at 530:5-10, 570:3-25 (Q. It doesn't say here that it's about the office issue; correct? **A. No.** Q. It says that it's about you; correct? **A. Yes.**"); see also Pl. Ex. 49.
[77] Tr. at 576:6-578:6; see also Def. Ex. SS.

*Seventh*, when Dr. Edelman's complaint was not resolved, she continuously followed up with HR over the status of her complaint and further highlighted the harassment stating that there was "inappropriate conduct" in the workplace, that she considered this "bullying" in the workplace, she needed to be able to work in a "non-hostile environment," and disappointment that she had to contend with "male chauvinism." It is also reasonable for the jury to infer that HR followed up with Antonik about Dr. Edelman's subsequent emails as part of NYU's investigation which again would have made Antonik aware of her protected activity.

*Lastly*, Antonik's subsequent adverse actions against Dr. Edelman after her complaint (especially in the absence of any such actions prior thereto) such as: (i) not allowing Dr. Edelman to expand her hours; (ii) the "Edelman issues" log appearing from Antonik's subordinate shortly after her complaint; and (iii) his November 6, 2020 email coordinating and encouraging her fellow employees to provide negative feedback about Dr. Edelman could lead the jury to reasonably infer that Antonik had a retaliatory animus against Dr. Edelman, not because of an office dispute, but because Dr. Edelman accused Antonik of discrimination and harassment. Further, Antonik's November 2020 emails provide sufficient circumstantial evidence that he had a retaliatory animus towards Dr. Edelman due to the complaint she filed against him.[78] Based on all of the above, the jury could therefore reasonably infer that, because Antonik was upset by Dr. Edelman's complaint, he instigated "concerns" about her to get her fired.

---

[78] Tr. at 500:1-6; see also Pl. Ex. 86 ("we need a clear, convincing summary with examples sent"); see also Edelman v. NYU Langone Health System, 2022 WL 4537972, at *11 (S.D.N.Y. 2022) ("While the lapse of a bit more than one year is longer than a typical temporal-proximity case, Plaintiff was not an at-will employee, and her conduct did not fit into any of the narrow categories of cause for which she could be fired immediately. Defendants began making a record of purportedly non-discriminatory reasons to discharge Plaintiff within weeks after she made her discrimination complaint and then fired her at the first opportunity, when her contract came up for renewal. Under those circumstances, the temporal proximity between Plaintiff's protected activity and her firing is sufficient to raise an inference of causation at the first step") (quoting Rasmy v. Marriott International, Inc., 952 F.3d 379, 391 (2d Cir. 2020) ("Questions regarding the time gap and causal connection of an alleged retaliatory termination may entail special consideration of the size and complexity of a defendant employer, where termination of employment may involve multiple layers of decisionmakers....").

For all the foregoing reasons, there was ample evidence and a plethora of reasonable inferences drawn by the jury that Antonik was well aware of Dr. Edelman's protected activity, and the jury's verdict was not the product of sheer surmise and conjecture needed to grant Defendants' Rule 50(b) motion.

> ii.   Defendants Failed to Establish an Absence of Evidence that Antonik Participated in the Adverse Employment Action Against Plaintiff

Defendants argue that Antonik did not participate in the process that led to Dr. Edelman's termination. They rely on <u>Olaechea v. City of New York</u>[79] for the proposition that an individual defendant must participate in the adverse employment action and have a retaliatory intent. But <u>Olaechea</u> is inapposite since the individual defendant consistently disavowed knowledge of the plaintiff's protected activity in that case, and the plaintiff was only able to adduce evidence that the court found was circumstantial. Here, and as set forth below, Defendants' argument is not supported by the trial record which contains evidence that Antonik knew about Dr. Edelman's complaint and that it was not just about office space.

Under the NYSHRL, any co-worker who actually participates in the conduct giving rise to a discrimination claim is liable under the NYSHRL even if that co-worker lacks authority to hire or fire the plaintiff.[80] In <u>Feingold</u>, the plaintiff proffered evidence that the individual defendants actually participated in conduct that gave rise to Plaintiff's discrimination claims and the supervisor made no efforts to remedy the behavior (despite awareness), and terminated the employment for impermissible factors. <u>Id.</u>

---

[79] <u>See</u> 2022 U.S. Dist. LEXIS 142037, *14.

[80] <u>See</u> <u>Feingold v. New York</u>, 366 F.3d 138, 158 (2d Cir. 2004); <u>see also</u> <u>Tomka v. Seiler Corp.</u>, 66 F. 3d 1295, 1317 (2d Cir. 1995). The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL applies to claims under the NYCHRL because the language of the two laws is virtually identical. <u>See</u> <u>Dunson v. Tri-Maintenance & Contractors, Inc.</u>, 171 F. Supp. 2d 103, 113-114 (E.D.N.Y. 2001); <u>see also</u> <u>Kato v. Ishihara</u>, 239 F. Supp. 2d 359, 365 (S.D.N.Y. 2002).

Specifically, the Second Circuit found in <u>Feingold</u> that defendants Lee–Sang, Tapia, and Waltrous all participated in creating a hostile work environment, (b) that Waltrous and Isaacs assigned him a disproportionate workload because of his race, and (c) that Sullivan and Schulgasser not only took no action to remedy such behavior although they were aware of it, but also terminated Feingold's employment on the basis of impermissible factors.[81]

This case is similar to <u>Feingold</u>, where: (i) Antonik – like Lee-Sang, Tapia, Waltrous, and Isaacs – engaged in discriminatory behavior by calling Dr. Edelman a bitch, then having a log created and soliciting others for negative feedback on Dr. Edelman which paved the way to retaliate against her by having her terminated; (ii) Rubin – like Sullivan and Schulgasser – not only took no action to remedy Antonik's behavior despite their awareness of it but instead terminated Dr. Edelman without performing a proper, independent investigation.

Crucially, under both the NYSHRL and the NYCHRL, the individual must have actually participated in the conduct that would reasonably deter a person from engaging in protected activity and and the NYCHRL provides "a broader basis for direct individual liability than" the NYSHRL, in that it permits liability regardless of the individual's decision-making power.[82]  In other words, it is irrelevant that Antonik had no decision-making authority over Dr. Edelman's employment at NYU.  Antonik's concerted action could reasonably have played an important role in her termination by having logs prepared, raising concerns with Kaplan and Dr. Porges, and encouraging others to pile on to Dr. Edelman.  This is more than enough to constitute "participation" under the NYSHRL and NYCHRL.  Indeed, Antonik was the catalyst and primary actor behind Dr. Edelman's termination,  and admitted that he was the first to complain about her.[83]

---

[81] <u>Id.</u>
[82] <u>See</u> <u>Fitchett v. City of New York</u>, 2021 WL 964972, at *8 (S.D.N.Y. 2021) (<u>citing</u> <u>Malena v. Victoria's Secret Direct, LLC</u>, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012).
[83] <u>Tr.</u> at 498:17-502:20, 504:5-12.

In addition, the jury could also reasonably infer that Antonik directed Ruiz, a subordinate, to create a log of "issues" for Dr. Edelman shortly after her complaint against him.[84]

Thereafter, Antonik raised clinical concerns about Dr. Edelman to Dr. Porges and Kaplan, even though it was not Antonik's job to do so. The creation of the log would be sufficient participation in that a reasonable person may be deterred from engaging in protected activity if they knew that a log would be created to document that their "alleged" work deficiencies.

After he raised these concerns, Antonik compiled and editorialized notes from the log and solicited others on his own to provide him with "clear and convincing" examples of Plaintiff's poor performance so that he could get this information to someone in a position to terminate Dr. Edelman. In short, Antonik instigated and targeted Dr. Edelman (and Dr. Edelman alone), and led a campaign against her that ultimately led to her termination.[85] Again, this type of solicitation of co-workers would reasonably deter someone from engaging in protected activity. Antonik's level of involvement constitutes participation under the NYSHRL and NYCHRL; without it, Dr. Edelman would not have been fired.[86] As such, Antonik sufficiently participated in Dr. Edelman's termination to hold him liable for retaliation as the jury concluded.

---

[84] Defendants' argument that there was no evidence Antonik directed Ruiz to log issues concerning Dr. Edelman following her complaint against Antonik is similarly non-sensical. Ruiz's log virtually matches Antonik's November 6, 2020 email in content and the log begins within two (2) months of Dr. Edelman's complaint against Antonik despite the fact Dr. Edelman has worked at NYU since December 2014 and Ruiz commenced employment with NYU many years earlier. Tr. at 77:16-78:1, 807:1-2.   The jury could reasonably infer that Antonik, as Ruiz's supervisor, was involved in the logs against Dr. Edelman.

[85] Further, it is evident that the jury rejected Antonik's testimony in its entirety in rendering the verdict. To the extent the jury did so, they were able to reject his entire testimony based on his lack of credibility. Tr. at 1436:17-1437:3 (charging jury that they "are not required to believe an interested witness" and that they "may accept as much of the witness's testimony as [they] deem reliable and reject as much as [they] deem unworthy of acceptance"); see also Martinez v. City of New York, 2023 WL 4627739, at *10 (E.D.N.Y. 2023) ("the jury was, of course, free to credit Plaintiff's own testimony and that of her expert witnesses and reject Defendants'").

[86] Defendants' argument that Antonik did not have any conversations about Dr. Edelman with Rubin or Swirnow is also unsupported by the trial record. Antonik met with Rubin and Swirnow on a monthly basis at their office in Manhattan, and Antonik admitted that the directives concerning office space came from Rubin and Swirnow, such that they would be kept informed about all developments concerning same. Tr. at 512:25-513:24, 512:10-18.

Finally, it bears emphasis that Antonik not only collected evidence from Ruiz concerning Dr. Edelman, but he editorialized them despite the fact he did not witness nor have first-hand knowledge of any of the items in Ruiz's log.[87] The jury could also conclude that Antonik participated in the process that led to Dr. Edelman's termination when he engaged and solicited others to provide "clear and convincing" evidence of "issues" with Dr. Edelman and did so with a retaliatory animus as there was no evidence presented that he did this for any other physician and Ruiz's log begins shortly after Dr. Edelman first complained about Antonik.

