# 24-0251-cv

## United States Court of Appeals

### *for the*

## Second Circuit

───────────────

DR. SARI EDELMAN,

*Plaintiff-Appellant,*

— v. —

NYU LANGONE HEALTH SYSTEM, NYU LANGONE HOSPITALS, NYU
LANGONE MEDICAL CENTER, NYU LANGONE NASSAU
RHEUMATOLOGY, NYU SCHOOL OF MEDICINE, NYU GROSSMAN
SCHOOL OF MEDICINE, NYU HOSPITALS CENTER, ANDREW T. RUBIN,
DAVID KAPLAN, JOSEPH ANTONIK, JOSHUA SMIRNOW,

*Defendants-Appellees.*

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

RICHARD LANE STEER
RICHARD S. SCHOENSTEIN
JUSTIN Y.K. CHU
INGRID JULIETH CARDONA
TARTER KRINSKY & DROGIN LLP
*Attorneys for Defendants-Appellees*
1350 Broadway, 11ᵗʰ Floor
New York, New York 10018
(212) 216-8000

COUNSEL PRESS   (800) 4-APPEAL • (330222)

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO RULE 26.1 OF THE
## <u>FEDERAL RULES OF APPELLATE PROCEDURE</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, NYU Langone Health System, NYU Langone Hospitals, and NYU Grossman School of Medicine, a Division of New York University, f/k/a "NYU Hospitals Center" s/h/a "NYU Langone Medical Center," "NYU Langone Nassau Rheumatology," "NYU School of Medicine," "NYU Grossman School of Medicine," and "NYU Hospitals Center", Defendants-Appellees in this action, state that they do not have a corporate parent, and there is no publicly held corporation that owns 10 percent or more of any of their respective stock.

I

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES ...................................................................1

SUMMARY OF THE ARGUMENTS........................................................2

STATEMENT OF THE CASE.....................................................................3

    A.    Relevant Facts Adduced at Trial.........................................................3

        1.    Appellant's Employment Prior to NYU and Her Contract with NYU ...............................................................................3

        2.    NYU's Rheumatology Practice and the Alleged Equal Pay Comparators....................................................................6

        3.    Appellant's Interactions with Antonik and Pacina and the Alleged Retaliation ........................................................14

        4.    The Non-Renewal of Appellant's Contract..................................19

    B.    Procedural History..........................................................................21

ARGUMENTS.............................................................................................23

POINT I    The District Court's Denial of Judgment as a Matter of Law on the Equal Pay and Discrimination Claims is Correct .......................23

    A.    Appellant Must Meet the Heightened Legal Standard .........................23

    B.    There is Ample Evidence to Support the Verdict .................................24

        1.    Equal Work..........................................................................26

        2.    Ample Evidence Supports Findings of Factors Other Than Sex .............................................................................31

        3.    Appellant's Case Citations are Inapposite .................................37

POINT II    The District Court's Grant of the Motion for Judgment Notwithstanding the Verdict on the Retaliation Claims was Correct.............................................................................................39

    A.    The Legal Standard for Judgment Notwithstanding the Verdict .........39

    B.    No Evidence that NYU Knew or Understood Appellant Complained of Discrimination ..........................................................40

        1.    Evidence as to Pacina's Knowledge and Understanding..............40

002528\5\170819189.v15

| | | |
|---|---|---|
| 2. | Evidence as to Antonik's Knowledge and Understanding | 43 |
| 3. | Evidence as to Kaplan's Knowledge and Understanding | 46 |
| 4. | Evidence as to Antonik's Lack of Participation in the Non-Renewal | 48 |
| 5. | Evidence as to Swirnow's Knowledge and Understanding | 50 |
| 6. | Cat's Paw and Evidence as to Rubin. | 50 |

POINT III The District Court did not Abuse its Discretion in Denying a New Trial .................................................................................52

POINT IV The District Court Correctly Determined that Appellant Adduced No Evidence to Support Punitive Damages ..........................54

POINT V The District Court was Correct in Refusing to Charge the Jury Regarding Disparate Impact and its Affirmative Defenses Under New York Labor Law §194 ..........................................................56

CONCLUSION .........................................................................................60

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ali v. Kipp*,
    891 F.3d 59 (2d Cir. 2018) ................................................................53

*Arizmendi v. Rich Products Corp.*,
    2023 WL 4246106 (2d Cir. June 29, 2023) ......................................46

*Batson v. Kentucky*,
    476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).......................59

*Bracey v. Bd. of Educ. of City of Bridgeport*,
    368 F.3d 108 (2d Cir. 2004) ..............................................................23

*Brady v. Wal-Mart Stores, Inc.*,
    531 F.3d 127 (2d Cir. 2008) ..............................................................39

*Campbell v. Nat'l Fuel Gas Distrib. Corp.*,
    723 F. App'x 74 (2d Cir. 2018)..........................................................50

*Chauca v. Abraham*,
    30 N.Y.3d 325 (2017) ........................................................................56

*Chin v. Port Authority of NY & NJ*,
    685 F.3d 131 (2d Cir. 2012) ..............................................................59

*Corning Glass Works v. Brennan*,
    417 U.S. 188, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974).......................31

*Cunningham v. Town of Ellicott*,
    No. 04-cv-301, 2007 WL 1756502 (W.D.N.Y. June 18, 2007),
    *aff'd*, 310 Fed. Appx. 448 (2d Cir. 2009) ...................................52, 53

*Edwards v. Rochester Inst. of Tech.*,
    794 F. App'x 65 (2d Cir. 2019)..........................................................50

*Eisenhauer v. Culinary Inst. of Am.*,
    84 F.4th 507 (2d Cir. 2023) ..........................................................31, 38

*Fairbrother v. Morrison*,
    412 F.3d 39 (2d Cir. 2005) ............................................................40

*Hodgson v. Corning Glass Works*,
    474 F.2d 226 (2d Cir. 1973) ..........................................................37

*Hornig v. Trs. of Columbia Univ. in City of New York*,
    No. 17 CIV. 3602 (ER), 2022 WL 976267 (S.D.N.Y. Mar. 31,
    2022) ..............................................................................................50

*Hughes v. Town of Bethlehem*,
    No. 10-cv-1489, 2015 WL 2130905 (N.D.N.Y May 7, 2015) ..........52

*ING Global v. United Parcel Services*,
    757 F.3d 92 (2d Cir. 2014) .......................................................24, 27

*Kregler v. City of New York*,
    987 F. Supp. 2d 357 (S.D.N.Y. 2013) ............................................51

*Lambert v. Genesee Hosp.*,
    10 F.3d 46 (2d Cir. 1993) ..............................................................40

*Manley v. AmBase*,
    337 F.3d 237 (2d Cir. 2003) ..........................................................52

*Mazzella v. RCA Global Comm., Inc.*,
    642 F. Supp. 1531 (S.D.N.Y. 1986), *aff'd*, 815 F.2d 653 (2d Cir.
    1987) ..............................................................................................31

*Olaechea v. City of New York*,
    2022 WL 3211424 (S.D.N.Y. Aug. 9, 2022).....................................50

*People v Allen*,
    86 N.Y.2d 101, 653 N.E.2d 1173 (1995) ........................................59

*People v. Hecker*,
    15 N.Y.3d 625 (2010).....................................................................59

*Pouncy v. Danka Off. Imaging Co.*,
    393 Fed. Appx. 770 (2d Cir. 2010)..................................................53

*Reeves v. Sanderson Plumbing Prods, Inc.*,
    530 U.S. 133 (2002)........................................................................26

iv

*Rossbach v. Montefiore Med. Ctr.*,
No. 19CV5758 (DLC), 2021 WL 930710 (S.D.N.Y. Mar. 11,
2021) .................................................................................................50

*Sidor v. Reno*,
No. 95-cv-9588(KMW), 1997 WL 582846 (S.D.N.Y. Sept. 19,
1997) ............................................................................................58, 59

*Stoler v. Inst. for Integrative Nutrition*,
No. 13-cv-1275, 2013 WL 6068598 (S.D.N.Y. Nov. 18, 2013) ........59

*Tepperwien v. Energy Nuclear Operations, Inc.*,
663 F.3d 556 (2d Cir. 2011) ........................................................55, 56

*Texas Dep't of Cmty. Affs. v. Burdine*,
450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) ..................59

*Tolbert v. Queens College*,
242 F.3d 58 (2d Cir. 2001) .................................................................24

*Tomka v. Seiler Corp.*,
66 F.3d 1295 (2d Cir. 1995) ...............................................................38

*Watson v. Fort Worth Bank & Trust*,
487 U.S. 977 (1988).......................................................................58, 59

*Wiercinski v. Mangia 57, Inc.*,
787 F.3d 106 (2d Cir. 2015) ...............................................................39

## Statutes

New York City Human Rights Law........................................................56

New York Labor Law §194 ...........................................................*passim*

## Other Authorities

29 C.F.R. Section 1607.4(D) ................................................................58

Rule 50 ....................................................................................23, 27, 53

Rule 50(a).........................................................................23, 24, 40, 54

Rule 50(b).........................................................................23, 24, 40, 53

Rule 59 ...................................................................................................53

Rule 59(a)..............................................................................................53

## <u>STATEMENT OF THE ISSUES</u>

1.      Were the jury findings against Appellant on the equal pay claims a manifest injustice? No.

2.      Was the District Court correct in determining that there was a complete lack of evidence to support the findings against Appellees on the retaliation claims? Yes.

3.      Did the District Court err in refusing to charge the jury as to punitive damages? No.

4.      Did the District Court err in refusing to charge the jury as to disparate impact under New York Labor Law §194? No.

002528\5\170819189.v15

## SUMMARY OF THE ARGUMENTS

Appellant does not meet the stringent standards of manifest injustice to overturn the jury's verdict on the equal pay claims, or that the verdict was wholly without legal support. Rather, it is supported by ample evidence. The jury was presented with extensive documentary and testimonial evidence as to each of Appellant's alleged comparators, all of whom testified at trial. The evidence adduced at trial shows that the alleged comparators were better credentialed than Appellant, performed functions that Appellant did not, and worked harder than Appellant. Based on that evidence, the jury properly answered in the special verdict form that Appellant failed to prove that she and the three alleged comparators performed jobs that required the same skill, effort, and responsibility. (A2597.) The jury also properly answered in the special verdict form that Appellant failed to prove that she did substantially equal work as her alleged comparators. (A2598.) Based on the same evidence, and more, the jury also found that the differences in pay were due to factors other than sex, and not because Appellant was a woman. (A2598.) There is thus no basis to disturb the jury's verdict on the equal pay claims.

