# 24-251-cv

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT



DR. SARI EDELMAN,

*Plaintiff-Appellant,*

v.

NYU LANGONE HEALTH SYSTEM, NYU LANGONE HOSPITALS, NYU LANGONE MEDICAL CENTER, NYU LANGONE NASSAU RHEUMATOLOGY, NYU SCHOOL OF MEDICINE, NYU GROSSMAN SCHOOL OF MEDICINE, NYU HOSPITALS CENTER, ANDREW T. RUBIN, DAVID KAPLAN, JOSEPH ANTONIK, JOSHUA SMIRNOW,

*Defendants-Appellees.*

―――――――――――――

*On Appeal from the United States District Court
for the Southern District of New York*

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

Joseph M. Labuda
MILMAN LABUDA LAW GROUP PLLC
*Attorneys for Plaintiff-Appellant*
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
516-328-8899



(212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

PRELIMINARY STATEMENT .................................................................1

STANDARD OF REVIEW .......................................................................2

ARGUMENT ...........................................................................................4

I.  POINT I: DR. EDELMAN HAS ESTABLISHED A PRIMA
    FACIE CASE OF RETALIATION AS AGAINST NYU
    AND ANTONIK ...............................................................................4

    A.  Dr. Edelman Engaged in Protected Activity ...........................5

    B.  Appellees Had Knowledge of Dr. Edelman's Protected
        Activity ....................................................................................7

        i.  Corporate Knowledge.......................................................7

    C.  Adverse Employment Actions .................................................15

    D.  There is Sufficient Evidence Establishing Causation ...........15

        i.  Temporal Proximity.........................................................17

        ii.  The Cat's Paw Theory Applies For Purposes of
             Establishing Causation ...................................................22

II.  POINT II: THE DISTRICT COURT IMPERMISSIBLY
     DISMISSED KAPLAN.......................................................................26

    A.  Kaplan's Retaliatory Intent and Involvement in Adverse
        Acts Against Dr. Edelman.......................................................26

III.  POINT III: THE DISTRICT COURT IMPERMISSIBLY
      PREVENTED THE JURY FROM CONSIDERING
      PUNITIVE DAMAGES.....................................................................28

i

CONCLUSION ...................................................................................................30

CERTIFICATE OF COMPLIANCE ......................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Arizmendi v. Rich Products Corp.,
  2023 U.S. App. LEXIS 16447 (2d Cir. June 29, 2023)........................................9

Bhatti v. Physician Affiliate Grp. of New York,
  2022 U.S. App. LEXIS 33909 (2d Cir. 2022) ..................................................5, 8

Casmento v. Volmar Constr., Inc.,
  2022 U.S. Dist. LEXIS 196744 (2d Cir. 2022) ..................................................28

Duplan v. City of New York,
  888 F.3d 612 (2d. Cir. 2018) ........................................................................17, 20

Edwards v. Rochester Inst. of Tech.,
  794 F. App'x 65 (2d Cir. 2019) ..........................................................................24

Farias v. Instructional Sys.,
  259 F.3d 91 (2d Cir. 2001) ..................................................................................28

Fischer v. Vassar College,
  114 F.3d 1332 (2d Cir. 1997) ................................................................................5

Gordon v. New York City Bd. of Educ.,
  232 F.3d 111 (2d Cir. 2000) ............................................................................8, 17

Grant v. Bethlehem Steel Corp.,
  622 F.2d 43 (2d Cir. 1980) ..................................................................................21

Henry v. Wyeth Pharms., Inc.,
  616 F.3d 134 (2d Cir. 2010) ....................................................................8, 10, 14

Inguanzo v. Hous. & Servs., Inc.,
  2014 U.S. Dist. LEXIS 132197 (S.D.N.Y. 2014)...............................................10

Joseph v. Leavitt,
  465 F.3d 87 (2d Cir. 2006) ..................................................................................15

Khan v. Elrac, LLC,
    2024 U.S. Dist. LEXIS 57570 (Conn. D.C. Mar. 29, 2024) ..............................17

Kregler v. City of New York,
    987 F. Supp. 2d 357 (S.D.N.Y. 2013) ..................................................24

Kwan v. Andalex Grp., LLC,
    737 F.3d 834 (2d Cir. 2013) ...........................................................7, 8

Nadel v. Isaksson,
    321 F.3d 266 (2d Cir. 2003) ................................................................2

Palin v. N.Y. Times Co.,
    2024 U.S. App. LEXIS 21801 (2d Cir. 2024) ...................................3, 4

Patane v. Clark,
    508 F.3d 106 (2d Cir. 2007) ...............................................................10

Presutti v. FDIC,
    24 Fed. Appx. 92 (2d Cir. 2001)...........................................................2

Simblest v. Maynard,
    427 F.2d 1 (2d Cir. 1970) ....................................................................2

Smith v. Lightning Bolt Prods., Inc.,
    861 F.2d 363 (2d Cir. 1988) ................................................................2

Tischmann v. ITT/Sheraton Corp.,
    1997 U.S. Dist. LEXIS 5283 (S.D.N.Y. 1997).....................................7

United States v. Space Hunters, Inc.,
    429 F.3d 416 ......................................................................................28

Vasquez v. Empress Ambulance Serv.,
    835 F.3d 267 (2d Cir. 2016) .......................................................23, 24

Warmin v. New York City Dep't of Educ.,
    2019 U.S. Dist. LEXIS 125774 (S.D.N.Y. 2019)..........................20, 21

**Rules**

Fed. R. Civ. P. 50 ......................................................................................3

Fed. R. Civ. P. 50(a)(1).............................................................................2

iv

Fed. R. Civ. P. 50(b) ................................................................9

Fed. R. Civ. P. 59 ..................................................................30

## PRELIMINARY STATEMENT

Appellees' opposition fails to establish that the jury's verdict in Dr. Edelman's favor on her retaliation claims contained an "utter lack of evidence" supporting the verdict or that the trial evidence was "so overwhelmingly" in Appellees' favor.