Based on the above, the jury could easily find that Antonik unquestionably instigated and directly participated in retaliating against Dr. Edelman for engaging in protected activity which ultimately led to her termination.

    iii.    Defendants Failed to Establish an Absence of Evidence that NYU Acted Negligently in Relying on the Information Provided by Antonik

Contrary to Defendants' argument, the trial record reflects ample evidence that NYU acted negligently in relying on the information provided by Antonik. Defendants rely on Kregler v. City of New York[88] to support the argument that they were not negligent in relying on the information provided by Antonik, but that case is inapposite. In Kregler, the individual who provided information to have the plaintiff there terminated had no knowledge of the plaintiff's complaint, whereas here, Antonik, Kaplan, and Dr. Porges were all aware of Dr. Edelman's complaint against Antonik.

---

[87] Compare Pl. Exs. 84 (Ruiz log) with 86 (Antonik email) with 1 (Dr. Porges email); see also Tr. at 504:13-16, 504:24-505:1, 505:14-16, 579:9-18, 580:23-581:3.
[88] See 987 F. Supp. 2d 357, 369 (S.D.N.Y. 2013).

In <u>Vasquez v. Empress Ambulance Service, Inc.</u>, the Second Circuit has held that an employer may be liable under Title VII when, through its own negligence, the employer gives effect to the retaliatory intent of one of its—even low-level—employees.[89]

The circumstances in <u>Vasquez</u> are virtually identical to those here. Like the plaintiff in <u>Vasquez</u>, Dr. Edelman complained about gender discrimination. Antonik learned about the complaint and offered information to NYU for the purpose of terminating Dr. Edelman. Like the employer in <u>Vasquez</u>, NYU relied on Antonik's information and negligently chose to credit only his account[90] without getting Dr. Edelman's side of the story and without performing a proper investigation.

Indeed, while Defendants argue that NYU did not act negligently in relying on what were ultimately Antonik's complaints against Dr. Edelman that came to NYU by and through Kaplan, Dr. Porges, and Dr. Goldberg, the jury had an ample basis to reject this testimony for several reasons. As an initial matter, there is no dispute that NYU had corporate knowledge of Dr. Edelman's complaint against Antonik.[91] As such, NYU should have questioned and investigated Antonik's claims knowing that he had a possible retaliatory motive to act against Dr. Edelman. As such, NYU should not have taken Antonik's complaints as gospel, but should have instead viewed the allegations with a jaundiced eye.

---

[89] <u>See</u> 835 F.3d 267, 273-74 (2d Cir. 2016) ("an employer can be held liable under Title VII if: the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation").

[90] While NYU sought accounts from Drs. Porges and Goldberg, the trial record establishes that: (i) Antonik came to Dr. Porges with the clinical concerns, which he claims to have investigated but failed to provide any evidence in support of any such investigation; and (ii) Dr. Goldberg only provided his opinion after Dr. Edelman was already terminated. Viewed in a light most favorable to Dr. Edelman, this "investigation" was not enough.

[91] <u>See</u> <u>Patane v. Clark</u>, 508 F.3d 106, 115 (2d Cir. 2007).

Critically, Defendants' myopic focus on the alleged clinical concerns ignore the fact that the jury squarely rejected Defendants' proffered reason for Dr. Edelman's termination as pretextual in light of the plethora of evidence that she was an amazing doctor who met all of her performance targets.[92]  Indeed, the evidence adduced at trial shows that Dr. Edelman was qualified, met all of her performance metrics, was not written up or disciplined in any way, and had a large following of loyal patients.  It is therefore obvious that her termination had nothing to do with her performance.  There is ample evidence and reasonable inferences the jury could draw to support its finding that NYU acted negligently in giving effect to Antonik's retaliatory intent.  Because NYU knew about Dr. Edelman's complaint against Antonik, it should have verified the concerns raised independently and failed to do so in numerous ways.

*First*, Defendants failed to discuss their alleged concerns with Dr. Edelman.[93]  The *sine qua non* to any reasoned determination is to hear from both sides in order to make an appropriate determination.  Defendants concede that they *never* discussed any of these serious concerns with Dr. Edelman, which support the reasonable inference the jury drew: the concerns were pretextual and NYU acted negligently.

*Second*, Defendants did not offer any evidence at trial supporting the clinical concerns.  For example, Dr. Porges testified that Dr. Edelman ordered way too many labs and x-rays.  Yet, NYU failed to even identify the number of labs and x-rays that Plaintiff performed other than stating that it was "too many" which the jury could have easily found unpersuasive.  Further, Defendants failed to produce any evidence concerning any comparison with the other rheumatologists with respect to labs and x-rays ordered.

---

[92] See Pl. Ex. 93.  As such, there was not an absence of evidence for the jury to be unable to infer that Antonik discussed Dr. Edelman's complaint with Swirnow and/or Rubin. See Pl. Ex. 62 (referencing the fact that leadership – i.e., Rubin and/or Swirnow – had to be notified about Dr. Edelman's complaint).
[93] See, e.g., Tr. at 825:23-24.

Dr. Porges even conceded that it was at times necessary to order many labs.[94]  Again, this was negligent on the part of NYU.  Moreover, Defendants claim that Dr. Edelman's clinical performance was not up to NYU's standards, but failed to present any evidence at trial as to what those standards are.  As such, it was reasonable for the jury to conclude that this purported reason for Dr. Edelman's termination was pretextual and not worthy of belief.

*Third*, Defendants failed to follow protocol concerning patient care issues to the extent they existed.  NYU did not report Dr. Edelman's conduct to the compliance department or the Office of Professional Medical Conduct, nor did they remove Dr. Edelman from NYU to avoid the risk of any other alleged patient care issues.

*Fourth*, NYU kept Dr. Edelman employed as a physician for six (6) months after learning that of her alleged clinical concerns.  The jury could have reasonably inferred that if there were actual clinical concerns, Defendants would not have permitted to remain employed for six (6) additional months to avoid any risk to patients.

*Lastly*, there was no evidence offered of any interpersonal conflicts other than two isolated instances in November 2019 and March 2020, both of which were after Dr. Edelman's complaint against Antonik.  Without such conduct, the jury could reasonably infer that the Plaintiff's alleged conflicts with staff did not merit termination.   It also bears emphasis that Dr. Edelman began working for NYU in November 2014 and had no issues with her employment for six (6) years.  With these complaints suddenly surfacing, it was reasonable for the jury to infer they were raised as a pretext for retaliation.  Where an employer offers different reasons for termination, pretext is inferred.[95]

---

[94] Tr. at 1144:12-18.
[95] See EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994).

SJA-887

In <u>Warmin v. New York City Dep't of Educ.</u>,[96] the court held, and cited cases in support of the holding, that:

> [C]ausal connection may still be inferred where longer periods of time separate a protected activity and adverse action, if it is plausible that there was no earlier opportunity to retaliate in the manner alleged.[97] ... In this case, Warmin has alleged that the DOE acted to block his employment at its first opportunity, when he was nominated for a job in 2016. These facts support a reasonable inference of causal connection under the law of the Second Circuit.

Viewing the facts in this light most favorable to Dr. Edelman, as required on a Rule 50(b) motion, it is reasonable for the jury to infer that that Defendants engaged in after-the-fact justifications for their decision to terminate Dr. Edelman, which was obviously based on her decision to pursue a complaint against Antonik and that NYU was negligent in reaching its decision to terminate Dr. Edelman.

Their decision was a *fait accompli*, and NYU was negligent in giving effect to Antonik's complaints about Dr. Edelman.

## II.   THE COURT SHOULD DENY DEFENDANTS' MOTION FOR REMITTITUR OF THE JURY'S FRONT PAY AWARD

### A.   Legal Standard

Rule 59 allows a district court "to alter or amend a judgment."[98]  This rule "enables a party to request that a district court reconsider a just-issued judgment."[99]

---

[96] <u>See</u> 2019 U.S. Dist. LEXIS 125774, *23-24, 2019 WL 3409900 (S.D.N.Y. 2019)

[97] <u>See</u> <u>Grant v. Bethlehem Steel</u>, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding that plaintiff established causal connection despite an eight-month lapse in time when the defendant was unable to retaliate in the manner alleged any sooner); <u>see also</u> <u>Massaro v. Bd. of Educ.</u>, 774 Fed. Appx. 18 (2d Cir. May 21, 2019) (summary order) (finding causal connection where a school retaliated against an employee at its earliest opportunity, after summer break had concluded); <u>Blanco v. Brogan</u>, 620 F. Supp. 2d 546, 557 (S.D.N.Y. 2009) (collecting cases for proposition that "[t]he Second Circuit and the Courts of this District have found a causal connection" where a defendant retaliated at its first opportunity, even where action was up to 13 months removed from the protected activity).

[98] <u>See</u> Fed. R. Civ. P. 59(e).

[99] <u>See</u> <u>Banister v. Davis</u>, 140 S. Ct. 1698, 1703 (2020).