In contrast, as to the retaliation claims, Appellees demonstrated to the District Court post-trial that the jury's verdict was devoid of evidentiary support. This Court should decline Appellant's invitation to engage in the speculation and

conjecture that would be necessary to reverse the District Court's grant of judgment notwithstanding the verdict on the retaliation claims. As aptly observed by the District Court, to accept Appellant's arguments on the retaliation claims would be tantamount to doing away with the requirement that a verdict must be based on evidence, and instead would let stand a verdict that is based on "rank speculation and conjecture" and "reasoning [that] crosses the line from reasonable inference to conjectural leap." (SPA38-39.) As further observed by the District Court, Appellant's arguments on the retaliation claims boil down to the "assertion that anyone who learns of an employee has lodged a complaint is *ipso facto* aware that the complaint concerns discrimination. But law and logic alike require more." (SPA36.) The District Court's grant of judgment notwithstanding the verdict on Appellant's retaliation claims should therefore be affirmed.

## STATEMENT OF THE CASE

### A.    Relevant Facts Adduced at Trial

The evidence described below was presented to the jury during an eight-day trial from July 10, 2023, through July 19, 2023.

### 1.    Appellant's Employment Prior to NYU and Her Contract with NYU

Appellant is a rheumatologist. She graduated from medical school in 2003. (A2654.) After she finished her residency and rheumatology fellowship, Appellant began private practice with a female partner, Dr. Kavini Mehta, who is also a rheumatologist. (A2654; A1383:4-10.) Together, they engaged in private practice

from 2008 through 2014 in Lake Success, Long Island. (A2654.) The evidence at trial showed that their practice operated at a loss and was sustained by a loan. (*See* A1492:1-9; A1563:3-4; A1564:9-25; A1565:1-11; A1568:9-15; A2749-A2753.) According to Appellant, she and her partner paid themselves $60,000 per annum in the early years of their practice and were paying themselves $200,000 per annum when they were recruited to join NYU in 2014. (A1388:4-9; A1564:20-23; A1491:7-15; A1566:24-A1567:1.)

In 2014, Appellant and Dr. Mehta were recruited to join NYU. (A2654; A1390:2-16.) They negotiated the terms of their contracts with Joshua Swirnow, NYU's Vice President of Ambulatory Care and Business Strategy, and Andrew Rubin, NYU's Senior Vice President of Clinical Affairs and Ambulatory Care, ultimately approved the terms and made the offers of employment. (A1188:4-5; A1570:10-21; A1734:11-15.) In September 2014, Appellant and Dr. Mehta signed employment contracts with NYU and, in or about December 2014, commenced employment in NYU's Lake Success office on Long Island. (A2618-29; A2680-A2691.)

The contracts had a term of three years. (*Id*.) Appellant was to be paid $207,000 per annum. (A2622.) In addition to paying Appellant's salary, NYU agreed to assume Appellant's business loan from her private practice, as well as her 15-year office lease and her equipment leases, thus relieving her of those

financial obligations. (A1790:10-18; A1856:16-24; A2020:8-25; A2628(d).) The loan payments made by NYU amounted to about $326,000, which payments NYU ascribed 50/50 to Appellant and Dr. Mehta, *i.e.*, $53,3333 per annum for Appellant for three years. (A1547:7-A1548:7.)

Like other physicians at NYU, Appellant was expected to meet a target production goal as measured by work relative value units ("wRVU"), which NYU used to track its physicians' outputs to measure their productivity and performance. (A1178:18-24; A2093:4-9; A2625(VII)(c).) WRVUs are government-created metrics that reflect the relative time and difficulty of medical procedures for purposes of Medicare billing. (A1795-A1796.) As adduced at trial, a wRVUs "measures physician work" and is a "standardized, universal in the United States, measure of physician productivity." (A2015:2-15.) In her contract, Appellant's targeted wRVU goal was 4,966, above which she would receive a monetary bonus. (A2625-26.)

In November 2017, Appellant's contract was renewed for another three-year term. (A2633-A2636.) With her having met the targeted wRVU goal and her business loan from her private practice having been paid off, NYU increased her salary to $278,000 per annum. (A2635.) Her targeted wRVU goal was increased slightly to 5,200, which number corresponded to her production in the prior years at NYU. (A2636.)

5

In December 2020, upon the expiration of the three-year term, NYU informed Appellant that her contract would not be renewed and that her employment would be terminated in six (6) months. (A2631.)

2. **NYU's Rheumatology Practice and the Alleged Equal Pay Comparators**

   i. <u>As to Dr. Goldberg</u> – Prior to 2014, NYU lacked a rheumatology practice on Lond Island. (A1801:2-10.)  In early 2014, NYU hired Dr. Avram Z. Goldberg to start and build a rheumatology practice on Long Island since NYU wanted to expand its presence there.  (A2023:19-21; A2712-A2724.)  Prior to joining NYU, Dr. Goldberg was a full-time Assistant Professor of Medicine at Hofstra North Shore-LIJ School of Medicine. (A2790; A2103:6-8.)  He also was a full-time faculty member at the North Shore University Hospital Long Island Jewish Medical Center, where he was the Director of Scleroderma and Raynaud's Treatment Center and a member of the Performance Improvement Committee. (A2103:6-8; A2790- A2791.) In addition to these broader responsibilities, Dr. Goldberg had twelve years more experience as a physician than Appellant.   (Compare A2790-A2791 and A2709- A2711.)  As testified to by Swirnow, Dr. Goldberg's background reflects the prestige and value that he brought to NYU's start-up rheumatology practice, which NYU wished to build and expand with his assistance.  (A1801:2-10; A2023:19-A2024:1.)

The evidence presented to the jury showed that Dr. Goldberg succeeded in building the Long Island rheumatology practice, as well as his own patient care

6

practice, where his production far exceeded Appellant's. (A1805:3-25.) In fact, as part of his role in the growth of this practice, Dr. Goldberg recruited Appellant and Dr. Mehta to join NYU. (A1161:12-14; A1390:7-16.) As to his productivity, he essentially doubled his production as measured by wRVUs once he joined NYU. (A1805:17-22: A2721; A3329.) In 2017, Dr. Goldberg was generating 5,850 wRVUs, compared to Appellant's 5,200. (A3329 and A2636, respectively.) Evidence also was presented to the jury that, unlike Appellant, Dr. Goldberg did not have a business loan that NYU had to pay off, nor a burdensome office lease or equipment leases that NYU had to assume. (A2154:2-11.)

At trial, Appellant contended that Dr. Goldberg was a proper comparator, and that NYU violated the equal pay acts because she was paid less than he. The jury found otherwise. (A2597-A2599.) In the special verdict form, the jury answered in the negative the questions of whether Appellant and Dr. Goldberg were employed in a job requiring substantially equal skill, effort, and responsibility, and whether they did substantially equal work. (A2597-A2598.) The jury also affirmatively found that the difference in Appellant's and Dr. Goldberg's pay was due to factors other than sex. (A2598.)

ii.  <u>As to Dr. Porges</u> – Appellant also contended at trial that Dr. Andrew Porges was a proper comparator. The jury found the opposite. (A2597-A2598.) Dr. Porges was recruited by Dr. Goldberg to join NYU in 2014. (A2156:2-

7

4.)  Like Dr. Goldberg, Dr. Porges performed leadership and administrative duties, which are important functions Appellant did not perform. (A1821:17-A1822:11; A1283:14-18; A1398:13-15; A1413:12-15; A2745: SJA237-SJA238.) For example, Dr. Porges was the Clinical Director of Ambulatory Rheumatology in Long Island and then promoted to Medical Director of the Lake Success site, having the responsibility for ensuring the overall quality of patient care at that site. (A2742-A2745; SJA237-SJA238.) Also, like Dr. Goldberg, Dr. Porges' experience far exceeded Appellant's. (Compare A2793-A2795 with A2709-A2711.)  In fact, Appellant was merely a child when Dr. Porges was already a physician practicing rheumatology.  (*See* A2793-A2795; A1414:7-22.)  Moreover, Dr. Porges performed clinical research that generated revenue for NYU, functions which Appellant did not perform. (A1815:8-11; A1819:6-15; A2730.)

The evidence showed that while both Dr. Porges and Appellant were recruited from private practice, with patient bases that NYU expected to absorb upon hire, their respective practices were far different. Dr. Porges' operated a successful and profitable private practice. (A1562:22-A1563:7; A1564:9-A1565:11; A1808:19-A1809:11; A1815:2-11; A2747-A2753.) Dr. Porges' practice generated $2 million in revenue (A1808:22-24; A2747-A2748), compared to $726,151 that Appellant's and Dr. Mehta's private practice generated.  (A2750-A2753.)  Dr. Porges' private practice generated profits,

8

whereas Appellant's private practice had to be supported by a business loan and operated at a loss. (A1562:22-A1563:7; A1564:9-A1565:11; A1808:19-A1809:11; A1815:2-11; A2747-A2753.) While Dr. Porges' wRVU target was 6,524, he typically achieved more than 6,000 wRVUs a year, which far exceeded Appellant's. (A2288:6-11; and A2734 (Porges' 6,524 wRVUs) compared to A2625 (Appellant's 4,966 wRVUs).)

After hearing this evidence at trial, the jury answered in the negative the questions of whether Appellant and Dr. Porges were employed in a job requiring substantially equal skill, effort, and responsibility, and whether they did substantially equal work. (A2597-A2598.) The jury also affirmatively found that the difference in Appellant's and Dr. Porges' pay was due to factors other than sex. (*Id*.)

      iii.   <u>As to Dr. Modi</u> **-** Similar to Dr. Goldberg, Dr. Modi was hired to build out and expand NYU's rheumatology practice on Long Island, specifically its Huntington location. (A2026:13-A2027:7.) As Rubin testified at trial, NYU had a "large medical group" and a "huge patient population" in the Huntington location, but with very limited rheumatology services there. (*Id*.) NYU therefore wanted to fill the "role" in patient care. (A2075:14-21.)

The jury was presented with evidence that, like Dr. Goldberg and unlike Appellant, Dr. Modi held significant leadership roles and responsibilities prior to

joining NYU that made him a valuable asset and well-suited to build up the Huntington site. (A1826:14-25; A2360:23-A2362:14; A2692.) Dr. Modi was the Chief Rheumatologist for the Queens Long Island Medical Group, a multi-specialty group of 500 physicians. (A2360:23-A2361:4.) Dr. Modi then became a Medical Director at Advantage Care Physician when it took over the Queens Long Island Medical Group. (A2361:25-A2362:3.)

More specifically, as Dr. Modi testified, he had the following leadership and administrative responsibilities while at the Queens Long Island Medical Group:

> Q. And as the chief rheumatology, what were your duties?
> A. Be the liaison between the rheumatologists in the group and administration leadership to kind of discipline them or improve the quality of care standards, as well as a connection between the physicians and leadership if there was a need for any modern equipment, approve their CMEs, their vacation time, any connection between leadership and the rheumatology division.
>
> Q. And how many rheumatologists did you oversee, if any?
> A. Six.