Moreover, Appellees repeatedly and improperly fail to recite the facts in the light most favorable to Dr. Edelman. Appellees assert facts which the jury could have rejected on the basis of credibility or for any reason whatsoever. For example, Appellees reference: (i) Kathleen Pacina denying that Dr. Edelman's complaint was sex-based, which is contradicted by Dr. Edelman's own testimony; (ii) Joseph Antonik denying that he made a sex-based comment to Dr. Edelman- again in contradiction to Dr. Edelman's testimony; and (iii) Rubin solely relying on Drs. Porges and Dr. Goldberg's clinical evaluation when Antonik's "clear and convincing" e-mail was considered by Rubin in terminating Dr. Edelman.

In fact, Appellees "facts" are so skewed and take such an enormous frolic from the appellate standard of *de novo* review that these "facts" are not only unhelpful but should be completely ignored by this Court. In reality, the trial evidence overwhelmingly supports the jury's verdict that Dr. Edelman established her prima facie claims of retaliation. As such, the jury's verdict should stand, and the District Court's order should be reversed.

1

The retaliation claim against Kaplan and the issue of punitive damages were also incorrectly decided by the District Court and should be remanded back to the trial court for a new trial.

Lastly, as for the Equal Pay Act ("EPA") claim, Appellees fail to raise any legal or factual issues in their opposition papers. As such, Dr. Edelman stands on her arguments contained in her initial brief on the EPA and need not address Appellees' opposition in her reply brief herein.

## STANDARD OF REVIEW

As set forth in Appellant's moving brief, this Court reviews a district court's decision to set aside a jury verdict *de novo*, "but use[s] the same standards that [the district court] must apply." Presutti v. FDIC, 24 Fed. Appx. 92, 95 (2d Cir. 2001). A judgment notwithstanding the verdict, or JNOV, may only be granted if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed. R. Civ. P. 50(a)(1); see also Simblest v. Maynard, 427 F.2d 1, 5 (2d Cir. 1970); Nadel v. Isaksson, 321 F.3d 266, 271-72 (2d Cir. 2003).

Like the standard for determining a motion for summary judgment, in determining a JNOV the Court must: "consider the evidence in the light most favorable to the party against whom the motion was made and [] give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence". Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988).

For purposes of this appeal, this Court must assume all facts in favor of Dr. Edelman. Appellees in their brief, like the District Court, erred in failing to look at the facts most favorable to Dr. Edelman, instead making their own credibility and evidentiary assessments regarding same. Indeed, NYU's improper citations to the District Court's December 26, 2023 order granting JNOV on Dr. Edelman's retaliation claims (the "Order") should be completely ignored because the standard on appeal is not an abuse of discretion standard: it's a *de novo* standard.

This Court recently held in <u>Palin v. N.Y. Times Co.</u>, 2024 U.S. App. LEXIS 21801 (2d Cir. 2024) that: "a district court may not make credibility determinations when considering a Rule 50 motion and, 'although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe'" (internal citations omitted). <u>Id</u>. at *27 (emphasizing that "the jury was not required to believe [defendant] Bennet's testimony, which could be viewed as self-serving. The district court's acceptance of that testimony in the jury's stead improperly infringed on the jury's exclusive role"). This same standard applies here.

Here, the jury made credibility assessments regarding, *inter alia*, Dr. Edelman, Pacina, and Antonik and decided to believe Dr. Edelman. For purposes of appeal, the jury rejected NYU's version of events and reasonably concluded that Pacina told Antonik about Dr. Edelman's complaint that Antonik called her a bitch. Yet, the

3

District Court, in granting Appellees' JNOV motion, ignored this Court's ruling in Palin and improperly substituted its own credibility determinations for those of the jury.

As set forth, *infra*, the trial evidence shows that the jury's determinations and credibility assessments were far from speculation and conjecture. Rather, the jury had many reasons to believe that Dr. Edelman was retaliated against based on temporal proximity and disparate treatment. Dr. Edelman engaged in protected activity by complaining about Antonik and Kaplan's sexist behavior, and in response, she was retaliated against multiple times and ultimately terminated by NYU at the first opportunity.

## **ARGUMENT**

### I. **Point I: Dr. Edelman Has Established a Prima Facie Case of Retaliation as Against NYU and Antonik**

The evidence proffered at trial supports the jury's finding that Appellees unlawfully retaliated against Dr. Edelman. In other words, the jury found that Dr. Edelman established a prima facie case of retaliation under federal, state, and city law, which is comprised of four (4) elements: (1) the plaintiff's participation in a protected activity; (2) the defendant's knowledge of plaintiff's participation in the protected activity; (3) an adverse employment action against the plaintiff; and (4) a causal connection between the plaintiff's participation in the protected activity and

the adverse employment action. See Bhatti v. Physician Affiliate Grp. of New York, 2022 U.S. App. LEXIS 33909, *2 (2d Cir. 2022).

This Court has repeatedly held that ""[t]he burden of establishing a prima facie case [of discrimination] . . . is not onerous.' In fact, the plaintiff's burden of establishing a prima facie case has been frequently described as 'minimal.'" Fischer v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997) (internal citations omitted). As will be demonstrated in detail below, the trial record establishes that Dr. Edelman made out her prima facie claims of retaliation and the District Court erred in vacating the jury's verdict.

### A. Dr. Edelman Engaged in Protected Activity

At trial, Dr. Edelman clearly established the first element—that she engaged in protected activity by raising multiple gender-based complaints with HR against Antonik and others at NYU.