The rule "gives a district court the chance 'to rectify its own mistakes in the period immediately following' its decision."[100] Critically, "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly."[101] "In reviewing a claim that the jury awarded excessive damages, we view the evidence and draw all factual inferences in favor of the [non-moving party], and we accord substantial deference to the jury's determination of factual issues."[102] Front pay compensates employees for the diminution in expected earnings for as long as the injury from the discrimination is expected to affect their job prospects.[103] Front pay is a form of equitable relief.[104] By its nature, front pay is not a fixed, precise amount; calculating front pay necessarily implicates predictions and assumptions about the future.[105] Courts include sums that compensate employees for lost earnings and benefits in fashioning front pay awards, including employer contributions toward benefits and net lost pension benefits.[106]

**B.     The Jury's Front Pay Award of $700,000.00 Should Not be Disturbed**

Defendants' argue that the jury's $700,000.00 verdict is not supported by the record and unduly speculative. However, there is more than sufficient evidence with which the jury could have rendered its conclusion. As an initial matter, front pay awards may be sustained if they are based on instructions to "apply sound judgment [and] common sense in reaching the proper amount of damages" and that "there must be evidence to establish damages."[107]

---

[100] Id. (quoting White v. N.H. Dep't of Emp. Sec., 455 U.S. 445, 450 (1982)).
[101] See Mohammadi v. Islamic Republic of Iran, 782 F.3d 9, 17 (D.C. Cir. 2015) (citing 11 Charles Alan Wright et al., Federal Practice & Procedure § 2810.1 (3d ed.2012)); see also Soto-Padro v. Public Bldgs. Authority, 675 F.3d 1, 9 (1st Cir. 2012) ("Given all this, it is exceedingly difficult for a litigant to win a Rule 59(e) motion").
[102] See Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 683 (2d Cir. 1993) (internal quotation marks and citations omitted) (citing Martell v. Boardwalk Enters., 748 F.2d 740, 750 (2d Cir. 1984)).
[103] See Maxfield v. Sinclair Int'l, 766 F.2d 788, 795-97 (3d Cir. 1985)).
[104] See Hayes v. SkyWest Airlines, Inc., 12 F.4th 1186, 1205 (10th Cir. 2021).
[105] Id.
[106] See Hartley v. Dillard's, Inc., 310 F.3d 1054, 1063 (8th Cir. 2002); see also Blum v. Witco Chem. Corp., 829 F.2d 367, 373-74 (3d Cir. 1987)).
[107] See Broadnax v. City of New Haven, 141 Fed. Appx. 18, 23 (2d Cir. 2005).

District courts in this Circuit have interpreted Broadnax to stand for the proposition that, as long as a court instructs a jury to tether its damages award to lost compensation, a front pay award is proper. Notwithstanding, Defendants rely on Olaechea for the proposition that front pay awarded based on speculation should be subject to remittitur. However, that court vacated the front pay award because there was *no evidence* the plaintiff there made any effort to mitigate her damages. Here, the trial record contains extensive evidence of Dr. Edelman's mitigation efforts.[108]

Moreover, Dr. Edelman clearly sought as front pay her lost retirement benefits, medical benefits, and expense reimbursements, among other benefits. Further, there is no basis to conclude that the jury's $700,000.00 award was excessive. The evidence adduced at trial shows that Dr. Edelman would have had a successful career at NYU were it not for Defendants' retaliatory conduct. She always met or exceeded her wRVU targets, and hence would have enjoyed increases in pay as a result of same. Indeed, the trajectory of the increases in her compensation – from $207,000.00 (2014-2017) to $278,000.00 (2018-2021) – suggests a similar large increase in 2021 but for Defendants' unlawful retaliation against her. Indeed, because Dr. Edelman received an approximately thirty-five percent (35%) increase in salary following her first renewal at NYU, it would be reasonable for the jury to conclude that she could have received a similar increase for her second renewal, i.e., $375,300.00 which would justify the jury's proper front pay award.[109]

Further, it is undisputed that the benefits at Dr. Edelman's new practice in Florida pale in comparison to that of NYU's in every respect. Dr. Edelman lost those benefits upon being unlawfully terminated. This is especially true of retirement benefits, given their tax advantages and expected rates of return over the course of many years, and courts routinely award such

---

[108] Tr. 145:5-14; see also Pl. Ex. 88.
[109] Dr. Edelman's renewed contract does not state a basis for the increase which the jury could reasonably infer was a merit increase.

benefits as part of a plaintiff's Title VII damages on the basis that such relief is "necessary to fulfill the court's duty to remedy the Defendants' proven past wrongs."[110]  Courts have also awarded retirement benefits as part of a plaintiff's NYSHRL and NYCHRL damages.[111]  Here, Dr. Edelman lost health benefits and related benefits that the jury could reasonably have inferred the value of based on their common sense and life experiences.[112]  In addition, the jury was instructed that front pay awards may be issued towards some unfixed future point in time.[113]  Defendants did not object to this language, and it was reasonable for the jury to infer the value of Dr. Edelman's benefits at NYU totaled $700,000.00 based on what she could have expected to earn there over the course of her long career at NYU had she not been unlawfully terminated.  Because, "in all cases, juries are presumed to follow the court's instructions,"[114] the jury in this case is presumed to have found that Dr. Edelman lost $700,000.00 in wages and benefits if she was not retaliated against for engaging in protected activity.[115]

Defendants also argue without any legal support that Dr. Edelman's front pay award should be reduced due to her Rule 26 disclosures.  However, as the court aptly noted to the jury, front pay is for lost compensation "even if difficult to calculate" and "[a]ny uncertainty about the amount of lost compensation to be awarded to Dr. Edelman should be resolved in her favor." Moreover, front pay is awarded for compensation *after* the jury verdict for *future* lost compensation which would be difficult to predict and impossible to calculate in Rule 26 disclosures.  Accordingly, Defendants' argument is meritless.  As such, there is no basis to reduce front pay award here.

---

[110] See Santiago v. Crown Heights Center for Nursing and Rehabilitation, 2017 WL 9482107, at *20 (E.D.N.Y., 2017) (citing United States v. City of N.Y., No. 07-CIV-2067, 2015 WL 1800245, at *7 (E.D.N.Y. Apr. 16, 2015)).
[111] See Sass v. MTA Bus Co., 6 F. Supp. 3d 238, 258 (E.D.N.Y. 2014) (ordering defendant to provide contributions to plaintiff's retirement plan as part of plaintiff's damages awarded under the NYCHRL).
[112] See https://www.kff.org/report-section/ehbs-2022-section-1-cost-of-health-insurance/ ("The average annual premiums in 2022 are … $22,463 for family coverage").
[113] Tr. at 1473:15-1474:2.
[114] See CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009)
[115] See KT Group Limited v. NCR Corporation, 412 F.Supp.3d 305, 327 (S.D.N.Y. 2019).

SJA-891

**<u>CONCLUSION</u>**

Based on the foregoing, Defendants' motion for judgment as a matter of law and to alter

or amend the judgment must be denied in its entirety

Dated:    Lake Success, New York
          September 21, 2023                          Respectfully submitted,

                                          **MILMAN LABUDA LAW GROUP PLLC**

                                          By:_____/s/_____
                                             Joseph M. Labuda, Esq.
                                             Emanuel Kataev, Esq.
                                             3000 Marcus Avenue, Suite 3W8
                                             Lake Success, New York 11042
                                             (516) 328-8899 (office)
                                             (516) 328-0082 (facsimile)
                                             joe@mllaborlaw.com
                                             emanuel@mllaborlaw.com

                                             *Attorneys for Plaintiff*
                                             *Dr. Sari Edelman*

26

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DR. SARI EDELMAN,

        Plaintiff,

    – against –

NYU LANGONE HEALTH SYSTEM, NYU LANGONE
HOSPITALS, NYU LANGONE MEDICAL CENTER, NYU
LANGONE NASSAU RHEUMATOLOGY, NYU SCHOOL
OF MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER, ANDREW T.
RUBIN, DAVID KAPLAN, JOSEPH ANTONIK, and
JOSHUA SWIRNOW,

        Defendants.

**ORAL ARGUMENT REQUESTED**

Case No. 1:21-cv-502 (LJL)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION
FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) AND TO
ALTER OR AMEND THE JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)**

SJA-893

## TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................................... 1

Argument ............................................................................................................................... 2

    I.   Defendants' Motion for JMOL on Remaining Claim for Retaliation ............................ 2

        1.   There is no evidence that Antonik had knowledge of Plaintiff's
            purported activity prior to NYU's non-renewal of Plaintiff's
            employment ..................................................................................................... 2

        2.   No evidence of any actual participation on the part of Antonik ............................ 4

        3.   No evidence that NYU acted negligently ............................................................. 5

    II.  Defendants' Motion for Remittitur of the Jury's Front Pay Award .............................. 8

        1.   The Front Pay Award Should be Vacated ............................................................. 8

Conclusion .......................................................................................................................... 10

002528\5\170399268.v1

SJA-894

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barkley v. Olympia Mortg. Co.*,
   557 Fed. Appx. 22 (2d Cir. 2014)......................................................................2

*Casmento v. Volmar Constr., Inc.*,
   No. 20-cv-0944, 2022 WL 15773966 (S.D.N.Y. Oct. 28, 2022)..............................2

*Dunlap-McCuller v. Riese Org.*,
   980 F.2d 153 (2d Cir. 1992)........................................................................10

*Edwards v. Rochester Inst. of Tech.*,
   794 F. App'x 65 (2d Cir. 2019).....................................................................6

*ING Glob. V. United Parcel Serv. Oasis Supply Corp.*,
   757 F.3d 92 (2d Cir. 2014).........................................................................2

*Krasner*,
   680 F. Supp. 2d 502, 520 (citations omitted).....................................................3

*Kregler v. City of New York*,
   987 F. Supp. 2d 357 (S.D.N.Y. 2013)..............................................................7

*Olaechea*,
   2022 WL 3211424, at *6 (citation omitted)..................................................4, 5, 9

*Olivares v. Brentwood Indus.*,
   822 F.3d 426 (8th Cir. 2016) .......................................................................9

*Smith v. Farmstand*,
   No. 11-cv-9147, 2016 WL 5912886 (N.D. Ill. Oct. 11, 2016) ..................................9

*Tolbert v. Queens Coll.*,
   242 F.3d 58 (2d Cir. 2001)..........................................................................2

*Torres*,
   2023 WL 4487726, at *13 ...........................................................................8

*Vasquez v. Empress Ambulance Serv. Inc.*,
   835 F.3d 267 (2d Cir. 2016). (Pl. Memo .) ..........................................................6

SJA-895

**Other Authorities**

Fed. R. Civ. P. 50(a) ...................................................................................................1, 2

Fed. R. Civ. P. 50(b) ......................................................................................................1

Rule 26 ...................................................................................................................2, 10

SJA-896

**Preliminary Statement**

Defendants renew their Fed. R. Civ. P. 50(a) motion,[1] for judgment as a matter of law (JMOL), pursuant to Fed. R. Civ. P. 50(b) on Plaintiff's retaliation claim under Title VII, the SHRL, and the CHRL, against NYU and Joseph Antonik, and the jury's related award of front pay.