A2361:5-13.

He also had subsequent larger leadership roles and duties while at Advantage Care Physicians, immediately prior to joining NYU:

> Q. And how many physicians did ACP, I'm going to call it, Advantage Care Physicians, ACP, how big was it at the time that you became the clinical director?
> A. The entire practice was approximately same as Queens Long

10

Island Medical Group, 500 physicians.

Q. How many physicians, if any, did you oversee?
A. The practice had over 20 offices. I was the medical director of the Hempstead medical office, which comprised about 15 physicians, two PAs, two nurse practitioners, seven or eight RNs, and then the rest of it was front desk, receptionists, medical assistants.

A2362:4-14.    The record included testimony by Swirnow that these and other

qualities made Dr. Modi "attractive to NYU." (A1826:14-25.) As Swirnow testified:

A. I remember him being a busy rheumatologist, I remember him having a good reputation in the community, and I remember him having had demonstrated leadership positions and that we were recruiting him to our Huntington Medical Group practice, which was a large existing group, about 50 physicians in that practice. But we didn't have any rheumatology services at that practice and we wanted to add that because our patients in that area needed that service, so we identified Dr. Modi as someone that could help -- come in and help see those patients for us.

Q. In hiring Dr. Modi, did NYU have to assume any loans?
A. No.

Q. Did NYU have to take over an office lease?
A. No.

Q. Did NYU have any expenses that it had to take over for staff or office supplies or overhead?
A. No.

(A1826:17-A1827:7.)

The jury also heard additional evidence showing that, like Drs. Goldberg and

Porges, NYU hired Dr. Modi to expand the geographical reach of its rheumatology

practice. As Rubin testified):

11

Q.  So what do you recall about figuring out Dr. Modi's salary?

A.  A couple, couple things. One, he had been referred to us from -- we had been having discussions at the time with Advantage Care Physicians about doing some collaboration services, and his name had come up as a very strong and capable rheumatologist.

We have a large medical group, very large medical group in Huntington, Long Island, with a huge patient population. We did not have rheumatology services there, so we were looking to fill a hole that we had in our network to be able to provide that care. So that would be an example where I was telling you why another -- a salary may be different in that case is because we had a hole to fill, patients that we needed to take care of, so we needed to get someone in there.

(A2026:19-A2027:7.)

The jury also heard from Rubin that the physician's reputation is of "extraordinary" value because it helps to both recruit other physicians and attract patients.  (A2089:22-A2090:8.)  The evidence showed that Dr. Modi possessed significant reputational prominence, having held leadership roles in a large medical practice. These were leadership responsibilities, experiences, and reputation that Appellant did not possess.

Dr. Modi further distinguished himself from Appellant in terms of productivity and effort.  Prior to joining NYU, Dr. Modi already was more productive than Appellant, having produced 6,100 wRVUs in his last year at Advantage Care Physicians. (A2365:22-A2366:25; A2692.)  This productivity for which he was recruited continued at NYU, where he consistently generated higher

12

wRVUs than Appellant. (A2636; A2671; A2351:6-22.) Moreover, the unrebutted evidence showed that Dr. Modi's production reflected effort that far exceeded that of Appellant. (*Id.*) When they were both employed at NYU, Dr. Modi saw patients five days a week (A2370:2-5), while Appellant saw patients less than four days a week. (A2369:11-15; A1205:13.) Dr. Modi had wRVU targets of over 6,000 annually at NYU, which he met each year. (A2351:7-A2353:8.) That put Dr. Modi in the top ten percent of all rheumatologists in the country. (A2366:3- A2367:6.) Appellant's effort was not even close - her wRVU target was 5,200 in 2017. (A2636.)

In addition to outworking Appellant, Dr. Modi is also more experienced than Appellant, having practiced two years longer than she. (A2345:19-A2346:21.) Furthermore, Dr. Modi testified that he would not have joined NYU without a raise. (A2365:1-12.)

At trial, Appellant contended that Dr. Modi was a proper comparator. The jury found otherwise. (A2597-A2598.) In the special verdict form, the jury answered in the negative the questions of whether Appellant and Dr. Modi were employed in a job requiring substantially equal skill, effort, and responsibility, and whether they did substantially equal work. (A2597-A2598.) The jury also affirmatively found that the difference in Appellant's and Dr. Modi's pay was due to factors other than sex. (A2598.)

13

On appeal, Appellant implicitly acknowledges that the jury's findings as to Dr. Goldberg and Porges were proper and does not contest that portion of the verdict, but contends that the jury's findings as to Dr. Modi were "wholly without legal support" and that must be set aside to "prevent manifest injustice." (App. Br. 40.)

### 3. Appellant's Interactions with Antonik and Pacina and the Alleged Retaliation

On September 16, 2019, Joseph Antonik, a member of NYU's administrative staff and Site Director at NYU's Lake Success location, visited Appellant's office in that location. (A1203-A1204.) Appellant testified that Antonik informed her that, because NYU had hired a new rheumatologist, another physician would need to use Appellant's office during the two days of the week when Appellant was not using it. (A1204:9-16.) Appellant told Antonik that she would need to review her employment contract, together with her attorney, at which point Antonik allegedly became animated. (A1205:7-18.) According to Appellant, Antonik raised his arms and pointed to pictures and other personal items in the office, stating that Appellant did not own the office just because she put her stuff there. (A1206:6-12.) Appellant testified that Antonik said that it all belongs to NYU and that we own you. (A1206:12-14.) Appellant further testified that Antonik also uttered the word "bitch" under his breath. (A1206:16.) Antonik denied using that word. (A1623:16-22.) Appellant further testified that she felt intimated because she is a small person

whereas Antonik is tall, and told Antonik to leave her office, which he did. (A1206:9-19.)

The next day, Appellant called Kathleen Pacina, a NYU Human Resources manager responsible for handling performance issues, employee disputes, and other employee related issues. (A1209:21-24; A2176; SJA236.) Appellant complained to Pacina about what transpired with Antonik. (A1210:2-10; SJA236.) When asked by her attorney at trial why she made the complaint, Appellant testified that Antonik conduct was "hostile and abusive" and "sexist, discriminatory, and chauvinistic." (A1210:2-6.)

Pacina took detailed notes of the call with Appellant. (SJA236; A2195:19-24.) Her notes mention that, according to Appellant, Antonik was "intimidating" and was "throwing his arms and pointing at things" and that Antonik told Appellant that he would bring it up to "the power that be" when Appellant said that contractually the office is designated for her. (SJA236.) Absent from Pacina's notes of her call with Appellant, however, are any mention that Antonik's interactions with Appellant were described as "abusive and hostile" or "sexist, discriminatory, and chauvinistic." (SJA236; A2198:1-4; A2198:24-A2199:1.) Nor do the notes state that Antonik used the word "bitch." (SJA236.) Pacina testified that her notes contained what Appellant had told her. (A2195:19-24; A2196:18-22.) Appellant similarly

15

testified that Pacina took down everything that Appellant said on the call. (A1210:7-10.)

Pacina testified that she did not understand Appellant's complaint to be a matter of discrimination, but rather a dispute about office space. (A2189:23-25; A2190:6-13; A2198:1-4; A2208:5-14; A2212:10-20.) Under direct examination by counsel for Appellant, Pacina testified that she understood that Appellant's complaint was about office space, as reflected in her contemporaneous notes, and not about discrimination.

> Q. Did you understand that Dr. Edelman complained about the way she was treated vis-à-vis her gender?
> A. No.
>
> Q. It's fair to say that Dr. Edelman told you that her complaint was not just about office space, correct?
> A. No. She -- she spoke to me about the office space.
>
> Q. And she never told you that it was not about the office space, it's about the way she was spoken to; that's your testimony today?
> A. When -- I don't recall if it was about the way she was spoken to, but what I can recall is about the office space.
>
> Q. And our testimony, as you sit here today, is that Dr. Edelman's complaint did not raise any concerns to you about a hostile work environment; correct?
> A. That's correct.

A2189:23-25; A2189:6-13; A2198:1-4.)

Not only is there a complete lack of evidence from Pacina that Appellant complained about discrimination during the call, there is also a complete lack of such evidence from Appellant regarding the call. Presumably for strategic reasons, Appellant's counsel never asked Pacina or Appellant the specific questions of whether Appellant told Pacina during the call that she thought Antonik's action was "abusive and hostile" or "sexist, discriminatory, and chauvinistic." Appellant's counsel also chose not to ask Pacina or Appellant the direct question of whether Appellant said during the call that Antonik used the word "bitch." As aptly observed by the District Court, Appellant "neither testified nor adduced any other evidence indicating she told Pacina that Antonik had called her a 'bitch.'" (SPA33.)

On cross, Pacina testified further that Appellant's complaint to her was about office space, and not about discrimination:

> Q. With respect to the phonecall you had with Dr. Edelman, you only talked to her the one time; right?
> A. Yes.
>
> Q. So what do you recall about the nature of that phonecall and what she said to you?
> A. I remember her, she was upset about being told that she had to have someone else in the office space and that she said she was entitled to that office space per her contract.
>
> Q. Do you recall anything else specifically that she said?
> A. No, not specifically.
>
> Q. Did she raise issues that at the time you regarded as being discrimination, gender discrimination, that kind of thing?
> A. No.

17

(A2208:2-14.)

After the phone call with Appellant, Pacina spoke with Antonik. (SJA236; A2196:23-A2197:2.) According to her notes of the call, Antonik denied raising his arms and said that his request to Appellant to share her office was not personal, as office sharing happens often with other NYU doctors. (SJA236; A2196:23-A2197:2.) Pacina advised Antonik that she would speak with his supervisor, David Kaplan, and that Mr. Kaplan should reach out to Appellant. (SJA236; A2193:14-24: A2209:15-24.) Pacina testified at trial that she decided to reach out to Kaplan because she thought Appellant reported to Antonik and, as per NYU protocol, she wanted someone in leadership above Antonik to be aware of Appellant's complaint. (A2209:15-24.) There is no evidence in the record that after this one call with Antonik, Pacina had any further communications with him. (A1617:19-21; A2196:23-A2197:2)

Pacina then spoke with Kaplan. (SJA236; A2193:17-A2194:4.) Subsequently, on September 25, 2019, Kaplan met with Appellant in her office. (A1686:20-A1687:16.) Although Kaplan apologized for what happened with Antonik, he explained to Appellant that her contract did not give her the right to be in her office five days a week and that she would need to share her office on Thursday and Fridays, when she was not using the office. (A1213:15-21; A1687:23-A1688:8.) According to Appellant, she became "upset." (A1214:7-11.) Kaplan responded by

18

asking her to "calm down," which Appellant felt was "demeaning" and "patronizing." (A1215:7-12.)  She got up and told Kaplan to leave, which he did. (A1215:11-12; A1687:23-A1688:8; A1451:2-4.)   After this meeting, Appellant wrote an email to Pacina, complaining about the "mannerism with which I was treated" and opining that Kaplan engaged in "bullying." (SJA293-SJA294.) Appellant further stated that she was disappointed in having to deal with "male chauvinism" and that she does not know why she was "being discriminated against to accommodate another physician."[1]   (*Id*.)   Pacina forwarded this email to her supervisor, Claudia Rose, and requested to have a call with her. (*Id*.)