Dr. Edelman testified that, *inter alia*, Antonik called her a bitch on September 16, 2019 and that she complained to Kathleen Pacina in HR about this incident *the next day*. A1210; 6-8. Dr. Edelman testified that she told Pacina "everything" that happened with Antonik during their initial call on September 17, 2019—which would include the fact that Antonik called Dr. Edelman a bitch. See A1209; 21-25-A1210; 1-10. Dr. Edelman also testified that she went through "the events of what happened" between her and Antonik. Id. It should be noted that, at trial, for tactical

reasons, NYU did not ask Dr. Edelman on cross-examination if she told Pacina that Antonik called her a bitch, even after she testified that she told Pacina "everything", and NYU never asked Pacina if Dr. Edelman ever told her same. Appellees had an opportunity to clarify the record but failed to do so. The jury could rightfully infer that "everything" meant everything, and that when Dr. Edelman "went through the events" of what happened with Antonik with Pacina that the events included the bitch comment.

On September 25, 2019, Dr. Edelman also engaged in subsequent protected activity when she sent an email to Pacina as a follow-up to their initial conversation about the Antonik incident. Therein, she complained about both the initial incident with Antonik and her subsequent meeting with Kaplan about having "to contend with male chauvinism"; that "[i]t remains unclear to [Dr. Edelman] why I am being discriminated against to accommodate another . . . male physician"' and that "[t]his is the first time in all these years where I feel my growth as a physician is being deliberately infringed on by senior male managers." See SJA-290-SJA-291.

Moreover, Dr. Edelman engaged in yet further protected activity on November 1, 2019 when she sent another email to Pacina stating:

> The harassment complaint was extensive detailed letter about treatment by manager using abusive and bullying behavior. While I spoke with Joshua Smirnow [sic] about the office space, I also was clear that the complaint was separate issue about treatment of females within workplace at NYU which is unacceptable moving into 2020.

6

SJA-288-289.

Clearly, the September 16th verbal complaint and the September 25th and November 1st emails each separately and distinctly constitute protected activity concerning sex-based discrimination.[1]

### B. Appellees Had Knowledge of Dr. Edelman's Protected Activity

  i.   Corporate Knowledge

All that is required to satisfy the second element of knowledge is general corporate knowledge. Kwan v. Andalex Grp., LLC, 737 F.3d 834, 835 (2d Cir. 2013).

Dr. Edelman satisfied the knowledge element of her retaliation claims based on her repeated complaints to HR. This Court has repeatedly stated that "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has

---

[1] It should be noted that the District Court, Judge Schofield, L., in denying NYU's motion for summary judgment with respect to Dr. Edelman's retaliation claims held that Dr. Edelman engaged in a protected activity and found that Dr. Edelman had established a prima facie case for retaliation. See A130-A162. In her decision denying NYU's motion for summary judgment on this issue Judge Schofield held:

> Contrary to Defendants' argument, Plaintiff's communications with Defendants' HR professionals throughout October and November 2019 made clear that she was complaining of sex discrimination, which is a protected activity under Title VII. (Emphasis added)

A152; see also A160; A159. This Court, in its discretion, may deem Judge Schofield's decision as law of the case. As such, if Dr. Edelman, at trial, introduced at least the same evidence as presented at trial (which she did), then the Court has already ruled that such evidence was sufficient to establish a prima facie case of retaliation and cannot later reverse course and hold that such evidence is not sufficient as a matter of law. See Tischmann v. ITT/Sheraton Corp., 1997 U.S. Dist. LEXIS 5283, *15 (S.D.N.Y. 1997) ("The rule [regarding law of the case doctrine] is discretionary . . . for a court that is considering whether to revisit its own decision or the decision of a sister court prior to final judgment").

engaged in a protected activity" (Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116-17 (2d Cir. 2000)) and that "[a] defendant's knowledge may be shown through either 'general corporate knowledge' of the protected activity or the defendant's agents having knowledge of the protected activity" (Bhatti, 2022 U.S. App. LEXIS 33909 at *3). See also Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 148 (2d Cir. 2010).

In fact, the District Court properly instructed the jury that "general corporate knowledge that Dr. Edelman engaged in a protected activity is sufficient under the state human rights law." A1457.

Here, there is sufficient evidence in the trial record that Dr. Edelman complained about sex-based discrimination to Pacina verbally on September 16, 2019, and via email on September 25, 2019 and November 1, 2019, respectively. Thus, so long as the jury found that anyone at NYU (such as Pacina) had knowledge that any of Dr. Edelman's multiple complaints were based on gender then the jury could reasonably find that Dr. Edelman satisfied the knowledge element of her retaliation claims against Appellees under city, state, and federal law.[2] In Kwan v.

---

[2] The District Court also instructed the jury that, with respect Dr. Edelman's Title IV claims: "[t]here's no dispute that NYU knew of Plaintiff's protected activity. If you find that Plaintiff engaged in protected activity, I direct you to find that Plaintiff also satisfied this element" of knowledge. A1452. Based on this instruction alone, the jury could reasonably find that the knowledge element was satisfied. Notably, Appellees did not object to these instructions—though they had the right to do so—and, thus, the District Court was required to apply same in evaluating the evidence and the jury's verdict. Clearly, the District Court failed to apply its own instructions regarding knowledge.

Andalex Grp., LLC, 737 F.3d 834 (2d Cir. 2013), a case directly on point, this Court held that:

> With respect to the knowledge prong, the District Court held that the plaintiff could not demonstrate Andalex's knowledge of her protected activity because Kwan had provided no evidence that Andrew Silverman had knowledge of Kwan's September 3 conversation with Alex Silverman when Andrew made the decision to terminate her. However, for purposes of a prima facie case, a plaintiff may rely on "general corporate knowledge" of her protected activity to establish the knowledge prong of the prima facie case.