There was insufficient evidence for a jury to determine in Plaintiff's favor any, let alone all, of the following requisite elements of a retaliation claim: (1) that Plaintiff was engaged in protected activity; (2) that NYU and/or Antonik were aware of protected activity; (3) that Antonik participated in the decision not to renew Plaintiff's expiring employment agreement; (4) that NYU (through the acts of its ultimate decision maker) was negligent in relying on any information it received in connection with Plaintiff's non-renewal; or (5) that there was any causal connection between Plaintiff's complaint to Human Resources and her non-renewal more than a year later.

Rather, the evidence shows that Andrew Rubin, the decision-maker on the non-renewal of Plaintiff's contract, had no animus towards Plaintiff, and that he acted in good faith and made his decision based on the review of medical opinions provided by two non-biased supervisory physicians, Dr. Avram Goldberg and Dr. Andrew Porges.[2] These physicians have not been accused, let alone been shown, to have any animus towards Plaintiff. Further, there is no evidence that the information provided to Rubin was inaccurate or false, or that Antonik ever directly communicated with, or influenced, Rubin. Likewise, there is no evidence that NYU or Rubin

---

[1] Declaration of Richard L. Steer executed August 16, 2023 ("Steer Decl."), Ex. A (July 18 Ct. Tr. 1298:6-1309:13)).

[2] The lack of NYU's animus is reflected by Rubin's attempt to assist Plaintiff in her job search. (Steer R. Decl. Ex. O (Pl.'s Trial Ex. 123).) As Plaintiff expressed a desire to relocate to Florida, Rubin emailed a colleague there indicating that she was a very good doctor. (*Id.*) When questioned about his email, Rubin testified that he was very clear that she was nonrenewed because "she didn't meet NYU's clinical standards," and that the standards of the other medical school are less than NYU's. (Steer R. Decl. Ex. P (July 17 Ct. Tr. 977:2-8).) While Plaintiff did not meet NYU's high clinical standards, her performance did not rise to the level of "immediate concern" that would have required reporting to the Office of Professional Medical Conduct. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. 1214:10-15.)

1

negligently relied upon false or biased information or were negligent in the non-renewal decision.

Further, the jury's $700,000 front pay award should be vacated as the record evidence shows that Plaintiff never went a day unemployed and makes roughly $71,000 more a year than she did at NYU, thereby impermissibly putting Plaintiff in a better position than when employed by NYU. Moreover, the award far exceeds the maximum amount of damages Plaintiff alleged that she lost for front and back pay as set forth in her First Amended Rule 26 Disclosures (Steer Decl. Ex. N (Dkt. No. 202-1, at 3, C(ii))) and Joint Final Pretrial Order (Dkt. No. 197).

## Argument

## I.  Defendants' Motion for JMOL on Remaining Claim for Retaliation[3]

As detailed below, Defendants' motion directed at the retaliation claim should be granted because there is no evidence that: (1) Antonik knew or could not have reasonably known that Plaintiff engaged in protected activity; (2) Antonik participated in the decision not to renew Plaintiff's contract; and (3) NYU acted negligently in its decision not to renew Plaintiff's contract. Indeed, the evidence demonstrates the complete opposite to be true.

### 1.   There is no evidence that Antonik had knowledge of Plaintiff's purported activity prior to NYU's non-renewal of Plaintiff's employment

As a requisite element of a retaliation claim, an employer must be aware of the protected activity, *i.e.*, "it understood, or could reasonably have understood, that the plaintiff's opposition

---

[3]     As required, Defendants' instant motion is premised on the grounds specified in their Rule 50(a) motion. *See Barkley v. Olympia Mortg. Co.*, 557 Fed. Appx. 22, 27 (2d Cir. 2014). Plaintiff was sufficiently put on notice by Defendants' Rule 50(a) motion as to the issues for which she needed to put forth more evidence. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 76 (2d Cir. 2001). Defendants argued that (i) there was no protected activity; (ii) any alleged protected activity did not cause an adverse employment action; and (iii) Antonik did not retaliate because all he did was forward information upon the request of others. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. at 1298:3-1331:19.) The Court may nonetheless grant a post-trial motion to a party that did not make the requisite predicate motion "to prevent manifest injustice." *Casmento v. Volmar Constr., Inc.*, No. 20-cv-0944, 2022 WL 15773966, at *4 (S.D.N.Y. Oct. 28, 2022). "Manifest injustice" exists when, as here, a jury's verdict is wholly without legal support." *Id.; ING Glob. V. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014). Here, the jury's verdict with respect to the retaliation claim as to NYU and Antonik and the related front pay award were wholly without legal support.

2

was directed at conduct prohibited by Title VII." *Krasner*, 680 F. Supp. 2d 502, 520 (citations omitted). (Steer R. Decl. Ex. R (July 19 Ct. Tr. 1467:16-1468:1-16).)  Here, there is no evidence that Antonik was aware that Plaintiff was engaged in "protected activity." Antonik's knowledge was limited to Plaintiff's complaint about NYU's request to permit another doctor to use Plaintiff's office on the days that she was not using it and his purportedly raising his arms during their meeting about the use of her office.[4] (Steer Decl. Exs. B (Pl's. Trial Ex. 21); C (July 12 Ct. Tr. 530:8-10); Steer R. Decl. Ex. S (July 12 Ct. Tr. 523:11-524:1, 14-18).) Plaintiff testified that she complained to Kathleen Pacina who "took everything down." (Steer R. Decl. Ex. T (July 11 Ct. Tr. 117:6-8).) Yet, according to Pacina's notes from that call, Plaintiff was complaining only about office space.[5] (Steer Decl. Ex. B.) There is no mention of any purportedly "sexist," "discriminatory," or "chauvinistic," conduct, or of Antonik purportedly calling her a "bitch."[6] *Id.*

Plaintiff's utter speculation as to the knowledge possessed by Antonik regarding her internal complaint is contradictory to all evidence of what was known at the time, and is not a substitute for the evidence necessary to permit rational inferences by a jury of Antonik's

---

[4]      While Plaintiff alleges that David Kaplan wrote to Joshua Swirnow that Plaintiff filed a complaint against Antonik for being aggressive and retaliating for not allowing her to expand her hours, there was no reason for NYU or Antonik (who was not copied on the email) to understand that it had to do with gender discrimination. (Steer Decl. Ex. U (Ds' Trial Ex. SS).) As stated by this Court, in addressing Plaintiff's opposition to Defendants' 50(a) motion, "It's not gender discrimination for somebody to be intimidating, whether the person is a male or female. Put another way, the fact that somebody happens to have the genetic features of a male and the physical features of a male doesn't make the threating activity to be gender discrimination." (Steer Decl. Ex. Q (July 18 Ct. Tr. 1317:2-8.) In response to Plaintiff's assertion that "were it not for the fact that she was a female, he would have never spoken to her that way," the Court responded that "You're not going to support a verdict on that basis." (*Id.* at 1317:11-15.) Plaintiff's argument to the contrary are purely speculative and not based on any evidence.

[5]      When Antonik was shown an email thread within HR (in which he is not copied) (Steer Decl. Ex. V (Pl's. Trial Ex.79)), at trial, he testified that his understanding was it had to do with the way he spoke to Plaintiff (as opposed to just office space). (Pl. Memo at 4, n. 19 (citing Tr. 530:5-10).) However, there is no evidence that Antonik had ever seen this email prior to the commencement of this lawsuit or that Antonik was aware that what Plaintiff was complaining about to Human Resources was anything more than gender neutral conduct.

[6]      Antonik testified that he did not call her a bitch (Steer Decl. Ex C (Tr. 530:16-22); Steer R. Decl. Ex. S (July 12 Ct. Tr. 544:19-25)), and there is also no testimony that Plaintiff ever told anyone that Antonik purportedly called her a bitch or that any such allegation was conveyed to Antonik. (Steer R. Decl. Ex. W (July 13 Ct. Tr. 637:13-24.) Indeed, the allegation of his purported use of the word "bitch" was never documented in any internal complaint at NYU, nor was it included in Plaintiff's EEOC Charge or her court Complaints filed herein. (Steer R. Decl. Exs. X (Ds' Trial Ex. QQQ); Y (Ds' Trial Ex. RRR); Z (Ds' Trial Ex. TTT); AA (Ds' Trial Ex. VVV).)

purported knowledge of alleged protected activity or retaliatory motive. *Olaechea*, 2022 WL 3211424, at *6 (citation omitted). Plaintiff's later email to HR using buzz words like "harassment" and "toxic work environment" also does not amount to protected activity. *Robinson*, 2023 WL 4862772, at *90-91. Of even greater significance, there is no record evidence that Antonik was aware of those subsequent communications from Plaintiff to HR. Because there is no record evidence that Antonik was aware of any complaints about purported discrimination, Plaintiff failed to prove the existence of the predicate for a retaliation claim. Even if the jury had credited Plaintiff's testimony that Antonik had said the word "bitch," which is a stray remark, attributing knowledge of protected activity on Antonik's part would still be speculative because, based on his conversation with Pacina, there was no reason for him to believe Plaintiff's complaint was about discrimination. Indeed, the jury found for Defendants on the claim of discrimination despite Plaintiff's testimony that Antonik had muttered such word.

2.   No evidence of any actual participation on the part of Antonik

The jury was instructed that if they "find that the individual defendants *actually participated in the decision* to not renew plaintiff's contract and to terminate her employment, then [they] may find them liable under an aider-and-abettor theory." (Steer R. Decl. Ex. R (July 19 Ct. Tr. 1462:20-24) (emphasis added).) Here, Antonik did not participate in the decision. He did not even know that a decision to non-renew Plaintiff's contract was being considered. (Steer Decl. Ex. C (July 12 Ct. Tr. 534:2-13; 535:13-17).) Antonik was not consulted as to whether Plaintiff's contract should be non-renewed. (*Id.* at 535:13-17.) He had no knowledge or recollection as to why Plaintiff was terminated. (Steer R. Decl. Ex. S (July 12 Ct. Tr. 498:19-21).)