On October 8, 2019, Pacina wrote in her notes that Appellant's complaint had been resolved, in that Appellant had met with NYU's senior executive Swirnow, who explained to Appellant the rationale for other doctors to use her office when she is not physically in the Lake Succes location and that she was not the only one whose office was needed and had to be shared.   (SJA236; A2204:9-16; A2208:20-A2209:10.)

### 4.  <u>The Non-Renewal of Appellant's Contract</u>

In November 2020, Dr. Porges, the Medical Director at the Lake Success location having supervisory responsibility over Appellant's patient care (SJA237-

---

[1] The trial record shows that both female and male physicians alike had to share their offices. (A1635:15-A16367:1; A1923:7-A1924:12.)

SJA238), raised issues concerning Appellant's performance. (A2804-A2812.)  His

concerns were twofold, to wit: the quality of her patient care and her treatment of

other NYU employees in the office.  (A2804-A2812.)  Dr. Porges reported that while

he had those concerns for several years, they escalated recently.  (A2804.)  In

particular, Dr. Porges noted the following:

> Dr. Edelman has a pattern of ordering lab tests in a pattern not in
> keeping with the usual standards of rheumatology practice.  Her
> MA [Medical Assistant] is routinely needing more than 10 tubes
> of blood to run a long list of obscure tests. The result of excessive
> testing is many false positive results, which then leads to more
> testing and some questionable diagnoses being pursued.  In many
> cases, as a result of excessive testing important true positive
> findings have been lost for weeks or longer.  Similarly, the Xray
> techs have come to me on many occasions expressing concern
> regarding excessive Xrays.  I have received complaints that she is
> ordering xrays on more than 10 areas in a single patient visit on a
> frequent basis.  Aside from the resultant work flow, the Xray staff
> are genuinely concerned about unnecessary patient Xray
> exposure.

(A2805.)

Given these serious clinical concerns regarding patient care expressed by Dr.

Porges, who was the Medical Director responsible for overseeing NYU's Lake

Success site, Rubin investigated the matter. (A2027:19-A2028:16.) He spoke with

Drs. Porges and Goldberg to better understand their concerns.  (A2027:19-

A2028:16.)  Both Dr. Porges and Dr. Goldberg advised that it was their opinion as

supervising physicians that the clinal practice problems exhibited by Appellant could

not be remediated and, consequently, recommended that Appellant's contract with

20

NYU not be renewed at the end of its term. (A2028; A2133:19-21; A2144:6-9; A2167:24-A2168:3-14; A2230:20-A2231:1-12; A2325:24-A2326:1-3.) Nonetheless, Rubin considered options other than not renewing Appellant's contract and further queried whether this was "something fixable." (A2029:11-17.) Drs. Porges and Goldberg, however, advised Rubin that "it was their professional opinion that it couldn't be resolved." (A2029:19-20; A2133:19-21; A2230:20-A2231:12.) As a result, Rubin consulted with "the chair of medicine and [his] boss", who supported Appellant's nonrenewal. (A2030:4-6.) After also consulting with attorneys at NYU, Rubin advised Appellant in December 2020 that her contract would not be renewed. (A2029:21-A2030:2; A2631.)

## B.   **Procedural History**

After she was notified that her contract with NYU would not be renewed, Appellant filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission on January 8, 2021. (A3238-A3266.) On January 20, 2021, Appellant commenced her lawsuit in the Southern District of New York (A3269-A3287), even though she had not yet received a right to sue notice from the EEOC. (*See* A3279:59.)

In February 2022, Appellees filed a motion for summary judgment seeking to dismiss the entire action. (A22-A23 (Dkt. No. 108-115).) In September 2022, Judge Schofield rendered a decision on the motion. (A130-A162.) Judge Schofield granted

summary judgment on (i) EPA unequal pay claims against Kaplan and Antonik; (ii) Title VII and NYSHRL discrimination claims against all defendants; (iii) Title VII retaliation claims against the individual defendants; and (iv) NYCHRL discrimination claims against all defendants except to the extent the claims are based on alleged sexist remarks. (A162.) Judge Schofield denied the motion in regard to (i) unequal pay under the EPA against NYU, Swirnow, and Rubin; (ii) Title VII retaliation against NYU; (iii) NYCHRL discrimination based on alleged sexist remarks against all Defendants; and (iv) NYCHRL and NYSHRL retaliation against all defendants. (*Id.*)

In December 2022, Judge Schofield granted Appellant leave to file a second amended complaint to assert an additional equal pay claim under New York Labor Law § 194. (A31 (Dkt. No. 169); A174-A187.)

On June 7, 2023, the action was reassigned to Judge Liman for trial. (A38.) Judge Liman conducted the trial commencing July 10, 2023, through July 18, 2023. (A44-A46.) At the close of evidence, Appellees moved for a directed verdict. (A2387-A2398:14.) Appellant opposed the motion and did not move for a directed verdict. (A2398:15-A2419:16.) Judge Liman partially granted Appellees' motion, dismissing all claims against Kaplan and all punitive damage claims. (A2431:A2433:5.)

On July19, 2023, the jury rendered its verdict. (A2597-A2603.) Both sides then filed post-trial motions for judgment notwithstanding the verdict under Rule 50. (*See* A47-A49.) Judge Liman denied Appellant's motion to vacate the jury verdict on her equal pay and discrimination claims. (SPA2-SPA48.) Judge Liman granted Appellees' motion to vacate the jury verdict on the retaliation claims and entered judgment in favor of Appellees. (SPA2-SPA48.)

## ARGUMENTS

### POINT I

### The District Court's Denial of Judgment as a Matter of Law on the Equal Pay and Discrimination Claims is Correct

**A.      Appellant Must Meet the Heightened Legal Standard**

Appellant did not move for a judgment as a matter of law at trial under Rule 50(a). As a result, Appellant may only be granted a judgment notwithstanding the verdict to prevent manifest injustice. Appellant has not met this heightened and stringent standard.

As this Court explained: "A post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if Rule 50(a) motion for judgment as a matter of law has been made before submission of the to the jury." *Bracey v. Bd. of Educ. of City of Bridgeport,* 368 F.3d 108, 117 (2d Cir. 2004). Because Rule 50(b) merely permits a party to "renew" its motion after an unfavorable verdict, "the posttrial

motion is limited to those grounds that were specifically raised in the prior motion for JMOL; the movant is not permitted to add new grounds after trial." *Tolbert v. Queens College,* 242 F.3d 58, 70 (2d Cir. 2001).

"The law is pellucid that a party's failure to move under Rule 50(a) has consequences. If that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice." *ING Global v. United Parcel Services*, 757 F.3d 92, 97 (2d Cir. 2014). "Manifest injustice exists where a jury's verdict is wholly without legal support." *Id.* Since Appellant did not move for a directed verdict under Rule 50(a) and is therefore limited to challenging on appeal the District Court's denial of her motion under Rule 50(b), she acknowledges she must meet this elevated standard. (App. Br. 40.) But she then ignores and fails to meet it.

**B.**     <u>**There is Ample Evidence to Support the Verdict**</u>

After an eight-day trial in which Appellant was permitted to present exhaustive evidence concerning her equal pay claims, she failed to obtain a verdict in her favor. Having failed to persuade the jury, Appellant now seeks to have this Court grant her the judgment she could not achieve at trial.

At trial, Appellant contended that three male physicians, Drs. Goldberg, Porges, and Modi, were proper comparators for her equal pay claims and presented

extensive evidence in that regard. The jury heard from these physicians and found that, as to each of them, Appellant did not prove they were employed in a job requiring "substantially equal skill, effort, and responsibility" as hers. (A2597 (Question No. 1).) This finding, alone, doomed Appellant's equal pay claims. The jury also found that Appellant failed to prove, as to each comparator, she was paid less for doing substantially equal work. (A2598 (Question No. 3).) This additional finding, alone, also doomed Appellant's equal pay claim.

In addition, the jury also determined that Appellees proved their affirmative defense that the difference in Appellant's pay was due to factors other than sex. (A2598 (Question Nos. 4 and 6).) This finding provided a separate and additional bar to Appellant's equal pay claims.

Completely defeated at trial on her equal pay claims, Appellant now changes tack on appeal and ignores the evidence that she introduced at trial as to who were her proper comparators. Instead, she seeks to effectively have this Court, instead of the jury, retry the case, using only Dr. Modi as the comparator. Appellant would have this Court ignore the compelling evidence presented at trial that the jury certainly was entitled to rely upon as to why the male doctors she identified were paid more than she. There is no such do-over under the rules. Nor is there any reason to supplant the jury's findings. Appellant was able to try the case she chose and lost. Simply put, there is no "manifest injustice" for the jury to find against

25

Appellant where the evidence showed that all her alleged comparators, including Dr. Modi, have better credentials, worked harder, were more productive, and served the strategic goals of NYU that she did not.

Appellant's attempt now to isolate Dr. Modi fails in any event because there is ample evidence to support the verdict as to him. As Appellant acknowledged in opposing Appellees' motion for a directed verdict at trial, the determination of the claims and issues are "very fact-intensive" that must be based on the "totality of the circumstances." (A2399:17-18; A2401:4-5, A2407:14-17, A2409:14-16); *see Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 149 (2002) ("in entertaining a motion for judgment as a matter of law, the court should review all of the evidence on the record" and "must draw all reasonable inferences in favor of the nonmovant"). The evidence adduced at trial, sampled below, was more than sufficient for the jury to reach its verdict.

## 1. **Equal Work**

As to the legal standards on equal work (A2610 (Question No. 1)), the District Court's unchallenged instructions to the jury included the following:

> [W]ork is not considered substantially equal if material differences in skill, effort, or responsibility exists."
> (A2530:19-20.)

> First, in deciding whether jobs require substantially equal skill, you should consider such factors as the level of education, experience, training, and ability necessary to meet the performance requirements of their respective jobs.

26

(A2531:4-8.)

Second, in deciding whether the jobs require substantially equal effort, you should consider the mental or physical exertion in connection with the performance of the job. (A2531:19-22.)

In deciding whether the jobs involve substantially equal responsibility, you should consider the degree of accountability *expected* by the employer for the person filling the jobs, as well as the amount of preparation required to perform the job duties. (A2532:14-18.)