Id. at 844.

In their opposition, Appellees cite to Arizmendi v. Rich Products Corp., 2023 U.S. App. LEXIS 16447 (2d Cir. June 29, 2023), for the proposition that one cannot be motivated to retaliate by something he was unaware of. Id. at *5.[3] However, NYU misapplies the law and confuses and conflates "motivation" (which applies to the causation element) with "knowledge" (which applies to the knowledge element). Motive and knowledge are two (2) separate and distinct elements in a retaliation claim, and motive plays no role in determining the knowledge element. In fact, this Court has specifically held that "a jury may find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury

---

[3] At the conclusion of Plaintiff's case at trial, Appellees argued generally that all Appellees did not "understand Plaintiff's complaint to raise gender based discrimination." A3366. In contrast, Appellees' subsequent Rule 50(b) motion concerned the "lack of knowledge" of Antonik based on Pacina allegedly not mentioning the word bitch to him. These two (2) arguments are quite different. Accordingly, Appellees did not sufficiently raise this issue at trial as to Antonik's lack of knowledge of protected activity.

9

finds that the circumstances evidence knowledge of the protected activities." <u>Henry</u>, 616 F.3d at 147-49.

In <u>Patane v. Clark</u>, 508 F.3d 106 (2d Cir. 2007), another case directly on point, this Court found corporate knowledge where a plaintiff complained about a defendant's discriminatory conduct to an employee (like Pacina) "whose job it was to investigate and resolve such complaints". <u>Id.</u> at 115 (finding prima facie evidence of corporate knowledge that the defendant [university] employer "was aware of [plaintiff's] protected activity [] since she allege[d] that she complained directly to a university employee"); <u>see also</u> <u>Inguanzo v. Hous. & Servs., Inc.</u>, 2014 U.S. Dist. LEXIS 132197, * (S.D.N.Y. 2014) (finding that "[b]ecause knowledge of employees tasked with investigating and evaluating claims of discrimination is sufficient to show corporate knowledge, Plaintiff's letters to HSI's CEO and Human Resources Manager were certainly sufficient under this standard").

At trial, Dr. Edelman testified that the entire discriminatory incident with Antonik occurred when she told Antonik that she needed to look at her contract and have her attorneys review same because it was her understanding that her contract "afforded [her] full-time use of [her] office" (A1205; 9-12) and when Antonik stated:

> We -- <u>we own you</u>. And at that point I backed myself up and I said you need to leave. <u>During his rant he uttered, under his breath, bitch</u>. (Emphasis added)

A1206; 13-16.

10

During her cross-examination Dr. Edelman testified:

Q. So it wasn't until [Antonik] muttered that word [bitch] that he injected sexism in to the conversation?

A: I felt all of it was sexist, but that word defined it.

A1443; 25-A1444; 1-2 (emphasis added). Dr. Edelman also testified that Antonik "doesn't have the right to physically intimidate me, shout at me, wave his arms in front of me and call me a bitch." See A1452; 14-16.

Dr. Edelman then testified that *the very next day*, on September 17, 2019, she put in a verbal complaint with Pacina about the sexist incident with Antonik. See A1209; 15-25-A1210; 1. She testified that:

> My complaint was about the, the hostile and abusive behavior that had occurred the day before with Mr. Atonik [sic]; that I didn't feel safe and I wanted it rectified; that I felt that it was a sexist, discriminatory, chauvinistic attack and it needed to be addressed with HR. We went through the events of what happened on the phone. I was probably on the phone with [Pacina] for 20, 30 minutes. She took everything down. There was a case number assigned, and she said that she would get back to me. (Emphasis added).

A1210; 2-10.

Based on this testimony alone, the jury could reasonably infer that when Dr. Edelman testified that she told Pacina about "the events of what happened" that her complaint included Antonik calling Dr. Edelman a bitch and that Dr. Edelman explained how she felt that Antonik was sexist, discriminatory, and chauvinistic in his verbal attack against her.

11

Dr. Edelman also later testified that she described to Pacina <u>exactly</u> what she had just told the jury concerning the Antonik incident:

> Q: Did you explain to Ms. Pacina what you just described [regarding the Antonik incident] to the jury over the last couple minutes?
> A: I did.

A1211; 7-9.

Indeed, Dr. Edelman testified that she followed up with Pacina a week after she filed her initial complaint to complain about Kaplan after Kaplan had come to her office to discuss the office issue and the incident with Antonik:

> [I]t's been a week and the initial complaint from the September 16 incident still hasn't been addressed through HR at all. And now a week later, I'm -- I'm experiencing a similar hostile work environment [from Kaplan], and nothing's been done. And this is the email that I sent up; that this needs to be addressed; that I don't feel, feel comfortable working in the office knowing that at any moment that this type of thing can continue to happen. (Emphasis added)

A1216; 11-19. <u>see also</u> A2841-A2842.

In the September 25th email, Dr. Edelman again complained about sex-based discrimination when she complains about "male chauvinism" by Antonik and Kaplan, about being discriminated against in order to "accommodate a male physician", and that her "growth is being deliberately infringed on by senior male managers." <u>See</u> SJA-290-SJA-291. In her November 1, 2019 email to Pacina, Dr. Edelman further repeats her complaints about "harassment" by Antonik and Kaplan

12

and that she was treated poorly by them because she is "an educated female." <u>See</u> SJA-288-289

Dr. Edelman clearly testified that she told and reiterated to Pacina—both verbally and in writing—about both Antonik and Kaplan's discriminatory conduct, and it is clear from the record that these verbal and written complaints were gender-based. Thus, the jury had multiple reasonable bases to find that NYU, through Pacina, had knowledge of Dr. Edelman's gender-based complaints.