The record demonstrates that Antonik merely played a ministerial role in the gathering of information compiled by Ruiz concerning Plaintiff at the direction of others. (Steer Decl. Ex. C (July 12 Ct. Tr. 500:4-9); Steer Decl. Ex. A (Tr. 1184:6-14).) But even if he had played more than a

4

ministerial role, his conduct had no effect on the non-renewal of Plaintiff's contract. As Dr. Porges testified at trial, he independently became aware of clinical issues with Plaintiff over a period of years. (Steer R. Decl. Ex. P (July 17 Ct. Tr. 1139:3-7.) Porges raised his concerns about Plaintiff's clinical practices via a telephone conversation with Kaplan. (*Id.* at 6-7; Steer R. Decl. Ex. W (July 13 Ct. Tr. 608: 6-18).) In turn, Kaplan asked Dr. Porges to put his concerns in writing. (Ex. W (July 13 Ct. Tr. 608:9-18).) Dr. Porges then reached out to the office nurse, the suite manager (Miriam Ruiz), and the site manager (Antonik), so that they could provide him records accumulated over the years regarding Plaintiff's patient problems. (Steer Decl. Ex. A (July 18 Ct. Tr. 1184:6-14).) On November 6, 2020, Dr. Porges emailed his concerns in writing to Kaplan. (Steer R. Decl. Ex. BB (Pl's Trial Ex. 1.) In his email, Dr. Porges stated "I have had the opportunity to review many charts and observe her practice when seeing patients in the office for second opinions or occasionally for emergency practice coverage. Dr. Edelman has a pattern of ordering lab tests in a pattern not in keeping with the usual standards of rheumatology practice." (*Id.* at 2 (D000004).) At trial, Dr. Porges testified that he wrote the paragraph quoted above without assistance from anyone. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. 1230:11-14.)

Thus, there is no record evidence that any information provided by Antonik affected Dr. Porges' evaluation and medical opinion that he provided to Kaplan, which formed the bases of Plaintiff's non-renewal. (Steer R. Decl. Ex. CC (July 14 Ct. Tr. 907:4-7).) The lack of evidence showing that Antonik participated in the non-renewal decision of Plaintiff's contract, a requisite element of the retaliation claim, requires the vacatur of the finding of retaliation. "For an individual defendant to be liable for retaliation under the NYCHRL, he must have 'actually participated in the conduct giving rise to the plaintiff's' claims.'" *Olaechea*, 2022 WL 3211424, at *5.

3.   No evidence that NYU acted negligently

The jury was charged with a Cat's Paw instruction. (Steer Decl. Ex. G (July 19 Ct. Tr.

5

1459:8-24)); *see also, e.g., Edwards v. Rochester Inst. of Tech.*, 794 F. App'x 65, 67 (2d Cir. 2019) (finding no liability affirmed where, *inter alia*, that although the employer consulted with the discriminatory employee before terminating plaintiff, the employer also spoke with four other employees and found the evidence consistent) (citations omitted)). Here, consistent information was conveyed to the decision-maker, Rubin, from multiple sources – none of which was shown to be false or malign. Neither Antonik nor any other employee, was shown to have provided false information upon which a decision was based. There is no evidence that Rubin was negligent in such reliance, or that he was manipulated by anyone.[7] The evidence shows that he based his decision, in good faith, on the evaluations by multiple physicians who were non-parties, none of which was found to be "false" or "malign," to wit: Drs. Goldberg and Porges, who both determined independently from any alleged bias of Antonik that Plaintiff's clinical practice was inconsistent with NYU standards and could not be remediated. (Steer R. Decl. Exs. CC (July 14 Ct. Tr. 942:20-943:1-6); P (July 17 Ct. Tr. 1044:19-21; 1141:22-1142:1-4).)[8]

---

[7]     Plaintiff attempts to compare herself to the plaintiff in *Vasquez v. Empress Ambulance Serv. Inc.*, 835 F.3d 267 (2d Cir. 2016). (Pl. Memo at 19.) However, the facts in *Vasquez* are remarkably different in every respect as Vasquez, within a span of 24 hours, "faced unwelcome sexual advances in the workplace, complained about that conduct to her employer, and lost her job." *Vasquez*, 835 F.3d at 269. Further, when Vasquez's coworker discovered her complaint, the co-worker provided the employer with false documents purporting to show Vasquez's consent, and in reliance on those false documents the employer immediately fired Vasquez alleging she had engaged in sexual harassment despite her offers to produce evidence in refutation. *Id.*

[8]     Plaintiff, without citing to any evidence, contends that Antonik directed Ruiz to prepare her log. (Pl. Memo at 17.) However, Ruiz testified that since she first started working for NYU, prior to 2019, she created spreadsheets of all types of complaints. (Steer Decl. Ex. F (July 14 Ct. Tr. 839:10-18, 857:8-16).) While Plaintiff further questions the timing of Ruiz's log (Pl. Memo at 17, n 84), Ruiz testified that the first entry of her log about Plaintiff was undated as it was a "consistent problem." (Steer R. Decl. Ex. CC (July 14 Ct. Tr. 839:19-840:1-14).)
        Plaintiff alleges that Antonik participated in Plaintiff's non-renewal because he purportedly editorialized Ruiz's log in his email to Dr. Porges. (Pl. Memo at 18.) However, the Court sustained Defendants' objections to Plaintiff's counsel's attempt to question both Antonik and Ruiz, at the trial, about whether Antonik "editorialized" the log and was directed to "ask in a different form without the 'editorialized.'" (Steer R. Decl. Exs. W (July 13 Ct. Tr. 579:19-23); CC (July 14 Ct. Tr. 825:3-6).) Antonik's email dated November 6, 2020, to Porges (Steer R. Decl. DD (Pl's Trial Ex. 86)) included a summary of Ruiz's underlying log and its attached supporting documents. For example, Antonik summarizes the November 13, 2019, entry from Ruiz's chart (along with the referenced example 11.13.19 attached to Ruiz's chart). (Steer R. Decl. DD (Pl's Trial Ex. 86); EE ( Pl's Trial Ex. 84); FF (Ds' Trial Exhibit JJJ (D001100, D001104)).) There is no evidence that anything in Antonik's email to Porges contained anything inaccurate based on the documentary support that Antonik was instructed to gather. Further, Antonik testified that "from [his]

6

"Moreover, unlike the typical cat and monkey roles, here there were additional layers of attenuation" between Antonik and Rubin. *See Kregler v. City of New York*, 987 F. Supp. 2d 357, 369 (S.D.N.Y. 2013). Like in *Kregler*, Plaintiff's theory that one person gave information to a second person that was tainted by retaliatory animus, and that person in turn provided information to a third person that was also tainted, "strains the cat's paw theory beyond existing case law." *Id.* Like in *Kregler*, this Court should grant Defendants' judgment as a matter of law.[9]

Plaintiff's contention that NYU should have investigated "Antonik's claims knowing that he had a possible retaliatory motive" (Pl. Memo at 19) is a mere attempt at diversion. First, Antonik made no claims against Plaintiff. At the direction of Porges, he gathered and relayed the information gathered by Ruiz. Second, and more importantly, it was Dr. Porges who independently raised concerns regarding Plaintiff's clinical practice that eventually led to the non-renewal of Plaintiff's contract. Thus, regardless of Antonik's alleged conduct or motive, Rubin determined not to renew Plaintiff's contract based on the reviews and medical opinions of Drs. Goldberg and Porges, not based on any input by Antonik (he had none).[10]

---

own knowledge, at the time, [he] did not know that any of this would be used for termination." (Steer R. Decl. Ex. S (July 12 Ct. Tr. 503:2-3, 9-10).) Assuming, *arguendo,* none of these issues were discussed with Plaintiff as she alleges (Pl. Memo at 5), there is no evidence that NYU was required to do so. Plaintiff does not cite any legal authority for her claim that hearing from both sides is the *sine qua non* to any reasoned determination. (Pl. Memo. At 20.) Further, Porges testified that NYU is not a training program and that he is not training the doctors. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. 1204:6-8, 16-19).) It is clear from the record that speaking with Plaintiff would have been futile as Drs. Porges and Goldberg did not believe that Plaintiff's practice issues could be remediated or that they could mentor her to improve her quality standards. (Steer R. Decl. Exs. W (July 13 Ct. Tr. 683:14-17); P (July 17 Ct. Tr. 1044:19-21, 1141:25-1142:1-4.) In any event, Dr. Porges did testify that he talked to the [rheumatology] group as a whole about excessive x-rays. (Steer R. Decl. Ex. Q (July 18 Ct. Tr. 1186:15-18.)

9    Plaintiff's attempt to distinguish *Kregler* based on the notion that "the individual who provided information to have the plaintiff there terminated had no knowledge of the plaintiff's complaint" purportedly unlike the defendants here (Pl. Memo. at 18) is unavailing. It appears that Plaintiff fails to include a supporting cite as the alleged protected activity in *Kregler* was not predicated on a complaint, and Plaintiff's complaint was not protected activity in any event.

10    Plaintiff alleges that a causal connection may be inferred where longer periods separated the protected activity and adverse action if it is plausible that there was no earlier opportunity to retaliate. (Pl. Memo at 22.) However, the jury was charged that a causal connection can be established by Plaintiff by, *inter alia*, showing that the protected activity was *followed closely* by the alleged adverse action and that NYU subjected her to the adverse employment action *because of* her participation in the protected activity. (Steer R. Decl. Ex. R (July 19 Ct. Tr. 1453:2-10).) There

## II. Defendants' Motion for Remittitur of the Jury's Front Pay Award

The Court may determine that remittitur, as opposed to a new trial on damages, is appropriate with respect to a jury's award for lost wages that is, like here, unduly speculative and without adequate support. *Torres*, 2023 WL 4487726, at *13. "Front pay damages, if any, represent a plaintiff's lost salary and benefits, caused by an unlawful discharge or other adverse action, accruing from the time of trial through some point in the future." (Steer Decl. Ex. G (July 19 Ct. Tr. 1473:23-1474:1-2).) Here, Plaintiff suffered no loss in compensation. The award of $700,000 is therefore an unwarranted windfall and should be vacated.