Critically, the District Court further instructed the jury, "[y]ou should note that 'skill,' 'effort,' and 'responsibility' constitute separate tests, each of which must be met in order for the equal pay requirement to apply." *(*A2532:23-25.)  The jury determined that Appellant failed to carry the burden on these threshold issues.

Now, on appeal, Appellant has failed to carry her burden under Rule 50 showing that the jury's verdict is "wholly without legal support." *ING Global*, 757 F.3d at 97.  Rather than meeting this burden, Appellant's brief presents merely a repetition of what she apparently believes to be her strongest evidence that she already pitched to the jury without success.  (App. Br. 42-46.)  But the jury was not bound to credit only the evidence Appellant now selects.  This Court should decline to engage in the fact finding that Appellant urges upon it.

In contrast to Appellant's lack of evidence to carry her burden, Appellees presented ample evidence for the jury to find against Appellant on the following, even though Appellees did not bear any burden of proof on these issues.

### i. As To Skill

The trial evidence showed that Dr. Modi was more experienced than Appellant by at least two years. (A2345:19-A2346:21.)

The evidence further showed Dr. Modi's significantly superior leadership and management experience and responsibilities before joining NYU, having served as the Chief Rheumatologist and Medical Director at his prior employer, where he supervised fifteen physicians, twelve non-physician medical professionals, and several support staff. (A2360:19-A2362:14; A2692.) In contrast, Appellant came from a small two-physician practice that she ran at a financial deficit. (A2750; A1383:4-16; A1492:1-9; A1563:3-4; A1564:9-A1565:11; A1568:9-15.)

In sum, Dr. Modi had greater skills, especially to meet NYU's business goal of expanding its rheumatology practice on Long Island, factors to which its business leaders testified were relevant to their decision on hiring and compensation. (A1826:14-25; A1826:17-A1827:7; A2346:20-21; A2360:9-A2362:14; A2026:20-A2027:7; A2793.)

### ii. As to Effort

Dr. Modi testified that he saw patients 5 days a week at NYU (A2370:2-5), compared to Appellant who generally saw patients less than four days a week (A1205:12-15; A2369:11-15.) Dr. Modi's productivity target was 6,100 wRVUs annually at NYU when he was hired in 2017. (A2352:15-A2353:8; A2367:1-6.)

That put Dr. Modi in the top tenth percentile of all rheumatologists in the country. (A2366:22-25.) Appellant's effort was not even close, never approaching the targets regularly set for Dr. Modi that he exceeded. Instead, Appellant's wRVU target was much lower at 5,200 in 2017 compared to Dr. Modi's 6,100. (A2636.) As explained by Rubin, wRVU is a "standardized, universally accepted in the United States, measure of physician productivity." (A2015:2-15.) As further explained by Rubin, because some physicians work slower and some faster, "the only measure we can use that's universally accepted and fair for everyone is the work-RVU. It removes all other factors and styles on how physicians choose to practice. … It's the equalizing number." (A2017:3-11.) From an economic perspective, Rubin explained that "the concept is the more RVUs the more efficient the practice is, and therefore, the more economic – positive economic value there is to the [NYU] health system." (A2016:5-8.) Appellant's and Dr. Modi's levels of productivity were consistently unequal throughout their respective tenures at NYU, as well as prior to their recruitment. Accordingly, Dr. Modi's economic value to NYU was higher than that of Appellant.

In this regard, the trial evidence also showed: (i) Dr. Modi saw patients five days a week, whereas Appellant saw patients less than four days a week (A2370:2-5; A1205:12-15; A2369:8-15); and (ii) Dr. Modi was brought in to be responsible for rheumatology care of virtually the entire Huntington location, which was "a huge

patient population," whereas Appellant was one of several rheumatologists in the Lake Success location.  (A1897:12-19; A2026:13-A2027:7.)

Simply put, Dr. Modi outworked and out produced Appellant, exerting more "effort" both before and after he was hired. (A1897:12-19.)

### iii.   As to Responsibility

NYU was building and expanding its rheumatology practice on Long Island when it hired Dr. Modi, just as it did when it hired Dr. Goldberg, albeit further along in that process.  (A2023:19-A2027:7.)

Dr. Modi was responsible for virtually the entire rheumatology practice at the Huntington location, which had "a huge patient population" (A2026:13-A2027:7), whereas Appellant was one of several rheumatologists in the Lake Success location working under the leadership of Drs. Goldberg and Porges. (A1897:12-19.)   In sum, Dr. Modi had more responsibility than Appellant.

Thus, the mass of evidence on the separate tests of skill, effort, and responsibility heard by the jury provided sufficient evidence to conclude that Appellant failed to prove equal work.  Appellant must satisfy each of the three individual tests to prove equal work, but instead she failed to meet any. As the District Court stated in instructing the jury, "'skill,' 'effort,' and 'responsibility' constitute separate tests, each of which must be met in order for the equal pay requirement to apply." (A2532:23-25.) The vast amount of evidence provided more

30

than a sufficient basis for the jury to find that Appellant failed to prove that she was paid less for doing substantially equal work in comparison to Dr. Modi. Based on this evidence, there is no "manifest injustice" in the jury's verdict that Appellant failed to prove her equal pay claims.

## 2. **Ample Evidence Supports Findings of Factors Other Than Sex**

In addition to finding that Appellant failed to prove equal work, the jury also found that Appellees proved that any difference in pay was based on factors other than sex, even though Appellees did not bear this burden since Appellant failed to prove her prima facie case. The jury finding for Appellees on this affirmative defense is a complete bar to the equal pay claims, even if Appellant had proven all elements of the claims, which she did not. *Mazzella v. RCA Global Comm., Inc.*, 642 F. Supp. 1531, 1551 (S.D.N.Y. 1986), *aff'd*, 815 F.2d 653 (2d Cir. 1987) (the "factor other than sex" affirmative defense, if proven, "is a complete defense to conduct that would otherwise violate the statute").

The law is clear that factor other than sex is a "catch all" used to cover a myriad of non-sex-based factors for the difference in pay. *Corning Glass Works v. Brennan*, 417 U.S. 188, 204, 94 S. Ct. 2223, 2232, 41 L. Ed. 2d 1 (1974); *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 519 (2d Cir. 2023).

The evidence adduced at trial showed that those factors included: the physicians' credentials, years of experience, reputational status, productivity, the

31

need of the NYU network, and whether a particular geographical location was being covered. These elements constitute factors other than sex under the EPA and under NYLL §194. An examination of the District Court's decision, in this regard, shows that it was not erroneous and was supported by the evidence. (*See* SPA22-SPA25.) Below is a sampling of that evidence.

i.   As To Gender Neutral Factors Generally

Rubin, the decision-maker on hiring and compensation, testified to the jury as to the gender-neutral factors that were considered by NYU in hiring physicians and determining their compensation.

> Q. What is your role in determining what physicians are hired and how much they get paid?
> A. My role? I hire the person. I make the offer.
>
> Q. OK. And what is your process for determining what offer to make?
> A. I'm going to look at the business plan that we've all seen. I'm going to look at their credentials. I'm going to look at the need in the network. I'm going to look at how many years' experience they have. I'm going to look at their external activities, if they have them. And again, some do, some don't. I'm going to look at the geography, where we're putting them. And then based on all those factors, when I meet with the physician, with that business plan as sort of the foundation, we would present an offer.
>
> Q. That business plan gives you some of the economic information?
> A. Business plan – I used the word "foundation" on purpose. It sets the baseline for what we think, you know, gives us the guide point, the starting point of where we think we need to go.

Q. Is it the only relevant factor?
A. No. That's what I was saying. There's lots of other factors, and those, again, can be academic versus nonacademic; years of experience; the reputational status in the community; do we have a need in the community that we can't meet? Do we have a geography that we can't cover? So there are all sorts of factors that go into compensation of how we pay a physician beyond just the economics of a business plan.

(A2010:8-A2011:13.)

ii.   As To Gender Neutral Factors Regarding Modi

The testimonial and documentary evidence presented at trial showed not just one, but multiple, "factors other than sex" supporting the jury's finding that the difference in pay between Appellant and Dr. Modi's was not gender-based. Indeed, there is no evidence in the trial record from which a jury could conclude that gender played any role in setting the compensation of physicians at NYU. There is no manifest injustice in the jury's verdict in this regard.

The jury was presented with evidence showing that, like Dr. Goldberg, Dr. Modi was hired to further NYU's goal of geographical expansion of its rheumatology practice on Long Island and to fill the needs of a particular location. As Rubin testified:

Q. Were you directly involved in hiring Dr. Modi?
A. Yes.

Q. And you were involved in negotiating his salary?
A. I was.

Q. So what do you recall about figuring out Dr. Modi's salary?

A. A couple, couple things. One, he had been referred to us from -- we had been having discussions at the time with Advantage Care Physicians about doing some collaboration services, and his name had come up as a very strong and capable rheumatologist. We have a large medical group, very large medical group in Huntington, Long Island, with a huge patient population. We did not have rheumatology services there, so we were looking to fill a hole that we had in our network to be able to provide that care. So that would be an example where I was telling you why another -- a salary may be different in that case is because we had a hole to fill, patients that we needed to take care of, so we needed to get someone in there.

(A2026:13-A2027:7.) The jury therefore could consider this evidence and properly conclude that a gender neutral, bona fide business-related reason existed for the difference in pay: NYU's goal of expanding its rheumatology practice on Long Island.

Furthermore, the evidence presented to the jury showed that, similar to Dr. Goldberg and unlike Appellant, Dr. Modi had significant leadership roles and responsibilities prior to joining NYU.  For example, Dr. Modi testified he was the Chief Rheumatologist for the Queens Long Island Medical Group, a multi-specialty group of 500 physicians located in Queens and Long Island, where he supervised six rheumatologists.  (A2360:9-A2361:13; A2692.)  Dr. Modi then became a Medical Director at Advantage Care Physician when it took over the Queens Long Island Medical Group, where he supervised 15 physicians, twelve non-physician medical professionals, and several support staff. (A2360:9-14.)  These are leadership responsibilities and experiences, and prestige, that Appellant did not possess.  To the

34

contrary, the evidence showed that Appellant ran a money-losing two-person private practice and, while at NYU, had difficulty in maintaining a professional working relationship with the staff in the office she shared with other physicians and was counseled by leadership to interact successfully with her co-workers. (A1735:12-14; A1828:13-A1830:7.)

The evidence presented to the jury also showed that Dr. Modi is otherwise more qualified based on his greater experience, having practiced two years longer than Appellant. (A2345:15-A2346:21; A2692.)

The evidence therefore amply allowed the jury to properly conclude that employing a more qualified and more prominent rheumatologist than Appellant, such as Dr. Modi, would bring prestige and value to NYU and help its goal of expanding and improving its rheumatology practice on Long Island. As Rubin testified at trial, "having a strong clinical leadership, strong clinician with good stature, reputations in the community, the [NYU] health system benefits, and quite frankly, all the doctors who don't have that stature benefit." (A2090:4-8.) Indeed, the evidence showed that NYU repeatedly sought and hired highly qualified rheumatologists with significant reputational status in the community, from Dr. Goldberg, to Dr. Porges, to Dr. Modi, in the execution of its goals of expanding and improving its rheumatology practice.