Further, Pacina's trial testimony does not dispute Dr. Edelman's version of events. Indeed, Pacina testified that she did not "recall if [Dr. Edelman's complaint] was about the way she was spoken to" by Antonik (A2190; 12-13), and when asked if she recalled anything "specifically that [Dr. Edelman] said" during their phone call she testified, "[n]o not specifically." (A2208; 10-11). Pacina further testified that she did not recall what specifically was discussed with Antonik or speaking about retaliation (<u>see</u> A2196; 23-25-A2197; 1-20). Thus, the jury reasonably adopted Dr. Edelman's version of events since *she* remembered what she told Pacina (especially since Pacina could not recall same) and that Pacina passed on those complaints to Antonik.

Moreover, Pacina's notes (that do not contain the bitch comment) regarding Dr. Edelman's complaint are not evidence viewed in the light most favorable to Dr. Edelman and should be disregarded by the Court. Further, these notes are also not

contemporaneous because they are dated nearly six (6) months after Dr. Edelman first relayed her complaints to Pacina. The jury could reasonably reject Pacina's testimony regarding her notes and adopt Dr. Edelman's version of events. Indeed, Pacina had no explanation for why her notes were dated March 13, 2020, or whether they may have been edited, and she testified:

> Q: Because of the date issue here, you cannot state with any certainty whether this document [her notes] has ever been edited, correct?
>
> A: That's correct.

A2195; 25-A2196; 1-2.[4]

Lastly, as fully outlined in the causation section, *infra*, both (1) the close temporal proximity between Dr. Edelman's protected activity and the various adverse employment actions that she was subjected to and (2) Dr. Edelman's disparate treatment by Appellees give rise to "circumstances [that] evidence knowledge of [Dr. Edelman's] protected activities" by Appellees. Henry, 616 F.3d at 148.

Based on the above, the trial testimony supports Appellees' knowledge sufficient to establish the second element of Dr. Edelman's retaliation claims.

---

[4] Pacina also acknowledged that HR phone calls with employees were "not recorded or logged". See A2184; 15-17.

**C. Adverse Employment Actions**

As stipulated by the Appellees, there is no dispute that Dr. Edelman's termination constitutes an adverse employment action.

But Dr. Edelman also suffered other adverse employment actions. This Court has emphasized that adverse employment actions include, *inter alia*, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (internal citations omitted).

First, shortly after her initial sex-based complaint about Antonik, in September 2019, Antonik prevented Dr. Edelman from expanding her office hours. See A1670; 2-7. In fact, Kaplan emailed Joshua Swirnow on September 18, 2019 (a day after Dr. Edelman's complaint) that he "just received a call from Kathleen Pacina from Labor Relations, apparently Dr. Edelman filed a complaint against Joe Antonik for being aggressive and retaliating for not allowing her to expand her hours". A3229.

Second, in November 2019, Appellees created a log all of the "issues" they were having with Dr. Edelman which constituted a disciplinary rap sheet. See A1927; 21-25 to A1928; 1-11. Further, NYU only logged "evidence" on Dr. Edelman. Notably, NYU failed to present any evidence of any such similar logs

record-gathering on any other NYU doctor. See A1910; 21-25 to A1911; 1-2. This was clearly evidence of disparate treatment.

Third, on or about November 6, 2020, Antonik began a witch-hunt against Dr. Edelman when he circulated his email seeking "clear and convincing evidence" of Dr. Edelman's poor performance from her co-workers, effectively targeting Dr. Edelman. See 2879; see also A1592; 5-13 and 18-25-A1593; 1-9.

Fourth, Antonik's email to Porges on November 6, 2020 listing all of Dr. Edelman's "poor performance" constitutes an adverse employment action above and beyond her termination. See A2879; see also A3215-A3216 (as sent to Kaplan, then Swirnow).

As such, Dr. Edelman sufficiently established the adverse employment action element of her retaliation claim under Title VII, which under state and city law is an even lower standard.

**D. There is Sufficient Evidence Establishing Causation**

With regard to the fourth element of Dr. Edelman's retaliation claims, causation, the District Court instructed the jury that:

> In considering whether [Dr. Edelman] has proved that a material adverse action was taken against her because of protected activity she engaged in, you must first decide whether the defendant you are considering was, in fact, motivated by a desire to retaliate against her because of her complaints to human resources.

A1459.

16

"Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." <u>Duplan v. City of New York</u>, 888 F.3d 612, 625 (2d. Cir. 2018); <u>see</u> <u>also</u> <u>Gordon v. New York City Bd. of Educ.</u>, 232 F.3d at 117 ("proof of causation can be shown . . . indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct"); <u>Khan v. Elrac, LLC</u>, 2024 U.S. Dist. LEXIS 57570, *14 (Conn. D.C. Mar. 29, 2024) ("Temporal proximity can be sufficient to create an inference of retaliatory intent").

As set forth below, the trial evidence supports the jury's finding of the causation element.

### i. Temporal Proximity

Here, despite NYU's allegations to the contrary, Antonik played a more than "ministerial" role in Dr. Edelman's termination (<u>see</u> Appellees' Brief, p. 48). Rather, Antonik's conduct evinces his retaliatory animus through both temporal proximity and disparate treatment against Dr. Edelman. It culminated, at the first opportunity, in Dr. Edelman's termination. Even though Antonik himself did not have hiring or firing authority, he aided NYU in terminating Dr. Edelman's employment. <u>See</u>, <u>e.g.</u> A1462. Antonik's retaliatory conduct was extensive.

First, after Dr. Edelman filed her first complaint, Antonik prevented her from expanding her office hours. See A1670; 2-7. There is absolutely no evidence that other NYU doctors or employees were subjected to similar treatment.