### 1.  The Front Pay Award Should be Vacated

Just prior to Plaintiff's non-renewal, her compensation with NYU was $278,000. (Steer Decl. Exs. K, L (July 11 Ct. Tr. 107:19-24).) By February 16, 2021, Plaintiff secured a job in Florida. (Steer Decl. Ex. M.) Plaintiff did not go a day unemployed (Steer Decl. Ex. L (July 11 Ct. Tr. 87:21-23; 210:10-11)), and her new salary was higher at $300,000 for the first year (plus a $25,000 moving expense allowance). (Steer Decl. Exs. M.) Plaintiff also testified that $300,000 in Florida is worth more than $300,000 in New York. (Steer R. Decl. Ex. T (July 11 Ct. Tr. 220:22-221-1).)[11] Plaintiff's salary increased to $325,000 the following year. (*Id.*) Moreover, she also received incentive compensation in the amount of 20% of her gross collection in excess of 200% of her base salary for the first completed year of employment, and then 25% for the following years. (*Id.* at P4, Par. 15.) Plaintiff is earning approximately $71,000 more per year than she did while at NYU. (*See* Steer Decl. Exs. K, M.)

---

is insufficient evidence in the record connecting Plaintiff's HR complaint in September 2019 with her non-renewal (based on the review of her clinical issues resulting from non-party Dr. Porges' concerns raised in November 2022).

[11]    Plaintiff alleges "she was forced to relocate to Florida even though she wanted to remain in New York...." (Pl. Memo. At 7.) However, she testified that two days after she received her notice of non-renewal from NYU, she was telling recruiters that she was looking to make a move to Florida and had already identified specific locations in Florida in which she was interested. (Steer R. Decl. Ex. T (July 11 Ct. Tr. 223:12-224:6, 224:17-225:2).)

8

While Plaintiff alleges that front pay awards may be issued towards some unfixed future point in time (Pl. Memo at 25), the jury was instructed that:

> If you find that Dr. Edelman will be unable to earn in the future what she would have earned at NYU, then you may award her, as additional compensation, the amount she would have earned during the time period between the date of your verdict and either: 1) the date you believe she would have worked at NYU absent any discriminatory conduct or 2) *the date you can reasonably predict that she has a reasonable prospect of obtaining comparable employment.*

(Steer Decl. Ex. G (July 19 Ct. Tr. 1474:2-9) (emphasis added).) Plaintiff did not suffer any damages under the Court's unchallenged legal instructions.

Further, Plaintiff's award of front pay should be vacated as it impermissibly puts her in a better position than while employed by NYU. *See Olaechea*, at *8 (citations omitted); *see Smith v. Farmstand*, No. 11-cv-9147, 2016 WL 5912886, at *24 (N.D. Ill. Oct. 11, 2016) (plaintiff not entitled to front pay as he successfully mitigated damages by maintaining comparable job for more than 12 months that afforded him equal or greater salary).

Plaintiff's only claim for front pay is based on an alleged lack of contribution to her retirement plan by her new employer. (Steer Decl. Ex. L (July 11 Ct. Tr. 210:15-19).) But Plaintiff has no documentary proof that she does not receive retirement benefits now. Her very short, unspecific testimony that she has a 401k option in her present position just as she did at NYU is insufficient. (Steer Decl. Exs. L (July 11 Ct. Tr. 210:20-25); M); *see Olivares v. Brentwood Indus.*, 822 F.3d 426, 430 (8th Cir. 2016) (district court declined to speculate about a front pay award solely on plaintiff's testimony). There is no evidence that she contributed to her retirement plan at NYU, let alone that NYU provided any corresponding matching amount. Plaintiff only indicates that she had that ability to do so. (Pl. Memo. at 6.) There is also no evidence concerning the 401k option or Plaintiff's election or contribution or lack thereof at her new employer. Furthermore, she did not suffer any loss because her new compensation is above the combined level of salary and

002528\5\170399268.v1

retirement benefits she received at NYU. Any award in this regard would therefore be both against the Court's instructions and speculative. *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 159 (2d Cir. 1992) ("An award of front pay cannot be unduly speculative").

Further, it is illogical to look at only one component of Plaintiff's compensation (retirement benefits) while ignoring another (salary). Otherwise, if at her new job, her salary increased to $1 million more a year than she made at NYU (but with no retirement benefits), under her theory, she would still be entitled to the $26,000 maximum match from NYU (Steer Decl. Ex. K) to purportedly make her whole and would thus receive an unjust windfall.

The award to Plaintiff of lost front pay is therefore an unjustified and speculative windfall. Lastly, even if Plaintiff's damages award is not vacated, as it should be, it should be capped at $137,400. While Plaintiff alleges that front pay "would be difficult to predict and impossible to calculate in Rule 26 disclosures," (Pl. Memo at 25) she did so in her Amended Rule 26 Disclosures, dated April 3, 2023, stating that her "back pay and front pay" as "currently calculated at $137,400.00" was derived at based on her losing $27,800 per year in 2022-2024 for NYU's 10% match into her retirement account. (Steer Decl. Ex. N (p. 3, C(ii), n. 2).) She also included the same calculation of $137,400.00 as "lost wages (back & front pay)" in the Joint Final Pretrial Order also dated April 3, 2023. (Dkt. No. 197.) As Plaintiff failed to put forth any evidence that she suffered any loss entitling her to any front pay, the award must be vacated or alternatively remitted for an amount of no more than $137,400.

### Conclusion

Defendants respectfully request that their motion for JMOL be granted and the front pay award be vacated or, alternatively, remitted and limited to the amount Plaintiff sought in her pretrial filings.

002528\5\170399268.v1

Dated: New York, New York
October 12, 2023

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Defendants*

By:   */s/ Richard L. Steer*
      Richard L. Steer
      Richard C. Schoenstein
      Ingrid J. Cardona
      1350 Broadway, 11th Floor
      New York, New York 10018
      (212) 216-8000
      rsteer@tarterkrinsky.com
      rschoenstein@tarterkrinsky.com
      icardona@tarterkrinsky.com

002528\5\170399268.v1

SJA-907

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DR. SARI EDELMAN,

                                  **Case No.:** 1:21-cv-502 (LJL) (GWG)

                  Plaintiff,

       -against-

NYU LANGONE HEALTH SYSTEM, NYU
LANGONE HOSPITALS, NYU LANGONE
MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF
MEDICINE, NYU GROSSMAN SCHOOL OF
MEDICINE, NYU HOSPITALS CENTER,
ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH
ANTONIK, and JOSHUA SWIRNOW,

                  Defendants.
-----------------------------------------------------------------X

**PLAINTIFF'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF HER MOTION
FOR JUDGMENT AS A MATTER OF LAW
<u>OR, ALTERNATIVELY, FOR A NEW TRIAL</u>**

 

**MILMAN LABUDA LAW GROUP PLLC**
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
joe@mllaborlaw.com
emanuel@mllaborlaw.com

*Attorneys for Plaintiff
Dr. Sari Edelman*

SJA-908

## TABLE OF CONTENTS

I.      **PRELIMINARY STATEMENT** ........................................................................1

II.     **ARGUMENT** ...............................................................................................2

    A.  **Manifest Injustice Would Result in Upholding the Jury's Verdict** ...............................2

    B.  **There is No Evidence that Drs. Modi and Edelman Performed Unequal Work** ..........................................................................................4

        **i. Skill** .....................................................................................................4

        **ii. Effort** ...................................................................................................4

        **iii. Responsibility** ...................................................................................7

    C.  **Defendants Failed to Establish a *Bona Fide* Factor Other than Sex** ..........................7

    D.  **Dr. Edelman is Entitled to a New Trial** ....................................................10

III.    **CONCLUSION** ........................................................................................11

i

## TABLE OF AUTHORITIES

**Cases**

Aldrich v. Randolph Cent. Sch. Dist.,
  963 F.2d 520 (2d Cir. 1992)................................................................. 9

Belfi v. Prendergast,
  191 F.3d 129 (2d Cir. 1999)................................................................ 9

Burris v. Nassau Cty.,
  332 F. Supp. 3d 596 (E.D.N.Y. 2018) .............................................. 4

Cangemi v. Town of East Hampton,
  374 F. Supp. 3d 227 (E.D.N.Y. 2019) .............................................. 3

EEOC v. J.C. Penney Co., Inc.,
  843 F.2d 249 (6th Cir. 1988) ............................................................. 9

Husser v. New York City Dept. of Ed.,
  137 F. Supp. 3d 253 (E.D.N.Y. 2015) .............................................. 9

Kaplan v. N.Y. State Dep't of Labor,
  No. 18-CIV.-3629 (KPF), 2019 U.S. Dist. LEXIS 121131 (S.D.N.Y. July 19, 2019)..... 10

Kirsch v. Fleet Street, Ltd.,
  148 F.3d 149 (2d Cir. 1998)................................................................ 2

Knox v. John Varvatos Enterprises Inc.,
  512 F. Supp. 3d 470 (S.D.N.Y. 2021) ........................................... 5, 6

Marshall v. Meyer Memorial Hosp.,
  1982 WL 1991 (W.D.N.Y. 1982) ..................................................... 6

Norton v. Sam's Club,
  145 F.3d 114 (2d Cir. 1998)................................................................ 3

Osborn v. Home Depot U.S.A., Inc.,
  518 F. Supp. 2d 377 (D. Conn. 2007).............................................. 9

Pahuta v. Massey–Ferguson, Inc., 170 F.3d 125, 129 (2d Cir. 1999)
  843 F.2d 249 (6th Cir. 1988) ............................................................. 2

Rothstein v. Carriere,
  373 F.3d 275 (2d Cir. 2004)................................................................ 2

Setelius v. Nat'l Grid Elec. Servs. LLC,
    No. 11-CIV.-5528, 2014 WL 4773975, at *31 (E.D.N.Y. Sept. 24, 2014) ....................... 9

Sojak v. Hudson Waterways Corp.,
    590 F.2d 53 (2d Cir. 1978) ............................................................................. 3

Stephenson v. Doe,
    332 F.3d 68 (2d Cir. 2003) ............................................................................. 3

Tomka v. Seiler Corp.,
    66 F.3d 1295 (2d Cir. 1995) ............................................................................ 8

Usery v. Columbia Univ.,
    568 F.2d 953 (2d Cir. 1977) ............................................................................ 6

**Rules**

Fed. R. Civ. P. 50 .............................................................................. 2, 3, 4

Fed. R. Civ. P. 59 ................................................................................... 2

## I.      PRELIMINARY STATEMENT

Contrary to Defendants' assertions, there is absolutely no evidence to support the jury's verdict that Plaintiff Dr. Sari Edelman ("Dr. Edelman" or "Plaintiff") failed to establish a *prima facie* case under the federal and state Equal Pay Act ("EPA") as to Dr. Anang Modi ("Dr. Modi"), nor is there any evidence to support the jury's verdict that Dr. Edelman was paid less than Dr. Modi due to a *bona fide* factor other than sex.     As a result, manifest injustice would result in upholding the jury's verdict on Dr. Edelman's EPA claims as it relates to Dr. Modi.