Dr. Modi also distinguished himself from Appellant by outworking her, thus providing evidence to the jury of an additional factor other than sex. In this regard, the jury was presented with evidence showing that prior to joining NYU, Dr. Modi was already more productive than Appellant, having produced 6,100 wRVU in his last year at Advantage Care Physicians. (A2365:22-A2366:25.) As Dr. Modi explained, the 6,100 wRVU production put him in the top ten percent of all rheumatologists in the entire country. (A2366:22-25.) While at NYU, the evidence upon which the jury was entitled to rely showed that Dr. Modi's annual wRVU target in 2017 was 6,108 (A2662-A2673) (which he met each year (A2351:7-A2353:8)), whereas Appellant's wRVU target was 5,200 in 2017. (A2633-A2636.) The evidence further showed that while at NYU, Dr. Modi saw patients five days a week (A2370:2-5), while Appellant saw patients less than four days a week. (A2369:11-15; A1205:13-15.)

The jury was entitled to rely on and credit all or part of this vast amount of evidence, including that Dr. Modi was more qualified, worked harder, and was more productive than Appellant, even though they were both rheumatologists. The evidence at trial, therefore, provided the jury with a proper basis to determine that NYU proved that it actually paid based on bona factors other than sex, and that the factors were both job-related and consistent with business necessity.

36

The jury was also presented with evidence that, prior to joining NYU, Dr. Modi was already making more money than Appellant and that he would not have joined NYU without the raise for which he negotiated. (A2364:4-A2365:12.) The compensation that NYU offered Dr. Modi was necessary to lure him to the Huntington location in order to accomplish the business goals of geographical expansion of the rheumatology practice and to service the need of a large patient base in that location. (A2026:19-A2027:7.)

Accordingly, Appellant failed to prove that the jury's verdict was "wholly without legal support," a burden which she must carry for this Court to vacate the jury's verdict. Rather, there is ample evidence for the jury to conclude that Appellees carried their burden of proving factors other than sex. As this Court has explained, "differentials based on any other factor other than sex" exclusion is a "broad general exception" to the prohibition against pay differences between women and men. *Hodgson v. Corning Glass Works*, 474 F.2d 226, 232 (2d Cir. 1973) (quoting Congressional Committee Report). The jury certainly could have considered any or all of the gender-neutral distinguishing factors between Appellant and Dr. Modi in concluding that Appellant's sex did not play a part in the pay difference. Appellant has no basis to contest the jury's determination in this regard.

**3.** **Appellant's Case Citations are Inapposite** – The cases cited by Appellant in support of her equal pay claims are beside the point and do not support

37

the grant of a JNOV.  First, the cases do not present any novel legal principle, and, in any event, Appellant did not challenge the District Court's legal instructions on the elements of the equal pay claims and defenses thereto as insufficient or erroneous.  Second, inasmuch as those cases discuss general principles of law and their applications to the facts specific to those cases, they are inapplicable here since the jury heard evidence particular to this case and made its determinations based on the evidence presented to it.  Third, to the extent Appellant contends that the jury misapplied the law in reaching the verdict, Appellant has shown no such evidence, let alone demonstrating that the verdict is a manifest injustice and wholly without legal support.

Indeed, certain of the cases relied upon by Appellant are not even good law. For example, Appellant cites to *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), for the proposition that an employer "who attempts to justify a pay differential based on a 'factor other than sex' must also prove that the gender-neutral factor was adopted for a legitimate business reason." However, this Court abrogated the *Tomka* decision in *Eisenhauer*, 84 F.4th at 519 ("[t]o establish the EPA's 'factor other than sex' defense, a defendant must prove only that the pay disparity in question results from a differential based on any factor except for sex." *Id.* at 523-524.) Regarding footnote 7 of Appellant's brief (App. Br. 41), there was ample evidence for the jury to find that the factors other than sex established by NYU in setting

38

compensation were job related as required under NYLL §194. As shown above, the trial record is replete with extensive evidence demonstrating that the factors other than sex proven by Appellees were job related. The evidence presented at trial amply demonstrated that the factors utilized by NYU in negotiating rheumatologists' salaries had a manifest relationship to the jobs in question and there was no manifest injustice in the jury's verdict.

**POINT II**

**The District Court's Grant of the Motion for
Judgment Notwithstanding the Verdict
<u>on the Retaliation Claims was Correct</u>**

**A.  <u>The Legal Standard for Judgment Notwithstanding the Verdict</u>**

A judgment notwithstanding the verdict ("JNOV") "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against [it]." *Wiercinski v. Mangia 57, Inc*., 787 F.3d 106, 112 (2d Cir. 2015) (quoting *Brady v. Wal-Mart Stores, Inc*., 531 F.3d 127, 133 (2d Cir. 2008)).  A JNOV motion under Rule 50(b) "should be granted only if the court can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would

39

have been compelled to accept the view of the moving party." *Id*. at 113 (quoting *Fairbrother v. Morrison*, 412 F.3d 39, 48 (2d Cir. 2005)).

This Court further explained that because a JNOV "is in reality a renewal motion for a directed verdict, it cannot assert new grounds for relief." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53-54 (2d Cir. 1993). Unlike Appellant, Appellees moved under Rule 50(a) after the close of evidence at trial and preserved their right to renew the motion post-trial. Appellant does not challenge on appeal the District Court's determination that the grounds raised in Appellees' Rule 50(a) motion were sufficiently specific to include those raised in their Rule 50(b) motion. Rather, Appellant contests the District Court's determination that, given there was a complete lack of evidence to support the notion that Antonik was aware that Appellant's complaint concerned gender discrimination, Appellant failed to adduce evidence to sustain a finding of retaliatory intent necessary to establish a retaliation claim. (SPA 32-33.) Appellant continues to fail on appeal in this regard.

## B. <u>No Evidence that NYU Knew or Understood Appellant Complained of Discrimination</u>

**1. Evidence as to Pacina's Knowledge and Understanding** – In contending that there was evidence for the jury to conclude that Antonik knew Appellant had complained to Pacina about discrimination, Appellant relies on the following testimony.

> Q. Did you explain to Ms. Pacina what you had just described
> to the jury over the last couple minutes [sic]?
> A. I did. A1211:7-9.

 (App. Br. 16; *See also* A1210:11-A1211:4.) This reliance is flawed for the following reasons.

First, this testimony is insufficient evidence for the jury to conclude that Appellant's complaint to Pacina was about discrimination when she first spoke with her, and before Pacina spoke with Antonik. Appellant's testimony shows that her use of buzzwords such as "abusive and hostile" and "sexist, discriminatory, chauvinistic" was about how she *felt* about her interaction with Antonik, not what she *told* Pacina. (A1210:2-8.) Appellant cannot substitute how she felt with what she actually told Pacina as evidence of Pacina's knowledge. Moreover, Appellant's repeated use of the word "bitch" on appeal does not address the fundamental issue of what Pacina knew. As the District Court observed, Appellant "neither testified nor adduced any other evidence indicating that she told Pacina that Antonik had called her a 'bitch.'" (SPA33.) Having failed to adduce such evidence either through the notes of Pacina's call with her (SJA236), which do not mention the word "bitch" or any other indication of discrimination, or through any testimony at trial or any other evidence, Appellant cannot now ask this Court to try a different case under different facts.

41

Second, even assuming *argundo* that there was evidence that Appellant told Pacina that Antonik discriminated against her, there is no evidence that Pacina, in turn, informed Antonik that Appellant had complained of discrimination, rather than her displeasure regarding his request for the use of office space. Pacina testified repeatedly that she did not perceive Appellant's complaint to be about discrimination. (A2189:23-25; A2190:6-13; A2198:1-4; A2208:5-14; A2212:10-20.) Rather, as consistent with her contemporaneous notes of her call with Appellant, Pacina testified that Appellant complained about Antonik's request to share office space, and that Appellant did not raise any issue about discrimination. (*Id*; SJA236.) Simply put, what Appellant offered as to the contents of her discussions with Pacina is not competent evidence of the contents of discussions between Pacina and Antonik.

Given the lack of contemporaneous evidence of her having provided factual details of discrimination, Appellant resorts to sleights of hand and presents her characterization of the email, which characterization she sprinkles with buzzwords, as evidence that she informed Pacina of discrimination. However, Appellant's characterization at trial of her email, as opposed to the contents of the email, is not competent proof of what was conveyed to Pacina about Antonik that would allegedly enable Pacina to convey to him that Appellant's complaint against him was about

42

discrimination. (Compare App. Br. 19 with her email A2841- A2842.[2]) The competent proof, *i.e.*, what she wrote in her email, simply does not support Appellant's contention that she complained to Pacina of discrimination on the part of Antonik. (A2841- A2842.)

In sum, there is a complete lack of evidence that Pacina ever considered Appellant's complaint to be about discrimination. The District Court therefore correctly determined a factfinder would have to impermissibly engage in speculation and conjecture to conclude that Antonik learned from Pacina that Appellant had engaged in protected activity and was thus motivated by unlawful retaliatory animus.

**2.      Evidence as to Antonik's Knowledge and Understanding** – Appellant's reliance on Antonik's testimony to demonstrate knowledge is equally unavailing. Specifically, Appellant relied on the following testimony of Antonik to argue that there is evidence for the jury to conclude that he knew Appellant had complained of discrimination.

> Q.      You understood that Dr. Edelman's complaint had really nothing to do with office space; correct?
> A.      Correct.
>
> Q.      Her complaint was about the way you spoke to her; right?
> A.      Correct.

---

[2] The evidence adduced at trial showed that Appellant was asked to accommodate a female doctor, Dr. Margaret Li, and not a male doctor as Appellant claimed in her email. (A1609:4-8; A1924:6-8; SJA350.)

> Q.    And you were upset about the fact that she complained and you wanted her gone; correct?
> A.    I was bothered by it.

(App. Br. 28.)

The District Court correctly rejected Appellant's contention that this testimony is evidence that Antonik knew that Appellant's complaint was about discrimination.  As the District Court noted, while Antonik acknowledged that the complaint was about him (A1663:15-25), his testimony "does not mention sexism or gender nor suggest that the grievance about his manner of speech was related to gender."  (SPA39.)  Given the full scope of Antonik's testimony, rather than the out-of-context snippets selected by Appellant, the District Court correctly determined that "the Jury could not have treated those statements as an admission that Antonik knew Plaintiff's complaint concerned gender-based discrimination."  (SPA39.)