Second, around the time of Dr. Edelman's November 1, 2019 complaint, Miriam Ruiz, the office manager who reported directly to Antonik (see A1248; 17-19; A1899; 20-25 to A1900; 1-7), created a new log of company infractions on Dr. Edelman (A1911; 3-19). The first entry in this log was in November 2019 (approximately two (2) months after Dr. Edelman filed her complaint, and shortly after Dr. Edelman emailed Pacina on November 1, 2019 with her most recent complaint (see SJA-288-SJA-289)). This is the first time that a log of company infractions had been created against Dr. Edelman, even though she has worked at NYU for *over five (5) years* at that point. See A2618-A2629.[5] Dr. Edelman testified that there were no entries in the log prior to November 13, 2019. A1243; 7-5-A1244; 1-4. Ruiz testified at trial that the "documentation" of complaints about Dr. Edelman was prepared at Antonik's request. See A1927; 21-25 to A1928; 1-11.

---

[5] The record is clear that evidence regarding Dr. Edelman's purported performance issues did not exist prior to Dr. Edelman filing her complaint. As Judge Schonfield ruled in her order partially denying NYU's summary judgment motion:

> A jury also could find that, even if Plaintiff truly had performance issues, Plaintiff's complaint was a but-for cause of her firing, because it is the reason Defendants took notice and used those issues against her. Defendants apparently did not compile lists of her faults (or any other doctor's) before Plaintiff complained of discrimination.

A154.

Moreover, there is no evidence that NYU created a log for any other doctor or other employee other than Dr. Edelman. In fact, NYU failed to introduce a single log for any other NYU employee.

Third, Antonik's evidence collection began to kick into high gear shortly before Dr. Edelman's contract was set to expire, when he sought out examples of her allegedly poor performance from her co-workers. Ruiz testified that the "list of various issues with Dr. Edelman", which was ultimately submitted to Rubin—via Porges—in November 2020, "relate to exactly what [Ruiz] wrote in [her] log"— which began a year prior. See A1912; 1-15; see also A2878-A2879. Based on the evidence, a jury could easily conclude that Antonik went out of his way to get Dr. Edelman fired at the first opportunity by "aiding and abetting" NYU's decision regarding same. The facts are not as NYU has presented them.

NYU waited until Dr. Edelman's contract was set to expire to terminate her employment, establishing a causal connection based on temporal proximity.[6] See,

---

[6] Judge Schonfield, in her order denying in part NYU's motion for summary judgment, also emphasized that NYU fired Dr. Edelman at their first opportunity:

> While the lapse of a bit more than one year is longer than a typical temporal-proximity case, Plaintiff was not an at-will employee, and her conduct did not fit into any of the narrow categories of cause for which she could be fired immediately. Defendants began making a record of purportedly non-discriminatory reasons to discharge Plaintiff within weeks after she made her discrimination complaint and then fired her at the first opportunity, when her contract came up for renewal. Under those circumstances, the temporal proximity between Plaintiff's protected activity and her firing is sufficient to raise an inference of causation at the first step.

A152-A153

e.g., A2622-A2624, A2633, and A2631; see also Duplan v. City of New York; Warmin v. New York City Dep't of Educ. The trial record contains a chain of emails between and among, *inter alia*, Antonik and Ruiz, on or about November 6, 2020 in which Antonik states that: "David [Kaplan] requested all information on Edelman be sent to him today" (A1254; 21-22); they "need clear convincing summary with examples sent" (A1255; 3-4); and "[i]deally, [they] want recent examples of inappropriate behavior and communicates [sic] between Edelman staff and patients" (A1255; 6-8); see also A2878-A2881. These emails were exchanged less than a month before Dr. Edelman received notice of her termination from NYU on or about December 1, 2020. See A1241; 1-5. Indeed, Rubin testified that he was first alerted to complaints about Dr. Edelman in November 2020:

> Q:    Prior to the November 6, 2020, email that Dr. Porges sent, nobody else raised any issues regarding Dr. Edelman's clinical performance, correct?
> A:    Not to me.
> Q:    And Dr. Edelman was working at NYU for over six years at the time this issue was brought to your attention, correct?
> A:    That is correct.

A1976; 16-22.

It must be remembered that Dr. Edelman was under contract until approximately November 1, 2020, which contained a "for cause" termination clause, and NYU admitted at trial that they did not have cause to terminate Dr. Edelman. See A2744. Thus, the earliest NYU could terminate Dr. Edelman was November

20

2020 without breaking this contract. Accordingly, NYU had to wait to take the ultimate adverse action – termination of Dr. Edelman's employment. <u>See</u> <u>Grant v. Bethlehem Steel Corp.</u>, 622 F.2d 43, 45-46 (2d Cir. 1980) (finding an eight-month gap between the protected activity and the adverse action sufficient because the defendant could not retaliate any sooner); <u>Warmin v. New York City Dep't of Educ.</u>, 2019 U.S. Dist. LEXIS 125774, *23-24 (S.D.N.Y. 2019) (emphasizing that a causal connection can be established via temporal proximity when the employer commits an adverse action at the first opportunity).

The causation element was also exhibited by the disparate treatment in Dr. Edelman's termination. For example, NYU improperly terminated Dr. Edelman for, *inter alia*, allegedly subjecting her patients to excessive blook work tests and x-rays, but NYU offered absolutely no evidence as to the levels of blood tests and x-rays ordered by any of Dr. Edelman's fellow doctors. <u>See</u> <u>also</u> Section C, *supra*. Thus, the jury could easily determine that Dr. Edelman was disparately treated, further supporting the causation element of her retaliation claims.