In seeking to shore up support for the jury's verdict as it relates to Dr. Modi, Defendants inappropriately reference and rely on irrelevant evidence related to Drs. Andrew Goldberg ("Dr. Goldberg") and Andrew Porges ("Dr. Porges"), which is beyond the scope of the instant motion and therefore not at all pertinent to the question before this Court.  As to Dr. Modi, Defendants argue, without any evidentiary support, that he was hired to build out and expand NYU's rheumatology practice at its Huntington location to support his substantially higher compensation. Moreover, the weight of the evidence shows that – unlike Drs. Goldberg and Porges – Dr. Modi did not have any administrative responsibilities which could arguably justify a higher salary. Indeed, although Dr. Modi had some experience with administrative work at his prior position before joining NYU, no evidence was adduced that he performed any such work for NYU.

In fact, Dr. Modi himself testified that he had no such role.  Similarly, Defendants argue that Dr. Modi had leadership roles while Dr. Edelman did not, despite the fact Dr. Edelman established and ran a successful private practice, which Andrew Rubin ("Rubin") acknowledged. Again, Dr. Modi simply worked as a rheumatologist for NYU and had no leadership role warranting a higher salary.

SJA-912

Defendants also improperly argue that Dr. Modi's wRVU target was greater than Dr. Edelman's to justify the higher salary they paid him, but Defendants consistently presented evidence at trial that there was no correlation between wRVUs and compensation. Similarly, Defendants argue that Dr. Modi did not have a business loan, but ignore the fact that in 2017, when he joined, Dr. Edelman's loan had already been paid off and was no longer a factor in her 2017 compensation. The only other evidence Defendants can muster to justify Dr. Modi's substantially higher salary as compared to Dr. Edelman's is his measly two (2) years of experience over Dr. Edelman, which is clearly insufficient to justify a $82,000.00 pay disparity.

Because his administrative or leadership qualifications never entered into the compensation equation, two years' experience alone is insufficient to justify such a large differential, and the remaining attempts to justify his vastly greater pay as compared to Dr. Edelman are unavailing, no reasonably jury could find that: (i) Dr. Modi was not a proper comparator to Dr. Edelman; (ii) Dr. Edelman was not paid less for doing equal work; and (iii) the pay differences between Drs. Edelman and Modi were based on factors other than sex. Accordingly, this Court should enter judgment against Defendants and in favor of Plaintiff reversing the jury's verdict on Plaintiff's EPA claims as they relate to Dr. Modi notwithstanding the verdict or, alternatively, for a new trial.

## II.    ARGUMENT

### A.    Manifest Injustice Would Result in Upholding the Jury's Verdict

Defendants argue that because Dr. Edelman never made a motion for a directed verdict pursuant to Rule 50(a) at trial, she is barred from seeking relief under Rule 50(b). This is simply not the law. A court may grant judgment as a matter of law where no Rule 50(a) motion was made, if necessary to prevent "manifest injustice." See Pahuta v. Massey–Ferguson, Inc., 170 F.3d 125, 129 (2d Cir. 1999); see also Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 164 (2d Cir. 1998).

SJA-913

"Manifest injustice exists where a jury's verdict is wholly without legal support." See Rothstein v. Carriere, 373 F.3d 275, 291 (2d Cir. 2004). Here, the evidence adduced at trial shows that Dr. Edelman met her *prima facie* case and Defendants' *bona fide* factor other than sex defense was wholly without legal support, as there was no basis to pay Dr. Modi $360,000.00 in compensation while paying Dr. Edelman $278,000.00 for the same work. In fact, the Second Circuit has granted relief under Rule 50(b) notwithstanding the failure to make a Rule 50(a) motion where confusing circumstances led to a jury verdict that make it unjust to enforce a verdict. See Stephenson v. Doe, 332 F.3d 68, 75–76 (2d Cir. 2003) ("We believe, under the confusing circumstances in this case, that enforcing the jury's verdict on qualified immunity may unjustly deprive Stephenson of the right to recover for a violation of his constitutional rights").

Similarly, courts routinely grant Rule 50(b) motions to prevent manifest injustice where a jury's verdict is contrary to the evidence adduced at trial. See Sojak v. Hudson Waterways Corp., 590 F.2d 53, 54 (2d Cir. 1978); see also Norton v. Sam's Club, 145 F.3d 114, 117-18 (2d Cir. 1998) (court can order a new trial even in the absence of a renewed motion for judgment as a matter of law if failure to do so would result in "manifest injustice"). In Sojak, the Second Circuit held:

> … the unseaworthiness of the Transidaho was clearly established and that the jury's verdict to the contrary cannot stand … Plaintiff did not move for a directed verdict pursuant to Rule 50(a) …. Although he did move to set the verdict aside, Rule 50(b) allows a judgment n. o. v. to be granted only if the moving party requested a directed verdict before the submission of the case to the jury. However, we are not powerless to grant relief. Where a jury's verdict is wholly without legal support, we will order a new trial in order to prevent a manifest … injustice. … We therefore remand the case for a new trial on the merits of the unseaworthiness claim.

See 590 F.2d at 54-55.

As such, this Court may properly consider Dr. Edelman's instant motion based on the lack of any evidence to support the jury's findings on her EPA claims as to Dr. Modi.

3

Where, as here, the evidence adduced at trial does not support the verdict, Plaintiff's motion for judgment as a matter of law should be granted to prevent manifest injustice. See Cangemi v. Town of East Hampton, 374 F. Supp. 3d 227, 238 (E.D.N.Y. 2019) ("the Court finds that the verdict was against the weight of the evidence. The Town did not control the jetties, could not and did not engage in conduct, and lacked the requisite intent") (citing Burris v. Nassau Cty., 332 F. Supp. 3d 596, 610 (E.D.N.Y. 2018) ("If [the court] did not grant the Rule 50 motion, at the very least, [the court] would grant a new trial ... because the jury's finding is against the weight of the evidence and a manifest injustice"). Indeed, as set forth below, the trial record provides that Dr. Edelman established a *prima facie* claim under the EPA and that Defendants did not articulate a *bona fide* factor other than sex for the pay disparity.

**B.      There is No Evidence that Drs. Modi and Edelman Performed Unequal Work**

   i.      Skill

There is no dispute Dr. Edelman went to the same medical school and completed the same exact fellowships as Dr. Modi. See Plaintiff's Exhibits ("Pl. Exs.") 15 and 46.[1] However, Defendants argue that Dr. Modi's administrative experience warranted a higher salary. But the record is clear that he had no such responsibilities at NYU. See ECF Docket Entry 273-1 ("Tr.") at 1266:7-20, 1280:16-1281:1, 1284:16-22. Defendants also argue that Dr. Modi's two years of experience and leadership skills (which he did not use at NYU), and that his skills were necessary to meet its business goal of expanding its practice on Long Island (which he was not tasked with), justifies a $82,000.00 pay differential. See Pl. Exs. 15 and 46. This is not enough. The Second Circuit has found that even ten (10) years more experience is insufficient without linking the experience to the difference in pay. See Tomka v. Seiler Corp., 66 F.3d 1295, 1312 (2d Cir. 1995)

---

[1] All exhibits are attached in the Reply Declaration of Emanuel Kataev in numerical order.

("Seiler contended … that Abrams' higher salary resulted from the fact that he had over ten years of experience with a … competitor. While Abrams' experience may very well explain the discrepancy, Seiler has the burden of persuasion to show both that it *based Abrams' higher salary on this factor* and *that experience is a job-related qualification for the position in question*. … Seiler's mere assertion that Abrams' salary was based on his experience is insufficient to meet this burden …") (emphasis added).  Here, Defendants presented no evidence to meet their burden of establishing such a link.  Indeed, Dr. Porges made $340,000.00 upon starting with many years more experience than Dr. Modi, who earned $360,000.00 upon hire.  Tr. at 984:20-986:13 (Rubin). Therefore, no reasonable jury could conclude Dr. Modi had greater skill based on this trial record.

ii.   Effort

Defendants also argue that Dr. Modi exerted more effort and that his RVU target was substantially higher than Dr. Edelman's, warranting higher compensation to him.  But Defendants repeatedly presented evidence during trial that there is no correlation between compensation and the number of wRVUs.  Tr. at 337:15-338:2, 1366:24-1367:10.  Indeed, because Dr. Raminfard was paid $265,000.00 to meet a wRVU target of 3,900, and Dr. Goldberg was paid $290,000.00 to meet a wRVU target of 3,481, there is no basis for the jury to conclude that Dr. Modi was paid more than Dr. Edelman because his wRVU target was 6,100 while Dr. Edelman's was 5,200. Moreover, Drs. Edelman's and Modi's contracts each provide for identical effort (100% clinical) under the section actually entitled "Effort."  Pl. Exs. 8-9, 24, and 35-36.