As the District Court further explained, Appellant's reliance on the fact that Antonik was "bothered" that Appellant had complained to HR about him was evidence that he knew the complaint concerned discrimination and harassment "crosses the line from reasonable inference to conjectural leap." (SPA39.) Accepting Appellant's contention that co-workers' resentment of being reported to HR shows an awareness of protected activity would impermissibly "dilute that element of retaliation beyond recognition."  (SPA39.)  Indeed, accepting Appellant's argument would allow every office interpersonal conflict to be deemed evidence of awareness

44

of protective activity, thus doing away with a *sina qua non* of retaliation. The District Court therefore correctly concluded that "Antonik's antipathy towards Plaintiff after she complained about their dispute was not adequate evidence for the Jury to conclude that Antonik believed her complaint alleged gender discrimination." (SPA40.)

The District Court also correctly concluded that Appellant's contention that Antonik's allegedly "retaliatory conduct" is evidence of his supposed knowledge that Appellant had lodged a discrimination complaint is "sheer conjecture" and, in any event, "factually infirm." (SPA41-42.) Appellant's lengthy discussion on this contention (App. Br. 31-35) boils down to these facts: after Dr. Porges raised his concerns about Appellant, Kaplan requested that Antonik collect complaints about Appellant; Antonik did so, stating that "we need clear, convincing summary examples sent" to Kaplan (A2878-A2879); and, Antonik quickly compiled a list of complaints about Appellant as requested. (A2878-A2879.) As the District Court noted, while these facts may demonstrate that Antonik responded to his superior's request with eagerness and that Antonik may have had a personal animus toward Appellant because she had complained about him, there is no evidence showing that the animus was because Appellant had engaged in any protected activity. (SPA42.) Again, there is no evidence that Antonik was aware that Appellant's internal complaint was based on allegations of discrimination, and therefore was protected

45

activity under the law. As the District Court held, to conclude otherwise, given the lack of evidence that Antonik knew Appellant filed a discrimination complaint against him, would be to impermissibly engage in "sheer conjecture." (SPA42.) This Court should decline Appellant's invitation to engage in such speculation. *Arizmendi v. Rich Products Corp.*, 2023 WL 4246106, *2 (2d Cir. June 29, 2023) (summary order) ("since one cannot be motivated to retaliate by something he was unaware of, Arizmendi has failed to demonstrate that her termination occurred under circumstances giving rise to an inference of retaliatory intent").

**3.    Evidence as to Kaplan's Knowledge and Understanding –** Appellant adduced no evidence at trial that Kaplan had knowledge that Appellant supposedly complained of discrimination. On appeal, Appellant contends that Kaplan must have had knowledge based on her reaction to his asking her to "calm down" during their sole meeting in her office. (App. Br. 19.) Appellant contends on appeal that she supposedly told Kaplan that his request to her to calm down is a "sex-based discriminatory" comment. *Id.* However, Appellant did not offer any such testimony at trial.

Specifically, Appellant testified that in the evening of September 25, 2019, Kaplan visited her in her office. Kaplan apologized for what happened with Antonik, but explained that under her contract, she needed to share her office on Thursdays and Fridays with other doctors. (A1213:10-21.) Appellant testified that she became

46

upset, to which Kaplan responded in a condescending tone that she should "calm down," at which point Appellant told Kaplan to leave, which he did. (A1213:22-A1215:12.)

As described by Appellant at trial:

It was very – it was very demeaning. It was patronizing to me, and I stood up and said: you are going to leave my office now. I am not having this conversation. You're leaving. You're not going to treat me like that, which is where I drew the line.

(A1215:10-14.)

Appellant then went on to describe her thoughts and feelings:

I am not a child. I am a doctor. I'm entitled to an opinion, and I'm allowed to get upset. I am a physician and I'm a woman, and a woman can get upset. I'm allowed to have a dispute in my office and be upset, and it is sexist to say to a woman calm down. I can be upset at work the same way Dr. Forte in the office next to me might shout at his assistant sometimes because he's really frustrated about something. I don't have to calm down. That's sexist.

(A1215:15-22.) A perusal of the transcript demonstrates that her descriptions of her thoughts and feelings were her internal ruminations at trial, rather than what she said to Kaplan. (A1215:11-22.)

Moreover, as consistent with his email to Swirnow of September 18, 2019, Kaplan understood that Appellant's complaint was about her (gender-neutral) displeasure and disagreement concerning the manner with which Antonik discussed with her the use of office. (A3229.) As stated in the email:

Also, just received a call from Kathleen Pacina from Labor Relations, apparently Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours. Just wanted you to be aware. This was all related to him asking her to share her office on days she isn't there.

(A3229.)

As the District Court correctly determined, such gender-neutral complaints about the use of office space are not evidence of discrimination, and the use of a buzzword does not cure or substitute for the lack of evidence. Accordingly, the District Court's grant of a directed verdict as to Kaplan and denial of Appellant's JNOV motion should be sustained.

## 4. Evidence as to Antonik's Lack of Participation in the Non-Renewal

- Antonik, as the Site Director in Lake Success, had no firing authority with respect to Appellant or any of the doctors. (A1600:5-7.) There is no evidence that he participated in any hiring or firing decisions with respect to any doctors. (A1600:5-7.) There is no evidence that Antonik participated in the decision to renew Appellant's contract in 2017, or in the decision not to renew her contract upon its expiration in 2020. (A1628:13-17.) Indeed, the evidence shows that Antonik did not even know that a decision to non-renew Appellant's contract was being considered or that it could be considered. (A1628:2-13; A1628:13-17.)

The evidence shows that Antonik played a ministerial role in the gathering of information concerning Appellant. (A1593:4-9; A1594:20-25; A1595:1-3.) As part

48

of her job, Miriam Ruiz, the office manager, compiled a list of "issues" concerning Appellant as she did for all doctors in the suite where Appellant was located. (A1928:5-18; A2846-A2877.) There is no evidence whatsoever that Antonik requested or directed Ruiz to compile this list for Appellant or any other physician. Rather, Ruiz testified that since she first started working for NYU, prior to 2019, she kept records of anything that happened in the office suite, including creating spreadsheets of all types of complaints concerning the doctors. (A1928:5-18.) Ruiz testified that "before when [I] first started working for NYU, [I] kept spreadsheets of all types of complaints." (A1928:5-15.) She also testified that she kept "similar logs" for other doctors, including "patient complaints, workflow issues, … if the doctor didn't complete something that needed to be completed, just keeping track of things so that [I] had a recollection of what was going on." (A1946:8-16.) Ruiz further testified that she kept the logs in the "same format for the other doctors in the suite." (*A1946*:17-19.)

When Dr. Porges requested information concerning Appellant, Antonik, in response, merely sent an email including the information that he gathered concerning Appellant to Dr. Porges. (A1597:24-A1598:2.) There was no evidence adduced that the information he conveyed was in any way false or inaccurate. It was merely the observations of his subordinate, Ruiz, a non-party, who had no involvement in the underlying complaint or alleged retaliation.

49

The District Court therefore properly granted JNOV on the retaliation claims. *Olaechea v. City of New York*, 2022 WL 3211424, at *5, (S.D.N.Y. Aug. 9, 2022) (a retaliation claim "necessarily requires an individual's knowledge of the protected activity at the time of his participation" in the retaliation).

5. **Evidence as to Swirnow's Knowledge and Understanding –** For the same reasons, Appellant's testimony regarding her meeting with Swirnow also does not show any complaint of discrimination. (*See* App. Br. 20-21.) Her ruminations about how she "felt" is not proof of what she told Swirnow. (*See* App. Br. 21.) Rather, as is evident from his communications with Kaplan, Swirnow understood that Appellant complained for gender-neutral reasons. (A3229.)

6. **Cat's Paw and Evidence as to Rubin** – The Cat's Paw theory applies "[o]nly when an employer in effect adopts an employee's unlawful animus by acting negligently with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision." *Campbell v. Nat'l Fuel Gas Distrib. Corp.*, 723 F. App'x 74, 76 (2d Cir. 2018) (citing *Vasquez*, 835 F.3d at 275); *Hornig v. Trs. of Columbia Univ. in City of New York*, No. 17 CIV. 3602 (ER), 2022 WL 976267, at *23 (S.D.N.Y. Mar. 31, 2022) (citing *Vasquez*, 835 F.3d at 274–75); *Rossbach v. Montefiore Med. Ctr.*, No. 19CV5758 (DLC), 2021 WL 930710, at *5 (S.D.N.Y. Mar. 11, 2021) (citing *Vasquez*, 835 F.3d 267, 272); *see also, e.g.*, *Edwards v. Rochester Inst. of Tech.*, 794 F. App'x 65, 67 (2d

Cir. 2019) (summary judgment finding no liability under Cat's Paw theory affirmed where, *inter alia*, that "[a]lthough [the employer] consulted with [the discriminatory employee] before terminating [plaintiff], [the employer] also spoke with four other [ ] employees" and found the "evidence was consistent") (citations omitted)).

Appellant failed to adduce evidence at trial for Cat's Paw to apply. Rubin was the ultimate decision maker. There is no evidence that he was negligent in such reliance or that he was manipulated by anyone. Rather, he was not found by the jury to have retaliated against Appellant. (A2600-A2601.) The evidence shows that he based his decision, in good faith, on the evaluations by the clinicians, *i.e.*, Drs. Porges and Goldberg, who were not defendants in the case, and not because of any input from Antonik or any other facilities managers. (A1996:14-25; A2028:3-A2030:6; A2032:7-11.) Furthermore, the information provided by Ruiz through Antonik was not shown to be either "false" or "malign," but rather were her observations recorded in the course of her duties as Office Manager. Also, as noted above, Antonik himself had no knowledge of the protected activity, therefore any reliance on him likewise could not be based on unlawful retaliatory animus.

Moreover, unlike the typical Cat's Paw, there were additional layers of attenuation between Antonik and Rubin, making this theory inapplicable. *Kregler v. City of New York*, 987 F. Supp. 2d 357, 369 (S.D.N.Y. 2013). In *Kregler*, the court held that plaintiff's theory that one person gave information to a second person that

51

was tainted by retaliatory animus, and the untainted person in turn provided information to a third person which was also tainted, "strains the cat's paw theory beyond existing case law." *Id*. Such is the case here. After Dr. Porges raised his concerns about Appellant, Kaplan asked Dr. Porges to gather information, who in turn instructed Antonik to gather the requested information (A2273:8-14,18-25; A2282:18-24.) In response to that instruction, Antonik merely provided information that was prepared by someone else, Ruiz, and which information nonetheless was not shown to be inaccurate.