Thus, the evidence establishes temporal proximity sufficient for the jury to reasonably find that Dr. Edelman was fired because of her protected activity in filing her complaints with HR. Therefore, the jury's finding of retaliation was far from surmise and conjecture, and, as such, the verdict should be reinstated with respect to Dr. Edelman's retaliation claims against Antonik and NYU.

ii.    The Cat's Paw Theory Applies For Purposes of Establishing Causation

It should be noted at the onset that Antonik, as Dr. Edelman's office supervisor, engaged directly in retaliatory acts against Dr. Edelman which lead to her termination such that the Cat's Paw Theory need not apply. Here, Antonik was the Site Director of the Lake Success office and, therefore, Dr. Edelman's supervisor concerning office issues. See, e.g., A882; A1564; 3-4. Antonik had the responsibility of overseeing Dr. Edelman and the other doctors in terms of operations. See A1586; 4-15. Antonik also reviewed Dr. Edelman's performance as well as monitored her wRVU patient treatment output. See A1588; 11-22. As such, the jury could reasonably conclude that Antonik was Dr. Edelman's supervisor and retaliated against her absent any Cat's Paw.

In any event, the evidence also supports a finding of retaliation via the "Cat's Paw" theory. Appellees contend that the Cat's Paw theory does not apply because there are too many "layers of attenuation" between Antonik and Rubin (Appellee's Brief, p. 51). Appellees' argument is both factually and legally flawed.

The District Court instructed the jury that:

NYU's retaliatory intent may be imputed from a subordinate under New York State Human Rights Law if NYU's decision to terminate was proximately caused by a subordinate who had a retaliatory motive and intended to bring about the adverse employment action.

A1459. "The 'cat's paw' metaphor now 'refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action'". <u>Vasquez v. Empress Ambulance Serv.</u>, 835 F.3d 267, 272-73 (2d Cir. 2016).[7]

As set forth, *supra*, the trial testimony and evidence supports the jury's finding of retaliatory animus on the part of Antonik. It also establishes that Antonik played a meaningful role in Dr. Edelman's contract non-renewal.

The testimony further supports the transfer of that animus to NYU, via Rubin, and its negligence in terminating Dr. Edelman based on same. Rubin received Antonik's list of issues about Dr. Edelman on or about November 6, 2020, *less than a month* before Dr. Edelman was terminated. <u>See</u>, <u>e.g.</u>, A1976; 16-22. Appellees reply on testimony not most favorable to Dr. Edelman, which the jury could easily reject. Further, Appellees misrepresent Rubin's "reliance" on the evaluations of Porges and Goldberg in rendering his decision not to renew Dr. Edelman's contract and, in fact, the jury had reason to discard this entire line of testimony. Indeed, Goldberg testified that he did not have a phone call with Dr. Rubin about his review

---

[7] It should be noted that the District Court misapplied <u>Vasquez</u> in holding that Antonik had to have knowledge of Dr. Edelman's protected activity for Cat's Paw to apply.

of Dr. Edelman until "either mid December or maybe right after – either right before or after the holidays . . . mean[ing] the end of the year." See A2144; 3-24. Thus, this conversation with Rubin occurred after Dr. Edelman's contract had already been terminated on December 1, 2020 (A1241; 1-5).

Thus, unlike the case in Edwards v. Rochester Inst. of Tech., 794 F. App'x 65, 67 (2d Cir. 2019), also cited by Appellees, in which the defendant employer consulted with several employees about plaintiff's performance before terminating her, here there is no evidence that NYU conducted any sort of proper investigation into the complaints about Dr. Edelman prior to terminating her (i.e., regarding blood and x-ray test comparisons with other doctors), and before discussing same with Porges and Goldberg, evidencing negligence on the part of NYU. But see Vasquez, 835 F.3d at 275 (Empress's alleged negligence—in crediting Gray's accusations to the exclusion of all other evidence, and specifically declining to examine contrary evidence tendered by Vasquez, when it knew or, with reasonable investigation, should have known of Gray's retaliatory animus—caused Gray's accusations to form the sole basis for Empress's decision to terminate Vasquez"). Antonik's "evidence" against Dr. Edelman became the sole basis for Rubin's decision to terminate Dr. Edelman.

Further, there is no evidence that the Cat's Paw theory was "strain[ed] . . . beyond existing case law". Appellee's Brief, p. 52. Appellees cite to Kregler v. City

of New York, 987 F. Supp. 2d 357 (S.D.N.Y. 2013) for the proposition that when information by someone with retaliatory animus is provided to another person, who then provides it to a third, that there is too much attenuation to establish Cat's Paw. Id. Here, however, Ruiz acknowledged that Antonik's email to Rubin was identical to the evidence log that she prepared on Dr. Edelman (see A1912; 1-15 and A195; 3-13; see also A2878); thus, there is no "strain" or "taint" in the retaliatory animus or attenuation between the information provided to Antonik and that provided to Rubin, through Porges.

Further, Antonik is not "unknown" to Rubin, and Antonik did not use unwitting third-party intermediaries—i.e., Porges—to convey his retaliatory animus to Rubin. The jury could easily attribute Antonik's retaliatory animus through Rubin, as evidenced by Rubin's negligence in relying on Antonik's "evidence" in terminating Dr. Edelman, without investigation. This is sufficient to establish Cat's Paw.

Thus, the jury properly attributed Antonik's animus to Rubin for the purpose of establishing causation.

The trial testimony and evidence establishes that Dr. Edelman established all four (4) elements of her claims for retaliation against both Antonik and NYU. Therefore, it was far from surmise and conjecture for the jury to find in favor of Dr. Edelman on her retaliation claims.

II.   **Point II: The District Court Impermissibly Dismissed Kaplan**

The District Court also erred in granting Appellees' motion on JNOV with respect to Kaplan on the basis that "there [wa]s insufficient evidence in the record for a reasonable jury to conclude that Kaplan had any retaliatory intent or that he had any involvement in any adverse action. A2431; 22-25.