Defendants also argue that Dr. Modi saw patients five (5) days a week while Dr. Edelman "generally" saw patients only four (4) days a week.  However, the evidence adduced at trial establishes that Dr. Edelman routinely worked and saw patients five (5) days a week, and similarly consistently exceeded her wRVU targets.  Tr. at 180:13-15, 313:17-24.

Defendants' attempt to argue that Dr. Modi's higher wRVU target equates to greater effort also misses the mark. The jury was specifically instructed that that "equal effort" does not require people to use effort in exactly the same way, and that if one job requires additional tasks that consume a *significant amount of extra time and effort* that the other job does not require, then the jobs do not require substantially equal effort. See Tr. at 1442:19-1443:9. As such, even if Dr. Modi saw more patients than Dr. Edelman (or spent less time with each patient, unlike Dr. Edelman), this does not equate to greater effort on his part as Dr. Edelman took more time with each patient to understand their needs. Tr. at 1243:18-1244:4; see also Knox v. John Varvatos Enterprises Inc., 512 F. Supp. 3d 470, 480 (S.D.N.Y. 2021) (finding substantially equal effort based on identical job descriptions).

Defendants further confuse the amount of work with the type of work to justify their position, when, in reality, the test is whether the comparators perform the same type of work. Tr. at 200:21-201:4 (Edelman), 432:4-433:7 (Mehta); see also Pl. Exs. 8 and 9; compare with Pl. Ex. 35 (showing that Drs. Edelman's and Modi's faculty appointments, tenure status, employment titles, and full-time status were identical); see also Tr. at 313:17-315:16 (Dr. Edelman treated patients), 812:7-12 (Ruiz testimony regarding Dr. Edelman treating patients), 1008:5-7 (Rubin testimony regarding all rheumatologists treating patients); 1256:1-8, 1265:18-22 (Dr. Modi treated patients). There is thus no dispute that Drs. Edelman's and Modi's duties consist of equal work, i.e., that they see and treat patients, and prescribe medicine and other treatments. Id.

Here, like in Knox, Dr. Edelman's job description is identical to Dr. Modi's. As such, their work required substantially equal effort. Indeed, courts look to the core task in assessing effort, not the underlying performance metrics, in assessing effort. See Usery v. Columbia University, 568 F.2d 953, 959 (2d Cir. 1977) ("So long as the ultimate degree of exertion remains comparable,

the mere fact that two jobs call for effort different in kind will not render them unequal"); see also Marshall v. Meyer Memorial Hosp., 1982 WL 1991, at *11 (W.D.N.Y. 1982) ("The *core tasks* are essentially the same, and *require substantially equal effort* …").  Further, Defendants' presentation of evidence concerning wRVUs confused the jury, in that this metric relates to quantity and/or quality of production, for which defense Defendants did not adduce any evidence in support.  Tr. at 258:15-259:9, 264:6-15, 1152:12-1154:20.  In fact, the Court specifically rejected Defendants' request for a "system of quality/quantity" jury instruction on the grounds that there was insufficient evidence in the trial record to support such a defense.

As such, Defendants cannot rely on any wRVU disparity, and there was no other evidence to indicate that Dr. Modi exerted greater effort than Dr. Edelman in his job.

       iii.   Responsibility

With respect to responsibility, as set forth herein, there is no evidence in the record that Dr. Modi had a greater responsibility than Dr. Edelman.  Defendants assert that Dr. Modi was actually responsible for expanding the Huntington practice.  Yet, unlike Drs. Goldberg and Porges, whose contracts expressly apportioned their responsibilities to administrative time, Dr. Modi's contract only provided for clinical responsibilities.  See Pl. Exs. 24-26, 31-36.  As such, there was no evidence in the record to conclude that Dr. Modi was hired to build out the Huntington practice at NYU.  Indeed, the only evidence adduced concerning this point was stricken and, even if credited, does not provide any basis for a jury to conclude Dr. Modi did anything to build the Huntington practice.  Tr. at 1280:16-1281:1.  As with effort, Dr. Edelman's and Dr. Modi's contracts each provide for identical general and clinical responsibilities.  Indeed, their general and clinical responsibilities are identical under their contracts under the section aptly entitled "Responsibility." See Pl. Exs. 8 at D50 and D52-D53, 35 at D889 and D891-D892.

There was thus no evidence to indicate that Dr. Modi had any greater responsibilities.

**C.    Defendants Failed to Establish a _Bona Fide_ Factor Other than Sex**

There is also a complete absence of evidence to support the Defendants established that the clear pay disparity was based on a _bona fide_ factor other than sex.  At trial, Rubin testified that he reviewed the following items to determine compensation for physicians: (i) business plan; (ii) credentials; (iii) need in the network; (iv) years of experience; (iv) external activities; (v) geography; (vi) reputational status.  Tr. at 921:8-922:13.  None of these factors give rise to a _bona fide_ factor other than sex.  Dr. Modi had no business plan and, as noted above, both had similar years of experience.  Tr. at 937:13-938:7.  Geography and need in the network are neutral as both Drs. Edelman and Modi worked in Huntington.  There was no evidence at trial concerning external activities.  Finally, Drs. Edelman and Modi's reputational status was equal, and there was no evidence to the contrary at trial.

Defendants argue that Dr. Modi is similar to Dr. Goldberg in that he was hired to further NYU's goal of geographical expansion, but this is unsupported by the testimony that Dr. Modi simply worked as a rheumatologist with no leadership or administrative roles.  In fact, Dr. Modi's contract lacks any not mention of "geographical expansion."  Moreover, Dr. Modi himself testified that he did not have any such administrative role.

Similarly, the existence of Dr. Modi's administrative experience cannot form the basis for paying him more when – again – Dr. Modi did not perform any administrative work.  While Defendants rely on Husser v. New York City Dept. of Ed., 137 F. Supp. 3d 253, 269 (E.D.N.Y. 2015), Osborn v. Home Depot U.S.A., Inc., 518 F. Supp. 2d 377, 385 (D. Conn. 2007), and Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11-CIV.-5528, 2014 WL 4773975, at *31 (E.D.N.Y. Sept. 24, 2014) for the broad proposition that an employer may pay higher salaries to employees due to

greater experience, market forces, and better credentials, none of those factors are present here, as Dr. Edelman has relatively the same experience and virtually identical credentials to Dr. Modi. Defendants thus failed to adduce any evidence as to market forces.

Defendants' only two distinguishing characteristics between Dr. Modi and Dr. Edelman – years of experience and prior pay – have no bearing on the work they perform such that they could avail themselves of the *bona fide* factor than sex defense.  See Belfi v. Prendergast, 191 F.3d 129, 136 (2d Cir. 1999) ("… to successfully establish the 'factor other than sex' defense, an employer must also demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential"); see also Aldrich v. Randolph Cent. School Dist., 963 F.2d 520, 525-27 & n. 1 ("Without a job-relatedness requirement, the factor-other-than-sex defense would provide a gaping loophole in the statute through which many pretexts for discrimination would be sanctioned"); EEOC v. J.C. Penney Co., Inc., 843 F.2d 249, 253 (6th Cir. 1988) ("[T]he 'factor other than sex' defense does not include literally any other factor, but a factor that, at a minimum, was adopted for a legitimate business reason")).   Here, there is no evidence presented by Defendants justifying why Dr. Modi's pay is substantially higher than Dr. Edelman's pay, except that Dr. Modi was earning $340,000.00 and that he sought $360,000.00 in order to come to NYU. Tr. at 330:1-9 (Edelman), 714:10-13 (Swirnow), 999:15-1000:3 (Rubin). Meanwhile, Dr. Edelman sought $260,000.00 and only received $207,000.00.  Tr. at 81:7-9 (Edelman).

As to prior pay, Defendants merely argue that prior pay alone was not relied on to determine compensation, but there was no evidence the jury could rely on to support that contention.  In fact, this Court specifically noted that other courts have rejected prior pay as an affirmative defense to an unequal pay claim.

9

Defendants' other argument that Dr. Edelman's business loan was the reason Dr. Modi was paid more is equally unavailing, as her loan was paid off at the time Dr. Modi was onboarded in 2017. Tr. at 1259:6-13. Indeed, Defendants' argument concerning the loan is moot when comparing Dr. Edelman's compensation under her renewal contract in 2017 because the loan was paid off by then, and there is no justification provided by Defendants for paying Dr. Modi $82,000.00 more for the same work.

Finally, Defendants failed to address Dr. Edelman's arguments as to the New York EPA, merely stating that those claims are analyzed under the same standard as the EPA. However, because New York EPA claims differ as set forth in Dr. Edelman's moving papers (in fact, the Court instructed the jury in both laws), Defendants should be deemed to have abandoned that argument. See Kaplan v. N.Y. State Dep't of Labor, No. 18-CIV.-3629 (KPF), 2019 U.S. Dist. LEXIS 121131, at *14-15 (S.D.N.Y. July 19, 2019) (holding that courts will normally deem a claim abandoned if a party fails to address or oppose an adversary's arguments).

**D.      Dr. Edelman is Entitled to a New Trial**

Alternatively, this Court should find that the jury's verdict is against the weight of the evidence, such that a new trial is warranted for Dr. Edelman's EPA claims as they relate to Dr. Modi. Defendants argue that there was no serious error warranting a new trial, but their arguments as to why Dr. Modi performed unequal work as compared to Dr. Edelman fail as set forth above. Similarly, Defendants failed to establish the existence of any evidence to support their *bona fide* factor other than sex defense simply because no such evidence was proffered at trial.

**III.   CONCLUSION**

Based on the trial record, Plaintiff is entitled to judgment as a matter of law on her EPA claims as they relate to Dr. Modi. Plaintiff is thus entitled to judgment as a matter of law.

10

SJA-921

Dated: Lake Success, New York
      October 12, 2023

Respectfully submitted,

**MILMAN LABUDA LAW GROUP PLLC**

_/s/ Joseph M. Labuda, Esq._____
Joseph M. Labuda, Esq.
Emanuel Kataev, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (facsimile)
emanuel@mllaborlaw.com
joe@mllaborlaw.com

*Attorneys for Plaintiff*
*Dr. Sari Edelman*

11