### POINT III

### The District Court did not Abuse
### its Discretion in Denying a New Trial

In order to grant a new trial, the Court "must conclude that the jury has reached a seriously erroneous result, or the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase*, 337 F.3d 237, 234 (2d Cir. 2003). "[T]he court may only grant a new trial if, after viewing all the evidence, it has a definite and firm conviction that a mistake has been committed." *Hughes v. Town of Bethlehem,* No. 10-cv-1489, 2015 WL 2130905, at *2 (N.D.N.Y May 7, 2015); *Cunningham v. Town of Ellicott*, No. 04-cv-301, 2007 WL 1756502, at *4 (W.D.N.Y. June 18, 2007), *aff'd*, 310 Fed. Appx. 448 (2d Cir. 2009) (same). Where, as here, "to justify setting aside a special verdict and hold a new trial requires that the special verdict answers be ineluctably inconsistent."

52

*Cunningham*, 2007 WL 1756502, at *4. This Court reviews the District Court's decision of a Rule 59 motion for a new trial for abuse of discretion. *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018). As this Court explained:

> It is a deferential standard, which reflects district courts' significant—although not limitless—latitude to exercise their inherent discretionary authority. We view the evidence 'in the light most favorable to the nonmoving party,' and we will reverse a judgment only if the district court (1) based its decision on an error of law, (2) made a clearly erroneous factual finding, or (3) otherwise 'rendered a decision that cannot be located within the range of permissible decisions.'

Appellant has not met this standard. Rather, as detailed above, there is ample evidence to support the jury verdict. Based on the same evidence and for the same reasons discussed under Rule 50, Appellant's motion for a new trial was properly denied. This is particularly so since Appellant does not set forth separate reasons for its Rule 59(a) motion for a new trial, but rather indistinguishably seeks a Rule 50(b) judgment as a matter of law for the same reasons. *Pouncy v. Danka Off. Imaging Co.*, 393 Fed. Appx. 770, 773 (2d Cir. 2010) (affirming denial of both motions since movant's "arguments in support of his Rule 59(a) motion were identical to those in support of his Rule 50(b) motion" and concluding that there that jury verdict was not "seriously erroneous").

Simply put, Appellant has not demonstrated that the denial of a new trial was based on an error of law or that the District Court made a clearly erroneous factual finding. Rather, a new trial was unwarranted because the jury was presented with

53

ample evidence upon which to conclude that Appellant did not perform equal work to Dr. Modi, just like it did concerning the other two alleged comparators, Drs. Goldberg and Porges, as measured by skill, effort, or responsibility. Similarly, there was ample evidence provided to the jury to sustain its finding that Appellees proved the "factor other than sex" defense.  There was no "miscarriage of justice" in the determination by the jury that would warrant a new trial. The District Court, therefore, did not abuse its discretion in denying a new trial.

## POINT IV

### The District Court Correctly Determined that
### <u>Appellant Adduced No Evidence to Support Punitive Damages</u>

At the close of the evidence, Appellees moved for a directed verdict under Rule 50(a), including on the issue of punitive damages. Appellees contended that there was a lack of evidence to submit the issue of punitive damages to the jury. (A2398:2-12.)

The District Court gave Appellant the opportunity to show what evidence was adduced at trial to justify submitting the issue of punitive damages to the jury.  In response, Appellant made arguments, rather than providing evidence as directed by the District Court.  (A2417:17-A2418:9.)  Indeed, Appellant's justification for presenting punitive damages instructions to the jury in its entirety consisted of the following:

54

I think the evidence here shows, your Honor, that there was concerted activity by the individual defendants. Like I said before, there was a lot of cloak and dagger. They memorialized the complaint against Dr. Edelman. They did not memorialize any of their discussions. You would think if this was a genuine decision not to renew her [contract] based on clinical care concerns, they would speak to her about it. They would try to "remediate," which is a fancy word for fix.

They didn't make any effort to do any of that, and anytime there was any discussion about this issue, nothing was memorialized. And I think the jury understands that, and we covered that extensively. So to the extent that these individuals at NYU carried out a plan to retaliate against the doctor for not meeting their directives about office space, that's something that should go to the jury to decide. And this Court can, of course, correct any error that the jury makes with respect to the calculation of those damages.

(A2417:18-A2418:9.)

Based on this record, Appellant contends there was a sufficient evidentiary basis for a reasonable jury to conclude that Appellees acted with the requisite "malice" or "reckless indifference" to award punitive damages under Title VII. *Tepperwien v. Energy Nuclear Operations, Inc.*, 663 F.3d 556, 572-73 (2d Cir. 2011) (providing standard for punitive damages under Title VII). Appellant further contends that the record provides a sufficient evidentiary basis for a reasonable jury to conclude that Appellees "engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard" to justify the award of punitive damage

55

under the New York City Human Rights Law. *Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017) (providing standard for awarding punitive damages under NYCHRL).

There is no evidence, however, that Appellees committed the requisite acts under either *Tepperwien* or *Chauca*. The District Court therefore correctly granted Appellees judgment on the claim for punitive damages, explaining:

> There is no evidence from which a reasonable jury could find that defendants engaged in gross misbehavior or conduct that willfully or wantonly caused hurt to another or engaged in willful or wanton negligence or reckless conduct or consciously disregarded the rights of the plaintiff.

(A2432:17-22.) Appellant has not demonstrated otherwise on appeal. (*See* App. Br. 37-39.)

## POINT V

### The District Court was Correct in Refusing to Charge the Jury Regarding Disparate Impact and its Affirmative Defenses Under New York Labor Law §194

Appellant's contention that the District Court erroneously refused to instruct the jury on disparate impact under NYLL §194 fails for two reasons.

First, as a threshold matter, Appellant failed to specify the requisite "employment practice" that caused an adverse impact on the basis of sex. Instead, Appellant baselessly elevates an aspect of NYU's compensation determination, *i.e.*, the consideration of past salary among a myriad of factors, and baldly concludes that there was a practice where NYU "use[d] a prospective doctor's current pay to

56

negotiate their incoming pay at NYU." (App. Br. 55.) The evidence does not support this conclusion by Appellant. Rather, the evidence showed that NYU considered the candidates' experience, prestige in the medical community, productivity, value to NYU's strategic goal of expanding its rheumatology practice. (A1997:20-A1998:3; A2010:8-A2011:13.) Indeed, Swirnow testified that in trying to determine the salary for a physician who is not from private practice the "jumping-off point" is the "salary demands of the candidate." (A1803:10-13.) Swirnow further testified that to determine whether such demand is reasonable or whether to counterbid, "we think about it in terms of what role that physician is playing, all the different components that we talked about, his clinical practice, his clinical research activity, his leadership role and an investment in the future of building out a practice and a specialty that we felt was essential in that area." (A1803:14-21.) For physicians hired from private practice, Rubin testified that they consider the business plan, which contained various factors, not just what the physicians paid themselves. *Supra* (A210:8-A211:13.) The record reflects that physicians would not join NYU without an increase in compensation. (A2148:7-A2149:6; A2365:4-18.) Moreover, there is no evidence showing that past salaries, as opposed to other myriads of factors, caused the difference in pay. The District Court therefore properly denied Appellant's request to charge the jury on the issue of disparate impact.

Second, if there was evidence identifying a practice, the evidence adduced does not provide a sufficient or valid statistical sample to present the issue to the jury. As the Supreme Court has explained, "typical examples" of deficiencies or weaknesses in the statistical data include "small or incomplete data sets." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996-97 (1988). A plaintiff cannot make out a prima facie case of disparate impact when the relevant data base is "too small to permit any meaningful statistical analysis." *Id*. at 1000. Guidelines from the EEOC similarly provide that statistics based on samples of "small numbers" is unreliable and cannot be used in determining disparate impact. 29 C.F.R. Section 1607.4(D). Here, Appellant failed to adduce the requisite valid statistical evidence. Instead, Appellant only submitted proffered evidence of five (5) physicians out of the entire universe of thousands of physicians at NYU. As aptly observed by the District Court: "I don't think there's evidence in the record from which the jury could find that there was a disparate or adverse impact in this case, both because of the issues of defining the relevant universe and with respect to the small sample size." (A2427:15-20.) The District Court was therefore correct, and indeed bound, in refusing to instruct the jury on disparate impact.

Appellant's cited cases are inapposite and, indeed, misleading. For example, the *Sidor* and *City of New York* cases pattern or practice disparate treatment cases -- not disparate impact cases. *See Sidor v. Reno*, No. 95-cv-9588(KMW), 1997 WL

582846, *9-11 (S.D.N.Y. Sept. 19, 1997) and *City of New York,* 713 F. Supp. 2d 300 (S.D.N.Y. 2010). These cases neither bear on nor illuminate on the analysis of disparate impact claims.

Moreover, the *Sidor* case predates this Court's holding in *Chin* that the pattern or practice method of proof is unavailable in a non-class single plaintiff case such as here. *Chin v. Port Authority of NY & NJ,* 685 F.3d 131, 146 (2d Cir. 2012).

*Stoler v. Inst. for Integrative Nutrition* likewise is irrelevant because it deals with a motion to dismiss a putative pattern or practice class action. *Stoler v. Inst. for Integrative Nutrition*, No. 13-cv-1275, 2013 WL 6068598, (S.D.N.Y. Nov. 18, 2013). *Stoler* does not deal with disparate impact at all.

*People v. Hecker* and *Batson v. Kentucky*[3] also do not support Appellant's position. Both cases deal with a burden of proof given rise to an "inference of discriminatory purpose." However, proof of purposeful (intentional) discrimination is the burden of proof for a disparate treatment case, not a disparate impact case. (*See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093-94, 67 L. Ed. 2d 207 (1981); and *Watson*, 487 U.S. at 986 (unintentional discrimination).) *People v Allen*, 86 N.Y.2d 101, 653 N.E.2d 1173 (1995), also cited by Appellant, is irrelevant for the same reasons.

---

[3] *People v. Hecker*, 15 N.Y.3d 625 (2010) and *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

002528\5\170819189.v15

In light of the above, the District Court did not commit reversible error by refusing to give Appellant's requested disparate impact charge under NYLL §194.

## **CONCLUSION**

Based on the foregoing reasons, Appellees respectfully submit that this Court should affirm the District Court's decisions in all respects.

Dated:   August 6, 2024
        New York, New York

                              **TARTER KRINSKY & DROGIN LLP**
                              *Attorneys for Defendants-Appellees*

                              By:  */s/ Richard Lane Steer*
                                        Richard Lane Steer
                                        Richard S. Schoenstein
                                          Justin Y.K Chu
                                          Ingrid Julieth Cardona
                                          1350 Broadway, 11th Floor
                                          New York, New York 10018
                                          (212) 216-8000
                                          rsteer@tarterkrinsky.com
                                          rschoenstein@tarterkrinsky.com
                                          jchu@tarterkrinsky.com
                                          icardona@tarterkrinsky.com

002528\5\170819189.v15

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 13,642 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: August 6, 2021
   New York, New York

_____*/s/ Richard Lane Steer*_____
             Richard Lane Steer