A. **Kaplan's Retaliatory Intent and Involvement in Adverse Acts Against Dr. Edelman**

The trial record is replete with evidence of Kaplan's retaliatory intent since he knew that Dr. Edelman's complaints against Antonik and himself were based on gender discrimination (see A1213; 15-21) as far back as September 2019, when he came to Dr. Edelman's office to discuss the incident with Antonik on September 25, 2019. See SJA-290-SJA-291; see also A3229.

The record is also clear that Kaplan knew that Dr. Edelman had complained about him to HR. Dr. Edelman testified that after Kaplan visited her office, about a week after the incident with Antonik:

> A:   That night I - - before I left I sent another email up to Ms. Pacina, and I explained the events that happened. Now, you know, <u>it's been a week and the initial complaint from the September 16 incident still hasn't been addressed through HR at all. And now a week later, I'm -- I'm experiencing a similar hostile work environment [from Kaplan], and nothing's been done</u>. And this is the email that I sent up; that this needs to be addressed; that I don't feel, feel comfortable working in the office knowing that at any moment that this type of thing can continue to happen. (Emphasis added)

26

A1216; 7-19; <u>see also</u> A1217; 14-15-A1218; 1-5.

Thus, a jury could reasonably infer that Pacina, in the course of her HR duties, conveyed Dr. Edelman's gender-based complaint about Kaplan directly *to Kaplan*. Indeed, during their deliberations, the jury wrote a note to Judge Liman stating: "'We noticed that David Kaplan is mentioned as a Defendant but is not listed under any of the claims. Is there a reason for this?'" (internal citations omitted). <u>See</u> A2578; 6-8. Based on this note, it is likely that the jury thought that Kaplan retaliated against Dr. Edelman but were impermissibly prevented from rendering judgment against him by the District Court at the conclusion of Dr. Edelman' case.

Contrary to the District Court's Order, the trial record also establishes Kaplan's involvement in Dr. Edelman's termination, demonstrating causation sufficient to establish a prima facie case of retaliation as against Kaplan. <u>See</u>, <u>e.g.</u>, A1254; 21-22 ([from Antonik's November 6, 2020 email] "David [Kaplan] requested all information on Edelman be sent to him today"); A1255; 3-4 (they "need clear convincing summary with examples sent"); and A1255; 6-8 ("[i]deally, [they] want recent examples of inappropriate behavior and communicates [sic] between Edelman staff and patients"); <u>see also</u> A2878-A2881. The emails regarding Kaplan's supposed request for "evidence" were exchanged less than a month before Dr. Edelman received notice of her termination from NYU on or about December 1, 2020. <u>See</u> A1241; 1-5.

27

As such, the District Court erred in granting Defendants' motion for JNOV as to Kaplan, and the order granting same should be reversed.

### III. Point III: The District Court Impermissibly Prevented the Jury from Considering Punitive Damages

This Court "review[s] de novo the district court's refusal to put the issue of punitive damages to the jury." Farias v. Instructional Sys., 259 F.3d 91, 101 (2d Cir. 2001); see also United States v. Space Hunters, Inc., 429 F.3d 416, 427 ("We review de novo a district court's refusal to submit the issue of punitive damages to a jury").

Here, the District Court erred in preventing the jury from considering punitive damages and impermissibly substituting its own judgment regarding same. Concerning Dr. Edelman's NYCHRL and NYSHRL claims, "[t]he New York Court of Appeals has stated that this standard 'requires neither a showing of malice nor awareness of the violation of a protected right, representing the lowest threshold, and the least stringent form, for the state of mind required to impose punitive damages.'" Casmento v. Volmar Constr., Inc., 2022 U.S. Dist. LEXIS 196744, *31 (2d Cir. 2022) (internal citations omitted).

Based on the trial testimony and evidence of swift, deliberate, and retaliatory conduct by the Appellees in terminating Dr. Edelman without cause, as admitted by Appellees, the jury could reasonably conclude that the Appellees engaged in willful or wanton negligent or reckless conduct by disregarding Dr. Edelman's rights in

response to Dr. Edelman filing a gender-based discrimination complaint against Antonik.

As such, this Court should reverse the District Court's grant of JNOV with respect to punitive damages and remand the issue to the trial court to go before a jury.

## CONCLUSION

Dr. Edelman respectfully requests that this Court: (i) reverse the District Court's grant of JNOV in favor of the Appellees and reinstate the jury's verdict in favor of Dr. Edelman on her retaliation claims as against NYU and Antonik; (ii) reverse the District Court's grant of JNOV in favor of the Appellees in favor of Dr. Edelman on her retaliation claims as against Kaplan; and (iii) grant Dr. Edelman's request for a JNOV with respect to the federal and state EPA claims, or, in the alternative, grant a new trial under Rule 59.

Dated: Lake Success, NY
      September 17, 2024

 

**MILMAN LABUDA LAW GROUP PLLC**
By: /s/ Joseph M. Labuda
Joseph M. Labuda, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (fax)
joe@mllaborlaw.com
*Attorneys for Plaintiff-Appellant Dr. Sari Edelman*

**CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)**

1.  This brief complies with the type-volume limitation of Fed. R. App. P.
    32(a)(7)(B)(iii) because this brief contains 6997 words, excluding the parts of
    the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
    and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief
    has been prepared in a proportionally spaced typeface using Microsoft Word
    in Times New Roman, 14 point font.

Dated: Lake Success, NY
     September 17, 2024

 

**MILMAN LABUDA LAW GROUP PLLC**
By: /s/ Joseph M. Labuda
Joseph M. Labuda, Esq.
3000 Marcus Avenue, Suite 3W8
Lake Success, NY 11042-1073
(516) 328-8899 (office)
(516) 328-0082 (fax)
joe@mllaborlaw.com
*Attorneys for Plaintiff-Appellant Dr.*
*Sari Edelman*

31